**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**JOHN McGILBERRY** **PLAINTIFF**

**VS.** **CIVIL ACTION NO. 2:10cv159 KS-MTP**

**AMERICAN OPTICAL CORPORATION, ET AL.** **DEFENDANTS**

**AMERICAN OPTICAL CORPORATION'S RESPONSE TO PLAINTIFF'S EMERGENCY MOTION TO REMAND AND HIS SUPPLEMENTAL EMERGENCY MOTION TO REMAND**

American Optical Corporation ("American Optical") responds to Plaintiff's Emergency Motion to Remand and his Supplemental Emergency Motion to Remand as follows:

1.

Plaintiff filed this case on May 14, 2007. Pursuant to 28 U.S.C. §§ 1332 and 1446, American Optical properly removed the case on the basis of diversity jurisdiction on June 25, 2010.

2.

The amount in controversy is met, and there is complete diversity between Plaintiff, a Mississippi resident, and the properly joined defendants: here, American Optical, a business incorporated in Delaware with its principal place of business in Connecticut. It was not necessary for American Optical to obtain the consent/joinder of defendant E.D. Bullard, Inc., as Plaintiff abandoned his claims against that company and did not otherwise identify having used its products. *See Farias v. Bexar County Bd. of Trustees*, 925 F.2d 866, 871 (5th Cir. 1991) (holding that even diverse defendants need not join in removal if plaintiff cannot establish a cause of action against them).

3.

American Optical timely filed this removal pursuant to 28 U.S.C. § 1446(b), which requires a removal to be filed within 30 days of the receipt by the defendant of "a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." American Optical filed this Notice of Removal on June 25, 2010, within 30 days of the date of Plaintiff's May 26, 2010, deposition; the May 28, 2010, dismissal of the last Mississippi defendant; the June 3, 2010, receipt of the McGilberry deposition transcript; and the June 23, 2010, answers of plaintiff to requests for admission. At the least, prior to May 26, 2010, American Optical did not have information which made it "unequivocally clear and certain" that the case had become removable." *Bosky v. Kroger Texas, LP*, 288 F.3d 208, 21 (5th Cir. 2002).

4.

While 28 U.S.C. § 1446(b) contains a one-year limitation for removals based on diversity jurisdiction, the Fifth Circuit's equitable exception to this rule excuses the filing of this removal more than one year after the case was filed. *See generally Tedford v. Warner-Lambert Co.*, 327 F.3d 423, 428-29 (5th Cir. 2003) (recognizing equitable exception where Plaintiff's inequitable conduct results in forum manipulation). As set forth in more detail in the accompanying brief, Plaintiff denied, on the eve of trial, product usage claims he had made under oath earlier in the litigation, and he abandoned claims against the majority of the defendants including the last remaining Mississippi defendant. This inequitable conduct constituted forum manipulation, justifying the equitable exception to the one year rule.

5.

Therefore, for the foregoing reasons, as set forth in more detail in the accompanying Brief being filed herewith, American Optical respectfully requests that the Court deny Plaintiff's Emergency Motion to Remand and its Supplemental Emergency Motion to Remand.

6.

In further support of its Response in opposition to Plaintiff's Motions, American Optical attaches the following exhibits:

Ex. A   Plaintiff's Expert Designations

Ex. B   Plaintiff's Complaint

Ex. C   State Court Docket as of June 8, 2010

Ex. D   Dismissal Orders

Ex. E   Quickrete Dismissal

Ex. F   Quickrete Answer

Ex. G   Plaintiff's Affidavit with Attached Fact Sheets

Ex. H   Plaintiff's 2004 Deposition (Volume I)

Ex. I   Plaintiff's 2004 Deposition (Volume II)

Ex. J   Agreed Initial Discovery Order

Ex. K   Plaintiff's Original Discovery Responses

Ex. L   Transcript from Hearing on Motions for Summary Judgment

Ex. M   Orders Denying Motions for Summary Judgment and Related Petitions for Interlocutory Appeal

Ex. N   Motion to Compel without exhibits and American Optical Joinder

Ex. O   Plaintiff's Supplement Discovery Responses

Ex. P   Plaintiff's Answers to Requests for Admission

Ex. Q Plaintiff's May 26, 2010, Deposition

Ex. R Excerpts from Deposition of Steven Haber, M.D.

Ex. S Email of June 8, 2010, Regarding Dismissal of Quickrete Defendant

Ex. T Correspondence from Plaintiff's Counsel to American Optical Counsel of May 28, 2010

Ex. U Report of Steven Stogner, M.D.

Ex. V Documents from Mississippi Secretary of State

Ex. W Orders of Dismissal Entered After May 26, 2010.

Respectfully submitted,

AMERICAN OPTICAL CORPORATION,
Defendant

BY: _Robert B. Ireland_________________
ROBERT B. IRELAND, III

OF COUNSEL:

Walter T. Johnson (MSB #8712)
Michael O. Gwin (MSB #5086)
Joseph G. Baladi (MSB #100286)
Robert B. Ireland, III (MSB #100708)
WATKINS & EAGER PLLC
400 East Capitol Street
Post Office Box 650
Jackson, MS 39205
Phone: 601-965-1900
Fax: 601-965-1901

**CERTIFICATE OF SERVICE**

I, Robert B. Ireland, do hereby certify that on July 6, 2010, I electronically filed the above and foregoing pleading with the Clerk of the Court using the ECF System which sent notification of such filing to the following:

Fred Krutz, III; fred@fpwk.com

Jennifer J. Skipper; skipperjj@fpwk.com

John T. Givens; Johnny@portermalouf.com

Timothy W. Porter; tim@portermalous.com

Joseph G. Baladi; jbaladi@watkinseager.com

Michael O. Gwin; mgwin@watkinseager.com

Walter T. Johnson; wjohnson@watkinseager.com

I also certify that on July 6, 2010, I caused to be mailed by United States Mail, postage fully prepaid, a true and correct copy of the above and foregoing document to the following:

R. Allen Smith, Jr.
The Smith Law Firm, PLLC
681 Towne Center Boulevard, Suite B
Ridgeland, MS 39157

Hal Roach, Jr
Willingham, Fultz & Coughill LLP
808 Travis, Ste. 1608
Houston, TX 77002

Thomas McHale
Steve Bryant & Associates
3618 Mt. Vernon
Houston, TX 77006

This 6th day of July, 2010.

/s/ Robert B. Ireland
Robert B. Ireland, III

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN MCGILBERRY PLAINTIFF

VS. CIVIL ACTION NO.: 2007-16-CV5

PANGBORN CORPORATION, ET AL. DEFENDANTS

PLAINTIFF'S EXPERT WITNESS DESIGNATIONS

COMES NOW, John Mcgilberry, by and through his counsel of record, and files this Designation of Expert Witnesses as follows:

**Dr. Vernon Rose**
**3569 St. Ignatuis Lane**
**Franklin, TN 37209**
**(281) 535-1945**
**CV Attached as Exhibit "A"**

Dr. Rose is a Certified Industrial Hygienist and a Certified Safety Professional. Dr. Rose may testify to the efficacy and performance of certain masks, respirators, and hoods. He may testify regarding the adequacy of labels, use instructions, use limitations and other marketing of certain devices sold for respiratory protection and for use in abrasive blasting including sand and flint. He may give testimony regarding the conduct of each of the Defendants and whether or not it deviates from the standard of care. He may render testimony regarding whether or not a reasonably prudent seller to the sandblasting industry would continue to sell sand or begin selling sand after 1974, 1980 and other specific points in time. He may render testimony regarding what a reasonably prudent seller or marketer of equipment, respiratory equipment and/or sand should have known at different points in time, and what such Defendant probably did know from documents generated or received by such defendant and/or its employees. He may testify regarding the state of knowledge of employer compliance with the OSHA standards based upon studies and published literature dealing with the abrasive blasting industry and other industries, such that a reasonably prudent seller should have known, and probably did know, that most employers were choosing the wrong respirators, had inadequate respiratory protection programs and did not fully appreciate the hazards of abrasive blasting with silica sand. They were not teaching employees why respirators were needed in and around abrasive blasting, were not using air-supplied equipment properly or not using it at all. Dr. Rose may testify that the conduct and products of the defendants were causes of the overexposure and injury in fact. Dr. Rose may testify that sand and flint should not be sold for use in abrasive blasting due to the well-known and well-reported hazards inherent in their use.

EXHIBIT
"A"

Dr. Rose may testify as to what a reasonably prudent person, manufacturer or seller of sand, sandblasting equipment, or respiratory protection should have known and done as a result of the crescendo of regulatory activity in the 1970's as it relates to sandblasting, use of respirators, use of high silica containing abrasives, etc.

Dr. Rose may testify as to what a reasonably prudent person, manufacturer or seller should have known and done as a result of the Tulane Studies, the Boeing Studies, the Centaur Study, and others.

Dr. Rose may also testify as to what a reasonably prudent person should have known and done after notice that persons doing abrasive blasting claimed to have silicosis after using high silica containing abrasives and wearing various forms of protection, etc.

Dr. Rose may also render testimony in the following areas: industrial hygiene, performance of respirators, marketing of respirators, selection and use of respirators, the NIOSH criteria document, effects of silica exposure in humans and animals, state of-the-art regarding silica hazards, overexposure and under protection, industry knowledge of silica hazards, the occurrence of disease and disability from silicosis and other silica-related conditions in sandblasting, overexposure and under protection, the restriction of the use of high silica containing abrasives by governments, countries, regulatory agencies, and other groups, the regulation of silica, the Hazard Communication Act, the proposal to ban high silica containing abrasives in the United States, the industry response to such a proposal, the Silica Safety Association, product characteristics of products in this case, adequacy of warnings, defects of products, unreasonably dangerous products, misrepresentations contained in product literature, what reasonably prudent sellers should have done, substitute products, other subjects which are not capable of description at this time. Dr. Rose's opinions will be based in part on performance of certain products and/or respirators, design defects of certain products and/or respirators, conduct of certain sellers of abrasives, respirators and other products, the scientific and medical literature, trade literature, product literature, warnings given by defendants, product containers, standards issued by industry, standards issued by the government, studies conducted by industry, the government and others, his research and writing, his review of depositions and documents in this and other silicosis cases, and documents generated by or in the possession of certain defendants.

The opinions of Dr. Rose are based on his knowledge, skill, experience, training, and education that he has obtained throughout his career including his expertise as an industrial hygiene engineer. His testimony may also be based on his review of medical records. Additionally, he may respond to any and all issues raised by the defense or any of the defenses experts in either their reports, depositions, or in their testimony at trial.

Dr. Rose may testify in areas of liability, causation, and damages.

Dr. Rose will testify regarding his background, experience and education as an industrial hygienist, his doctorate in Occupational Health, and his board certification in industrial hygiene. Dr. Rose will testify as to his opinions, research, and studies formed during periods in which he held positions with the National Institute for Occupational Safety and Health (NIOSH), the U.S. Department of Labor, and the Bureau of Occupational Safety and Health (BOSH).

Dr. Rose may testify regarding the carcinogenic potential of silicosis and appropriate control measures. He will testify as to environmental measurements regarding same, evaluation of performance, air monitoring, and clearance inspections. Dr. Rose may testify concerning the conditions at Plaintiff's work sites based on testimony of coworkers, documents and discovery responses. Dr. Rose may further testify that Defendants' actions constituted negligence, gross negligence, and indicated that they were aware of the substantial certainty that their actions could or would result in significant illnesses and/or deaths. Dr. Rose may testify that Defendants were in violation of regulations promulgated by the United States government, and that Defendants violated their duties under the Occupational Safety and Health Act and its implementing regulations. Dr. Rose may further testify that Defendants were aware, or should have been aware, of the hazards of silica no later than the 1930s, as the result of medical, scientific and industrial hygiene literature available to all Defendants. Dr. Rose may testify as to the aerodynamic qualities, migration, re-entrainment, and drift of silica particles, and how such silica particles increase the risk of silica-related disease to persons who do not directly use silica-containing products.

Dr. Rose may testify as to the releasability of silica particles from various silica containing products, and silica-related industry and that the fracturing of that silica, and release into the air, poses an unreasonable hazard. Dr. Rose may offer opinions concerning exposures at Plaintiff's jobsites, including precautions needed to protect workers at those sites. Dr. Rose may also testify as to cancer trends in selected industries, cancer protection standards, and standards for control for carcinogens in the workplace.

The opinions of Dr. Rose will be supplemented when the defendants fully respond to the discovery in this matter. At that time, it is expected that his opinions will address new issues, which cannot be identified at this time. He may also testify in rebuttal to testimony by defendants' experts in his area of expertise.

**Dr. Edward W. Karnes, Ph.D**
**5843 Willowbrook Drive**
**Morrison, Colorado 80465**
**(303) 697-9650**
**CV Attached as Exhibit "B"**

Dr. Karnes has special knowledge and expertise in the area of manufacturer warnings. Dr. Karnes may testify as to his various areas of his expertise. Dr. Karnes is expected to testify as to the adequacy of warnings and instructions, safety analysis, foreseeable use, marketing and packaging, hazard perception, human factors and safety communications, with respect to Defendants'

products. Dr. Karnes may also testify regarding issues of liability, causation, and damages.

Dr. Karnes' mental impressions and opinions would be based on his experience, education, training and expertise, documents produced during discovery, interviews with Plaintiffs and others, Plaintiff's depositions, other witnesses' depositions and some or all of the testimony form the fact and exert witnesses.

Dr. Karnes should be prepared to report his mental impressions and opinions at a reasonable time after he is provided with all relevant documents produced during discovery, all relevant records obtained from third parties, and all fact witnesses' depositions that have been completed. At the time Dr. Karnes is offered for deposition, he intends to bring his entire case file for Defendant's inspection, which includes all documents, and things that Plaintiffs have provided to Dr. Karnes in anticipation of this testimony.

**Dr. Steven W. Stogner, M.D.**
**415 S. 28th Ave.**
**Hattiesburg, MS 39401**
**(601) 268-5650**
**CV Attached as Exhibit "C"**

Dr. Stogner has attained a board certification in the fields of internal medicine, pulmonary medicine and critical care medicine. Dr. Stogner's curriculum vitae is attached hereto as Exhibit "C." Dr. Stogner may testify as to his various areas of expertise.

Dr. Stogner may testify as to all matters pertaining to his review of the Plaintiff's medical records, x-rays, expert reports and supplemental expert reports; the diagnostic criteria used to diagnose silica related diseases; the Plaintiff's medical condition; his opinion as to whether the Plaintiff suffers from silica related disease and the basis of such opinions; and his prognosis with regard to the Plaintiff's medical condition. He may also provide testimony regarding general medical issues with an emphasis on the respiratory system and the effect that silica has on human health generally and the effect that silica has had on the Plaintiff in particular.

Dr. Stogner may also be called on to provide testimony regarding the following issues: the nature of the disease silicosis; State of the Art knowledge of silicosis; the physiology of the lung, the heart, the macrophage, the cilia and other relevant body parts; the effect of silica particles on the lungs and body generally and how fibrosis nodules are formed on the lungs from silica particles; the diagnosis of silicosis; the cost of medical care; treatment methods; respiratory failure; care for persons in respiratory decline and failure; environmental and occupational health issues relative to exposure, latency and dose-response; and factors with effect the progression of silicosis.

Dr. Stogner may express opinions of a general medicine nature. He may address causation of silicosis and or the occurrence of silicosis in the many silicotics who he has examined and taken occupational histories from. He may also express opinions on the relationship of cancer and

autoimmune diseases, which includes systemic lupus erythematosus (SLE), to the disease of silicosis. He may discuss the general trends of under protection, overexposure, and the occurrence of disease. He may discuss cases of silicosis which have occurred in persons who wore air supplied equipment.

Dr. Stogner's opinions will be based on the medical records reviewed in this case, x-rays reviewed in this case, his training, expertise in the field of pulmonology and occupational lung diseases, applicable medical literature, review of records and the Plaintiff's sandblasting history. Additionally, he may respond to any and all issues raised by the defense or any of the defenses experts in either their reports, depositions, or in their testimony at trial.

**David Rosner, Ph.D.**
**Professor of History and Sociomedical Sciences**
**Co-Director, Center for the History and Ethics of Public Health Columbia University**
**Mailman School of Public Health**
**722 West 168th Street, 9th Floor**
**New York, NY 10032**
**CV Attached as Exhibit "D"**

Dr. Rosner is a historian with special knowledge and expertise in the area of public health. Dr. Rosner has dedicated numerous hours to the study of the emergence of silicosis as a national social crisis and the response to this crisis by public health officials, labor officials and business entities. Dr. Rosner may testify as to his various areas of expertise.

Dr. Rosner may be called on to provide testimony regarding the following issues: occupational disease; public health; the history of industrial hygiene; the recognition of silicosis in the United States in the early years of the twentieth century; the response of industry to the advent of silicosis; industry knowledge of the dangers of silicosis; the role of industry in developing the definition of "industrial lung disease"; attempts by industry to resolve the silicosis crisis; advertisements generated by Defendants; the history of regulation relative to silicosis; the risk confronted by workers who used and/or were exposed to silica; and job sites that constitute "high risk environments." Dr. Rosner may also provide testimony regarding the issues of liability, causation and damages.

As Dr. Rosner becomes aware of additional facts and opinions of other experts and witnesses, he may testify as to the opinions suggested by the additional facts or in response to the opinions of other experts. Additionally, he may respond to any issues raised by the Defendants or Defendants' experts either in their reports, depositions or testimony at trial.

Dr. Rosner's opinions would be based on his vast research, experience, education, training, expertise, documents produced during discovery, interviews with the Plaintiff and others, the Plaintiff's depositions, other witness depositions and all other testimony provided by other expert

and fact witnesses.

Dr. Rosner should be prepared to report his opinions and research findings at a reasonable time after he is provided with all relevant documents produced during discovery, all relevant records obtained from third parties and all fact witness depositions that have been completed.

**Gerald E. Markowitz, Ph.D.**
**Distinguished Professor of History John Jay College of Criminal Justice**
**89910 Avenue**
**New York, NY 10019**
**(212) 237-8458**
**CV Attached as Exhibit "E"**

Dr. Markowitz is a historian with special knowledge and expertise in the area of public health. Dr. Markowitz has dedicated numerous hours to the study of the emergence of silicosis as a national social crisis and the response to this crisis by public health officials, labor officials and business entities. Dr. Markowitz may testify as to his various areas of expertise.

Dr. Markowitz may be called on to provide testimony regarding the following issues: occupational disease; public health; the history of industrial hygiene; the recognition of silicosis in the United States in the early years of the twentieth century; the response of industry to the advent of silicosis; industry knowledge of the dangers of silicosis; the role of industry in developing the definition of "industrial lung disease"; attempts by industry to resolve the silicosis crisis; advertisements generated by Defendants; the history of regulation relative to silicosis; the risk confronted by workers who used and/or were exposed to silica; and job sites that constitute "high risk environments." Dr. Markowitz may also provide testimony regarding the issues of liability, causation and damages.

As Dr. Markowitz becomes aware of additional facts and opinions of other experts and witnesses, he may testify as to the opinions suggested by the additional facts or in response to the opinions of other experts. Additionally, he may respond to any issues raised by the Defendants or Defendants' experts either in their reports, depositions or testimony at trial.

Dr. Markowitz's opinions would be based on his vast research, experience, education, training, expertise, documents produced during discovery, interviews with the Plaintiff and others, the Plaintiff's depositions, other witness depositions and all other testimony provided by other expert and fact witnesses.

Dr. Markowitz should be prepared to report his opinions and research findings at a reasonable time after he is provided with all relevant documents produced during discovery, all relevant records obtained from third parties and all fact witness depositions that have been completed.

**Dr. Glenda Glover, Ph.D.**
**Economic Analysis Inc.**
**330 Four Seasons Drive, #A-24**
**Jackson, MS 39206**
**CV Attached as Exhibit "F"**

Dr. Glenda Glover holds the degrees of Juris Doctor, Ph.D. in Business Economics and Policy, M.B.A. in Accounting, and Bachelor of Science in Mathematics. Dr. Glover obtained additional training in the field of business ethics, but also has undertaken teaching business ethics courses. Dr. Glover has more than 20 years of experience in higher education, economic development, and corporate financial management. She has served as an expert witness in the past. The Plaintiffs may call Dr. Glover as an expert in economic loss suffered by the Plaintiff. This testimony will include, but not be limited to, the net present cash value of economic damages. Dr. Glover's opinions are based on her knowledge, skill, experience, training, and education that she has obtained throughout her career including her experience as an attorney, accountant, marketing professor, her training in business ethics, and her position as Dean of the Business School at Jackson State University. Dr. Glover is a broadly educated and experienced individual whose testimony will provide the jury with a better understanding of the complicated issues at this trial. Her testimony may also be based on her review of Plaintiff's medical records, her observation of any examination of Plaintiff, analysis of scientific literature, deposition testimony, documents produced by the Defendants, and exhibits in this case. She will also provide testimony regarding areas relevant to punitive damages, including but not limited to net worth analysis, corporate ethics and corporate misconduct. Dr. Glover's opinions may be supplemented to the extent required by the *Mississippi Rules of Civil Procedure.*

**Charles N. Dennis, Ph.D, CFA**
**Economist**
**102 Darby Road**
**Hattiesburg, Mississippi 39402-2307**
**(601) 268-9659**
**CV Attached as Exhibit "G"**

Dr. Dennis is a Chartered Financial/Economist Analyst. The Plaintiff expects to call Dr. Dennis as an expert in the field of economics.

Dr. Dennis is expected to testify regarding the net worth of the Defendants and the meaning of the Defendants' financial statements. Dr. Dennis will testify as to economic damages suffered by the Plaintiff as well. His opinions cannot be finalized until he receives financial documents from the Defendants, which have been previously requested or will be requested.

Dr. Dennis anticipates reviewing the Defendants 10-K reports; annual reports; financial statements; balance sheets; print; radio; and television advertisements; cost/benefit analysis; sales projections; profit/loss statements; and documents issued to stockholders. Dr. Dennis' final

opinions will be provided when the Defendants fully comply with discovery.

The opinions of Dr. Dennis will be supplemented when the Defendants fully respond to the discovery in this matter. At that time, it is expected that his opinions will address new issues, which cannot be identified at this time. He may also testify in rebuttal to testimony by defendants' experts in his area of expertise. Dr. Dennis' CV is being produced with this Designation to Defendants.

**Howard T. Katz, M.D.**
**Gulf States Physical Medicine and Rehabilitation**
**1151 North State Street, Suite 511**
**Jackson, MS 39202**
**CV Attached as Exhibit "H"**

Dr. Katz is board-certified in Physical Medicine and Rehabilitation.

Dr. Katz may testify as to the Plaintiff's future medical needs, medical assessment, determine if maximum medical improvement has been achieved, impairment rating, estimate of future medical needs, functional limitations, and costs associated with each of these areas.

Dr. Katz' mental impressions and opinions are based on his experience, education, training, and expertise, documents produced during discovery, interviews, and/or examinations with Plaintiff and others, Plaintiff's depositions, other witnesses' depositions, and some or all of the testimony from the fact and expert witnesses.

**Frank L. Giles, Ph.D**
**Rehabilitation Consultant**
**Giles & Associates, Inc.**
**150 Bridge Water Drive**
**Madison, Mississippi 39110-8275**
**(601) 898-7775**
**CV Attached as Exhibit "I"**

Dr. Giles is a Certified Rehabilitation Counselor. Dr. Giles may testify as to the Plaintiff's pre- and post injury earning capacity. The Plaintiff's ability to perform work, analysis of the Plaintiff's employability, the Plaintiff's loss of access to the labor market, a life care plan for the Plaintiff, as well as vocational evaluation and testing. In addition, Dr. Giles may testify as to the costs and expenses associated with these areas.

Dr. Giles may also testify as to the Plaintiff's lost wages, earning capacity, loss of household services and loss of economic support to the Plaintiff's family. Dr. Giles may also testify regarding other economic damages experienced by the Plaintiff resulting from the Defendants' conduct.

Dr. Giles' mental impressions and opinions are based on his experience, education, training, and expertise, documents produced during discovery, interviews and/or examinations with Plaintiffs and others, Plaintiff's depositions, other witnesses' depositions, and some or all of the testimony from the fact and expert witnesses.

**Plaintiff's Treating Physicians**

The Plaintiff's treating physicians may offer expert opinions regarding their examinations, treatment, etiological factors, diagnoses, prognoses, and quality of life of patients. Their opinions will be based upon their education, background, and experience, their examination, care and treatment of Plaintiff, and their review of the Plaintiff's medical records.

**Reservation**

The Plaintiff reserves the right to call, any and all, experts designated or previously designated by the defense.

The Plaintiff reserves the right to call any expert to rebut testimony or opinions of defendant's experts.

The Plaintiff reserves the right to withdraw designation of any expert previously designated by the Plaintiffs.

DATED, this the 2nd day of July, 2008.

Respectfully submitted,

**JOHN MCGILBERRY, PLAINTIFF**

By: ______________________________
TIMOTHY W. PORTER, *Attorney for Plaintiff*

Of Counsel:

Timothy W. Porter, MSB No. 9687
Patrick C. Malouf, MSB No. 9702
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, Mississippi 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr., MSB No. 99984
THE SMITH LAW FIRM, P.L.L.C.
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

**CERTIFICATE OF SERVICE**

I, TIMOTHY W. PORTER, hereby certify that I have this day caused a true and correct copy of the above and foregoing instrument to be electronically delivered to all known counsel of record.

This, the 2nd day of July, 2008.

TIMOTHY W. PORTER

IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL DISTRICT
OF JONES COUNTY, MISSISSIPPI

JOHN MCGILBERRY — PLAINTIFF

VS. — CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. — DEFENDANTS

**PLAINTIFF'S FIRST SUPPLEMENTAL**
**DESIGNATION OF EXPERT WITNESSES**

COMES NOW, the Plaintiff, John McGilberry, by and through his attorneys of record, and hereby submit the following Expert Witness who may be called live or by deposition to be taken in this case in accordance with the Scheduling Order entered in this matter, as follows:

**I. First Supplement to Plaintiffs' Retained Expert Witnesses**

1. Kenneth E. Duff, Jr., M.D.
Hattiesburg Radiology Group, PLLC
5000 West 4th Street
Hattiesburg, Mississippi 39402-1077
(601) 264-2121

Please find Dr. Duff's Curriculum Vitae attached hereto as Exhibit "A".

DATED, this the 9th day of July, 2009.

Respectfully submitted,

**JOHN MCGILBERRY, PLAINTIFF**

By: ______________________
TIMOTHY W. PORTER, *Attorney for Plaintiff*

Of Counsel:

Timothy W. Porter, MSB No. 9687
Patrick C. Malouf, MSB No. 9702
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, Mississippi 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr., MSB No. 99984
THE SMITH LAW FIRM, P.L.L.C.
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

**CERTIFICATE OF SERVICE**

I, TIMOTHY W. PORTER, hereby certify that I have this day caused a true and correct copy of the above and foregoing instrument to be electronically delivered to all known counsel of record.

This, the 9th day of July, 2009.

TIMOTHY W. PORTER

**IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI**
**FIRST JUDICIAL DISTRICT**

**JOHN MCGILBERRY** **PLAINTIFF**

**V.** **CIVIL ACTION NO. 2007-16-CV5**

**PANGBORN CORPORATION; ET AL.** **DEFENDANTS**

**PLAINTIFF'S SECOND SUPPLEMENTAL DESIGNATION OF EXPERT WITNESSES**

COMES NOW the Plaintiff, John McGilberry, by and through the undersigned counsel, and files Plaintiff's Second Supplemental Designation of Expert Witnesses, and hereby designates the following individuals as persons who may be called as witnesses to testify by live testimony or by deposition at the trial of this matter as follows:

1. **Obie M. McNair, MD**
   **Central Mississippi Health Services**
   **1134 Winter Street**
   **Jackson, MS 39204**
   **(601) 948-5572**

Dr. McNair has attained a board certification in the field of internal medicine and pulmonology. Dr. McNair's curriculum vitae will be supplemented. Dr. McNair may testify as to his various areas of expertise.

Dr. McNair may testify as to all matters pertaining to his review of Mr. McGilberry's medical records, x-rays, expert reports and supplemental expert reports; the diagnostic criteria used to diagnose silica related diseases; Mr. McGilberry's medical condition; his opinion as to whether Mr. McGilberry suffers from silica related disease and the basis of such opinions; and his prognosis with regard to Mr. McGilberry's medical condition. He may also provide testimony regarding general medical issues with an emphasis on the respiratory system and the effect that silica has on human health generally and the effect that silica has had on Mr. McGilberry in particular.

2. **David Halinski, MD**
   **2100 Highway 61 North**
   **Vicksburg, MS 39183**
   **(601) 636-9064**

Dr. Halinski has attained a board certification in the field of internal medicine, critical care medicine, and pulmonology. Dr. Halinski's curriculum vitae is attached

hereto as Exhibit "A." Dr. Halinski may testify as to his various areas of expertise.

Dr. Halinski may testify as to all matters pertaining to his review of Mr. McGilberry's medical records, x-rays, expert reports and supplemental expert reports; the diagnostic criteria used to diagnose silica related diseases; Mr. McGilberry's medical condition; his opinion as to whether Mr. McGilberry suffers from silica related disease and the basis of such opinions; and his prognosis with regard to Mr. McGilberry's medical condition. He may also provide testimony regarding general medical issues with an emphasis on the respiratory system and the effect that silica has on human health generally and the effect that silica has had on Mr. McGilberry in particular.

3. **Steven Haber, MD**
**Texas Occupational Medicine**
**9225 Katy Freeway, Suite 404**
**Houston, TX 77024**
**(713) 932-8664**

CV attached as Exhibit "B."

The nature of the disease of silicosis.

The physiology of the lung, the heart, the macrophage, the cilia, and other relevant body parts.

State of the Art regarding silicosis.

The Plaintiff's condition, prognosis, etc.

The diagnosis/prognosis of silicosis.

Medical literature on silicosis.

Medical technology.

Cost of Medical Care.

Course of disease in silicotics.

Treatment methods of silicosis.

Respiratory failure.

Care for persons in respiratory decline and failure.

Environmental and occupational health issues on exposure, latency, dose/response, etc.

Factors which effect progression.

**IMPRESSIONS & OPINIONS**

Silicosis is a progressive disorder, which has no effective treatment or cure.

Dr. Haber may express other opinions on environmental and/or occupational issues particular to this case such as dose-response, latency, disease levels in other co-workers, etc.

Dr. Haber may express opinions of a general medicine nature. He may address causation of silicosis and/or the occurrence of silicosis in the many silicotics who he has examined and taken occupational histories from. He may also express opinions on the relationship of cancer and autoimmune diseases to the disease of silicosis. He may discuss the general trends of under protection, overexposure, and the occurrence of disease. He may discuss cases of silicosis, which have occurred in persons who wore air supplied equipment.

**SCIENTIFIC KNOWLEDGE**

Medical Literature.

Experience in diagnosing and treating occupational disease.

Review of records.

Review of diagnostic testing.

Histories of other sandblasters.

Mr. McGilberry's sandblasting history.

Review of x-rays, etc.

4.     **Kenneth E. Duff, Jr., MD**
       **Hattiesburg Radiology Group, PLLC**
       **5000 West 4th Street**
       **Hattiesburg, MS 39402-1077**
       **(601) 264-2121**

Dr. Duff has attained his board certification through the American Board of Radiology with a Specialty Certification in Diagnostic Radiology and is expected to testify in the field of his expertise to a reasonable degree of medical certainty. Dr. Duff's curriculum vitae is attached hereto as Exhibit "C."

Dr. Duff may testify as to all matters pertaining to his review of Plaintiff's x-rays and may testify as to his medical findings. It is expected that Dr. Duff may testify to a reasonable degree of medical certainty, that the findings on Mr. McGilberry's x-rays are consistent for silicosis, and consistent with that clinical diagnosis. Dr. Duff's report will be supplemented. Dr. Duff may provide a diagnosis of silicosis or silica related injury in this case.

Dr. Duff may render further opinions in rebuttal to opinion testimony offered by the Defendant at the trial of this matter.

5.   **Dr. Jerrold Abraham**
     **Associate Professor and Director of**
     **Environmental and Occupational Pathology**
     **State University of New York**
     **Department of Pathology**
     **750 East Adams Street**
     **Syracuse, NY 13210**
     **(315) 464-5540**

CV Attached as Exhibit "D"

**SUBJECT MATTER**

All subjects covered in prior reports in related cases, depositions in related cases, and trial testimony given in related cases. Among the many subjects previously addressed by this witness, the following is a good faith listing of subject matter:

Medical questions

Pathology

Chemistry

Toxicology

Medical literature

Medical state of the art

Scientific Reliability

**IMPRESSIONS & OPINIONS**

Presence of silicosis in John McGilberry's lungs

Silicosis and Silica-Related Lung Cancer

Extent of disease

Quantitative and qualitative analysis of dust in lung

Probability of progression

Prognosis

**SCIENTIFIC KNOWLEDGE**

Review of lung sample

Review of medical records

Amount of silica in lung

Type of silicosis in lung

Chemical and material composition of materials in plaintiffs' lung

Review of pathology of other workers

Background and comparatives exposures

RESPECTFULLY SUBMITTED, this the 8th day of December, 2009.

JOHN MCGILBERRY, PLAINTIFF

________________________________

R. ALLEN SMITH, JR.

OF COUNSEL:

Timothy W. Porter – MSB No. 9687
Patrick C. Malouf – MSB No. 9702
John T. Givens – MSB No. 101561
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, MS 39236
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr. – MSB No. 99984
THE SMITH LAW FIRM, P.L.L.C
681 Towne Center Blvd., Suite B
Ridgeland, MS 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

**CERTIFICATE OF SERVICE**

I, R. Allen Smith, Jr., do hereby certify that I have this day caused a true and correct copy of the above and foregoing *Plaintiff's Second Supplemental Designation of Expert Witnesses* to be electronically delivered to all counsel of record in the above matter.

THIS, the 9th day of December, 2009.

R. ALLEN SMITH, JR.



IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN MCGILBERRY — PLAINTIFF

V. — CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION;
CLARK SAND COMPANY, INC.;
SOUTHERN SILICA OF LOUISIANA;
DEPENDABLE ABRASIVES, INC.;
PRECISION PACKAGING, INC.;
QUICKRETE MATERIALS, INC.;
ASH GROVE CEMENT COMPANY;
GREEN BROTHERS GRAVEL COMPANY;
BLAIN SAND & GRAVEL, INC.;
THE MORIE COMPANY;
PEARL SANDS, INC.;
PEARL SPECIALTY SANDS, INC.;
LONE STAR INDUSTRIES;
CUSTOM AGGREGATES AND GRINDING, INC.;
SPECIALTY SAND CO.;
HANSON AGGREGATES CENTRAL, INC., f/k/a PIONEER CONCRETE OF TEXAS, INC., f/ka PIONEER SOUTH CENTRAL
HUMBLE SAND & GRAVEL, INC.;
PULMOSAN SAFETY EQUIPMENT CORP.;
SCOTT TECHNOLOGIES, INC.;
PARMELEE INDUSTRIES, INC., d/b/a CHICAGO EYE SHIELD COMPANY (CESCO);
E. D. BULLARD COMPANY;
AMERICAN OPTICAL CORPORATION;
EMPIRE ABRASIVE EQUIPMENT CORPORATION;
MINE SAFETY APPLIANCES COMPANY;
CLEMCO INDUSTRIES, INC.;
SCHMIDT MANUFACTURING, INC.;
BOB SCHMIDT, INC.;
PAULI & GRIFFIN COMPANY;
KEY HOUSTON, a Division of JACKSONVILLE SHIPYARDS, INC.;
KELCO SALES & ENGINEERING COMPANY;
MISSISSIPPI VALLEY SILICA CO., INC.;
UNIMIN CORPORATION; and
JOHN & JANE DOES 1 – 500, ET AL. — DEFENDANTS

FILED
...14 2007
CIRCUIT CLERK
JONES COUNTY, MISS

RECEIVED
AUG 27 2007
J.A.H.

EXHIBIT
"B"

## COMPLAINT

COMES NOW, John McGilberry, hereinafter referred to as "Plaintiff," by and through undersigned counsel, and files this his Complaint against these Defendants and would show the following to this Honorable Court in support thereof:

## I. HISTORY OF THE CASE

The Plaintiff's Complaint was originally filed in a multi-plaintiff case styled *George Buffington, et al. v. Pulmosan Safety Equipment, et al.*, civil action number 2002-194-CV6, in the Circuit Court of Jones County, Mississippi, Second Judicial District. On or about May 15, 2006, an Order was entered by the Circuit Court of Jones, Mississippi, Second Judicial District, pursuant to *Canadian National v. Smith, et al.*, 926 So.2d 839 (Miss. 2006) whereby the Plaintiff's Complaint was dismissed with a one (1) year tolling agreement to re-file the Plaintiff's cause of action in a proper venue according to new law in Mississippi. This case is being filed within the one (1) year time frame allowed by *Canadian National v. Smith, et al.*

## II. PLAINTIFF

Plaintiff is a resident of Ellisville, Mississippi. The Plaintiff's alleged injury is lung disease, silicosis, caused by exposure to respirable crystalline silica while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

## III.
## DEFENDANTS

PANGBORN CORPORATION is a foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving this Defendant's home office address or by serving process on, Thomas A. Briere, 529 Pangborn Boulevard; P. O. Box 380, Hagerstown, Maryland 21740 or 580 Pangborn Boulevard Hagerstown, Maryland 31740. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective personal respiratory products manufactured by this Defendant, and referenced above were sold under the brand name Pangborn, and is a non-air fed hood used and marketed for sandblasting.

CLARK SAND COMPANY, INC. is a foreign corporation that has done and/or is doing business in the State of Mississippi. This Defendant may be served with process by serving this Defendant's home office address, c/o John Richard Clark, No. Enrmann St., Pensacola, Florida 32507. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Clark Sand.

SOUTHERN SILICA OF LOUISIANA is a corporation organized and existing under and by virtue of the laws of the State of Louisiana and doing business in the State of Mississippi. Said defendant, therefore, may be served with summons by serving the registered agent: Marvin David Bryant, 6717 Oak Cluster Drive, Greenwell Springs, LA 70739, by process server. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other

manufacturing processes. Plaintiff used defective and toxic silica sand manufactured and supplied by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

DEPENDABLE ABRASIVES, INC. is a Mississippi corporation and may be served with process and summons to its registered agent: James Dickerson, 13066 Highway 67, Suite H, Woodmarket, MS 39532, c/o Secretary of State of MS, 700 North St., Jackson, MS 39202 via certified mail. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Dependable Abrasives and/or Quikblast.

PRECISION PACKAGING, INC., is a foreign corporation doing business and with a principal office in Mississippi. This Defendant can be served with process by serving its registered agent, CT Corporation System at 631 Lakeland East Drive, Flowood, Mississippi 39232. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Quikrete.

QUICKRETE MATERIALS, INC. is a Mississippi corporation. This Defendant may be served with process by serving its registered agent, C.T. Corporation System, 118 North Congress Street, Jackson,

Mississippi 39205. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Quikrete..

ASH GROVE CEMENT COMPANY individually and d/b/a Quikrete of Jackson d/b/a Quikrete d/b/a Quikrete Material Company d/b/a Precision Packaging of Jackson a/k/a Materials Packing Corp. a/ka/ Precision Packaging, Inc., is a corporation doing business in the state of Mississippi. This Defendant may be served with process by serving its registered agent, John Ross III, 8900 Indian Creek Parkway, Suite 600, Overland Park, Kansas 66210 or its home office, 11011 Cody, P.O. Box 25900, Overland Park, Kansas 66225. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Quikrete.

GREEN BROTHERS GRAVEL COMPANY is a Mississippi corporation. This Defendant may be served with process by serving its agent, Heyward Carter Green, 1900 Dunbarton Street, Suite J, P.O. Box 13218, Jackson, Mississippi 39236. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel

Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

BLAIN SAND & GRAVEL, INC. is a Mississippi corporation. This Defendant may be served with process and summons by serving its agent W. W. Blain, Jr., 98 Pearce Road, Mount Olive, Mississippi 39119. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

THE MORIE COMPANY is a foreign corporation doing business in Mississippi. This Defendant may be served with process by serving it at its home office address, c/o Corporate Company, 60 Commerce Street, Montgomery, Alabama 36104. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

PEARL SANDS, INC. is a Louisiana Corporation that conducted business in the state of Mississippi and may be served with process through its registered agent, to wit: R.W. Fisk 1661 Canal Street, New Orleans, Louisiana 70112, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi

from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Pearl Sands.

PEARL SPECIALTY SANDS, INC., is a Louisiana Corporation that conducted business in the state of Mississippi and may be served with process through its registered agent, to wit: R.W. Fisk 1661 Canal Street, New Orleans, Louisiana 70112, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Pearl Specialty Sands.

LONE STAR INDUSTRIES is a corporation organized and existing under and by virtue of the laws of the State of Connecticut. Said defendant, therefore, may be served with summons by serving Lone Star Industries, Inc., c/o C. T. Corporation System (agent for service), 631 Lakeland Drive East, Flowood, Mississippi, 39208. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Lone Star.

CUSTOM AGGREGATES AND GRINDING, INC., is a foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving its agent, A. Wayne Buras, 1000 Highway 190, Suite 103, Covington, Louisiana 70433. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to

defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

SPECIALTY SAND COMPANY, is a corporation organized and existing under and by virtues of the State of Texas and doing business in the State of Texas and doing business in the State of Mississippi. However, said defendant does not maintain either a regular place of business or an agent for service of process in this state. Said defendant therefore, may be served with citation by serving the home office of Defendant, to wit: SPECIALTY SAND COMPANY, 7500 San Felipe Street, Suite 1001, Houston, TX 77063, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Specialty.

HANSON AGGREGATES CENTRAL, INC., f/k/a PIONEER CONCRETE OF TEXAS, INC., f/ka PIONEER SOUTH CENTRAL, INC. is a foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving this Defendant's home office address, 1333 Campus Parkway, c/o Hanson Building, Materials America, Neptune, New Jersey 07753. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and

referenced above was sold under the brand name Pioneer and/or Texblast.

HUMBLE SAND & GRAVEL, INC. is foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving its President, Ron Humble, 800 South College, Picher, Oklahoma 74360. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Humble Sand & Gravel.

PULMOSAN SAFETY EQUIPMENT CORPORATION is a corporation organized and existing under and by virtue of the laws of the State of New York and doing business in the State of Mississippi. Said defendant, therefore, may be served with process by serving its home office address, c/o Howard M. Weiss, President, 150 East 69th Street, #17R, New York, New York 10021-5704, by process server. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective personal respiratory products manufactured by this Defendant and referenced above were sold under the brand name Pulmosan, and is a non-air fed hood used and marketed for sandblasting.

SCOTT TECHNOLOGIES, INC., is a corporation organized and existing under and by virtue of the laws of the State of Delaware, and may be served with process and summons by serving its agent, C. T. Corporation System, 631 Lakeland East Drive, Flowood, MS 39232. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica.

Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective personal respiratory products manufactured by this Defendant and referenced above were sold under the brand name Scott and were a respirator, dust mask, and non-airfed hood.

PARMELEE INDUSTRIES, INC., d/b/a CHICAGO EYE SHIELD COMPANY (CESCO), is a foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving this Defendant's home office address, P. O. Box 15965, Lenexa, Kansas 66215. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective personal respiratory products manufactured by this Defendant and referenced above were sold under the brand name CESCO and were non-air fed hood and air fed hood used and marketed for sandblasting.

E. D. BULLARD COMPANY is a corporation organized and existing under and by virtue of the laws of the State of California and doing business in the State of Mississippi. Said defendant, therefore, may be served with citation by serving the Registered Agent, to wit: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective personal respiratory products manufactured by this Defendant and referenced above were sold under the brand name Bullard and is an air fed hood used and marketed for sandblasting.

AMERICAN OPTICAL CORPORATION is a foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving its agent, c/o Secretary of State, Corporations Division, 30 Trinity Street, Hartford, Connecticut 06106. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective personal respiratory products manufactured by this Defendant and referenced above were sold under the brand name American Optical and is a dust mask and respirator used and marketed for sandblasting.

EMPIRE ABRASIVE EQUIPMENT CORPORATION is a corporation organized and existing under and by virtue of the laws of the State of Pennsylvania and maintaining its principal place of business in Pennsylvania. However, said defendant does not maintain either a regular place of business. Said defendant, therefore, may be served with citation by serving with process the Summons and copy of the Complaint to the Defendant's registered agent, to wit: Richard Woodfield c/o McKissock & Hoffman, 1700 Market Street, Suite 3000, Philadelphia, Pennsylvania, 19103, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective personal respiratory products manufactured by this Defendant and referenced above were sold under the brand name Empire, and is a non-air fed hood and sandblasting pot used and marketed for sandblasting.

MINE SAFETY APPLIANCES COMPANY is a corporation organized and existing under and by virtue of the laws of the State of Pennsylvania and doing business in the State of Mississippi. However, said defendant does not maintain either a regular place of business or an agent for service of process in this state. Said defendant, therefore, may be served with citation by serving the current Commanding Executive Officer of the Defendant, to wit: Thomas B. Hottop, CEO, 121 Gamma Dr., RIDC Industrial Park, Pittsburgh, Pennsylvania

13528, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around silica. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

CLEMCO INDUSTRIES, INC. is a corporation organized and existing under and by virtue of the laws of the State of Nevada and doing business in the State of Mississippi. Said defendant, therefore, may be served with citation by serving the a copy of the Complaint and Summons to its registered agent for process, to wit: Mark W. Cleary, 445 Bush Street, 9th Floor, San Francisco, California, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold defective sandblasting equipment that was used around silica, including sandblasting. Plaintiff used or worked around defective sandblasting or silica related equipment manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective sandblasting or silica related products manufactured, marketed, distributed or sold were sold under the brand name Clemco and is a sandblasting pot used and marketed for sandblasting.

SCHMIDT MANUFACTURING, INC. is a foreign corporation doing business in the State of Mississippi. This Defendant may be served with process by serving its registered agent, 75 Technology, Lowell, Massachusetts 01851. This is a Defendant that manufactured, marketed, distributed and sold defective sandblasting equipment that was used around silica, including sandblasting. Plaintiff used or worked around defective sandblasting or silica related equipment manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective sandblasting or silica related products manufactured, marketed, distributed or sold were sold under the brand name Schmidt and is a sandblasting pot used and marketed for sandblasting.

BOB SCHMIDT, INC. is a foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving its registered agent, C.T. Corporation System, 631 Lakeland East Drive, Flowood, Mississippi 39208. This is a Defendant that manufactured, marketed, distributed and sold defective sandblasting equipment that was used around silica, including sandblasting. Plaintiff used or worked around defective sandblasting or silica related equipment manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective sandblasting or silica related products manufactured, marketed, distributed or sold were sold under the brand name Schmidt and is a sandblasting pot used and marketed for sandblasting.

PAULI & GRIFFIN COMPANY is a foreign corporation that has done business in the State of Mississippi. This Defendant may be served with process by serving its registered agent, C. T. Corporation System, 350 North St. Paul Street, Dallas, Texas 75201 or 907 Cotting Lane Vacaville, California 95688. This is a Defendant that manufactured, marketed, distributed and sold defective sandblasting equipment that was used around silica, including sandblasting. Plaintiff used or worked around defective sandblasting or silica related equipment manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective sandblasting or silica related products manufactured, marketed, distributed or sold were sold under the brand name Pauli & Griffin and is a sandblasting pot used and marketed for sandblasting.

KEY HOUSTON a Division of JACKSONVILLE SHIPYARDS, INC., is a foreign corporation doing business in the State of Mississippi. This Defendant may be served with process by serving its registered agent, C. T. Corporation System, 631 Lakeland East Drive, Flowood, Mississippi 39208 or R. Stephen Ferrell, Giessel, Barker & Lyman, 909 Fannin Street, Suite 2700, Houston, Texas 77010-1063. This is a Defendant that manufactured, marketed, distributed and sold defective sandblasting equipment that was used around silica, including sandblasting. Plaintiff used or worked around defective sandblasting or silica related equipment manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974;

while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective sandblasting or silica related products manufactured, marketed, distributed or sold were sold under the brand name Pauli & Griffin and is a sandblasting pot used and marketed for sandblasting.

KELCO SALES & ENGINEERING COMPANY, a division of POLLEY, INC., is a foreign corporation doing business in the State of Mississippi. This Defendant may be served with process by serving this Defendant's home office address, 11936 East Front Street, Norwalk, California 90650. This is a Defendant that manufactured, marketed, distributed and sold defective sandblasting equipment that was used around silica, including sandblasting. Plaintiff used or worked around defective sandblasting or silica related equipment manufactured by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

MISSISSIPPI VALLEY SILICA CO., INC. is a foreign corporation with its principal office in Mississippi. This Defendant may be served with process by serving its registered agent, The Corporation Trust Company at Corporate Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. This is a Defendant that manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989. The defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant and referenced above was sold under the brand name Valco.

UNIMIN CORPORATION is a corporation organized and existing under and by virtue of the laws of the State of . Said defendant, therefore, may be served with summons by serving Unimin Corporation, c/o CT Corporation System, 645 Lakeland Drive East, Suite 101, Flowood, Mississippi 39232. This is a Defendant that

manufactured, marketed, distributed and sold silica sand used in sandblasting and other manufacturing processes, including foundry work, construction, etc. Plaintiff was exposed to defective and toxic silica sand manufactured, marketed, distributed or sold by this Defendant while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.

## IV.
## JURISDICTION

This Court has subject matter jurisdiction pursuant to Article 6 § 156 Mississippi Constitution 1890 and/or § 9-7-81 Mississippi Code 1972. Plaintiff claims herein are brought solely under Mississippi law. Plaintiff affirmatively states Plaintiff did not bring any claims for relief pursuant to any federal laws, statutes, or regulations. Consequently, this Court has jurisdiction and there is no arguable reason for the assertion of federal jurisdiction on the basis of a "federal question." Furthermore, the assertion by any Defendant of federal diversity jurisdiction would be improper in that Plaintiff is an adult resident citizen of the State of Mississippi and at least one of the Defendants is a Mississippi corporation in good standing. Consequently, "complete diversity" does not exist as is required for the assertion of federal diversity jurisdiction. In addition, upon information and belief, not all Defendants will agree or consent to removal of the referenced action to federal court and, therefore, any removal of this case is per se improper. Plaintiff formally puts all Defendants on notice that Plaintiff will seek all appropriate relief from any Defendant who removes this action without obtaining agreement or consent of all Defendants.

This Court has jurisdiction over all Defendants because they have done business in Mississippi, committed a tort in Mississippi and have had continuous contacts with

Mississippi. Specifically, they have all sold, designed, manufactured, or marketed an array of defective silica related products in the State of Mississippi. Therefore, all Defendants are amenable to service by a Mississippi court. In addition, the damages for which Plaintiff brings suit exceed the minimal jurisdictional limits of the Mississippi State Court.

## V.
## VENUE

Venue is proper in Jones County, Mississippi. See Sec. 11-11-3 Mississippi Code 1972. Specifically, this County is one in which the Plaintiff was exposed to or injured by silica and thus, this county is a location where an alleged act or omission occurred or where an event that caused the injury occurred. Alternatively, venue is proper in this county as it is a county where Plaintiff purchased a defective product, a Defendant resides or has its principal place of business, or where the Plaintiff resides.

## VI.
## FACTS

During all or part of the Plaintiff's working life, the Plaintiff worked with silica containing products, products that produce silica or products that cause the production of silica. While working with these products, Plaintiff wore devices and products that were marketed as "respiratory protection," allegedly designed to protect the Plaintiff and other workers from exposure to harmful airborne toxins, like silica. Additionally, Plaintiff worked with equipment that was represented to prevent or reduce their exposure to airborne toxins, like silica.

Plaintiff worked in various industries and trades that are known by the Defendants to result in increased exposures to silica. These trades may include, but are not limited to,

abrasive blasting, construction, ship yards, and other heavy industries throughout the United States. Plaintiff's jobs and tasks required Plaintiff to engage in activities known by the Defendants to produce high levels of respirable silica or work in environments that contained high levels of respirable silica. These tasks may have included, but are not limited to, abrasive blasting, and raw materials handling. Plaintiff's jobs caused him to be exposed to silica from silica containing products, products that produce silica or products that cause the release of silica into the environment.

In addition to the products listed above, several Defendants mined manufactured, processed, packaged, sold and/or distributed materials containing silica sand. The Defendants mined the material, usually sand, through a dredging system and then pump the material in a liquid slurry to a processing facility. There, the material is screened and filtered to remove impurities. The sand is then dried and re-screened for size prior to packaging or sale to distributors or users of this material.

As a result, Plaintiff was exposed to silica from the use of these products or from working in close proximity to these products. Plaintiff's exposure to silica has resulted in serious, permanent and irreversible damage to the Plaintiff. As a result of the inhalation of silica, Plaintiff's lungs and body were injured. Plaintiff's injuries resulted from repeated exposure to the products. The nature of the injuries prevents detection, until years after the initial exposures. This latent nature of the injuries and diseases prevents individuals such as the Plaintiff from discovering Plaintiff's injuries and/or illness for many years. The illness has caused great disability and degraded Plaintiff's quality of life. Plaintiff's conditions are incurable and progressive. Ultimately, Plaintiff faces respiratory failure and a premature death. In addition, Plaintiff has a fear of cancer

resulting from Plaintiff's exposure to silica related products.

The Plaintiff was injured and damaged through the Defendants' manufacture, mining, sale and supplying of silica-containing products, the Defendants' manufacture, sale, rental and supply of defective respiratory equipment (respirators, non-air fed hoods, and air-fed hoods) used by the Plaintiff, and the Defendants' manufacture, sale, rental and supply of equipment (including, but not limited to, compressors, sand pots, sand hoppers, hoses, couplings, fittings, nozzles and guns) used by the Plaintiff and other devices manufactured, sold, rented and supplied by the Defendants' that were used by the Plaintiff.

Additionally, the Defendants sold non-air supplied hoods or other non-air supplied equipment that was purportedly adequate for operations with silica or which Defendants knew were being used for such operations without warnings or with cautions, which were inadequate for the dangers involved in this operation. Further, Defendants sold masks and respirators, which were wholly inadequate and not approved for blasting operations or other operations with silica-containing products. These masks and respirators would not protect the workers from the dangerous silica and added to, and increased the risk of, exposure to these dangerous products. Even when air-supplied hoods and respirators were used, the Defendants sold non-approved air-supplied hoods or sold such hoods without adequate, intelligible and understandable warnings and instructions, which would ensure that the users would be under protected. These hoods were defective by reason of their design, marketing, and their foreseeable use or misuse. Thus, because of the negligence, design defects, and marketing defects (including using air fed hoods), the users were breathing contaminated air which contained dangerous

levels of free silica and other toxic products of abrasive blasting, when used in their usual, customary, and expected way.

Additionally, some Defendants designed, manufactured and marketed after market parts intended to be sold and used as component parts with a variety of different air fed hoods. By selling these components these Defendants knew or should have known that the NIOSH approval on the air fed hoods would be voided and the safety of the products compromised. These after market parts were defective at the time they were introduced into the stream of commerce and such defect was a producing cause of Plaintiff's injuries and damages.

At no time prior to diagnosis did the Plaintiff know, or should have known, the nature of his injury, the cause of the injury or premature disability. Defendants were aware of the dangers of silica and failed to convey such dangers to Plaintiff or those similar to Plaintiff who has knowledge common to the community. Plaintiff discovered the disease or injury within the applicable period of limitations. Plaintiff timely brings this suit.

## VII.
## CAUSES OF ACTION AND THEORIES OF RECOVERY

### COUNT ONE – STRICT LIABILITY AND PRODUCT DEFECTS

The Defendants' products were defectively designed for their known and/or intended use. The products were unreasonably dangerous for their known and/or intended use. In addition, the defect or defects were present at the time the products in question were manufactured, fabricated and/or distributed. The defect or defects made the products unreasonably dangerous to those persons, such as Plaintiff, who could reasonably be expected to use and rely upon such products and those individuals working

in the area or known zone of danger created by the products. As a result, the defect or defects were a producing cause of Plaintiff's injuries and damages. Therefore, the Defendants are liable under the Doctrine of Strict Liability in Tort.

The Defendants failed to give adequate and proper warnings with respect to the manner in which these products should be marketed, distributed and used. The Defendants knew or should have known that their products would be used in jobs, trades or industries that would expose individuals, such as the Plaintiff, to dangerous levels of respirable silica and therefore these Defendants should have warned persons like Plaintiff of the hazards and risks associated with the use of their product, including the danger of inhalation of respirable free silica. The Defendants failed to provide any such warnings or instructions regarding the risks associated with use of their products and the failure to provide such warnings or instructions constitute a marketing defect, which was a producing cause of Plaintiff's injuries and damages.

**COUNT TWO - NEGLIGENCE**

The Defendants were negligent including, but not limited to, the following particulars, each of which was a proximate cause of Plaintiff's injuries and damages:

- In failing to adequately warn Plaintiff of the hazards associated with the inhalation of silica and silica dust while using their products;
- In failing to properly test their products to determine adequacy and effectiveness or safety measures, if any, prior to releasing these products for consumer use;
- In failing to properly test their products to determine the levels of silica produced during the normal and/or intended use of the products;

- In failing to properly test their products to determine the zone of danger to co-workers, and other individuals working near users of their products;
- In failing to inform ultimate users, such as Plaintiff as to the safe and proper methods of handling and using their products;
- In failing to remove their products from the market when the Defendants knew or should have known their products were defective;
- In failing to instruct the ultimate users, such as Plaintiff as to the methods for reducing their exposure to silica, while using the products;
- In failing to inform the public in general and the Plaintiff in particular of the known dangers of breathing silica, even at levels below the government regulated levels;
- In failing to inform the users of their products of the dangers to co-workers, other workers in the area and individuals in the known zone of danger of the products;
- In failing to advise users how to prevent or reduce exposure to silica;
- In failing to warn that about the use of appropriate respiratory protection as a means of preventing or minimizing exposures to airborne free silica; and
- In designing, manufacturing, processing, packaging and/or distributing the products used by Plaintiff or in close proximity to the Plaintiff.

Each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

**COUNT THREE - BREACH OF WARRANTEES**

The Defendants designed, manufactured, assembled, fabricated and/or distributed the products in question in a defective condition and therefore breached an implied

warranty of fitness and an implied warranty of merchantability, in addition to various express warranties. The Defendants, as sellers, were merchants with respect to the products which they sold. In addition, these products were not fit for the ordinary purposes for which such goods are used. The Defendants also had reason to know of the particular purpose for which these products would be used, as well as the knowledge that persons such as Plaintiff would rely on the seller's skill to furnish suitable products.

Therefore, the Defendants have breached the implied warranty of merchantability as well as the implied warranty of fitness for a particular purpose, in addition to various express warranties. Such breach or breaches of implied and express warranties by the Defendants was a proximate cause of the injuries and damages sustained by Plaintiff.

**COUNT FOUR – CIVIL CONSPIRACY**

All of the allegations contained in the previous paragraphs are re-alleged herein. Plaintiff further alleges that Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves to cause Plaintiff's injuries, disease, and illnesses by exposing Plaintiff to harmful and dangerous silica containing products, and/or defective equipment, and/or respiratory, protective wear. Defendants further knowingly agreed, contrived, confederated and conspired to deprive Plaintiff of the opportunity of informed free choice as to whether to use said products or to expose Plaintiff to said dangers. Defendants committed the above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to Defendants' silica containing products, and/or equipment, and/or respiratory and protective wear, requiring or calling for the use of silica and/or silica containing particles.

In furtherance of said conspiracies, Defendants performed the following overt acts:

A.   For many decades, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which clearly indicated that inhalation of silica dust resulting from ordinary and foreseeable use of the above described products were unreasonable dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

B.   Despite the medical and scientific data, literature, and test reports possessed by and available to Defendants, Defendants individually, jointly, and in conspiracy with each other, fraudulently, willfully and maliciously:

1.   withheld, concealed and suppressed said medical information regarding the risks of silicosis, cancer, and other silicosis-related illnesses from Plaintiffs who were using and being exposed to Defendants' products (as set out in the "Facts" section of this pleading)"

2.   caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of silicosis, cancer, and other silicosis-related illnesses, which Defendants knew were incorrect, incomplete, outdated, and misleading.

C.   By these false and fraudulent representations, omissions, and concealments, Defendants intended to induce the Plaintiff to rely upon said false and fraudulent representations, omissions and concealments, and to continue to expose themselves to the dangers inherent in the use of and exposure to Defendants' products.

Plaintiff reasonably and in good faith relied upon the false and fraudulent representations, omissions, and concealments made by Defendants regarding the nature of their products. As a direct and proximate result of Plaintiff's reliance, Plaintiff has sustained damages including injuries, illnesses and disabilities and has been deprived of the opportunity of informed free choice in connection with the use of exposure to Defendants' silica containing products, and/or equipment, and/or respiratory and protective wear, requiring or calling for the use of silica and/or silica containing particles.

Specifically, at the end of 1935, the Air Industrial Hygiene Foundation ("IHF")

was incorporated and included many of the Defendants throughout its existence. IHF internally acknowledged it was a "creature of industry and is the one institution upon which employers can rely for a sympathetic appreciation of their viewpoint." Nonetheless, IHF outwardly presented itself as an unbiased group attempting to improve work conditions and began trying to shape occupational lung research and technical debate. IHF suggested a threshold safe exposure limit of 5 millions silica particles per cubic foot (mppcf) of air and presented it as a scientific and accurate standard. However, this was not true. In fact, IHF itself acknowledged that the 5-mppcf standard lacked entirely any published supporting data and was developed because it was about as low as then-modem engineering methods could achieve. Despite it maintaining the appearance of an unbiased group attempting to improve worker conditions, IHF was, in fact, promulgating an arbitrary, unscientific standard thereby attempting to avoid liability and promote a false sense of security.

In discussing the level of necessary exposure, IHF acknowledged that even industrial hygienists were lulled "into false security by reliance on the protection given by the strict adherence to these permissible limits." But rather then inform workers of the potential dangers, IHF members suggested that companies conduct "periodic physical evaluations" as a "biological check" for "concentrations of hazardous substances which had been sanctioned as being safe". They suggested that the very hazards of the job were effective devices for screening out workers whose physique left them susceptible to illness. They called this process "industrial selection" and endorsed the idea that those who are vulnerable to the exposure be weeded out by natural selection. This Darwinian/guinea pig approach was endorsed by the IHF and was never made public to

the workers whom they represented they were trying to protect.

This effort to withhold the dangers of silica was acknowledged by the Bureau of Mines "Review of Literature" in 1950 in which it stated that silicosis was a widespread hazard that was probably increasing, that the standards were questionable and that there was an "apparently concerted effort to hide" the silicosis problem rather then publicize it to the workers and the general public. Despite IHF's knowledge of the dangers of silicosis, the knowledge of its representations and omissions and the knowledge of lack of scientific backing for its silica standards, the standard remained virtually untouched from 1935 through the mid-1960s. During this period, workers continued to get sick and industry believed it was safe from liability.

Eventually a broader discussion about silicosis emerged. In February of 1975 several Defendants gathered together in Houston, Texas and to form the Silica Safety Association ("SSA"). The SSA publicly stated that it was formed to investigate the potential health hazards of silicosis and recommend adequate protective measures. Clearly, SSA stated it was formed for safety as evidenced by name. Yet, the SSA's primary purpose was to make sure that the Occupational Safety and Health Administration ("OSHA") did not follow the National Institute for Occupational Safety and Health's ("NIOSH") recommendations to ban silica as an abrasive in blasting and to strengthen regulations on silica exposure. SSA's public argument was that workers had come down with silicosis because they "had no air-fed hoods". Privately, SSA withheld a study conducted in a plant owned by one of the officers of the SSA that "under conditions considered good work practice", nearly half of all air samples were above the accepted standards, indicating danger for the workers. While deceiving workers through

withholding studies and intentionally misrepresenting itself as a safety organization, SSA successfully prevented the promulgation of additional safety regulations and rules for workers which could have saved the health and lives of numerous workers.

Many of the Defendants have been members of the IHF and thus are liable as co-conspirators in actively making and/or supporting fraud, misrepresentation, intentional omissions and misinformation to silica workers. The Defendants and the years they were members of these organizations are as follows:

Bob Schmidt -- Member of the SSA; attended 1st meeting; on board of directors

Clark Sand Company -- member of SSA

Clemco Industries -- member of SSA.

Mississippi Valley Silica -- member of SSA.

Schmidt Manufacturing -- member of SSA; Secretary of SSA

Pangborn Corp. -- member of IHF from 1948 until at least 1957.

Empire Abrasive Equipment -- member of SSA.

Specialty Sand -- member of SSA and on Board of trustees.

**COUNT FIVE - ACTING IN CONCERT**

Additionally and/or alternatively, the Defendants aided and abetted each other in the negligence, gross negligence, and reckless misconduct. Pursuant to the Restatement (Second) of Torts Section 876, each of the Defendants is liable for the conduct of the other Defendants for whom they aided and abetting.

**COUNT SIX- GROSS NEGLIGENCE**

Defendants' conduct was in conscious disregard for the rights, safety and welfare of the Plaintiff. Defendants acted with willful and wanton disregard for the Plaintiff.

Defendants' conduct constitutes gross negligence. Defendants' gross negligence was a proximate cause of Plaintiff's injuries. Defendants are liable for exemplary and punitive damages.

## VIII. DAMAGES

Plaintiff respectfully requests the following damages be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate Plaintiffs:

1. Severe impairment to their lungs and respiratory system;
2. Medical Expenses, past and future;
3. Pain and Suffering, past and future;
4. Mental Anguish, Anxiety, and Discomfort, past and future;
5. Lost wages and income, past and future;
6. Fear of Cancer or other silica related diseases;
7. Physical Impairment;
8. Physical Disfigurement;
9. Loss of Enjoyment;
10. Loss of Consortium;
11. Pre and post judgment interest;
12. Exemplary and Punitive Damages;
13. Treble damages;
14. Reasonable and necessary attorneys fees; and
15. Such other relief to which Plaintiff may be justly entitled.

## IX. DISCOVERY RULE

Plaintiff suffers from an occupational illness which has a latency period and does not arise until many years after first exposure to toxic dust. Plaintiff's occupational illness did not distinctly manifest itself until Plaintiff was diagnosed with silicosis. Consequently, the discovery rule applies to this case and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know of Plaintiff's occupational illness.

**X.**
**CONDITIONS PRECEDENT**

All conditions precedent have been performed or have occurred as required by the Mississippi Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment of and from the Defendants in an amount within the jurisdictional limits of this Honorable Court for compensatory damages against all Defendants, actual damages; consequential damages; exemplary damages, jointly and severally against all Defendants; interest on damages (pre-and post-judgment) in accordance with the law; Plaintiff's reasonable attorney's fees, as well as costs of court and all other costs incurred; and such other and further relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED, this the 11th day of May, 2007.

**TIMOTHY W. PORTER (MSB#9687)**

TIMOTHY W. PORTER, ESQ., MS BAR. NO. 9687
PATRICK MALOUF, ESQ., MS BAR NO. 9702
JOHN T. GIVENS, ESQ., MS BAR NO. 101561
E. CLARK TROUT, ESQ., MS BAR NO. 102207
PORTER & MALOUF, P.A.
825 RIDGEWOOD ROAD
RIDGELAND, MS 39157
POST OFFICE BOX 12768
JACKSON, MS 39236
TELEPHONE (601) 957-1173
TELEFAX (601) 957-7366

7006 2760 0003 5248 8114

American Optical
c/o Jeffrey Healy, Esq.
925 Euclid Ave. Suite 1150
Cleveland, Ohio 44115



1st Judicial District
101 N. Court Street Suite B
Ellisville, MS 39437
Phone (601) 477-8538
Fax (601) 477-8539

BART GAVIN
Circuit Clerk - Jones County

2nd Judicial District
P.O. Box 1336
Laurel, MS 39441
Phone (601) 425-2556
Fax (601) 399-4774

DATE: 6/8/10

FAX#: __________

TO: Dora

RECEIVED
JUN 08 2010

FROM: BART GAVIN, CIRCUIT CLERK
JONES COUNTY, MS
101 N. COURT ST., STE. B
ELLISVILLE, MS 39437
FAX: (601) 477-8539

__________, D.C.

RE: __________

NUMBER OF PAGES (INCLUDING THIS PAGE): ______

EXHIBIT "C"

*~ Proudly serving the people of Jones County ~*

ATTORNEYS FOR PLAINTIFF
Timothy W. Porter
P.O. Box 12768
Jackson, MS 39236
(601) 957-1173

NO. [illegible]
John McGilberry
vs
Eagleton Corporation, Clemco [illegible] Sand Company, Inc.; Southern Silica of Louisiana; Dependable Abrasives, Inc.; [illegible] et al

ATTORNEYS FOR DEFENDANT

PLEADINGS, EXHIBITS, ORDERS FILED, DISPOSITION, ETC

| Month | Day | Year | Entry | Book | Page |
|---|---|---|---|---|---|
| 5 | 14 | 2007 | Complaint | | |
| 8 | 17 | 2007 | Summons Issued (34) (Ret. to Atty for Process) | | |
| 8 | 30 | 2007 | Order [illegible] | | |
| 8 | 27 | 2007 | Plaintiff's Motion for Additional Time To Serve Process | 37 | 311 |
| 9 | 4 | 2007 | Letter/Response (C T Corp. System) | | |
| 9 | 13 | 2007 | Answer And Defenses of Green Brothers Gravel Company Inc. To Plaintiff's Complaint And All Cross-Claims | | |
| 9 | 13 | 2007 | Kelco Sales & Engineering Company, A Division of Polley, Inc.'s Answer To Plaintiffs' Original Complaint, Affirmative Defenses And Answer To All Defendants' Cross-Claims | | |
| 9 | 13 | 2007 | Answer And Defenses of Mississippi Valley Silica Company, Inc. To Plaintiff's Complaint | | |
| 9 | 17 | 2007 | Pulmosan Safety Equipment Corporation's Answer And Defenses To Plaintiff's Complaint | | |
| 9 | 17 | 2007 | Answer And Defenses of Empire Abrasive Equipment Corporation To Plaintiff's Complaint And To All Cross Claims | | |
| 9 | 18 | 2007 | Answer of Pauli + Griffin Company, Inc. Filed | | |
| 9 | 18 | 2007 | Notice of Service of Discovery Filed | | |
| 9 | 21 | 2007 | Answer To Complaint on Behalf of Defendant Scott Technologies, Inc. | | |
| 9 | 21 | 2007 | Defendant Clemco Industries Corporation's Answer To Plaintiff's Complaint | | |
| 9 | 24 | 2007 | Notice of Service of Discovery | | |
| 9 | 24 | 2007 | Notice of Service of Discovery | | |
| 9 | 24 | 2007 | Answer of Mine Safety Appliances Company | | |
| 9 | 24 | 2007 | Defendant Precision Packaging, Inc. F/K/A Quikrete Materials, Inc.'s Answer To Complaint | | |
| 9 | 24 | 2007 | Defendant Ash Grove Cement Company's Answer To Complaint (Vol. 2) | | |
| 9 | 25 | 2007 | Answer And Defenses Of Dependable Abrasives, Inc. | | |
| 9 | 26 | 2007 | Badschmidt, Inc.'s Answer And Defenses To Plaintiff's Complaint And All Cross-Claims | | |
| 9 | 26 | 2007 | Schmidt Manufacturing, Inc.'s Answer And Defenses To Plaintiff's Complaint And All Cross-Claims | | |

ATTORNEYS FOR PLAINTIFF

No 2007-16-CV5

John McGillberry

vs

Pangborn Corporation, ETAL

ATTORNEYS FOR DEFENDANT

PLEADINGS, EXHIBITS, ORDERS FILED, DISPOSITION, ETC

9 28 2007 Summons Issued (2) (Ret. to Atty. for Process)
10 1 2007 Answer and Defenses of Defendant Lone Star Industries, Inc. To The Complaint Filed.
10 1 2007 Expert Witness Designation of Defendant Lone Star Industries, Inc. Filed
10 1 2007 Defendant Parmelee Industries, Inc.'s Answer To Plaintiff's Complaint Filed
10 1 2007 Defendant Hanson Aggregates, Inc.'s Answer To Plaintiff's Complaint Filed
10 1 2007 Unimin Corporation's Answer, Defenses And Affirmative Defenses To Plaintiff's Complaint
10 1 2007 The Morie Company's Answer, Defenses And Affirmative Defenses To Plaintiff's Complaint
10 4 2007 Custom Aggregates + Grinding, Inc.'s Answer To Plaintiff's Complaint
10 9 2007 Defendant Pangborn Corporation's Answer To Plaintiff's Complaint
10 10 2007 Empire Abrasive Equipment Corporation's Fact And Expert Witness Designation
10 15 2007 Notice of Filing
10 15 2007 Plaintiff's Motion To Serve Defendant Dependable Abrasives, Inc., Outside of Time
Vol.3
10 17 2007 American Optical Corporation's Answer And Defenses To Plaintiff's Complaint
10 24 2007 Agreed Order of Dismissal As To All Claims of Plaintiff Against Green Brothers Gravel Company Inc. 37 377-378
10 26 2007 Notice of Voluntary Dismissal
10 29 2007 Answer And Affirmative Defenses of Defendant Specialty Sand Company To Plaintiff's Complaint
10 29 2007 Motion And Incorporated Brief of Defendant Specialty Sand Company For Summary Judgment
11 5 2007 Southern Silica of Louisiana, Inc.'s Answer And Defenses To Plaintiff's Complaint
11 5 2007 Order 37 395
11 7 2007 Notice of Hearing (11-26-07 10:00 Am Laurel, MS)
11 9 2007 Real Sands, Inc. And Real Specialty Sands, Inc.'s Answer And Defenses To Plaintiff's Complaint,
11 15 2007 Defendant Clark Sand Company, Inc.'s Answer To Plaintiff's Complaint
11 16 2007 Notice of Service of Discovery
11 20 2007 Summons Issued (1) (Ret. to Atty.)
11 20 2007 Notice of Service of Discovery
11 29 2007 Paul + Griffin Company, Inc.'s Motion For Summary Judgment
12 3 2007 Agreed Order of Dismissal 37 471

Cont'd to pg 451

ATTORNEYS FOR PLAINTIFF

No. [illegible]

John McGillberry

vs.

Pangborn Corporation, ETAL

ATTORNEYS FOR DEFENDANT

PLEADINGS, EXHIBITS, ORDER - FILED, DISPOSITION, ETC.

| Date | Pleadings, Exhibits, Order - Filed, Disposition, etc. | Book Page |
|---|---|---|
| 12 10 2007 | Defendant E.D. Bullard Company's Answer To Plaintiff's Complaint | |
| 12 10 2007 | Defendant E.D. Bullard Company's Designation of Expert Witnesses | |
| 12 10 2007 | Defendant E.D. Bullard Company's Designation of Exhibits | |
| 12 10 2007 | Defendant E.D. Bullard Company's Preliminary List of Fact Witnesses | |
| 12 17 2007 | Notice of Service of Discovery Responses | |
| 12 17 2007 | Agreed Initial Discovery Order | |
| 12 19 2007 | Notice of Service of Discovery | 37 |
| 1 18 08 | Notice of Service of Defendants, Bob Schmidt, Inc. And Schmidt Manufacturing, Inc.'s Objections And Responses To Plaintiff's First Set of Requests For Admission Propounded To All Defendants | |
| 1 24 08 | Answer And Defenses (Dependable Abrasives, Inc.) | |
| 2 4 08 | Defendants, Bob Schmidt, Inc. And Schmidt Manufacturing, Inc.'s Designation of Fact And Expert Witnesses | |
| 2 20 08 | Notice of Service of Defendants Bob Schmidt, Inc.'s And Schmidt Manufacturing, Inc.'s Objections And Responses To Plaintiff's First Set of Interrogatories And First Set of Requests for Production of Documents To All Defendants | |
| 2 27 08 | Notice of Change of Address | |
| 2 24 08 | Defendants Bob Schmidt, Inc. And Schmidt Manufacturing, Inc.'s Motion To Substitute Counsel | |
| 3 31 08 | Order Permitting Substitution of Counsel | |
| 4 18 08 | Empire Abrasive Equipment Corporation's Supplemental Fact And Expert Witness Designation | 38 |
| 6 10 08 | The Moore Company's Joinder In Pauli And Griffin Company, Inc.'s Motion for Summary Judgment | |
| 6 10 08 | Unimin Corporation's Joinder In Pauli And Griffin Company, Inc.'s Motion For Summary Judgment | |
| 7 7 08 | Plaintiff's Expert Witness Designations | |

## JONES COUNTY CIRCUIT, 1ST JUDICIAL DISTRICT

**Case No:** 2007-016-CV05

**Style:** JOHN MCGILBERRY
VS.
PANGBORN CORPORATION, ET AL

**Presiding Judge:** LANDRUM, BILLY JOE

**Date/Time Filed:** 5/14/2007 08:46:00

**Court Type:** CIRCUIT **Case Type:** CIVIL

**Docket/Bk/Pg:** GENERAL

### Nature of Case

| | |
|---|---|
| Primary | TORTS-PERSONAL INJURY - Other |

### Parties/Representatives

| | | | |
|---|---|---|---|
| Plaintiff | MCGILBERRY, JOHN | Primary Atty | PORTER TIMOTHY |
| Defendant | PANGBORN CORPORATION | | |

### Docket Entries

| | |
|---|---|
| 05/14/2007 | CIVIL COVER SHEET - |
| 07/22/2008 | AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE - PAULI & GRIFFIN CO., INC. |
| 07/23/2008 | AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE - DEPENDABLE ABRASIVES, INC. |
| 07/28/2008 | NOTICE OF SERVICE OF DISCOVERY - |
| 08/07/2008 | FACT AND EXPERT WITNESS DESIGNATION - UNIMIN CORP. |
| 08/07/2008 | DESIGNATION OF EXPERT WITNESS - UNIMIN CORP. |
| 08/13/2008 | ORDER - & JUDGMENT DISMISSING THE MORIE CO. WITHOUT PREJUDICE |
| 09/19/2008 | AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE - AGAINST DEF, SCOTT TECHNOLOGIES, INC. |
| 09/30/2008 | AGREED ORDER SETTING CAUSE FOR TRIAL - |
| 10/29/2008 | NOTICE OF SERVICE OF DISCOVERY - |
| 12/04/2008 | MOTION FOR SUMMARY JUDGMENT - UNIMIN'S WITH EXHIBITS A, B, C, D |
| 01/20/2009 | NOTICE OF SERVICE OF DISCOVERY - |
| 01/23/2009 | PLAINTIFF'S RESPONSE - TO DEF EMPIRE ABRASIVE EQUIPMENT CORPORATION'S REQUESTS FOR ADMISSION |
| 01/23/2009 | NOTICE OF SERVICE - |
| 03/03/2009 | ORDER OF DISMISSAL WITHOUT PREJUDICE - AS TO LONE STAR INDUSTRIES, INC. |
| 03/13/2009 | NOTICE OF HEARING-CIVIL - |
| 03/13/2009 | MOTION FOR SUMMARY JUDGMENT - & ITEMIZATION OF UNDISPUTED FACTS |
| 04/22/2009 | RENOTICE - OF HEARING |
| 04/22/2009 | NOTICE OF CANCELLATION - OF HEARING |
| 05/12/2009 | MOTION TO COMPEL - BY MINE SAFETY APPLIANCES CC |
| 05/20/2009 | NOTICE OF CANCELLATION - OF HEARING / EMPIRE ADBRAIVE EQUIP. CORP. |
| 06/01/2009 | NOTICE OF HEARING-CIVIL - |
| 06/02/2009 | MOTION FOR SUMMARY JUDGMENT - MINE SAFETY APPLIANCE CO'S |
| 06/10/2009 | MOTION FOR SUMMARY JUDGMENT - ETC. / AMERICAN OPTICAL CORP. |
| 06/11/2009 | MOTION FOR SUMMARY JUDGMENT - ETC. / MS VALLEY SILICA CO. |
| 06/19/2009 | NOTICE OF HEARING-CIVIL - |
| 06/24/2009 | NOTICE OF HEARING-CIVIL - |
| 07/09/2009 | JOINDER IN MOTION - TO COMPEL |
| 07/13/2009 | PLAINTIFFS - FIRST SUPPLEMENTAL DESIGNATION OF EXPERT WITNESSESS |
| 07/13/2009 | NOTICE OF HEARING-CIVIL - |

## Docket Entries

07/13/2009 NOTICE OF HEARING-CIVIL -
07/21/2009 NOTICE OF CANCELLATION - OF HEARING
07/21/2009 RE-NOTICE OF HEARING -
07/22/2009 NOTICE OF CANCELLATION - & RE-SETTING OF HEAI ING
07/22/2009 CANCELLATION OF HEARING - & RE-NOTICE
07/23/2009 NOTICE OF CANCELLATION - OF HEARING
07/23/2009 RE-NOTICE OF HEARING -
08/07/2009 MOTION - TO SUBSTITUITE & WITHDRAW COUNSEL ( F RECORD
08/17/2009 REPLY - BRIEF IN SUPPORT OF MOTION FOR SUMMA RY JUDGMENT / AMERICAN OPTICAL
08/17/2009 AGREED ORDER - DISMISSING UNIMIN CORP. WITHO JT PREJUDICE
08/17/2009 PLAINTIFF'S RESPONSE - & INCORPORATED MEMOR NDUM TO AMERICAN OPTICAL'S MOTION FOR SUMMARY JUDGMENT
08/19/2009 AGREED ORDER - OF DISMISSAL WITHOUT PREJUDI( E / MS VALLEY
08/19/2009 AGREED ORDER - OF DISMISSAL WITHOUT PREJUDI( E / MINE SAFETY APPLIANCES
08/28/2009 ORDER - DENYING MOTION FOR SUMMARY JUDGMEI T / ANERICAN OPTICAL CORP.
08/28/2009 ORDER - DENYING MOTION FOR SUMMARY JUDGMEI T / EMPIRE ABRASIVE EQUIPMENT
09/01/2009 SUBPOENA DUCES TECUM ISSUED - KELLY HUTCHIN S
09/17/2009 SUBPOENA DUCES TECUM ISSUED - MANVILLE TRUS
09/25/2009 AMENDED - ANSWER BY CLARK SAND CO.
11/06/2009 ORDER - FROM SC / INTERLOCUTORY APPEAL DISMI SED / AMERICAN OPTICAL CORP.
11/06/2009 ORDER - FROM SC DENIED INTERLOCUTORY APPEAL / EMPIRE ABRASIVE EQUIPMENT CORP
12/04/2009 DEFENDANTS' - MOTION FOR LETTERS ROGATORY / . RMSTRONG WORLD IND., INC.
12/04/2009 DEFENDANTS' - MOTION FOR LETTERS ROGATORY / ;ABCOCK & WILCOX ASBESTOS
12/09/2009 PLAINTIFFS - SECOND SUPPLEMENTAL DESIGNATION OF EXPERT WITNESSES
12/14/2009 LETTERS ROGATORY - # 1 - REQUEST FOR JUDICIAL . SSISTANCE
12/14/2009 LETTERS ROGATORY - #2 - REQUEST FOR JUDICIAL A SSISTANCE
01/04/2010 DESIGNATION OF FACT AND EXPERT WITNESSES - DI F'S, SCHMIDT INC. & MFG. / FIRST SUPPLEMENTAL
01/04/2010 DESIGNATION OF FACT AND EXPERT WITNESSES - DI F, KELCO SALES & ENG. CO. / FIRST SUPPLEMENTAL
01/12/2010 NOTICE OF HEARING-CIVIL -
01/12/2010 MOTION FOR SUMMARY JUDGMENT - SOUTHERN SILI CA OF LOUISIANA, INC'S
01/21/2010 SUBPOENA DUCES TECUM ISSUED -
01/25/2010 NOTICE OF SERVICE OF DISCOVERY -
01/26/2010 AGREED JUDGMENT - OF DJISMISSAL DEF, BLAIN SAN D & GRAVEL CO., INC.
01/28/2010 NOTICE OF CANCELLATION -
01/28/2010 RE-NOTICE OF HEARING -
02/08/2010 NOTICE OF SERVICE OF DISCOVERY -
02/08/2010 NOTICE OF SERVICE OF DISCOVERY -
02/17/2010 NOTICE OF SERVICE OF DISCOVERY - RESPONSES / F JLMOSAN SAFETY EQUIPMENT CORP.
02/18/2010 NOTICE OF SERVICE OF DISCOVERY -
02/22/2010 NOTICE OF SERVICE OF DISCOVERY -
02/22/2010 NOTICE OF SERVICE OF DISCOVERY -
02/23/2010 NOTICE OF SERVICE OF DISCOVERY -
02/23/2010 NOTICE OF SERVICE OF DISCOVERY -
02/23/2010 NOTICE OF SERVICE OF DISCOVERY -
02/23/2010 NOTICE OF SERVICE OF DISCOVERY -
02/25/2010 NOTICE OF SERVICE OF DISCOVERY - RESPONSES
03/01/2010 NOTICE OF SERVICE OF DISCOVERY -
03/08/2010 NOTICE OF SERVICE OF DISCOVERY -
03/08/2010 NOTICE OF SERVICE OF DISCOVERY -
03/10/2010 AMENDED ORDER - AGREED / SETTING TRIAL
03/12/2010 NOTICE OF SERVICE OF DISCOVERY - RESPONSES

Docket Entries

| | |
|---|---|
| 03/22/2010 | NOTICE OF SERVICE OF DISCOVERY - |
| 03/24/2010 | SUBPOENA DUCES TECUM ISSUED - FLUOR DANIEL SERVICES CORP. |
| 03/29/2010 | SUBPOENA DUCES TECUM ISSUED - INTERNATIONAL BROTHERHOOD |
| 03/29/2010 | MOTION - TO SUBSTITUTE & TO WITHDRAW COUNSEL / AMERICAN OPTICAL CORP. |
| 03/30/2010 | ORDER - DENYING SOUTHERNSILICA MOTION FOR SUMMARY JUDGMENT |
| 04/12/2010 | ORDER - ON MOTION OF AMERICAN OPTICAL CORP. |
| 04/14/2010 | AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE - PANGBORN CORPORATION |
| 04/14/2010 | NOTICE OF HEARING-CIVIL - |
| 04/14/2010 | MOTION TO COMPEL - SUPPLEMENTAL RESPONSES TO DISCOVERY |
| 04/15/2010 | JOINDER - IN & ADOPTION OF CERTAIN DEFS' MOTION TO COMPEL SUPPLEMENTAL RESPONSES / EMPIRE ABRASIVE EQUIP. |
| 04/23/2010 | DESIGNATION OF FACT WITNESSES - BY PULMOSAN SAFETY |
| 04/23/2010 | DESIGNATION OF EXPERT WITNESS - BY PULMOSAN SAFETY |
| 04/30/2010 | NOTICE OF HEARING-CIVIL - |
| 04/30/2010 | MOTION - FOR CONTEMPT OR ALTERNATIVELY MOTION TO COMPEL |
| 05/10/2010 | NOTICE OF CANCELLATION - |
| 05/11/2010 | DEFENDANTS' - AMERICAN OPTICAL CORP. JOINDER IN & ADOPTION OF CERTAIN DEFS' MOTION TO COMPEL |
| 05/12/2010 | NOTICE OF SERVICE OF DISCOVERY - |
| 05/14/2010 | NOTICE OF HEARING-CIVIL - |
| 05/14/2010 | MOTION TO QUASH - NOTICE OF VIDEOTAPED DEPOSITION OR, IN THE ALTERNATIVE, MOTION TO LIMIT THE SCOPE OF VIDEOTAPED / EMPIRE ABRASIVE EQUIP. CO. |
| 05/14/2010 | NOTICE OF HEARING-CIVIL - |
| 05/17/2010 | MOTION TO QUASH - & FOR PROTECTIVE ORDER |
| 05/17/2010 | SUBPOENA DUCES TECUM ISSUED - |
| 05/18/2010 | ORDER - DENYING MOTION TO QUASH & FOR PROTECTIVE ORDER & MOTION TO QUASH THE NOTICE OF VIDEOTAPED DEPOSITION OR IN THE ALTERNATIVE MOTION TO LIMIT THE SCOPE OF VIDEOTAPED DEPOSITION |
| 05/18/2010 | ORDER - HOLDING RULING IN ABEYANCE ON MOTION TO COMPEL |
| 05/18/2010 | SUBPOENA DUCES TECUM ISSUED - IMPACT |
| 05/18/2010 | SUBPOENA DUCES TECUM ISSUED - JON A. SWARTZFAGER |
| 05/19/2010 | NOTICE OF DEPOSITION - VIDEOTAPED |
| 05/19/2010 | NOTICE OF SERVICE OF DISCOVERY - RESPONSES |
| 05/19/2010 | LETTER FILED - FROM J. SKIPPER TO P. MALOUF |
| 05/25/2010 | EXPERT WITNESS DESIGNATION - DEF'S |
| 05/26/2010 | DESIGNATION OF FACT WITNESSES - BY PEARL SANDS, INC. & PEARL SPECIALTY SANDS, INC. |
| 05/26/2010 | DESIGNATION OF EXPERT WITNESS - BY PEARL SANDS, INC. & PEARL SPECIALTY SANDS, INC. |
| 05/26/2010 | NOTICE OF SERVICE OF DISCOVERY - |
| 05/26/2010 | REQUEST - FOR ADMISSIONS, REQUESTS FOR PRODUCTION OF DOCUMENTS & INTERROGATORIES TO PLF |
| 05/28/2010 | SUBPOENA DUCES TECUM ISSUED - MDES |
| 05/28/2010 | MOTION - WRITTEN OBJECTIONS & MOTION TO QUASH OR FOR ALTERNATIVE RELIEF |
| 05/28/2010 | AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE ASH GROVE, CLEMCO IND., CUSTON AGGREGATES, HANSON AGGREGATES, HUMBLE SAND CO., ET AL |
| 06/01/2010 | CROSS-NOTICE - OF DEPOSITION / DEF - AMERICAN OPTICAL CORP. |
| 06/01/2010 | NOTICE OF DEPOSITION - |
| 06/03/2010 | DESIGNATION OF EXPERT WITNESS - BY AMERICAN OPTICAL CORP. |
| 06/04/2010 | ORDER OF DISMISSAL WITHOUT PREJUDICE - PULMOSAN SAFETY EQUIP. CORP. |
| 6/8/2010 | Agreed Order of Dismissal W/O Prejudice Pearl Sands + Pearl Specialty Sands |



FILED 10-24-07 ORDER

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN McGILBERRY — PLAINTIFF

VS. — CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. — DEFENDANTS

---

**AGREED ORDER OF DISMISSAL AS TO ALL CLAIMS OF PLAINTIFF AGAINST GREEN BROTHERS GRAVEL COMPANY, INC.**

---

THIS CAUSE having come on to be heard on the joint *ore tenus* Motion of Plaintiff John McGilberry and Defendant Green Brothers Gravel Company, Inc., and the Court having been advised that the parties have reached an agreement to the dismissal of Green Brothers Gravel Company, Inc., in the above referenced matter, the Court does hereby:

**ORDER AND ADJUDGE** that the claims of Plaintiff John McGilberry are hereby dismissed without prejudice as to Green Brothers Gravel Company, Inc., with each party bearing their own respective costs;

**ORDER AND ADJUDGE** that the Clerk of the Court is hereby directed to forthwith enter this Agreed Order, there being no just cause for delay.

So **ORDERED AND ADJUDGED** this 23rd day of October, 2007.

[signature]
CIRCUIT COURT JUDGE

STATE OF MISSISSIPPI
COUNTY OF JONES
1st JUDICIAL DISTRICT
I, LARRY ISHEE, Circuit Clerk, in and for said County and State, do hereby certify that the above and foregoing is a true and correct copy of the above instrument as same appears of record on file in the office of the Circuit Clerk at Jones County, Mississippi
Given under my hand and official seal, this the 24 day of October A.D., 2007
LARRY ISHEE, Circuit Clerk
Jones County, Mississippi
By [signature]

EXHIBIT "D"

FILED
OCT 24 2007
LARRY D. ISHEE
CIRCUIT CLERK
JONES COUNTY, MS

Agreed as to form and content:

W. MARK EDWARDS, ESQ. (MSB #8935)
Page, Mannino, Peresich & McDermott, PLLC
759 Vieux Marche Mall
Post Office Drawer 289
Biloxi, MS 39533
Telephone: (228) 374-2100 Fax: (228) 436-5081
***Counsel for Defendant Green Brothers Gravel Company, Inc.***

R. ALLEN SMITH, JR. (MSB #99984)
The Smith Law Firm, P.L.L.C.
681 B Town Center Blvd.
Ridgeland, MS 39157
Telephone: (601) 952-1422; Fax: (601) 952-1426

TIMOTHY W. PORTER, ESQ. (MSB #9687)
Porter & Malouf, P.A.
825 Ridgewood Road
Ridgeland, MS 39157
Post Office Box 12768
Jackson, MS 39236
Telephone: (601) 957-1173; Fax: (601) 957-7366
***Counsel on behalf of Plaintiff***

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

LARRY J. BEARD — PLAINTIFF

VERSUS — CIVIL ACTION NO.: 207-18-CV6

PANGBORN CORPORATION, ET AL — DEFENDANTS

**NOTICE OF VOLUNTARY DISMISSAL**

COMES NOW the Plaintiff, by and through undersigned counsel, pursuant to Rule 41(a) M.R.C.P., and files this his Notice of Voluntary Dismissal of Defendant, Dependable Abrasives, Inc. , agent of service of process Charles Evans, Mississippi Business I.D. # 683184. Plaintiff hereby dismisses with prejudice all claims against said Defendant in the above-styled and numbered cause. Plaintiff reserves all rights against all other defendants.

Respectfully submitted,

Timothy W. Porter (MSB # 9687)
Attorney for Plaintiff

Timothy W. Porter
Porter & Malouf, P.A.
P.O. Bo x12768
Jackson, MS 39236-2768
Phone: 601-957-1173
FAX: 601-957-7366

**CERTIFICATE OF SERVICE**

I do hereby certify that a true and correct copy of the foregoing **Notice of Voluntary Dismissal** has been served to all counsel of record via email.

This the 11 day of Oct, A.D., 2007.

Timothy W. Porter

FILED
OCT 26 2007
CIRCUIT CLERK
JONES COUNTY, MS

536

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN MCGILBERRY — PLAINTIFF

VS. — CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL — DEFENDANTS

**AGREED JUDGMENT OF DISMISSAL**

This matter was brought on for hearing on the oral motion of the defendant Dependable Abrasives, Inc. (Dissolved) to have the claims of plaintiff John McGilberry against Dependable Abrasives, Inc. (Dissolved) dismissed without prejudice. The Court, having considered the motion and the agreement of the parties, finds that the motion should be well taken and granted.

IT IS, THEREFORE, ORDERED that the claims of plaintiff John McGilberry are dismissed without prejudice against Dependable Abrasives, Inc. (dissolved). Each party is to bear its own costs and attorney fees.

SO ORDERED, this 23rd day of July, 2008.

CIRCUIT COURT JUDGE

APPROVED:

R. ALLEN SMITH - BAR # 99984
ATTORNEY FOR PLAINTIFF

VICTORIA HARDY RUNDLETT - BAR # 100436
ATTORNEY FOR DEPENDABLE ABRASIVES, INC. (DISSOLVED)

4281-118095/ba

FILED
JUL 23 2008
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

MIN BK 39 PG 44 - 07/25/2008 09:19 AM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN MCGILBERRY PLAINTIFF

V. CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. DEFENDANTS

MIN BK 40 PG 374 - 01/29/2010 09:29 AM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

## AGREED JUDGMENT OF DISMISSAL

THIS DAY this cause came on before the Court on Motion *ore tenus* of the Defendant, Blain Sand & Gravel Co., Inc. ("Blain"), to have the claims of Plaintiff, John McGilberry, against Blain dismissed without prejudice. The Court being advised that the Plaintiff has agreed to dismiss all claims against Blain in this matter without prejudice, finds said motion well taken and granted and hereby removes this matter from its docket.

IT IS THEREFORE ORDERED AND ADJUDGED that all claims of the Plaintiff John McGilberry against Defendant Blain, are hereby discharged and that the Complaint and pleadings of Plaintiff and all causes of action contained therein or referred to, be and all of the same are, hereby dismissed without prejudice with each party separately bearing its respective costs for this action.

SO ORDERED AND ADJUDGED this the 25th day of January, 2010.

CIRCUIT COURT JUDGE

Approved as to Form Only:

R. Allen Smith, Esq., MS Bar No 99984
John T. Givens, Esq., MS Bar No. 101561
Attorneys for Plaintiff

Silas W. McCharen, Esq., MS Bar No.2213
Attorney for Defendant Blain Sand & Gravel, Co., Inc.

FILED

JAN 26 2010

BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN McGILBERRY PLAINTIFF

v. CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, et al. DEFENDANTS

MIN BK 40 PG 682 - 06/01/2010 10:58 AM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE

This matter came before the Court on the joint motion of Plaintiff John McGilberry and Defendants Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc., to have plaintiff's claims against Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc. dismissed without prejudice. The Court, having considered the motion, and being further advised that the parties to this order are in agreement, finds that the motion is well-taken and should be granted.

IT IS, THEREFORE, ORDERED that the claims of Plaintiff John McGilberry are dismissed without prejudice as to Defendants Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc. with each party to bear its own costs.

SO ORDERED, this 27th day of May, 2010.

FILED
MAY 28 2010
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

EXHIBIT
"E"

CIRCUIT COURT JUDGE

AGREED TO:

Edwin S. Gault, Jr., MSB No. 10187
Jennifer J. Skipper, MSB No. 100808
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099
Telephone: (601) 960-8600
Facsimile: (601) 960-8613

Attorneys for Defendants

Timothy W. Porter, MSB No. 9687
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
P.O. Box 12768
Jackson, Mississippi 39236-2768

R. Allen Smith, MSB No. 99984
THE SMITH LAW FIRM
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

**Attorneys for Plaintiff**

MIN 40 683

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI

JOHN MCGILBERRY PLAINTIFF

VS. CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. DEFENDANTS

**DEFENDANT PRECISION PACKAGING, INC. f/k/a QUIKRETE MATERIALS, INC.'S ANSWER TO COMPLAINT**

Defendant Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. (hereinafter referred to as "Defendant" or "Precision") answers the above-styled Complaint as follows:

**DEFENSE 1**

Plaintiff's Complaint fails to state a claim or cause of action against this Defendant upon which relief may be granted.

**DEFENSE 2**

Defendant answers Plaintiff's Complaint filed against it paragraph by paragraph as follows:

**I. HISTORY OF THE CASE**

Defendant states no response is required for the unnumbered paragraph of Section I, "HISTORY OF THE CASE." To the extent a response is required, Defendant denies the unnumbered paragraph of Section I, "HISTORY OF THE CASE."

**II. PLAINTIFF**

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the unnumbered paragraph of Section II, "PLAINTIFF."

**III. DEFENDANTS**

Defendant admits that it is a corporation of a state other than the State of Mississippi

CLX KRW Sandbox

FILED SEP 24 2007 LARRY ISHEE CIRCUIT CLERK JONES COUNTY, MISS

EXHIBIT "F"

Defendant denies the remaining allegations of the unnumbered paragraphs under Section III, "DEFENDANTS," as they pertain to this Defendant. To the extent the remaining allegations pertain to other Defendants, Defendant lacks sufficient information to admit or deny the allegations.

## IV.
## JURISDICTION

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the first and second unnumbered paragraphs under Section IV, "JURISDICTION" and therefore, denies the same.

## V.
## VENUE

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the unnumbered paragraph under Section V, "VENUE" and therefore, denies the same.

## VI.
## FACTS

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the first unnumbered paragraph under Section VI, "FACTS" and therefore, denies the same.

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the second unnumbered paragraph under Section VI, "FACTS" and therefore, denies the same.

Defendant admits that it sold industrial sand for a period of time. Defendants lacks knowledge or information sufficient to admit or deny the remaining allegations of the third unnumbered paragraph under Section VI, "FACTS" and therefore, denies the same.

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the fourth unnumbered paragraph under Section VI, "FACTS" and therefore, denies the same.

Defendant denies the allegations of the fifth unnumbered paragraph under Section VI,

"FACTS."

Defendant denies the allegations of the sixth unnumbered paragraph under Section VI, "FACTS."

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the seventh unnumbered paragraph under Section VI, "FACTS" and therefore, denies the same.

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the eighth unnumbered paragraph under Section VI, "FACTS" and therefore, denies the same.

## VII.
## CAUSES OF ACTION AND THEORIES OF RECOVERY

### COUNT ONE - STRICT LIABILITY AND PRODUCT DEFECTS

Defendant denies the allegations of the first and second unnumbered paragraphs under the section titled "Count One - Strict Liability and Product Defects."

### COUNT TWO - NEGLIGENCE

Defendant denies the allegations of the first and second unnumbered paragraphs and all subparagraphs contained therein of the section titled "Count Two - Negligence."

### COUNT THREE - BREACH OF WARRANTEES

Defendant denies the allegations of the first and second unnumbered paragraphs under the section titled "Count Three - Breach of Warranties."

### COUNT FOUR - CIVIL CONSPIRACY

Defendant denies the allegations of the unnumbered paragraphs, and all subparagraphs, of the section titled "Count Four - Civil Conspiracy."

### COUNT FIVE - ACTING IN CONCERT

Defendant denies the allegations of the unnumbered paragraph of the section titled "Count

Five - Acting In Concert."

**COUNT SIX - GROSS NEGLIGENCE**

Defendant denies the allegations of the unnumbered paragraph of the section titled "Count Six - Gross Negligence." Defendant further denies that Plaintiff is entitled to recover exemplary and punitive damages from this Defendant.

**VIII.**
**DAMAGES**

Defendant denies that Plaintiff is entitled to recover any damages from this Defendant.

**IX.**
**DISCOVERY RULE**

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the unnumbered paragraph under the section titled "IX - Discovery Rule" and therefore, denies the same.

**X.**
**CONDITIONS PRECEDENT**

Defendant lacks knowledge or information sufficient to admit or deny the allegations of the unnumbered paragraph under the section titled "X - Conditions Precedent" and therefore, denies the same.

Defendant denies the allegations of the unnumbered paragraph which begins with "WHEREFORE," and specifically denies that Plaintiff is entitled to compensatory damages, punitive damages, interests, cost or any judgment against it jointly or severally in any amount whatsoever.

**DEFENSE 3**

If none of the witnesses to the alleged silica exposure of Plaintiff reside in Mississippi, or

if most reside outside of Mississippi, travel to and from Plaintiff's state of residence for witnesses and counsel for necessary discovery and trial would place an undue burden upon Defendants. Furthermore, this Court may be required under principles of conflicts of law to apply foreign law, with which this Court and Mississippi counsel are unfamiliar. This Defendant, therefore, moves to dismiss this action under the doctrine of forum non conveniens.

**DEFENSE 4**

Defendant objects to process and service of process as insufficient.

**DEFENSE 5**

This Court lacks jurisdiction over the person and/or property of this Defendant. Accordingly, this action should be dismissed as to this Defendant.

**DEFENSE 6**

This Court lacks jurisdiction over the subject matter of Plaintiff's claims.

**DEFENSE 7**

This action should be stayed pending the outcome of other, similar actions pending in Mississippi, Texas, and other jurisdictions.

**DEFENSE 8**

Plaintiff's fraud claims should be dismissed for failure to plead such claims with sufficient particularity, as required by Miss. R. Civ. P. 9.

**DEFENSE 9**

Plaintiff's injuries, if any, were proximately caused by Plaintiff's free and voluntary assumption of risks, which were known by the Plaintiff.

**DEFENSE 10**

The conditions alleged by Plaintiff to have caused his injuries were both open and obvious.

**DEFENSE 11**

Plaintiff's claims are barred by the applicable statutes of limitation of this state and/or other states, or alternatively, by the doctrine of laches.

**DEFENSE 12**

Plaintiff's claims, or some of them, are barred by the provisions of Miss. Code Ann. § 15-1-41.

**DEFENSE 13**

If Plaintiff suffered injury or damage as alleged, which is denied, the same resulted solely from acts or omissions of persons or entities for which this Defendant is neither liable nor responsible. Such acts or omissions on the part of others constitute an independent, intervening and sole proximate cause of such injury or damage.

**DEFENSE 14**

Plaintiff's claims against this Defendant are speculative and do not warrant recovery.

**DEFENSE 15**

It was the duty of Plaintiff's employers, and not this Defendant, to furnish Plaintiff with a reasonably safe place within which to work, including all necessary and adequate warnings and safety appliances, and if Plaintiff received any injury or suffered any damage from working with this Defendant's product, which is denied, the failure of Plaintiff's employers in their duty was the sole proximate cause of any such injury or damage, if any. In the alternative, the failure of Plaintiff's employers in their duty, was such an intervening cause as to relieve this Defendant from any liability to Plaintiff.

**DEFENSE 16**

If Plaintiff sustained any injury as alleged, which is denied, the same resulted, upon

information and belief, from Plaintiff's own negligence, including the failure to care for his own health by using tobacco products over an extended period of time. The use of said tobacco products or other contributing negligence is the sole, direct and proximate cause, or a contributing cause, of the alleged injuries or damages, if any, about which Plaintiff complains.

**DEFENSE 17**

To the extent the Plaintiff's Complaint alleges injuries from any product used by the government or its agencies, the use by Plaintiff of silica-containing materials, if any, was in accordance with the requirements of the designs, plans, and specifications of the government or its agencies and in strict compliance therewith and with all required federal regulations and standards. This Defendant cannot be held liable to the Plaintiff for complying with the designs, plans, specifications, and requirements of the government or its agencies under national defense procurement contracts or other government contracts and for supplying materials for such contracts in accordance with their terms, and under, but not limited to, the Government Contractor Defense.

**DEFENSE 18**

Any product manufactured, sold or supplied by this Defendant was not defective or unreasonably dangerous in that it complied, at all relevant times, with all applicable government safety standards.

**DEFENSE 19**

If Plaintiff sustained any injury or damage, which is denied, then such injury or damage was proximately caused or contributed to by exposure to and inhalation of noxious and deleterious fumes and residues from industrial products and by-products prevalent on Plaintiff's job sites and substances other than those manufactured or sold by this Defendant, and by cumulative exposure to all types of environmental and industrial pollutants of air and water.

**DEFENSE 20**

The doctrines of payment, release, and accord and satisfaction, where applicable, bar the recovery sought by Plaintiff against this Defendant.

**DEFENSE 21**

There should be no recovery because, upon information and belief, Plaintiff failed to mitigate his damages, if any, as required by law.

**DEFENSE 22**

There should be no recovery against this Defendant because, upon information and belief, the conduct of Plaintiff or others constituted abuse and misuse of the product so as to substantially change the condition of the product prior to Plaintiff's injuries, if any.

**DEFENSE 23**

There should be no recovery of punitive damages against this Defendant because such a recovery would violate:

a. The Eighth Amendment to the Constitution of the United States;

b. The Fourteenth Amendment to the Constitution of the United States;

c. The Fifth Amendment to the Constitution of the United States;

d. The Tenth Amendment to the Constitution of the United States;

e. Federal common law; and

f. The Constitutions of the State of Mississippi and of Plaintiff's residence.

**DEFENSE 24**

An award of punitive damages against this Defendant in this case is unconstitutional and in violation of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States, as well as Article 3, Section 14 of the Constitution of the

State of Mississippi.

**DEFENSE 25**

An award of punitive damages against this Defendant in this case would violate the Excessive Fines Clause of the Eighth Amendment of the Constitution of the United States.

**DEFENSE 26**

Plaintiff's claims for punitive damages are barred by the "Double Jeopardy" Clause of the Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

**DEFENSE 27**

A damage award based on conspiracy constitutes a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the Constitution of the United States.

**DEFENSE 28**

If Plaintiff has heretofore settled or should hereafter settle for any of the alleged injuries and damages with anyone, including other parties or potential joint tortfeasors, this Defendant is entitled to a credit and offset in the amount of said settlement and/or for the amount of the settling parties' and/or persons' allocated a percentage of fault.

**DEFENSE 29**

Upon information and belief, the Complaint fails to name indispensable parties and, therefore, must be dismissed. Alternatively, this civil action should be stayed pending other appropriate relief by the Court.

**DEFENSE 30**

This Defendant has no liability to Plaintiff because Plaintiff's employers were sophisticated users and/or learned intermediaries with the result that any duty of this Defendant to warn of any

danger incident to use, exposure or installation of the products (the existence of such duty is denied) was discharged by those employers' intervening duties to give Plaintiff all required warnings.

**DEFENSE 31**

There should be no recovery against this Defendant for medical expenses incurred in the care, diagnosis or treatment of injury to Plaintiff, if any, because said Plaintiff's employers are obligated under the Workers' Compensation laws of the state of Plaintiff's residence to pay for medical expenses which were incurred as a result of this occurrence, or because said Plaintiff was entitled to receive benefits from private or public health insurance programs, health benefit plans, union-sponsored or union-provided health benefit plans, or other sources of health benefits which are responsible for the payment of all past, present and/or future medical expenses.

**DEFENSE 32**

There should be no recovery against this Defendant because, to the extent that this Defendant acted or failed to act, this Defendant's conduct was in keeping with the state of the medical and industrial arts as they existed at all pertinent times.

**DEFENSE 33**

There should be no recovery against this Defendant because of any failure to warn or inadequacy of warning because, upon information and belief, at all times pertinent to Plaintiff's claims, said Plaintiff was possessed of or should have been possessed of good and adequate knowledge which negated any need for said warning and/or Plaintiff was required to follow specific written safety procedures as established by Plaintiff's employers which negated the need or requirement for any such warning.

**DEFENSE 34**

There should be no recovery against this Defendant because the exposure of Plaintiff to this

Defendant's products, if any, was de minimus. If it is shown at the time of trial that Plaintiff was exposed to any product of this Defendant, said exposure was so minimal as to be insufficient to establish to a reasonable degree of probability that this Defendant's product substantially factored in or was the proximate cause of the alleged injuries.

**DEFENSE 35**

Upon information and belief, this action is barred by Miss. Code Ann. § 15-1-65 (1972).

**DEFENSE 36**

To the extent that Plaintiff has filed an action in any other Court against some or all of these same Defendants, this action should be dismissed in the interest of judicial economy and so as to prevent double recovery.

**DEFENSE 37**

The products in issue were changed, altered, or modified after they left this Defendant's control and such change, alteration, or modification was the legal cause of Plaintiff's damages, if any.

**DEFENSE 38**

Plaintiff was negligent in the use and operation of the products in issue, if any, and any recovery should be reduced in proportion to the degree of Plaintiff's own negligence.

**DEFENSE 39**

Plaintiff's claims are preempted by the regulations of the Occupational Safety and Health Administration and other applicable federal laws.

**DEFENSE 40**

If Plaintiff used any of this Defendant's products, which is denied, on information and belief, such products were used for a purpose, in a manner or in an activity contrary to express adequate

instructions or warnings appearing on or attached to the products or on their original containers or wrappers. Alternatively, the absence of warnings on any products sold by this Defendant did not make such products defective and unreasonably dangerous nor did it lead to reliance by the Plaintiff or his employers, on the safety of any such products.

**DEFENSE 41**

This Defendant was not negligent, did not furnish a product defective and unreasonably dangerous, and did not make or breach any express or implied warranties.

**DEFENSE 42**

This Defendant denies that Plaintiff was ever exposed to any silica-containing products sold by this Defendant.

**DEFENSE 43**

If it be proved that this Defendant furnished any products to the employers of Plaintiff, to which products Plaintiff was exposed, then any such products were furnished in strict conformity to the specifications furnished through such employers.

**DEFENSE 44**

To the extent that the Plaintiff was exposed to any alleged product which was acquired from or sold by or used on behalf of the United States of America or any state or political subdivision thereof, this Defendant is entitled to any sovereign or governmental immunity available to the United States or any such state or political subdivision.

**DEFENSE 45**

To the extent applicable, this Defendant pleads the provisions of Miss. Code Ann. § 85-5-7 (Supp. 1994).

**DEFENSE 46**

This Defendant pleads the applicable provisions of Miss. Code Ann. § 11-7-15.

**DEFENSE 47**

This Defendant denies that it participated in any conspiracy or conduct designed or intended to deceive or misrepresent the qualities, characteristics, or properties of any product it designed, manufactured, marketed or sold.

**DEFENSE 48**

Plaintiff is barred from bringing this action under the doctrine of res judicata.

**DEFENSE 49**

Some or all of the issues in this lawsuit have already been litigated and, therefore, Plaintiff is collaterally estopped from re-litigating those issues.

**DEFENSE 50**

No duty to warn or notify Plaintiff of any danger from exposure to this Defendant's products has ever devolved upon this Defendant; nevertheless, any delay by this Defendant in notification or warning to Plaintiff of such danger, which is claimed to have been required (and this Defendant denies that there was any such requirement or delay) is of no consequence and gives rise to no claim on the part of Plaintiff against this Defendant. Significantly, before the time any alleged duty to notify or warn could have arisen as to this Defendant, Plaintiff was exposed to silica and/or silica containing products from other sources sufficient to cause his alleged conditions, and notification or warning thereafter is of no value. There is, therefore, no proximately causal relationship between any delay in notification or warning to Plaintiff and his subsequent alleged conditions.

**DEFENSE 51**

Any injuries, illnesses, diseases, disabilities, losses or damages alleged by Plaintiff was

proximately caused or contributed to by an act or acts and omission or omissions on the part of Plaintiff's fellow servants, fellow supervisors and employers, and, accordingly, recovery or relief against this Defendant is barred.

**DEFENSE 52**

If Plaintiff was an employee of this Defendant during his alleged exposure, his claims are barred by the exclusive remedy provisions of the applicable Workers' Compensation Act as to each applicable Defendant.

**DEFENSE 53**

The manufacture, packaging, and sale of all products produced by this Defendant met all state-of-the-art design and manufacturer requirements, as well as all applicable federal and state codes at the time of manufacture.

**DEFENSE 54**

The injuries, if any, for which Plaintiff seeks recovery resulted from Plaintiff's pre-existing illnesses or conditions not common to other persons and not determinable or foreseeable by this Defendant. All injuries and damages alleged by Plaintiff, if any, were proximately contributed to by Plaintiff's pre-existing injuries and conditions.

**DEFENSE 55**

This Defendant reserves the right to amend its answer and affirmative defenses after investigation, discovery and further information is disclosed to this Defendant to enable it to properly answer the Complaint and defend the claim asserted herein against this Defendant. This Defendant further will rely upon any law that is available to it after the completion of discovery and investigation of this cause.

**DEFENSE 56**

This Defendant retains its right to seek contribution and/or indemnification against any and all manufacturers of silica-containing materials who have filed petitions in various bankruptcy courts and consequently are not presently within the jurisdiction of this Court.

**DEFENSE 57**

This Defendant adopts and incorporates any and all other defenses raised by any other Defendant in this litigation to the extent that said defenses are not inconsistent with this Defendant's assertion that it is not liable to Plaintiff for any amount whatsoever.

**DEFENSE 58**

The Complaint should be dismissed based on a mis-joinder of parties and/or claims.

**DEFENSE 59**

Venue is improper.

**DEFENSE 60**

Plaintiff was a sophisticated user of any product manufactured, supplied or sold by Defendant.

**DEFENSE 61**

Defendant pleads the applicable provisions of the Noerr-Pennington Doctrine.

**DEFENSE 62**

The Complaint improperly joins parties in this action. Plaintiff's claims against Defendants are independent and do not arise out of the same transaction, occurrence, or event and individual questions of fact or law predominate. Therefore, the Complaint should be dismissed for misjoinder of parties, or this action should be severed, or the Court should stay this action pending appropriate relief.

**DEFENSE 63**

The Complaint must be dismissed pursuant to Miss. R. Civ. P. 12(b)(6) and/or 12(e), or in the alternative, Plaintiff must replead the Complaint, in order to satisfy the requirements of Miss. R. Civ. P. 8, 9, and 11. As the Mississippi Supreme Court's decision in *Harold's Auto Parts, Inc., et al. v. Flower Mangialardi, et al.*, 889 So. 2d 493 (Miss. 2004) holds, to satisfy Rules 8, 9, and 11, Plaintiff must plead specific facts and legal conclusions that provide each Defendant fair notice of each claim made against it and the grounds thereof. The Complaint fails to meet this standard. As such, it must be dismissed or Plaintiff must be required to replead it, as required by *Mangialardi*.

**DEFENSE 64**

Plaintiff is judicially estopped from bringing this action.

**DEFENSE 65**

Plaintiff's claims are barred by the doctrine of election of remedies.

Now, having fully answered the allegations of Plaintiff's Complaint, Defendant respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice and award Defendant costs, expenses, and any other appropriate relief.

**ANSWER OF PRECISION PACKAGING, INC.**
**TO ALL CROSS-CLAIMS ASSERTED BY OTHER DEFENDANTS**

Defendant, PRECISION, files this answer to all cross-claims asserted by other Defendants, and says as follows:

**DEFENSE 1**

Each and every cross-claim filed herein fails to state a cause of action against this Defendant upon which relief may be granted.

**DEFENSE 2**

This Defendant denies each and every allegation against it contained in each and every cross-claim filed herein.

**DEFENSE 3**

This Defendant hereby adopts and incorporates herein by reference each and every responsive pleading and affirmative defense as set forth in its answer to the Complaint as if fully set forth herein.

**DEFENSE 4**

Those defendants filing cross-claims have no cause of action for contribution and/or indemnification against this Defendant.

WHEREFORE, Defendant Precision Packaging, demands that all claims against it be dismissed with prejudice.

THIS, the 21st day of September, 2007.

Respectfully Submitted,

Christy Crockett

EDWIN S. GAULT, JR., MSB #10187
M. CHRISTINE CROCKETT, MSB #10107

ATTORNEYS FOR PRECISION PACKAGING, INC.
f/k/a QUIKRETE MATERIALS, INC.

FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 South Lamar Street
City Centre Building
Suite 100
Jackson, Mississippi 39201
(601) 960-8600 - Telephone
(601) 960-8613 - Facsimile

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that I have this day mailed, via United States mail, postage prepaid a true and correct copy of the above and foregoing to the individual Plaintiff's Counsel of record and written notice of filing of the foregoing document to counsel for defendants at their usual business addresses and/or facsimile and/or electronic correspondence.

THIS the 21st day of September, 2007.

Christy Crockett
M. Christine Crockett

STATE OF MS

COUNTY OF Jones

SS: 

AFFIDAVIT OF JOHN McGILBERR

BEFORE ME, the undersigned authority, on this day persona y appeared, Affiant, John McGilberry, known to me to be the person whose signature app ars on this document, and after being duly sworn states as follows:

1. My name is John McGilberry.

2. I am over the age of eighteen (18) and of sound mind.

3. I was exposed to silica at several of my jobsites as spe ified in my deposition taken on April 5-6, 2004.

4. I wore American Optical dust masks and respirators wh ile being exposed to silica as specified in my sworn fact sheet of January 16, 200 (01/16/2004) and amended sworn fact sheet dated April 5, 2004 (04/05/2 )04).

FURTHER, AFFIANT SAYETH NOT.

John McGilberry

JOHN McGILBERRY

SUBSCRIBED AND SWORN TO BEFORE on this the 13th ay of August, 2009.

BART GAVIN, Circuit C erk Charlotte Hollifield, D.C.

NOTARY PUBLIC

My Commission Expires:

My Commission Expires 1st Monday, Ja

EXHIBIT "C"

EXHIBIT "G"

**BUFFINGTON PLAINTIFF FACT SHEET**

**Background Information**

Name: [redacted] [redacted]

Address [redacted] City: [redacted] State: [redacted]

D.O.B. [redacted] D.O.D.___________ Cause of Death________________

**If you are completing this questionnaire in a representative capacity (*i.e.*, on behalf of the estate of a deceased person), please complete the following:**

Your Name:________________________________________

Your Address:______________________________________

In what capacity you are representing the individual:____________________

____________________________________________________

If you were appointed by a Court, state the:

Court:______________________ Date of Appointment:__________

**[If you are completing this questionnaire in a representative capacity, please respond to the remaining questions with respect to the person who was allegedly exposed to silica. Those questions using the term "You" or "Plaintiff" refer to the person who was allegedly exposed to silica. If the individual is deceased, please respond as of the time immediately prior to his or her death unless a different time period is specific.]**

**Plaintiff's State and County of Residence when allegedly exposed to silica:**

| Date(s) | State of Residence | County of Residence |
|---|---|---|
| 1976 – 1985 | Mississippi | Jones |
| 1973 – 1976 | Mississippi | Jones |
| 1971 – 1973 | Mississippi | Jones |
| 1985 – 1987 | Mississippi | Jones |
| 1987 – 1990 | Mississippi | Jones |

EXHIBIT "A"

**Plaintiff's Employment History**

1. Employer Name: Nehi Plant
Employer Address: Laurel, MS 39440

Date(s) of Employment 1972

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS | 1972 | Loading Trucks | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

2. Employer Name: Tom Pittman

Date(s) of Employment 1973 – 1974

Employer Address: Ellisville, Mississippi

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Ellisville, Mississippi | 1972-1974 | Sandblaster and cement finisher | Do Not Recall At This Time | Yes | Willson #6 Dustite Respirator & Box, Willson #11 Dustite Respirator and box, American Opticla black rubber dual cartridge respirator, H-30 type non-airfed hood (Pulmosan), U.S. Safety "Multipurpose 7-1" Dual cartridge respirator 300ML (dark gray) with head harness, North 770030L, half mask dual cartridge respirator, North 7175N95 disposable particulate respirator in box, Norton 65306 Nuisance dust mask in bag, Norton 65076 Nuisance dust mask in |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | package, 3M 8500 Nuisance paper dust mask in box of 20, Cesco Black Shoulder Length hood with plastic facepiece, Eastern Safety Comfort Masks Code 348-2, Eastern Safety ALLPRO dust masks in box of 50, Standard Sand & Silica Co.-50 lb bag, Dupont-Florida Zircon Sand-50 lb bag, Texas Mining Co.-Blastsand-50 lb bag, Oglebay Norton Industrial Sands Inc-50 lb bag, Empire SuperBlast Blasting Machine (from Empire SuperBlast catalogue), Empire SuperBlast 650 Blasting Machine (from Empire SuperBlast catalogue), Texblast-Lone Star Industries, Souther Silica "Blasting Sand", Gerson 1501 mask, Unimin Industrial Quartz, Diamond Blast d-b-a Dependable Abrasive |

3. Employer Name: Howard Industries Date(s) of Employment 1975 & 1981 - 1983

Employer Address: Laurel, Mississippi

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, Mississippi | 1975 | Core Lacer/painter | Do Not Recall at this Time | No | Worked around sandblaster but did not use any products |
| b. | | 1981 – | | Do Not Recall at | | |

| | | | | | |
|---|---|---|---|---|---|
| | 1983 | Core Lacer/painter | this Time | | |

4. Employer Name: Sanderson Farms Date(s) of Employment 1983 - 1985
Employer Address: Laurel, MS

| Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|
| a. Laurel, MS. | 1983 – 1985 | Truck Driver | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

**(Please attach additional sheets if necessary)**

5. Employer Name: H.Gordon Myrick Date(s) of Employment 1985 - 1987
Employer Address: Laurel, MS

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1983 – 1985 | Cement Finisher | Do Not Recall At This Time | Yes | American Optical Dual Cartridge Respirator 50119 Medium, Wilson AR 700 Double Cartridge Respirator,U.S. Safety "Multipurpose 7-1" Dual Cartridge Respirator 300ML (dark gray) with head harness, American Optical 500809M Half Mask dual cartridge respirator, Gerson 1501 Nuisance Paper Dust Mask in box of 50, Norton 65306 Nuisance dust amsk in bag, Norton 65076 Nuisance Dust masks in package, Oxwall DM5 Nuisance Paper dust mask in plastic bag of five, 3M 8715 Paper Dust and Mist Respirator in box of 20, 3M 8500 Nuisance Paper dust mask in box of 20, 3M 8651Es Nuisance Paper Dust mask in package, Eastern Safety Comfort Masks code 348-2, Eastern Safety ALLPRO Dust Masks in box of 50, Texas Mining Company-Industrial Sand-50 lb bag, Schmidt Manufacturing Abrasive Pressure Blasters (from |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Schmidt Manufacturing), Pauli & Griffin Blast Machines, Sanstorm Packaged Units (from Sanstorm-Bowen tools catalogue 1975-1976), Clemtex sand, Ottawa Silica Company "Flint Shot", Gerson 1501 mask, Kelco-Two sandblast pots, Clark Sand Bag, Diamond Blat d-b-a Dependable Abrasives, Schmidt Manufacturing Blast Pac, Sullair 150 Engine Compressor |

6. Employer Name: Southern Touch
Employer Address: Laurel, MS
Date(s) of Employment 1987 - 1991

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1987 – 1991 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

7. Employer Name: Pauline Moore
Employer Address: Laurel, MS
Date(s) of Employment 1991 - 1994

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1991 – 1994 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

8. Employer Name: Victor Gibbs
Employer Address: Laurel, MS
Date(s) of Employment 1994 - 1997

| Jobsite/Location (Including | Date(s) | Trade or Occupation | Identity of Contractor or | Masks or Respirators | Identification of All Products Used by |
|---|---|---|---|---|---|

| | City/State) | | | Other Party at Jobsite Plaintiff Contends Responsible | Used (y/n) | Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1994 – 1997 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

9. Employer Name: SRT                       Date(s) of Employment 1997 - 2002
   Employer Address: Laurel, MS

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1997 – 2002 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

Plaintiff's Silica Exposure and Product Usage

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| # 6 Dustite Respirator & Box | Willson | Will Supplement | Respirator |
| # 11 Dustite Respirator and Box | Willson | Will Supplement | Respirator |
| Agritox Model C. Dual Cartridge Respirator & Box w/ R490 filters | Willson | Will Supplement | Respirator |
| Agritox Respirator & Box | Willson | Will Supplement | Respirator |
| 780A and Box | Willson | Will Supplement | Respirator |
| 1200 Series Half Mask | Willson | Will Supplement | Respirator |
| Valuair Plus 6100 V-M Half Mask Respirator | Willson | Will Supplement | Respirator |
| Dual Cartridge Respirator 50119 Medium | American Optical | Will Supplement | Respirator |

**Plaintiff's Silica Exposure and Product Usage**

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| Black Rubber Dual Cartridge Respirator | American Optical | Will Supplement | Respirator |
| Dual cartridge Respirator | Scott ATO | Will Supplement | Respirator |
| Dual Cartridge Respirator (medium) with Chemical Filters and Head Harness | Willson | Will Supplement | Respirator |
| AR 700 Double Cartridge Respirator | Willson | Will Supplement | Respirator |
| H-30 Type Non-Airfed Hood | Pulmosan | Will Supplement | Hood |
| R5050 Dual cartridge Respirator with Box | American Optical | Will Supplement | Respirator |
| Dual Cartridge Respirator with AO Safety Combination Cartridge | American Optical | Will Supplement | Respirator |
| R8210N95 Dust Mask | AO Safety | Will Supplement | Mask |

**(Please attach additional sheets if necessary)**

**Plaintiff's Silica Exposure and Product Usage**

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| Dual Cartridge Paint Spray Respirator in box | DeVilbiss | Will Supplement | Respirator |
| 8001 Dual Cartridge Respirator (tax) with head harness and chemical cartridges | Moldex | Will Supplement | Respirator |
| 100 Disposable Respirator (Model No. 10002S or 10002M | North | Will Supplement | Respirator |
| "Multipurpose 7-1" Dual Cartridge Respirator 300M_L (dark gray) with head harness | US Safety | Will Supplement | Respirator |
| Air Fed Hood | So Go Jo | Will Supplement | Hood |
| 4-1050 Accordian Style Paper Dust Mask | American Optical | Will Supplement | Mask |
| R5050 Half Mask Dual Cartridge Respirator in box | American Optical | Will Supplement | Respirator |
| 5035SM Half Mask, Dual Cartridge Respirator in Plastic Bag | American Optical | Will Supplement | Respirator |

(Please attach additional sheets if necessary)

Plaintiff's Silica Exposure and Product Usage

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| 500809M Half Mask Dual Cartridge Respirator | American Optical | Will Supplement | Respirator |
| 1501 Nuisance Paper Dust Mask in Box of 50 | Gerson | Will Supplement | Mask |
| 770030L, Half Mask Dual Cartridge Respirator | North | Will Supplement | Respirator |
| 7175N95 Disposable Particulate Respirator in Box | North | Will Supplement | Respirator |
| 65306 Nuisance Dust mask in Bag | Norton | Will Supplement | Mask |
| 65076 Nuisance Dust Masks in Package | Norton | Will Supplement | Mask |
| DM5 Nuisance Paper Dust mask in Plastic Bag of Five | Oxwall | Will Supplement | Mask |
| 2100S Half Mask Dual Cartridge Respirator ("Blue") in plastic bag | Survivair | Will Supplement | Respirator |

(Please attach additional sheets if necessary)

Plaintiff's Silica Exposure and Product Usage

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| 8715 paper Dust and Mist respirator in box of 20 | 3M | Will Supplement | Respirator |
| 8500 Nuisance Paper Dust Mask in Box of 20 | 3M | Will Supplement | Mask |
| 8651ES Nuisance Paper Dust mask in Package | 3M | Will Supplement | Mask |
| R5000 Sure-Guard Dual Cartridge Respirator with R30 disc-type filter | American Optical | Will Supplement | Respirator |
| Black Shoulder Length Hood with Plastic Facepiece | Cesco | Will Supplement | Hood |
| Filter-Mask code 335 with facelet | Eastern Safety | Will Supplement | Mask |
| Dust Masks, reorder Number 947 | Bondo | Will Supplement | Mask |
| Comfort Masks Code 348-2 | Eastern Safety | Will Supplement | Mask |

(Please attach additional sheets if necessary)

**Plaintiff's Silica Exposure and Product Usage**

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| KA Kleen Airmask w/ Sanitary Face Cloth Code 505 | Eastern Safety | Will Supplement | Mask |
| Nuisance Dust masks Code 928-X in Box of 50 | Eastern Safety | Will Supplement | Mask |
| ALLPRO Dust Masks in Box of 50 | Eastern Safety | Will Supplement | Mask |
| Old Pulmosan Hood (dark) | Pulmosan | Will Supplement | Hood |
| Dual cartridge 7700 Series Respirator (blue) | Survivair | Will Supplement | Respirator |
| Healthguard No. 99 Dual Cartridge Respirator | Cesco | Will Supplement | Respirator |
| BH-5 Red and Blue non-airfed hood | Empire | Will Supplement | Hood |
| Sand – 50lb bag | Standard Sand & Silica Company | Will Supplement | Sand |

(Please attach additional sheets if necessary)

**Plaintiff's Silica Exposure and Product Usage**

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| Black Beauty Slag Products – 100 lb bag | Reed Minerals | Will Supplement | Sand |
| Star Blast Ultra Blasting Abrasive – 50lb bag | Dupont | Will Supplement | Sand |
| Florida Zircon Sand – 50lb bag | Dupont | Will Supplement | Sand |
| Filtrasand – 100lb bag | Texas Mining Company | Will Supplement | Sand |
| Blastsand – 50lb bag | Texas Mining Company | Will Supplement | Sand |
| Industrial Sand - 50lb bag | Texas Mining Company | Will Supplement | Sand |
| Industrial Sands – 50lb bag | Oglebay Norton | Will Supplement | Sand |
| Abrasive Pressure Blasters | Schmidt Manufacturing | Will Supplement | Pots |

(Please attach additional sheets if necessary)

Plaintiff's Silica Exposure and Product Usage

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| SuperBlast Blasting Machines | Empire | Will Supplement | Blasting Machine |
| SuperBlast 650 Blasting Machine | Empire | Will Supplement | Blasting Machine |
| Packaged Units (1970 – 1971 Sanstorm Bulletin No. 1213) | Sanstorm | Will Supplement | Blasting Kit |
| Blast Machines | Pauli & Griffin | Will Supplement | Blast Machines |
| Hoods | Pauli & Griffin | Will Supplement | Hoods |
| S-70 Sandblast Helmet; and AC-1 Vortex Air Conditioning Helmet Accessory | Sanstrom | Will Supplement | Helmet |
| Packaged Units (from Sanstorm-Bowen Tools Catalogue 1975 or 1976 | Sanstorm | Will Supplement | Blasting Kit |
| Sand | Clemtex | Will Supplement | Sand |

(Please attach additional sheets if necessary)

**Plaintiff's Silica Exposure and Product Usage**

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| Abrasive Flint | Humble | Will Supplement | Sand |
| Flint Shot | Ottawa Silica Company | Will Supplement | Sand |
| Lone Star Industries | Texblast | Will Supplement | Sand |
| Sand | Specialty Sand Company | Will Supplement | Sand |
| Blasting Sand | Southern Silica | Will Supplement | Sand |
| Single Cartridge | American Optical | Will Supplement | Respirator |
| E-450 Cartridge | Eastern Safety | Will Supplement | Respirator |
| 1504 | Gerson | Will Supplement | Mask |

**(Please attach additional sheets if necessary)**

**Plaintiff's Silica Exposure and Product Usage**

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| Mask | Martindale | Will Supplement | Mask |
| Three Canned Sand Units | Bob Schmidt | Will Supplement | Pressure Blaster |
| Two Sandblast Pots | Kelco | Will Supplement | Pots |
| Airblast Tank | Pangborn | Will Supplement | Blast Tank |
| Sand Bag | Clark Sand | Will Supplement | Sand |
| Industrial Quartz | Unimin | Will Supplement | Sand |
| Sand | Diamond Blast d/b/a Dependable Abrasives | Will Supplement | Sand |
| Black magnum | Fairmount Minerals Coal Slag Abrasives | Will Supplement | Sand |

**(Please attach additional sheets if necessary)**

Plaintiff's Silica Exposure and Product Usage

| Specific Product Name | Manufacturer | Supplier | Product Description |
|---|---|---|---|
| Blast Machines | Clemco | Will Supplement | Blast Machines |
| 3 Dual Cartridge Respirators | American Optical and Willson | Will Supplement | Respirators |
| "Mighty Mite" Model SCW 1028 | Clemco | Will Supplement | Blast Machine |
| Blast Pac | Schmidt Manufacturing | Will Supplement | Blasting System |
| 1500 Engine Compressor | Sullair | Will Supplement | Compressor |
| | | | |
| | | | |
| | | | |

(Please attach additional sheets if necessary)

**Medical History**

1. Any respiratory illness, disease or condition and each silica related illness, disease or condition claimed by plaintiff: Silicosis, asbestosis, sarcoidois and coal workers pneumoconiosis

2. List the name and address of each physician who has seen plaintiff for each condition:

| | Name | Address | Date(s) | Condition |
|---|---|---|---|---|
| a. | Dr. Ray Harron | P. O. Box 400<br>Bridgeport, WV, 26330 | 06/26/02 | Silicosis, asbestosis and Coal workers pneumoconiosis |
| b. | Dr. Louis Neese | 415 South 28th Ave. | 12/07/00 – 03/11/02 | sarcoidosis |
| c. | Dr. Parkman | Hattiesburg, MS | 1983 | sarcoidosis |
| d. | Dr. Reno | Hattiesburg, MS | 1996 | sarcoidosis |

**(Please attach additional sheets if necessary)**

3. List the name and address of each physician who diagnosed plaintiff with each condition:

| | Name | Address | Date(s) | Diagnosis |
|---|---|---|---|---|
| a. | Dr. Ray Harron | P. O. Box 400<br>Bridgport, WV 26330 | 06/26/02 | Silicosis, asbestosis and coal workers pneumoconiosis ILO 3/3 |

**(Please attach additional sheets if necessary)**

**Smoking History**

| Date(s) | Type/brand of tobacco product | Quantity (*i.e.* packs/day/ week) | Duration of use at that quantity |
|---|---|---|---|
| 1930-1939 | | | |
| 1940-1949 | | | |
| 1950-1959 | | | |
| 1960-1969 | | | |
| 1970-1979 | | | |
| 1980-1989 | | | |
| 1990-1999 | | | |
| 2000-Present | | | |

List all other lawsuits in which you have been or are a party. Identify the law suit by style, civil action number, county in which it was filed/transferred and the name of your attorney.
*George Buffington, et al v. Pulmosan Safety Equipment, et al.* Case filed in Jones County Mississippi, Circuit Court Cause No. : 2002-194-cv6

**DECLARATION**

I declare that all the information provided in this Fact Sheet is true and correct to the best of my knowledge. If I recall or discovery additional information, I will promptly provide the information to supplement or correct these responses.

John McGilberry

John McGilberry
Printed

1-16-04
Date

Plaintiff or Plaintiff's Representative Signature

John Foxworth
Printed Name

Sworn to and subscribed before me, this 16th day of January, 2004

Penelope Lane Dedeaux
NOTARY PUBLIC

My Commission Expires:
8-5-04

PENELOPE LANE DEDEAUX NOTARY PUBLIC HARRISON COUNTY, MS

## BUFFINGTON AMENDED PLAINTIFF FACT SHEET

Background Information

Name: John McGilberry

Address: [redacted] City: [redacted] State: [redacted]

D.O.B. [redacted] D.O.D.__________ Cause of Death________________

If you are completing this questionnaire in a representative capacity (*i.e.*, on behalf of the estate of a deceased person), please complete the following:

Your Name:____________________________________

Your Address:__________________________________

In what capacity you are representing the individual:________________

________________________________________________

If you were appointed by a Court, state the:

Court:____________________ Date of Appointment:__________

[If you are completing this questionnaire in a representative capacity, please respond to the remaining questions with respect to the person who was allegedly exposed to silica. Those questions using the term "You" or "Plaintiff" refer to the person who was allegedly exposed to silica. If the individual is deceased, please respond as of the time immediately prior to his or her death unless a different time period is specific.]

Plaintiff's State and County of Residence when allegedly exposed to silica:

| Date(s) | State of Residence | County of Residence |
|---|---|---|
| 1976 – 1985 | Mississippi | Jones |
| 1973 – 1976 | Mississippi | Jones |
| 1971 – 1973 | Mississippi | Jones |
| 1979 - 1980 | North Carolina | Fayetville, N.C. |
| 1985 – 1987 | Mississippi | Jones |
| 1987 – 1990 | Mississippi | Jones |

EXHIBIT
tabbies
"B"



Plaintiff's Employment History

1. Employer Name: Nehi Plant
Employer Address: Ellisville, MS 39440

Date(s) of Employment 1972

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS | 1972 | Loading Trucks | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

2. Employer Name: Tom Pittman

Date(s) of Employment 1973 – 1974

Employer Address: Ellisville, Mississippi

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Ellisville, Mississippi | 1972-1974 | Sandblaster helper and cement finisher | Do Not Recall At This Time | Yes | Pulmosan H-30 non-airfed hood, 3M 8500 Nuisance paper dust mask in box of 20, Cesco Black Shoulder Length hood with plastic facepiece, Eastern Safety Comfort Masks Code 348-2, Eastern Safety ALLPRO dust masks in box of 50, Standard Sand & Silica Co.- 50 lb bag, Empire SuperBlast Blasting Machine (from |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Empire SuperBlast catalogue), Empire SuperBlast 650 Blasting Machine (from Empire SuperBlast catalogue), Texblast-Lone Star Industries, Souther Silica "Blasting Sand", Unimin Industrial Quartz, Pine Belt Ready Mix sand, American Sand and Gravel sand, 3 M (Dust Mask), Quikrete cement |

3. Employer Name: Howard Industries Date(s) of Employment 1975 & 1981 - 1983

Employer Address: Laurel, Mississippi

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, Mississippi | 1975 | Core Lacer | Not claiming exposure at this site | No | Not claiming exposure at this site |
| b. | | 1981 – 1983 | Core Lacer | Not claiming exposure at this site | | |

4. Employer Name: Daniel Construction Date(s) of Employment 1979 - 1980
Employer Address: Apex, North Carolina

| Jobsite/Location | Date(s) | Trade or | Identity of | Masks or | Identification of |
|---|---|---|---|---|---|

| (Including City/State) | | Occupation | Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Respirators Used (y/n) | All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|
| a. Apex, N.C. | 1979 – 1980 | Laborer and cement finisher | Unknown | Yes | 3M 8500 dust mask |

5. Employer Name: Sanderson Farms
Employer Address: Laurel, MS

Date(s) of Employment 1983 - 1985

| Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|
| a. Laurel, MS. | 1983 – 1985 | Truck Driver | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

6. Employer Name: H.Gordon Myrick
Employer Address: Laurel, MS

Date(s) of Employment 1985 - 1987

| Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|
| a. Laurel, MS. | 1983 – 1985 | Cement Finisher and Sandblaster Helper | Plaintiff does not recall at this time | Yes | Gerson 1501 Nuisance Paper Dust Mask in box of 50, Norton 65306 Nuisance dust amsk in bag, Norton 65076 Nuisance Dust masks in package, Oxwall |

| | | | | | DM5 Nuisance Paper dust mask in plastic bag of five, 3M 8715 Paper Dust and Mist Respirator in box of 20, 3M 8500 Nuisance Paper dust mask in box of 20, 3M 8651Es Nuisance Paper Dust mask in package, Eastern Safety Comfort Masks code 348-2, Eastern Safety ALLPRO Dust Masks in box of 50, Sanstorm sandblasting pot and equipment, Ottawa Silica Company "Flint Shot", Gerson 1501 mask, Clark Sand Bag, Sullair 150 Engine Compressor, Pine Belt Ready Mix sand and cement, American Sand and Gravel sand, gravel and cement, Walker Jones Equipment rental, Phillips Building Supply sand and cement, Quikrete cement |
|---|---|---|---|---|---|

7. Employer Name: Southern Touch Date(s) of Employment 1987 - 1991
Employer Address: ~~Laurel, MS~~ Ellisville

| Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|

| | | | | Responsible | | |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1987 – 1991 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

8. Employer Name: Pauline Moore Date(s) of Employment 1991 - 1994
Employer Address: Seminary, MS

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Seminary, MS. | 1991 – 1994 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

9. Employer Name: Victor Gibbs Date(s) of Employment 1994 - 1997
Employer Address: Bassville, MS

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Bassville, MS. | 1994 – 1997 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

10. Employer Name: SRT Date(s) of Employment 1997 - 2002
Employer Address: Laurel, MS

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1997 – 2002 | Sanderson Farms (truck driver) | Not claiming exposure at this site | Not claiming exposure at | Not claiming exposure at this site |

this site

11. Employer Name: Bush Construction
Employer Address: Laurel, MS
Date(s) of Employment 1992

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Laurel, MS. | 1992 | Truck driver | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

12. Employer Name: City of Ellisville
Employer Address: Ellisville, MS
Date(s) of Employment 1975 - 1976

| | Jobsite/Location (Including City/State) | Date(s) | Trade or Occupation | Identity of Contractor or Other Party at Jobsite Plaintiff Contends Responsible | Masks or Respirators Used (y/n) | Identification of All Products Used by Manufacturer, Model #, or Other Information |
|---|---|---|---|---|---|---|
| a. | Ellisville, MS. | 1975 - 1976 | Truck driver hauling household garbage | Not claiming exposure at this site | Not claiming exposure at this site | Not claiming exposure at this site |

| Specific Product Name | Manufacturer | Supplier | Product D |
|---|---|---|---|
| H-30 Type Non-Airfed Hood | Pulmosan | Will Supplement | Hood |
| R8210N95 Dust Mask | AO Safety | Will Supplement | Mask |
| 4-1050 Accordian Style Paper Dust Mask | American Optical | Will Supplement | Mask |

| | | | |
|---|---|---|---|
| 1501 Nuisance Paper Dust Mask in Box of 50 | Gerson | Will Supplement | Mask |
| 65306 Nuisance Dust mask in Bag | Norton | Will Supplement | Mask |
| 65076 Nuisance Dust Masks in Package | Norton | Will Supplement | Mask |
| DM5 Nuisance Paper Dust mask in Plastic Bag of Five | Oxwall | Will Supplement | Mask |
| 8500 Nuisance Paper Dust Mask, 8651 Nuisance Paper Dust mask, and other Paper Dust Masks | 3M | Phillips Building Supply and Walker Jones Equipment Rental | Mask |
| Black Shoulder Length Hood with Plastic Facepiece | Cesco | Will Supplement | Hood |
| Filter-Mask code 335 with facelet | Eastern Safety | Will Supplement | Mask |
| Dust Masks, reorder Number 947 | Bondo | Will Supplement | Mask |
| Comfort Masks Code 348-2 | Eastern Safety | Will Supplement | Mask |

| Specific Product Name | Manufacturer | Supplier | Product De |
|---|---|---|---|
| KA Kleen Airmask w/ Sanitary Face Cloth Code 505 | Eastern Safety | Will Supplement | Mask |
| Nuisance Dust masks Code 928-X in Box of 50 | Eastern Safety | Will Supplement | Mask |
| ALLPRO Dust Masks in Box of 50 | Eastern Safety | Will Supplement | Mask |

| | | | |
|---|---|---|---|
| Old Pulmosan Hood (dark) | Pulmosan | Will Supplement | Hood |
| BH-5 Red and Blue non-airfed hood | Empire | Will Supplement | Hood |
| Sand – 50lb bag | Standard Sand & Silica Company | Will Supplement | Sand |
| Star Blast Ultra Blasting Abrasive – 50lb bag | Dupont | Will Supplement | Sand |
| Florida Zircon Sand – 50lb bag | Dupont | Will Supplement | Sand |
| Filtrasand – 100lb bag | Texas Mining Company | Will Supplement | Sand |
| Blastsand – 50lb bag | Texas Mining Company | Will Supplement | Sand |
| Industrial Sand - 50lb bag | Texas Mining Company | Will Supplement | Sand |
| Industrial Sands – 50lb bag | Oglebay Norton | Will Supplement | Sand |
| Abrasive Pressure Blasters | Schmidt Manufacturing | Will Supplement | Pots |

| Specific Product Name | Manufacturer | Supplier | Product De |
|---|---|---|---|
| SuperBlast Blasting Machines | Empire | Will Supplement | Blasting Machin |
| SuperBlast 650 Blasting Machine | Empire | Will Supplement | Blasting Machin |

| Packaged Units (1970 – 1971 Sanstorm Bulletin No. 1213) | Sanstorm | Will Supplement | Blasting Kit |
|---|---|---|---|
| Blast Machines | Pauli & Griffin | Will Supplement | Blast Machines |
| Sanstorm sandblasting pot and equipment | Air Liquide / Sanstorm | Walker Jones Equipment Rental | Sandblasting pot equipment |
| Sand and cement | Pine Belt Ready Mix | Pine Belt Ready Mix | Sand and cemen |
| Sandblasting sand and cement | Will supplement | Phillips Building Supply | Sandblasting sar |

| Specific Product Name | Manufacturer | Supplier | Product I |
|---|---|---|---|
| Abresive Flint | Humble | Will Supplement | Sand |
| Flint Shot | Ottawa Silica Company | Will Supplement | Sand |
| Lone Star Industries | Texblast | Will Supplement | Sand |
| Sand | Specialty Sand Company | Will Supplement | Sand |
| Blasting Sand | Southern Silica | Will Supplement | Sand |
| 1504 | Gerson | Will Supplement | Mask |

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

GEORGE BUFFINGTON, et al.,
Plaintiffs,

VERSUS CIVIL ACTION NO. 2002-194-CV6

PULMOSAN SAFETY EQUIPMENT, et al.,
Defendants.

VIDEOTAPED DEPOSITION
OF JOHN E. MCGILBERRY
VOLUME I OF II

Taken at the Ramada Inn Conference Center, 1105 Sawmill Road, Laurel, Mississippi, on Monday, April 5, 2004, beginning at 10:41 a.m.

REPORTED BY:

GERI BETH LADNER, CSR #1219
State-Wide Reporters
4400 Old Canton Road, Suite 201
Post Office Box 14113 (39236)
Jackson, Mississippi 39211
Telephone: (601) 366-9676
Fax: (601) 366-9756

Coast Address:

764 Water Street
Post Office Box 389 (39533)
Biloxi, Mississippi 39530
Telephone: (228) 432-0770
Fax: (228) 432-0690

EXHIBIT
"H"

APPEARANCES:

JOHN A. FOXWORTH, JR., ESQUIRE
Foxworth & Casano, P.A.
12311 Ashley Drive, Suite C
Gulfport, Mississippi 39503
Telephone: (228) 328-0202
Fax: (228) 328-0201
ATTORNEY FOR PLAINTIFFS

JENNIFER J. SKIPPER, ESQUIRE
Forman, Perry, Watkins, Krutz & Tardy
Suite 1200, One Jackson Place
188 E. Capitol
Jackson, Mississippi 39201
Telephone: (601) 960-8600
Fax: (601) 960-8613
ATTORNEY FOR CLEMCO INDUSTRIES, INC.; CLARK SAND COMPANY, INC.; CLARK SALES & RENTALS, INC.; CUSTOM AGGREGATE & GRINDING; DEVILBISS AIR POWER COMPANY; EASTERN SAFETY EQUIPMENT; HANSON AGGREGATES CENTRAL, INC.; HUEY STOCKSTILL, INC; HUMBLE SAND & GRAVEL; INGERSOLL-RAND COMPANY; ILLINOIS TOOL WORKS, INC.; KELCO SALES & ENGINEERING COMPANY, a Division of POLLEY, INC.; LAUREL MACHINE & FOUNDRY COMPANY; LOCKHEED MARTIN CORPORATION; MOLDEX-METRIC, INC.; OTTAWA SILICA COMPANY; PANGBORN CORPORATION; P.K. LINDSAY COMPANY; PRECISION PACKAGING; SOUTHERN SILICA; TRUMAN'S, INC.; and U.S. SILICA COMPANY as successor by merger to Ottawa Silica Company

CHARLES W. FERGUSON, ESQUIRE
Baker, Donelson, Bearman & Caldwell
4268 I-55 North Meadowbrook Office Park
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Fax: (601) 351-2424
ATTORNEY FOR VULCAN MATERIALS COMPANY

APPEARANCES: (Continued)

ASHLEY PLATT, ESQUIRE
Brown, Buchanan & Sessoms, P.A.
3112 Canty Street
Pascagoula, Mississippi 39567
Telephone: (228) 762-0035
Fax: (228) 762-0299
ATTORNEY FOR AIR LIQUIDE; SANSTORM; SURVIVAIR; BIG 3; and RENTAL SERVICE CORPORATION

ABEL MANJI, ESQUIRE
Steve A. Bryant & Associates
3618 Mt. Vernon, Suite A
Houston, Texas 77006
Telephone: (713) 526-7474
Fax: (713) 526-7720
ATTORNEY FOR E.D. BULLARD COMPANY

WILL MANUEL, ESQUIRE
Bradley, Arant, Rose & White, LLP
Suite 450, One Jackson Place
188 East Capitol Street
Jackson, Mississippi 39215
Telephone: (601) 948-8000
Fax: (601) 948-3000
ATTORNEY FOR MINNESOTA MINING and MANUFACTURING COMPANY (3M)

WRIGHT HILL, ESQUIRE
Page, Kruger & Holland, PA
10 Canebrake Boulevard, Suite 200
Flowood, Mississippi 39232
Telephone: (601) 420-0333
Fax: (601) 420-0033
ATTORNEY FOR SPECIALTY SAND COMPANY and DFM EQUIPMENT

KATHY B. VAN ZUTPHEN, ESQUIRE
Deutsch, Kerrigan & Stiles, L.L.P.
2510 14th Street, Suite 1001
Gulfport, Mississippi 39501
Telephone: (228) 864-0161
Fax: (228) 863-5278
ATTORNEY FOR MARTIN MARIETTA MATERIALS, INC.

Appearances: (Continued)

RANDI P. MUELLER, ESQUIRE
Page, Mannino, Peresich & McDermott
759 Vieux Marche' Mall
Biloxi, Mississippi 39530
Telephone: (228) 374-2100
Fax: (228) 432-5539
ATTORNEY FOR GREEN BROTHERS GRAVEL COMPANY

DAN ALEXANDER, ESQUIRE
Allen, Vaughn, Cobb & Hood, P.A.
One Hancock Plaza, 12th Floor
Gulfport, Mississippi 39501
Telephone: (228) 864-4011
Fax: (228) 864-4852
ATTORNEY FOR LOUIS M. GERSON COMPANY, INC.

SARAH A. CUNNINGHAM, ESQUIRE
Wells, Moore, Simmons & Hubbard
4450 Old Canton Road, Suite 200
Jackson, Mississippi 39211
Telephone: (601) 354-5400
Fax: (601) 355-5850
ATTORNEY FOR MINE SAFETY APPLIANCES COMPANY (MSA) and SCHRAMM

CHRIS WELLS, ESQUIRE
Sessums, Dallas & Morrison
2829 Lakeland Drive, Suite 1650
Jackson, Mississippi 39212
Telephone: (601) 933-2040
Fax: (601) 933-2050
ATTORNEY FOR VALLEN SAFETY SUPPLY, INC. and VALLEN CORPORATION

MARK SMITH, ESQUIRE
Holcomb Dunbar
1217 Jackson Avenue
Oxford, Mississippi 38655
Telephone: (662) 234-8775
Fax: (662) 238-7532
ATTORNEY FOR BOB SCHMIDT/ SCHMIDT MANUFACTURING

APPEARANCES: (Continued)

BETH WINDHAM, ESQUIRE
Aultman, Tyner & Ruffin, Ltd.
315 Hemphill Street
Hattiesburg, Mississippi 39401
Telephone: (601) 583-2671
Fax: (601) 583-2677
ATTORNEY FOR PHILLIPS BUILDING SUPPLY

JOHN M. KINARD, ESQUIRE
KEVIN MELCHI, ESQUIRE
Dogan, Wilkinson, Kinard, Smith & Edwards
734 Delmas Avenue
Pascagoula, Mississippi 39567
Telephone: (228) 762-2272
Fax: (228) 762-3223
ATTORNEYS FOR SCOTT AVIATION, INC.; SCOTT TECHNOLOGIES; WHEELER PROTECTIVE APPAREL; and AMERICAN SAND & GRAVEL

CORRIE SCHULER, ESQUIRE
Steen, Dalehite & Pace
401 East Capitol Street, Suite 415
Jackson, Mississippi 39201
Telephone: (601) 969-7054
Fax: (601) 353-3782
ATTORNEY FOR RENT ALL OF LAUREL, INC.

L. IVAN BURGHARD, ESQUIRE
Allen, Allen & Breeland
214 Justice Street
Brookhaven, Mississippi 39602
Telephone: (601) 833-4361
Fax: (601) 833-6647
ATTORNEY FOR D&B SAND & GRAVEL COMPANY, INC.

GRETA COCHRAN CROWLEY, ESQUIRE
Daniel, Coker, Horton & Bell, P.A.
4400 Old Canton Road
Suite 400
Jackson, Mississippi 39211
Telephone: (601) 969-7607
Fax: (601) 969-1116
ATTORNEY FOR BLAIN SAND & GRAVEL

APPEARANCES: (Continued)

CHERI D. GREEN, ESQUIRE
Brunini, Grantham, Grower & Hewes
1400 Trustmark Building
248 E. Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 948-3101
Fax: (601) 960-6902
ATTORNEY FOR SAINT-GOBAIN ABRASIVES, INC. f/k/a NORTON COMPANY; NORTH SAFETY PRODUCTS, INC. f/k/a SIEBE NORTH, INC.; and TEXTRON, INC.

KIMBERLY P. WALLACE, ESQUIRE
Barfield & Associates
233 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 968-9420
Fax: (601) 968-9425
ATTORNEY FOR LONE STAR INDUSTRIES, INC.

KRISI ALLEN LEE, ESQUIRE
Watkins & Eager, PLLC
400 East Capitol Street, Suite 300
Jackson, Mississippi 39201
Telephone: (601) 948-6470
Fax: (601) 354-3623
ATTORNEY FOR SHERWIN-WILLIAMS and PINE BELT READY MIX

ROBERT X. LOUYS, JR., ESQUIRE
Hopkins, Barvie' & Hopkins, PLLC
2701 24th Avenue
Gulfport, Mississippi 39501
Telephone: (228) 864-2200
Fax: (228) 868-9358
ATTORNEY FOR BACOU-DALLOZ SAFETY, INC.

T-A-B-L-E O-F C-O-N-T-E-N-T-S

Examination by: Page
Mr. Manuel 13

Exhibits:
Exhibit 1, Buffington Plaintiff Fact Sheet Concerning John McGilberry 13
Exhibit 2, Buffington Plaintiff Fact Sheet Concerning John McGilberry 13
Exhibit 3, Buffington Amended Plaintiff Fact Sheet Concerning John McGilberry 13
Exhibit 4, Diagram 106
Exhibit 5, Declaration Page Concerning John McGilberry 172

Stipulation 8

Certificate of Reporter 179

Witness Signature Sheet 180

STIPULATION

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys of record, that this deposition may be taken at the time and place hereinbefore set forth, by Geri Beth Ladner, Court Reporter and Notary Public, pursuant to the Mississippi Rules of Civil Procedure, as amended;

That the formality of reading, signing, is specifically NOT WAIVED;

That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until such time as this deposition, or any part thereof, may be used or is sought to be used in evidence.

---

MR. MANUEL:

Before we begin this deposition, my name is Will Manuel. I represent 3M. I'd like to just state a couple of things for the record.

As you know, in this case, the Buffington case, plaintiffs' counsel is required to supply the defendants with completed fact sheets that were discussed and established by Judge Starrett.

It's the intent of these fact sheets, from my understanding, to allow the defendants to properly prepare for the depositions as they're taken, even to the point of certain defendants relying on the fact sheets as to whether they are to be included as defendants in this specific litigation of this plaintiff or not.

In this case, we were provided with an initial fact sheet that had a number of work sites and products named. Then, we were provided with a supplemental fact sheet. Both of those, to be fair, were provided in advance of the depositions, but are different in certain aspects.

Then, today, at the -- right before

the deposition, we were provided by Mr. Foxworth with yet a third fact sheet that I am attaching as Exhibit 3, with the first two fact sheets being 1 and 2. And this is entitled the Buffington Amended Plaintiff Fact Sheet and, yet again, changes the information that is included.

As Mr. Foxworth has pointed out with regard to my client, 3M, they are still listed as a defendant. But I think the intent of the fact sheets, if this is going to be a continuing process, that we are going to have to show up at the depositions to see whether you're named as a defendant or not, that completely does away with what we hoped to achieve by having the plaintiffs fill out the fact sheets.

I will point out that the fact sheet we received today was the first time that we had a new work site listed, which is Daniel Construction in Apex, North Carolina from 1979 to 1980. And, interestedly enough, that the only products listed to be used in that construction is 3M, at that new work site. But, yet, we did not have this work site at all listed in either of the two fact sheets before it.

I think it was clear that Judge Starrett said that we are to rely on these, and, if there were any changes to the defendants or work sites or anything with regard to the facts requested in those fact sheets, it better be a big surprise to Mr. Foxworth. Obviously, these aren't surprises because he's had the time to formulate these new amended fact sheets, and yet, we're only provided with the newest one on the date and the -- within minutes before the beginning of the deposition.

3M would like to reserve the right to continue this deposition. To the effect that it needs anything that shows up in the new amended fact sheet, we'd like to be able to continue the deposition, since we did not have time to -- to adequately prepare for it. And we'd like to reserve the right to file any motions to seek other relief as a result of what 3M believes is a violation of the Court's order.

MS. WINDHAM:

Beth Windham of Aultman, Tyner joins in the objection.

MR. FOXWORTH:

Noted.

MS. GREEN:

John, am I correct that the amended fact sheet presented today is the only one we need to review, that --

MR. FOXWORTH:

Correct.

MS. GREEN:

-- Number 1 and Number 2 have been taken off the table?

MR. FOXWORTH:

Correct.

MR. MANUEL:

And the amended fact sheet, as Ms. Green points out, is going to be Exhibit 3 to the deposition.

Despite our objection, and in the interest of moving forward and in the interest of cooperation in the discovery process, 3M will -- we will continue to go forward with the deposition today.

MR. FOXWORTH:

In an effort to maintain the billing process.

MR. MANUEL:

You can go ahead and get on the --

did you make sure to get that last one? No, just kidding.

(Exhibits 1, 2 and 3 were marked.)

VIDEO TECHNICIAN:

This is the videotape deposition of John McGilberry taken by counsel for the defendants in the matter of George Buffington, et al. versus Pulmosan Safety Equipment, et al., in the Circuit Court of Jones County, Mississippi, Second Judicial District, Civil Action Number 2002-194-CV6.

Today's date is April 5th, 2004. The time is 10:41 a.m.

The court reporter may now swear in the witness.

JOHN E. MCGILBERRY

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MANUEL:

Q. Mr. McGilberry, my name is Will Manuel. We met just briefly outside the room today before your deposition. I represent 3M Corporation, and I'm going to be taking your

deposition today.
Have you ever given a deposition before?
A. Yes.
Q. Okay. What -- what kind of case were you involved in in which you gave a deposition?
A. I had an accident driving a truck.
Q. Okay. Were you named as a defendant in that, or were you suing somebody else?
A. No. I was the defendant.
Q. The defendant.
Who were you working for at the time that you gave that deposition?
A. SRT.
Q. Did -- was -- were you named individually as a defendant in that case? Did they name you, Mr. McGilberry, as a defendant?
A. I think me and the company I was driving for.
Q. Where -- do you remember who it was that took your deposition?
A. No.
Q. Where was your deposition taken?
A. New Orleans.
Q. Did you suffer any injuries in that

accident?
A. No.
Q. Have you given any depositions other than that deposition involving the accident at SRT?
A. No.
Q. Have you been in any -- have you ever testified at trial?
A. No.
Q. All right. Well, I'm sure -- how long ago was it that you -- you had the deposition for SRT?
A. Oh, I'm trying to figure up, because I've been off -- I've been off work for about three, four years. And it happened right as I first started working for them. So I --
Q. When you first started working for SRT?
A. Yeah. I worked for them five years.
Q. Okay. Off of your -- what's Exhibit 3, the amended plaintiff fact sheet, I think it shows that you worked for SRT from 1997 to 2002. Does that sound about right?
A. Yes, sir.
Q. So it would have been in the late

1990s that you gave that deposition?
A. Yes, sir.
Q. Well, I'm just going to go over a couple of rules -- not rules, just things to tell you.
I'm going to be asking you some questions today. And I'm going to try and make it move along as quickly as possible. But I want you to feel comfortable. If you need a break at all during the deposition, if you need to step out or go to the rest room, get something to drink or just rest, I hope you'll just tell me that you need to take a break, and I'll be glad to do that for you. Is that okay?
A. Yes, sir.
Q. And I'm going to be asking questions, and I hope that they're going to be clear questions. But, as your attorney will tell you, at times I tend to get all, my words all mangled up. And if I do, I'm not attempting to -- to trick you at all.
A. Uh-huh.
Q. I'm just getting confused.
So if I ask you a question that's all mangled up and you don't understand it, will you

ask me to rephrase it, and I'll try my best to make it a lot simpler; is that fair?
A. Yes, sir.
Q. Okay. So, and if I ask you a question and you answer it, then I'm going to assume that you understood it; is that correct -- is that fair?
A. Yes, sir.
Q. And this nice lady here is taking down everything we say. And you're doing a great job of saying yes and no and not nodding your head, and I'll try and do the same. But, we also need to watch so we don't interrupt each other, because she gets real mad and will kick either one of us if we start interrupting each other. And we don't want any of that, do we? So we'll try not to interrupt each other. Okay?
A. Yes, sir.
Q. Can you give me your full name, please.
A. John E. McGilberry.
Q. What does the E stand for?
A. El- -- Elwin -- Elman, E-L-M-A-N.
Q. E-L-M-A-N?
A. Yes, sir.

Q. What's your address, Mr. McGilberry?
A. 809 McManus, that's M-C-M-A-N-U-S, Street, Ellisville, Mississippi.
Q. How long have you lived there on McManus Street?
A. About forty-three years.
Q. Forty-three?
A. Yeah.
Q. Who lives there at McManus Street with you?
A. Me and my wife.
Q. What's your wife's name?
A. Paula.
Q. How long have y'all been married?
A. About 28 years.
Q. Were you married at all before Paula?
A. No.
Q. She's your only wife?
A. Yes, sir.
Q. Do you have any children?
A. Five girls.
Q. Five girls?
A. Yeah.
Q. So the wedding bill is going to be pretty extensive for you?

A. No.
Q. Okay. Do any of your girls live there with you?
A. I've got one daughter stay with me now.
Q. And what's her name?
A. Courtney McGilberry.
Q. And how old is she?
A. Twenty-two.
Q. Is she a dependent of yours? Do you support her financially? I mean, I guess let's say more than just a normal father would? I mean, do you -- do you have -- do you list her as a dependent on your taxes?
A. No.
Q. Okay. Does she work?
A. Yes, sir.
Q. But she doesn't have to pay rent?
A. Yeah.
Q. Oh, she pays you rent?
A. Yeah.
Q. That's a pretty good deal.
Okay. I'm going to ask you some questions about some of your other children a little later on.

A. All right.
Q. Do you have any nicknames that you go by?
A. Johnny Boy, Cornbread.
Q. All right. Any other nicknames that you're known by, that you know of?
A. Yeah. The -- the black mayor in Ellisville.
Q. Black mayor of Ellisville?
A. Right.
Q. Why do they call you the black mayor of Ellisville?
A. I, you know, can -- can seem to, you know, get stuff done with the city.
Q. Have you ever served as a -- as an officer or any kind of political deal in Ellisville? Have you ever run for office?
A. No, sir.
Q. You've just got some good connections with the City of Ellisville?
A. Yes, sir.
Q. I want to ask you some questions -- well, let me ask you your educational background very quickly. Where did you go to high school?
A. South Jones High.

Q. Did you graduate from South Jones?
A. Yes, sir.
Q. What year did you graduate?
A. '73.
Q. Did you go to any school after South Jones?
A. No, sir.
Q. Have you had any vocational training or any vo-tech or --
A. I took drafting in -- in high school at vo-tech.
Q. Okay. But since you left vo-tech -- I mean, since you left high school, have you had any other classes or formal training?
A. No, sir.
Q. Okay. I want to ask you some questions about places that you've worked. And we've got the -- the latest and greatest fact sheet from your attorney.
MR. FOXWORTH:
I'm glad you think it's the greatest, Will.
MR. MANUEL:
Q. The -- on this fact sheet, it's got that the first place that you worked was the

Nehi Plant in Ellisville?
A. Yes, sir.
Q. Okay. And that would -- started in 1972? Is that correct?
A. Yes, sir.
Q. Were you still in high school at the time you worked there?
A. Yes, sir.
Q. Were you around any sandblasting at the Nehi Plant?
A. No.
Q. And were you -- did you -- were you involved with any concrete finishing or any concrete work at the Nehi Plant?
A. No, sir.
Q. So are you claiming any exposure to silica while you worked at the Nehi Plant?
A. No, sir.
Q. And is that -- Nehi, that's the -- like the grape and orange drink, Nehi?
A. Yeah.
Q. Okay. Did you get free Nehi when you worked there?
A. All you can drink.
Q. The next place that's listed is

Tom Pittman. And it says you worked there from '73 to '74.
And it lists on here that you were a sandblaster helper and cement finisher. Is that the only types of jobs that you did for Tom Pittman?
A. Well, construction, you did a little of everything.
Q. Did you -- so you were around sandblasting at Tom Pittman?
A. I was -- we had one job that I did sandblasting with.
Q. And where was that job?
MR. FOXWORTH:
Now, he's not talking about the sandblasting you did. He's talking about if you were around it.
MR. MANUEL:
Q. Or if you did it, I guess, yeah, that's a --
MR. FOXWORTH:
Either one.
MR. MANUEL:
Q. Did you do sandblasting, as well?
A. No, sir.

Q. Did you -- did you do any sandblasting at Tom Pittman yourself?
A. Well, I tried it once.
Q. Okay. The one time that you tried it, is that the only time you actually did sandblasting at Tom Pittman?
A. Yes, sir.
Q. But you were -- were you around sandblasting other than that one time that you tried it at Tom Pittman?
A. Yes, sir.
Q. And it says on here a cement finisher. What was your job as a cement finisher at Tom Pittman?
A. Well, we finished the concrete when it was poured.
Q. All right. And I'm just going through these very quickly right now, and I'll probably come back and ask some more detailed questions about --
A. Can I get some water?
Q. Oh, sure. Do you want to keep going while -- while she gets you your water?
A. Okay. Yeah.
Q. We'll just -- that will make it go a

little faster.
MR. FOXWORTH:
If y'all will hold on one second --
MR. MANUEL:
Okay.
Q. Okay. The next place that's listed is Howard Industries. And it says you worked there, I guess, for the first time in 1975; is that correct?
A. Yes, sir.
Q. And, also, in 1981 to 1983?
A. Yes, sir.
Q. During the 1975 time period that you were there, were you -- did you do any sandblasting at Howard Industries?
A. No, sir.
Q. Were you around any sandblasting at Howard Industries in 1975?
A. I don't know.
Q. Don't know?
A. Don't know.
Q. But you don't remember being around any sandblasting in 1975?
A. No, sir.
Q. Were you involved in any sort of

concrete work at Howard Industries in 1975?
A. No, sir.
Q. How about in the time period that you worked from '81 to '83 at Howard Industries, did you do any sandblasting then?
A. That's the second time I was there?
Q. Yes, sir.
A. No, sir.
Q. Did you -- were you around any sandblasting the second time that you were at Howard Industries?
A. No, sir.
Q. Did you do any sort of concrete work at Howard Industries from 1981 to '83?
A. No, sir.
Q. So is it fair to say that you're not claiming any exposure to silica at Howard Industries either of the times that you worked there; is that correct?
A. Yes, sir.
Q. Okay. All right. The next one is, listed on here is Daniel Construction?
A. Yes, sir.
Q. And you worked there from 1979 to 1980?

A. Yes, sir. It will be two years.
Q. What did you do between 1975, when you were at Howard, and 1979, when you were at Daniel Construction?
A. When I was at Howard's, I was a -- a lacer and a crew leader.
Q. Okay. I was just -- because, on here, it lists that you were only -- you were at Howard Industries the first time just for 1975. Did you only work there one year, the first time you were there?
A. No, I -- I think the -- when I left and went to Daniels, I had left Howard then.
Q. Okay. So there's not a -- there's not a lag -- a lag time in between there? When you left Howard was when you went to go work for --
A. Right.
Q. -- Daniel Construction?
A. Right.
Q. Okay. And at Daniel Construction, it has listed here that your job was a laborer and cement finisher; is that correct?
A. Yes, sir.
Q. Did you do any sandblasting at

Daniel Construction?
A. No, sir.
Q. Were you around any sandblasting at Daniel Construction?
A. I wasn't around no sandblasting, but I was around a lot of sand.
Q. Okay. How were you around a lot of sand with Daniel Construction?
A. Well, on one of the -- some of the jobs we had, we had to patch holes. And you had to mix the cement and the sand together, you know, to patch the holes.
Q. Okay. Did -- is that -- you had listed on here that you were a laborer and cement finisher. Is that the type of work that you were doing as a cement finisher, mixing the sand and the concrete together?
A. No. When it was my time to mix it, that's -- that's when I mixed it.
Q. What type of concrete work did you do while you were at Daniel Construction?
A. Finish concrete.
Q. Did you do any breaking up of concrete at all?
A. Yes, sir.

Q. The next place listed is Sanderson Farms from 1983 to 1985. Did you go -- was there anywhere that you worked in between Daniel Construction and Sanderson Farms?
A. No, sir.
Q. All right. Were you off work anytime between that time, or did you go directly --
A. Daniel Construction and Sanderson?
Q. Yes, sir.
A. I was -- Howard, Howard --
Q. Oh, you went back to Howard.
A. Yes.
Q. Okay. That was the time you went back to Howard. I'm sorry.
A. Yes.
Q. And worked from '81 to '83. Thank you for pointing that out.
At Sanderson Farms, your job was a truck driver?
A. Yes, sir.
Q. So you did not do any sandblasting at Sanderson Farms from '83 to '85?
A. No, sir.
Q. And you did not do -- you were not around any sandblasting at Sanderson Farms from

1983 to 1985?
A. No, sir.
Q. Did you do any concrete work at Sanderson Farms between 1983 and 1985?
A. No, sir.
Q. So is it fair to say that you do not -- you're not claiming exposure to silica at Sanderson Farms from 1983 to 1985?
A. Yes, sir.
Q. The next place listed is H. Gordon Myrick from 1985 to 1987. And it says on -- on this fact sheet that you -- well, one place, it says you worked there from '85 to '87. And in another place, it says you worked from '83 to '85. Did you go to work at Gordon Myrick after Sanderson Farms?
A. Yes, sir.
Q. Was there anywhere else that you worked in between the two?
A. No, sir.
Q. Okay. Do you think it was -- so -- and I'll -- I'll maybe get with your attorney at the break and figure out, because it lists '85 to '87 on one spot, and then '83 --
MR. FOXWORTH:

You -- I think --
MR. MANUEL:
Q. -- to '85. Yeah.
MR. FOXWORTH:
-- he's probably the better person to answer that.
MR. MANUEL:
Q. Okay. Does it -- you worked -- if you worked from Sanderson Farms to '83 to '85, is it your recollection that you worked at Gordon Myrick from '85 to '87? You didn't work two jobs at once, did you?
A. No, sir.
Q. Okay.
A. Not then.
Q. Okay. So there wasn't a time that you worked at both Sanderson Farms and Gordon Myrick at the same time?
A. No, sir.
Q. All right. And at Gordon Myrick, it has your trade listed as a cement finisher and sandblast helper. Did you do any sandblasting yourself at Gordon Myrick?
A. I was a pot, pot tender.
Q. Pot tender?

A. Uh-huh.
Q. But as far as handling the sandblasting hose yourself, you didn't do that at Gordon Myrick?
A. Like help him get it out, you know, to where he's going to start.
Q. But -- but actual sandblasting --
A. No, sir.
Q. -- you didn't do any actual sandblasting --
A. No, sir.
Q. -- at Gordon Myrick?
Is the pot tender job that you had the being around sandblasting at Gordon Myrick? Is that the times that you were around sandblasting was as a pot tender?
A. Yes, that one spot, one time.
Q. And it also says that you did concrete -- I mean, cement finisher at Gordon Myrick. What type of cement work did you do at Gordon Myrick?
A. Sidewalks.
Q. Did you do any breaking up of sidewalks?
A. Yes, sir.

Q. And you also did finishing of concrete after it had already been poured?
A. Some of the smaller pours.
Q. Some of the smaller -- pardon me? What was --
A. Some of the smaller pours.
Q. Okay.
A. Something you can, you know, do without having problems.
Q. Some of the smaller pours, talking about a --
A. Yes.
Q. -- large size pour versus a smaller pour?
A. Right.
Q. And the next place we have listed is Southern Touch in Laurel from 1987 to 1991?
A. That should be Ellisville.
Q. Okay. Ellisville?
A. Yes, sir.
Q. And you worked as a truck driver for Southern Touch?
A. Yes, sir.
Q. Did you do any sandblasting at Southern Touch?

Page 34

A. No, sir.
Q. Were you around any sandblasting at Southern Touch?
A. No, sir.
Q. Did you do any cement or concrete work at Southern Touch?
A. Now, Southern Touch and -- and -- and -- and H. Gordon Myrick, now, I was working both jobs at the same time.
Q. Okay.
A. One of them was a weekend job, and one of them was -- like Gordon Myrick was, you know, five days. And Southern Touch was the -- just the weekend.
Q. And it has you listed for Southern Touch that you were a truck driver?
A. Yes, sir.
Q. Is that the only job you had at Southern Touch was driving a truck?
A. I loaded trucks, too.
Q. Okay. So, but you didn't do any concrete work for Southern Touch. You may have done some work for Gordon Myrick --
A. Gordon Myrick.
Q. -- at the same time?

Page 35

A. Yeah, when I was working with both of them.
Q. Okay. But as far as for Southern Touch, you didn't do any concrete work?
A. No, sir.
Q. Okay. The next place listed is Pauline Moore?
A. Yes, sir.
Q. And did you also work as a truck driver for Pauline Moore?
A. Yes, sir.
Q. Did you do any sandblasting for Pauline Moore?
A. No, sir.
Q. Did you -- were you around any sandblasting at Pauline Moore?
A. No, sir.
Q. And how about concrete or cement work, did you do any concrete or cement work for Pauline Moore?
A. No, sir.
Q. So you're not claiming any silica exposure while you worked for Pauline Moore; is that correct?
A. Yes.

Page 36

Q. The next place listed is Victor Gibbs. It also says there that you worked as a truck driver; is that correct?
A. Yes, sir.
Q. So you don't believe that you were exposed to silica while you were working at Victor Gibbs; is that correct?
A. No, sir.
Q. That's not -- I mean, you were not exposed to silica at Victor Gibbs?
A. I don't think so.
Q. You don't think so. And is the only job you had for Victor Gibbs was driving a truck?
A. Yes, sir.
Q. All right. Getting close.
A. All right.
Q. The next place listed was SRT?
A. Uh-huh.
Q. And did you also do a -- did you also drive a truck for SRT?
A. Yes, sir.
Q. Did you do any sandblasting for SRT?
A. No, sir.
Q. Okay. Did you do any sort of

Page 37

concrete work while you were at SRT?
A. No, sir.
Q. So you're not claiming any -- you weren't exposed to silica while you worked for SRT; is that correct?
A. Well -- no, sir.
Q. Okay. You're not -- you're not claiming -- you're not claiming silica?
A. (No verbal response.)
COURT REPORTER:
No?
THE WITNESS:
No.
MR. MANUEL:
Q. The next place that we have listed is Bush Construction. And it says there that you also worked as a truck driver?
A. Yes, sir.
Q. Again, no -- you weren't around any sandblasting or concrete work for Bush Construction?
A. All we did, we hauled sand.
Q. Hauled sand?
A. Yes, sir.
Q. But were you ever actually around any

sandblasting that went on while you were driving the truck?
A. No, sir.
Q. Were you around any concrete work while you were driving the truck for Bush Construction?
MR. FOXWORTH:
Around in the sense outside the truck doing it or --
MR. MANUEL:
Q. Yeah, outside the truck doing it. Were you outside the truck doing any concrete work while you worked for Bush Construction?
A. No, sir.
Q. And the last place we've got listed on here is the City of Ellisville. And it has listed on here that you also did -- you were a truck driver for the City of Ellisville?
A. Yes, sir.
Q. No -- you didn't do any sandblasting while you were driving the truck?
A. No, sir.
Q. And you weren't doing any concrete work while driving the truck for the city?
A. No, sir.

Q. So is it -- tell me if I'm correct that the places that you were -- that you're claiming that you may have been exposed to silica would have been at Tom Pittman?
A. Yes, sir.
Q. Daniel Construction?
A. Yes, sir.
Q. Gordon Myrick?
A. Yes, sir.
Q. And those are the only places that you're claiming that you were exposed to silica?
A. Yes, sir.
Q. All right. Are you okay? Do you need to take a break or anything?
MR. FOXWORTH:
Do you need to go to the restroom?
A. Yeah, please.
VIDEO TECHNICIAN:
Off the record. The time is 11:06.
(Off the record.)
VIDEO TECHNICIAN:
Back on record. The time is 11:15.
MR. MANUEL:
Q. Mr. McGilberry, we've gone through the -- all your work sites, and now I'm going to

focus on just those three work sites in which you claim you were possibly exposed to silica.
The first one I want to talk about is Tom Pittman. Where is -- where is Tom Pittman located? Or where was it located --
A. It --
Q. -- at the time you worked for them?
A. -- was located in Ellisville.
Q. Was the work that you did for Tom Pittman done in Ellisville?
A. No, sir.
Q. So where did you go to travel to do the work that you did for Tom Pittman?
A. Hattiesburg, Mississippi. Waynesboro, Mississippi. Raleigh, Mississippi.
And we did some work up there in Laurel, Mississippi. And Bay Springs, Mississippi. And State Line. It's -- it's in Mississippi.
Q. Right. It's down there by -- near --
A. Near Waynes- --
Q. -- near Leakesville and Waynesboro?
A. No, near -- near Waynesboro.
Q. Near Waynesboro.
What sort of things were y'all

building for Tom Pittman?
A. Buildings, pouring slab.
Q. Were these commercial buildings or -- or residences?
A. Commercial buildings.
Q. And was the work that you did for Pittman mainly on the slab stuff?
A. Yes, sir.
Q. Were you involved in any construction after the slab was laid for Tom -- when you --
A. Yes, sir.
Q. -- when you were working for Tom Pittman?
A. Yes, sir.
Q. You mentioned when I -- we were talking earlier that that was the one job that you actually did try some sandblasting on; is that correct?
A. Yes, sir.
Q. Do you remember where you were when you actually tried to do the sandblasting, what location? Or what city?
A. I think I left one name out, Heidelberg, Mississippi. And that's -- I think that's where we did the sandblasting at.

Page 42

Q. Hollowburg?
A. Heidel -- Heidelberg.
MR. FOXWORTH:
Heidelberg.
MR. MANUEL:
Okay. Heidelberg. Yeah, okay.
Q. That's where you did the sandblasting?
A. Yes, sir.
Q. Do you remember when that was, what year it was that you did the -- because you worked there, it looks like, for two years, in '73 and '74. Was it early in your career with Tom Pittman or late?
A. I'm not for sure.
Q. When you say that you tried, tell me what you did when you said you tried doing the sandblasting. What were y'all sandblasting?
A. We was sandblasting some steps. And I tried it then.
Q. How long -- how long did you try it?
A. I don't know.
Q. More than an hour or -- or --
A. Or less.
Q. Less than an hour.

Page 43

What -- did you have on any kind of protective equipment that one time that you sandblasted the steps with Pittman?
A. Yeah, I had a helmet on.
Q. A helmet. Describe for me the helmet that you had on.
A. Okay. It was a -- it was a heavy cloth. You know, like that -- that tarp they use on the trucks, they tarp the loads down with.
Q. Okay.
A. That heavy kind of tarp. And it had the little window in it.
Q. How far down did the tarp come down on your body?
A. Well, the one I remember using -- I am not for sure how -- how low did it come.
Q. Would it come down further than your neck, or down to your waist or -- or --
A. Just a little below my shoulders, I believe it was.
Q. Did the -- did it have any kind of -- any hoses coming into it or anything like that, the -- the helmet that you wore?
A. No, sir.

Page 44

Q. So there wasn't any air feeding into the -- to the helmet?
A. No, sir.
Q. Do you remember what color it was?
A. It was a dark color. That's the only thing -- I'm not for sure what color it was.
Q. Do you remember how it -- did it have any attachments on it or anything that you used to -- to adjust the helmet?
A. I'm not for sure about that.
Q. Do you remember any straps or buckles or snaps or zippers?
A. I don't, really don't remember.
Q. The -- you said it had a window in front. Do you remember what shape that window was?
A. Square.
Q. And if I were looking at you when you had that on, how much of your face would I see through that window? How far down did it come on your face?
A. You could see outside, the outside of my -- my eyes, a little bit -- a little bit higher than my eyelashes and a little bit lower than my nose.

Page 45

Q. Okay. So right above your eyelashes down to part of your nose?
A. Yes, sir.
Q. Did you ever have to change out that window -- well, you only used it that one time?
A. Just one time.
Q. Okay. And that one time you used it, you used it for less than an hour; is that correct?
A. Yes, sir.
Q. So you never -- do you know how the window was changed -- could you change out the window at all?
A. Yes, sir, you could change it.
Q. Did you ever see anybody change it out?
A. I seen them change it once.
Q. Do you know how they -- I mean, what they did to change it out?
A. I'm not for sure.
Q. All right. If you felt the top of that -- that helmet, was it hard?
A. This one didn't have no helmet in it.
Q. It -- it didn't have a helmet in it?
A. No, sir.

Page 46

Q. So it just fit, just the tarp part just fit right on top of your head?
A. Yes, sir.
Q. Did you wear -- could you have worn a helmet under it? Or did you wear a helmet under it? I guess that's --
A. Oh, I had a hat on.
Q. You had a hat?
A. Yes, sir.
Q. A baseball cap or --
A. Yes, sir.
Q. Do you remember what condition that hood was in? I mean, did it have any tears or cracks or tape on it or anything like that?
A. I'm not for sure.
Q. Is that the only time that you've ever worn a piece of equipment like that, a helmet made out of the tarp?
A. Yes, sir.
Q. At any of the jobs that you've worked on?
A. Yes, sir.
Q. All right. Why did you -- why was that the only time that you ever tried sandblasting?

Page 47

A. That was the only job we done.
Q. Oh, really?
A. Yes, sir.
Q. Was that the only -- when you worked at Tom Pittman, was that the only job in which y'all did any sandblasting, was sandblasting those steps?
A. Yes, sir.
Q. So, do you remember any of the guys that were working with you when y'all were sandblasting the steps?
A. Oh, they're not living now.
Q. Okay. Do you remember their names at all?
A. No.
Q. You don't remember.
Do you -- when you weren't -- that less than an hour that you were doing the sandblasting, is that as long as it took to do the steps?
A. Oh, that's all I done, just that --
Q. Okay.
A. -- that little time.
Q. Was there -- did anybody else do any sandblasting at that site while you were there

Page 48

at Pittman?
A. Yeah. The guy that -- that was doing it, he -- he -- he did it.
Q. All right. Do you remember who that was?
A. The same guy that -- that -- you know -- I don't know his name for sure.
Q. Okay. Did you have to -- do you know what they were using to blast those steps, what material they were using?
A. What you mean? Explain yourself.
Q. I mean, was it -- I mean, was it sand? Was it shot, steel shot? Was it -- or do you know what it was?
A. It was sand.
Q. Do you know how -- did -- do you know how the sand got there that y'all used to sandblast those steps?
A. Laurel Machine & Foundry, I think is --
Q. Why do you think it came from there?
A. That was one of the places we got supplies from.
Q. Do you remember specifically getting sand from Laurel Machine & Foundry to use on

Page 49

those steps?
A. Yes, sir.
Q. What -- what did it come in? When y'all went to go get it, what did it -- what did the sand come in? Was it in a truck or --
I'm just trying to figure out what kind of -- well, did it come in a container, or was it just loose sand?
A. It was -- no, it was in a bag.
Q. In a bag. Do you remember what that bag of the sand that you used while you were at Pittman, what it looked like?
A. A brown bag with red writing.
Q. Do you remember any other types of bags other -- that you used with Pittman other than the brown bag with red writing?
A. That's the only one I remember.
Q. Do you know what the red writing said?
A. No.
Q. How many bags -- do you remember how many bags it was?
A. I'm not for sure how many bags we got.
Q. The sandblasting of the steps that

you did for Pittman, was it done outside?
A. Yes, sir.
Q. And I know you said you did the -- the blasting you actually tried, you did for less than an hour. But how long did it take total to do -- do the blasting of those steps; do you know?
A. No, I don't know how many hours it took.
Q. But it wasn't more than one day?
A. I'm not for sure if we finished in one day or what.
Q. Do you think -- but it was not more than two days? I mean, you may have done it one day and finished up the next day, or -- or do you remember?
A. Something like that.
Q. Okay. Do you remember any of the blasting equipment that was used that one time that y'all sandblasted the steps for Pittman, what it looked like?
A. I'm not for sure on that one.
Q. Did you ever load any of the equipment that was used for blasting of those steps?

A. I'm not for sure.
Q. Do you specifically -- do you remember if you -- you're saying you don't remember loading any of the sandblasting equipment used on those steps?
A. Yes, sir. I don't remember.
Q. Okay. Do -- can you tell me anything about the equipment that was used to sandblast those steps when you were working for Pittman?
A. Yeah. All I remember is the hose was black.
Q. Pardon me?
A. The hose was black.
Q. The hose was black? Okay.
Do you remember how you -- could you control -- were there any controls on the hose, the black hose that was used?
A. Yes, sir.
Q. Okay. How did it -- how was it controlled?
A. It had like a knob you could mash, you know, flow of the air and the sand.
Q. So there was a knob you could push down?
A. Yes, sir.

Q. Were there any other controls on the hose itself that you remember on that equipment at Pittman?
A. No, sir.
Q. Do you remember what the hose hooked up into?
A. All I remember, you -- you take them and just -- (witness indicating) -- twist them together when you -- from the machine and -- and -- and to the line, just take it and twist it. And it's --
Q. And it's connected --
A. It was hooked up. Yes, sir.
Q. Okay. And that's what I'm -- I'm asking about the -- the -- the machine that the hose was hooked up to.
A. Okay.
Q. Can you tell me what that machine looked like?
A. No, sir.
Q. Do you remember, was it a -- do you remember the color or size or shape or anything about that machine?
A. No, sir.
Q. Do you know how the machine was

powered?
A. I think we had -- we had an air compressor on that one.
Q. What did the air compressor look like?
A. On that -- on the pot, all I remember, it had a deep valley in it where you poured the sand in. And other than what it looked like, I don't know.
Q. Okay.
MR. FOXWORTH:
You talking about the top of the pot?
THE WITNESS:
Yes, sir.
MR. MANUEL:
Q. And that was where -- do you remember, was there anything like a lid to the top of the pot or anything like that?
A. No, sir. There's no lid.
Q. No lid?
A. Not as I know of.
Q. Do you know how tall that pot was?
A. A little over five foot.
Q. Did you ever load that pot?
A. Yes, sir.

Page 54

Q. How many -- do you remember how many bags of sand you would load into that pot before it would be full?
A. I never did put -- try to, you know, count how many I put in there. You know, just -- just try to keep enough in it.
Q. Okay. Did you have to stand up on anything to be able to load the top of that -- load that pot? Or could you stand on the ground and load it?
A. I think I was standing on one of those blocks. I remember, yeah, a block.
Q. I'm going to ask you what's going to sound like a strange question, but it's going to help me figure out how big this thing is.
A. Uh-huh.
Q. If you were to go up and want to put your arms around that pot, could you reach around to it, the other side?
A. No, sir.
Q. Okay. Do you remember if it had any wheels on it?
A. This one, I don't remember no wheels on it.
Q. No wheels? Is that correct?

Page 55

A. Yes, sir.
Q. Did you ever have to move that pot at all?
A. No.
Q. Do you know how it got there, to the stairs?
A. No, sir.
Q. Do you remember what color it was?
A. No, sir.
Q. Do you remember if there was any writing on the pot?
A. I'm not for sure.
Q. Okay. Is there something that you think you may remember about it or writing on it? You say you're not sure, but do you remember -- is there something you remember about that pot?
A. Well, about that pot, I know it was something about like a small door in front of it, where you can, you know, unscrew it and -- (witness indicating).
Q. Do you know what -- what the door was for on that pot?
A. No.
Q. Did you ever have to mess around with

Page 56

what was behind the door?
A. No, sir.
Q. Okay. Did -- could the pot that was used on the steps for Pittman be loaded while somebody was still sandblasting, or did you have to stop the sandblasting, load it, and then start sand- -- sandblasting, again?
A. And say that, again, now.
Q. Yeah. That was kind of a hard question.
The pot that was used there at the stairs that were sandblasted while you worked for Pittman, did they have to cut it off, cut the sandblasting machine off to load the sand into it, or could you load it while it was still going?
A. Oh, you can load it while it's still going.
Q. Okay. And did -- you described that you said that there was an -- you remembered an air compressor with regard to that pot? Or did I misunderstand you?
A. I'm not for sure on this here, but I -- I -- I know about that other one.
Q. About the other one?

Page 57

A. Yes, on -- on Gordon.
Q. On Gordon. Okay. We're still talking about the one at Pittman.
A. Right.
Q. So you're not sure if there was --
A. Yeah, I'm not for sure.
Q. Okay. You don't recall whether there was an air compressor on the one at -- at Pittman?
A. No, sir.
Q. And you couldn't describe any sort of air compressor that you -- you may have used at Pittman, correct?
A. No, sir.
Q. While you were -- did -- did you actually load the pot while y'all were blasting those stairs for Pittman?
A. No, sir, we didn't -- I didn't -- didn't -- I didn't load it.
Q. You didn't load it?
A. No.
Q. When -- the time you said that you had done a little bit of sandblasting, were you around the stairs at all while the other guy was sandblasting?

Page 58

A. Well, I did it when he -- when he was on break.
Q. Oh, you did the sandblasting while he was on break?
A. Yes.
Q. Okay. So the times that the other guy was doing the sandblasting of the stairs, were you around those stairs at all?
A. Yeah. I was close -- you know, tending the pot, you know, you've got to stay pretty close.
Q. What were you doing to tend the pot while the other guy was sandblasting at Pittman?
A. To make sure it didn't get empty.
Q. And you'd tell somebody else to come load it, load it in, load sand into it?
A. Well, I didn't --
Q. Or it never got empty?
A. It never did get empty.
Q. Okay. Did -- how far away were you from the steps that the guy was sandblasting when you were making sure that the pot didn't get empty?
A. I'm not for sure on how many feet was it from it, but it was -- I would say about

Page 59

twenty-five foot.
Q. Twenty-five feet?
A. Something like that.
Q. The time that you were there tending the pot, did you wear any kind of protective equipment?
A. I had a -- a dust mask.
Q. Did you have anything else while you were tending the pot there at Pittman other than a dust mask?
A. No, sir.
Q. Did you -- was it just -- did you wear more than one type of dust mask while you were there tending the pot that day y'all were sandblasting or --
A. No, sir, just that one.
Q. There was just one type?
A. Just that one type.
Q. And was there any time that you were there tending the pot that you didn't have the dust mask on?
A. I always had a dust mask on.
Q. You always had one on?
A. Yes, sir.
Q. Tell me what it looked like, the dust

Page 60

mask that you wore while you were there tending the pot at Pittman.
A. Okay.
Q. What color was it?
A. It was white with the -- it looked like a -- like a rubber band, you know, to -- to hold it on. And you had the --
Q. Was there -- let me -- and I don't mean to interrupt you, but was there just one rubber band that held it on?
A. Yes, sir. One side to the other side.
MR. FOXWORTH:
He said it was like a rubber band.
MR. MANUEL:
Q. Okay. What color was that -- so --
A. White.
Q. -- it was elastic, the -- the band was?
A. Yes.
Q. Okay. And it was a white color?
A. Yes, sir.
Q. The -- the band itself was white?
A. Yes, sir.
Q. Was there any writing on the band

Page 61

that you remember? It may not have been big enough to have any writing on it, I guess? You don't remember any writing on it?
A. No, sir.
Q. Okay. The -- do you know how that band was attached to the mask?
A. Like a little staple.
Q. Was there anything on the -- you were -- I think you were describing to me something on the front of the mask?
A. Yes, a little aluminum, like it's made out of aluminum, which you can -- when you put it on, you can shape it around your nose.
Q. Like a nose clip?
A. Yes, sir.
Q. What was the color? Was it aluminum color?
A. Yes, sir.
Q. Was there anything else on the front of that mask that you used at Pittman other than that nose clip?
A. Well, other than knowing what it was is the ridges it had in it, you know.
Q. But as far as -- there wasn't any other piece or anything like that on the front

Page 62

of that?
A. No, sir.
Q. Which -- you said there were some ridges, they were -- which way did the ridges go on the mask that you used at Pittman?
A. Straight across (witness indicating). Staggered, you know -- not staggered, but you know how steps is, you know. Start up here and long, and then the next -- I mean, short up here, and then it get a little bit longer as you go down.
Q. Okay. So the -- the ridges went horizontal across the mask?
A. Yes, sir. Straight across (witness indicating).
Q. And they started small and got bigger as they went down the mask, the ridges?
A. Yes, sir. Then -- yes, sir.
Q. Okay. Was there anything else on the front of that mask other than ridges? Do you remember any writing at all on the mask?
A. No, sir.
Q. No writing?
A. No, sir.
Now, on that -- (witness

Page 63

indicating) -- now, they just don't -- like I said, it's -- you know, start here and get bigger. You know, start at the top, and, about so far down, it'd get that long. And then, it just work itself back, again (witness indicating).
Q. Like a diamond on the front of it?
A. Yes, sir.
Q. How far -- how far down did the mask itself come on your face? Below your chin or --
A. Yes, sir, below your chin.
Q. Where -- where did you get the masks that you used at Pittman?
A. We got them from Phillips, Phillips Building Supply in Ellisville.
Q. Do you remember anywhere else that you would have gotten --
A. We --
Q. -- dust masks?
A. We only used Phillips, Ellisville and Laurel.
Q. Did you -- were you ever the person that was responsible to go get them --
A. No, sir.
Q. -- get the masks?

Page 64

Okay. Did you ever see the packaging that the masks you used at Pittman came in?
A. No, sir.
Q. How did you get them on the work site? Did somebody bring them to you, or -- or were they laying in the back of a truck or --
A. Sometimes they'd be in the truck, in the toolbox, or in the window.
Q. But you never saw the packaging at Pittman that the masks came in?
A. No, sir.
Q. And did you -- were you ever given any kind of brochures or instructions about the masks that you used at Pittman?
A. Not as I know of.
Q. Did -- if you looked at the mask that you had at Pittman, was there anything on the inside of that mask?
A. No kind of writing, now. Not as I know of.
Q. No writing?
A. No.
Q. Okay. Do you remember anything else, any kind of pieces or anything like that --
A. Well, the only thing you can remember

Page 65

is that it's made the same way from the inside and outside, you know.
Q. So it looked the same --
A. Right.
Q. -- material?
Did anybody at Pittman ever give you any instructions on how to wear that mask?
A. No, sir.
Q. Did anybody ever do any fit testing or test how it fit on your face there at Pittman?
A. No, sir.
Q. Did you use any other types of masks? I know we've been talking about the time you were sandblasting the stairs, but did you use, in the other jobs that you did at Pittman, any other types of masks other than that one that you've described?
A. No. We used about the same, same masks, the same color masks.
Q. So it was the -- are you saying here today that that's the only type of mask you used at Pittman while you worked at Pittman is the one you just described?
A. What I can remember.

Page 66

Q. Okay. Do you remember, while you were at Pittman, any other types of masks that you used or anything different about any other types of masks?
A. No, sir.
VIDEO TECHNICIAN:
Excuse me. I need to change out my tape.
Off the record. The time is 11:49.
(Off the record.)
VIDEO TECHNICIAN:
Back on record. The time is 11:49.
MR. MANUEL:
Q. Did you ever go with anybody to buy the masks that were used at Pittman?
A. Yes.
Q. You did?
A. When we -- well, you know, we get ready to go to the job site, we stop and pick up stuff.
Q. Did you ever go in and have a conversation with anybody --
A. No, sir.
Q. -- about what type of mask to use?
A. No, sir.

Page 67

Q. All right. Did -- did you ever see -- well, let me ask you this: The work that you did for Pittman, was it always outside, any of the work that you did?
A. Well, we did both outside and inside.
Q. Okay. The concrete work that you did for Pittman, was that always outside?
A. Some outside, some inside.
Q. Okay. What type of concrete work would you have done inside?
A. Like where we tear out, tear out a spot and, you know, like patch in the back.
Q. Tearing out a spot of concrete?
A. Yes, sir.
Q. Okay. How much -- how much of the time that you worked at Pittman did you do actually tearing out of concrete?
A. Quite a few times.
Q. Okay. When y'all were working on tearing out concrete, what was your job? What did you do?
A. I ran that -- the jackhammer.
Q. The times that you -- you ran the jackhammer tearing out concrete, did you wear any kind of protective equipment?

Page 68

A. That same kind of dust mask.
Q. The -- the kind of dust mask you just described for us?
A. Yes, sir.
Q. Okay. Did you -- were there any times that you ran the jackhammer that you didn't wear a dust mask?
A. No, sir. I always had a dust mask on.
Q. Was there any time that you ran the jackhammer that you wore either -- that you wore a dust mask that was different than the one that you just described for us, the time that you're working at Pittman?
A. No, sir.
Q. And how -- when you were running the jackhammer, how long would you typically -- I mean, is there a time period that you'd use the jackhammer? I mean, is it an eight-hour thing or an hour thing? Or, I mean, I imagine a jackhammer is pretty tough on you?
A. Yeah.
Q. What would -- typically, when you were running the jackhammer, how long would you run it?

Page 69

A. Well, I -- I could say until -- until my hand got --
Q. Tired?
A. Yeah.
Q. But, I mean, it wouldn't be something that you'd have to go in there and go for an hour straight --
A. No, sir.
Q. -- jackhammering?
A. No, sir.
Q. Okay. Were there other jobs that you did when you were tearing out concrete besides running the jackhammer? Were there other things that you did besides run the jackhammer?
A. We put buildings up. You know, we hung buildings. We done remodeling and stuff like that.
Q. Okay. I'm mainly just talking about when -- when the tearing of the concrete was going on --
A. Oh, okay.
Q. -- was there anything else you did besides run the jackhammer?
A. Yeah, I did something there besides the jackhammer.

Q. And what else did you do?
A. Well, like I say, we was -- when we was tearing out, you know, if -- if I got tired, he put somebody else over, and I'd go like do what he was doing. See what I'm saying?
Q. Right. Just like cleaning up or --
A. Right.
Q. -- or hauling stuff off or stuff like that?
A. Yes, sir.
Q. Okay. The times that you would be over there hauling stuff off, how close would you be to where they were doing the jackhammering?
A. I'm not for sure how far.
Q. Did -- if you were doing something else besides running the jackhammer when y'all were tearing out concrete, did you wear any kind of protective equipment?
A. I had the -- the dust mask on.
Q. And is that the same dust mask that you described earlier for us?
A. Yes, sir, the same.
Q. All right. Did you ever see -- while you worked at Pittman, did you ever see any kind

of written respiratory program? Or any kind of written documents about respiratory protection while you worked at Pittman?
A. No, sir.
Q. Did y'all have safety meetings while you worked at Pittman?
A. No, sir.
Q. Did they do any kind of physical exams on you while you worked at Pittman? Like send you to a doctor for --
A. I went to the doctor one time.
Q. Okay. And that was the company sent you to the doctor?
A. Yes.
Q. Why did the company send you to the doctor at Pittman?
A. I got cut over the eye with -- pushing some blocks.
Q. And as far as like just checkups that the company would send you to, did they do that at Pittman at all?
A. No, sir.
Q. Were there any rules about wearing the dust mask while you worked at Pittman? Did they have any -- did they require you to do

it?
A. Yes, sir.
Q. Just a second.
While you worked at Pittman, did you have any facial hair at all, either a beard or mustache?
A. No, sir.
Q. All right. Let me ask you, at that -- the -- the time that you said that you had done the sandblasting at the steps, that's the only time you either did sandblasting or were around any sandblasting while you worked for Pittman; is that correct?
A. Yes, sir.
MR. FOXWORTH:
You mean the time that he did it and the time that he was there filling the pots; is that what you're talking about?
MR. MANUEL:
Right.
MR. FOXWORTH:
Okay.
MR. MANUEL:
That's the same time, I assume, isn't it?

MR. FOXWORTH:
Yeah. But the way you phrased it, it was like the only time he did it --
MR. MANUEL:
Okay.
Q. But the only time that you were ever around sandblasting at Pittman was the time that y'all sandblasted the steps, and you did it for less than an hour, and then you helped --
A. Yes.
Q. -- the other guy?
A. Yes, sir.
Q. Okay. All right. The next place that I think we talked about was Daniel Construction from 1979 to 1980. What was your job at Daniel Construction?
A. I was a laborer and a cement finisher.
MR. MANUEL:
You know, I need that -- no, I think I've got it.
Q. Do you remember who your supervisor was at Pittman? Was it Mr. Pittman?
A. Pittman.
Q. Tom Pittman?

A. Tom Pittman.
Q. Do you know where -- is Mr. Pittman still in Ellisville?
A. I'm not for sure.
Q. Did you have anybody else who was a supervisor other than Mr. Pittman?
A. Just him.
Q. Okay. Were there any other -- and I asked you -- may have asked you this, but I don't know if I just asked you about sandblasting the steps. Do you remember any of your co-workers that worked with you at Pittman, the names of any of them?
A. I had a brother, James McGilberry.
Q. James McGilberry?
A. Yes, sir.
Q. Is James still around?
A. Yes, sir.
Q. Does he live in Ellisville?
A. No, sir.
Q. No. Where does he live?
A. I think he stay in Laurel.
Q. In Laurel?
A. Yes, sir.
Q. Anybody else that you remember that

worked with you at Pittman?
A. I'd have to think on that one. I don't know for sure.
Q. Okay. If you think of anybody else that you worked with at Pittman, can you tell your attorney and let him tell us?
A. Okay.
Q. All right. And we're talking about Daniel Construction. You said you worked as a laborer at Daniel Construction. What -- where did you do -- what -- where did you work for Daniel Construction, what places?
A. I worked at Apex, North Carolina, a nuclear power plant.
Q. Is that the only place that you did any work for Daniel Construction?
A. Yes, sir.
Q. And you said you -- you were hired on as a laborer; is that correct?
A. Yes, sir.
Q. Do you remember who your supervisor was at Daniel Construction?
A. No, sir.
Q. Do you remember any of your co-workers at Daniel Construction?

A. I'm not for sure what's --
Q. Was there anybody that was from down here in Laurel that you worked with up there?
A. No.
Q. Or down here from -- I mean, down in Mississippi at all?
A. Not as I know of, not on the crew I was on.
Q. Okay. What kind of shifts did you work at Apex? How long?
A. 6:00 in the morning until you got through.
Q. What was it that y'all were building at the nuclear power plant? Were y'all putting a slab in for it or --
A. We were building the power plant, what we did.
Q. What part of the power plant, I guess I should ask? Or what kind of stuff were y'all working with?
A. What kind of stuff we were working with?
Q. I mean, were y'all doing the concrete work or doing the steel work, or -- or what were y'all --

A. Well, when I was a laborer, I was just mostly cleaning up as a laborer. Cleaning up and chipping.
Q. Okay. What --
A. With a hammer, chipping hammer.
Q. What were you chipping with a hammer, concrete?
A. Yes, sir.
Q. And you didn't do -- did you do any sandblasting at -- while you worked for Daniel Construction?
A. No, sir.
Q. Were you around any sandblasting at Daniel Construction?
A. Not no sandblasting, but sand, I was.
Q. Okay. Just sand?
A. Yeah.
Q. All right. Tell me how you were -- and you've described it a little bit before, but how you were around sand while you were at Daniel Construction.
A. Well, say you make a pour on a wall. Then, once you pull the form off, and if it's got honeycombs in it, it's got to be chipped out. Then, you've got to replace it, you know,

mix that -- that sand and cement together and patch it.
Q. So you were mixing sand with already wet cement --
A. No, no.
Q. -- to patch? Oh, okay.
A. Dry cement. Sometimes it's dry cement, sometimes it's wet cement.
Q. So the -- the mixing of the sand with the cement to patch the -- the walls after the forms had come off, that was the times that you were around sand?
A. Yes, sir.
Q. Is that the only sand that you were around at Daniel Construction?
A. Yes, sir.
Q. What did y'all use to mix it up, what kind of equipment? A mixer, sand mixer?
A. Your hand.
Q. Oh.
A. And a hoe.
Q. A hand and a hoe?
A. Uh-huh.
Q. So y'all just had it down in a --
A. Yeah, in a bucket -- I mean, that

little -- little hopper, mix it back and forth (witness indicating).
Q. Did you use any other equipment to mix the sand and the concrete together besides a hoe?
A. No, sir.
Q. Did you do any work on a jackhammer while you were at Daniel Construction?
A. Yes, sir.
Q. What kind of things did you jackhammer?
A. Walls, floors, anything that was messed up.
Q. Did -- was it always concrete that you were jackhammering?
A. It was always concrete.
Q. Okay. When you worked the -- the jackhammer at Daniel Construction, did you wear any kind of protective equipment?
A. We used them dust masks.
Q. Okay. Are you all right? Do you want --
A. Huh-uh.
Q. Do you want to take a break?
MR. FOXWORTH:

Take a break?
A. Yeah.
MR. MANUEL:
Okay.
VIDEO TECHNICIAN:
Off the record. The time is 12:05.
(Off the record.)
VIDEO TECHNICIAN:
Back on record. The time is 1:28.
MR. MANUEL:
Q. Mr. McGilberry, when we took a break, we were talking about your -- your work at Daniel Construction up in North Carolina. Do you remember that?
A. Yeah.
Q. And we had just -- we were talking about the breaking up of concrete that you've been involved with there at the nuclear plant in North Carolina.
A. Uh-huh.
Q. And I think that you said that you wore a dust mask while you operated the jackhammer; is that correct?
A. Yes, sir.
Q. Were there any times that you

operated the jackhammer while working at Daniel Construction in which you did not wear any protection?
A. No, sir.
Q. Okay. And did you always have a dust mask on; is that what you wore?
A. Yes, sir.
Q. Tell me, what color was the dust mask that you used at -- at Daniel Construction.
A. It was mainly about the same as the rest of them, white, the same kind of ridges (witness indicating). I think the only difference from that was the string was blue.
Q. The -- the --
A. The rubber -- the --
Q. The -- the strap?
A. Yes, sir.
Q. Okay. Was it a single strap --
A. Yes, sir.
Q. -- on the mask?
And what was that strap made out of?
A. It was about the same as the rest of them --
Q. Okay.
A. -- that rubber.

Page 82

Q. Rubber?
A. Uh-huh.
Q. Do you know how that blue strap was attached to the white mask at Daniel Construction?
A. Sort of like that, like a little -- with a -- with a staple, small staple.
Q. And was there anything on the front of the mask that you used at Daniel Construction?
A. Not as I know of.
Q. Okay. Was there any sort of nose piece at all on the front of the one --
A. No, sir.
Q. The ridges that you -- that you said -- was there something on the front of the mask?
A. No, sir.
Q. No -- nothing?
A. Yeah, the ridges (witness indicating).
Q. Oh, ridges.
A. Yeah, okay. I'm -- okay. I'm thinking about something else you were saying.
Q. How -- which way did the ridges go on

Page 83

the mask at Daniel Construction?
A. The same way.
Q. Horizontal?
A. Yes, sir.
Q. If you looked inside that mask that you used at Daniel Construction, was there anything on the inside of it? Anything different than from the outside?
A. No, sir.
Q. Was there any writing on the outside of the mask at Daniel Construction?
A. Not as I remember.
Q. Were there any other types of masks that you used at Daniel Construction other than the white mask with the single blue strap?
A. No, sir.
Q. That's the only kind you used at Daniel Construction?
A. Yes, sir.
Q. Did you ever see the packaging that the masks came out of at Daniel Construction?
A. No, because they always had to go to the back and get it, you know, behind doors.
Q. So, no, you never saw the package?
A. No, we never did see the packaging.

Page 84

Q. Did -- did anybody ever give you any handouts or written instructions on how to wear the mask or how to use the mask at Daniel Construction?
A. No, sir.
Q. When you said that you -- you had to -- somebody had to go to the back to get the masks --
A. Well, they had to go behind the doors. You know, just like a counter, you know.
Q. Was this a --
A. When you come get your tools, you leave something -- leave -- you had to leave a little badge when you pick up something.
Q. So this was like a toolroom there?
A. Yes, sir.
Q. Okay. And is that the only place that you got any of the masks --
A. Yes, sir.
Q. -- at Daniel Construction?
A. Yes, sir.
Q. Did -- do you know who it was that ran the toolroom at Daniel Construction?
A. No, sir. No, sir.
Q. Would -- could you ask for different

Page 85

types of mask, or did you just say dust mask, and that's what they gave you?
A. Just say dust masks.
Q. And so that was the only type of dust mask you were provided --
A. Yes, sir.
Q. -- at Daniel Construction?
Did you ever participate in deciding what masks would be used at Daniel Construction?
A. No, sir.
Q. At Daniel Construction, did -- were there any rules about when you had to wear a dust mask?
A. Yeah. There's a rule. If you didn't wear them, you get fired.
Q. You had to wear them at all times?
A. Just about all times.
Q. Okay. Were there times that you --
A. All the time.
Q. Oh, you had to wear them all the time?
A. Uh-huh. And --
Q. What would happen --
A. For what we was doing, we had to wear them. You know, I can't say what everybody else

had to do.
Q. And what was the job that you were doing that required you to have to wear a dust mask?
A. Like chipping, sweeping, stuff like that.
Q. The chipping that you're doing, would that count using the jackhammer?
A. Yes, sir.
Q. All right. And what other type of chipping did you do?
A. Well, we had the little -- little hand chip, you know, chipper, you know, like the welders have. You know, you can take that and knock, you know, some of the concrete off. And if -- you know, if you need to go back any -- any further, unless it's a small, something small, you don't need something real big to do it. I did that.
Q. And like -- the hand chipper is kind of like a little hammer-looking thing?
A. Right, right.
Q. Okay. And did you have to wear a dust mask when you used the hand chipper, as well?

A. That's a rule up there. You've got to wear them.
Q. Did -- what would happen if you -- if you didn't wear your dust mask --
A. You get fired.
Q. You got fired?
A. Two write-ups, you're fired.
Q. Did you ever get written up for not wearing it?
A. No, sir.
Q. The toolroom that you talked about, do you know if that toolroom was run -- was run by Daniel Construction, or was it run by the power plant?
A. I believe it was run by the construction company, Daniel.
Q. Did -- did you know anybody that got fired for not wearing their dust mask at Daniel Construction?
A. Not as I know of.
Q. The -- the sand, you talked about how you'd -- you'd mix some sand using a -- using your hand and a hoe, essentially?
A. Yes, sir.
Q. Where did -- what -- how -- what kind

of containers was that sand in there at Daniel Construction?
A. All they did was brought it with a front-end loader and dumped it on the ground.
Q. Do you know where it came from?
A. It was already on the yard. That's all I know of.
Q. Okay. Did y'all have safety meetings at Daniel Construction?
A. Yes, sir.
Q. How often?
A. Twice a day.
Q. When -- at the beginning of the shift and the end of the shift?
A. No, at the beginning of the shift and after dinner.
Q. Do you recall, while working at Daniel Construction, was there any safety meeting held that discussed the dangers of silica exposure?
A. Not as I knowed of -- I heard of, you know.
Q. Not that you heard of?
A. Yes, sir.
Q. Okay. Was there any -- were there

any safety meetings held about the proper type of respiratory equipment to wear, respiratory protection equipment to wear?
A. Not in -- only -- I remember, you know, anytime we was cleaning up, chipping, you know, to keep from breathing that -- you know, taking that dust in, we had to wear a mask. That's all.
Q. Did you ever -- when you were working at Daniel Construction, did you ever -- ever have any complaints about the masks you were wearing?
A. No, sir.
Q. Did you ever have any problems with them protecting you from the dust?
A. No, sir.
Q. Did -- how many would you -- while you were at Daniel Construction and you were working on the, let's say, chipping and jackhammering, would you wear more than one mask a day?
A. Whatever it takes, two, three.
Q. When would you --
A. When you need it.
Q. I'm sorry. I didn't mean to

interrupt you.
A. I -- I say, yes, sir, just by when you need it, you know.
Q. How would you know when you needed to change one out?
A. I -- I guess, when it got too dirty, dusty.
Q. It got more difficult to breathe through it?
A. Yes, sir.
Q. And would you just go back to the toolroom and ask for another one?
A. Yes, sir.
Q. Did anybody -- and I'm -- I apologize if -- if I asked you this before lunch, but I don't remember. Did anybody do any fit testing of you at Daniel Construction for how the mask fit to your face?
A. No, sir.
Q. Did anybody give you any instructions on how to fit the mask to your face at Daniel Construction?
A. No, sir.
Q. Do you remember if there were any signs up at the power plant telling you about

any dangers of dust or silica exposure?
MR. FOXWORTH:
If you don't remember, you don't remember. Don't guess. Okay?
A. I don't know.
MR. MANUEL:
Q. Do -- the -- the chipping and concrete work that you did at the power plant, was it inside or outside?
A. Both, inside and outside.
Q. When you were doing concrete work inside, what type of ventilation did they have in the -- in the places that you worked?
A. Unless it rained, we had a tarp, you know, to keep -- keep the floor from getting wet. But if it's not raining, it always was open.
Q. So is -- when you talk about doing concrete work inside, you're talking about doing it under a tarp?
A. Yes.
Q. So as far as being inside a building doing concrete work, you didn't do any of that at Daniel Construction?
A. Patching.

Q. Okay. The patching after the forms come off?
A. Yes, sir.
Q. Okay. But as far as jackhammering, that was all done either under a tarp or in the open air?
A. It always was done in the open, you know, unless you was in a room was closed in.
Q. Okay. Do you remember doing any jackhammering at Daniel Construction in a closed-in room?
A. Yeah.
Q. Okay. Describe for me the room that you were doing the jackhammering in. Like how big was it?
A. Well, it can be the size of this room right here (witness indicating). And then, you know, like around the door, where the -- the concrete then -- then all get to the door. And you might have a honeycomb around it, and you've got to chip the honeycomb out then -- and then re- -- and then patch it.
Q. What percentage of time would you say that you had to do any jackhammering inside during the years that you were there? Was it

less than 50 percent?
A. I believe it was more.
Q. More than 50 percent?
A. Yeah, because -- yeah, I believe it was more.
Q. In the rooms that you worked at, worked inside of at Daniel Construction, did they ever have any big fans or windows open or anything like that for ventilation?
A. We had doors open, you know, but I don't -- I don't remember no fans.
Q. Did you have a safety man at Daniel Construction?
A. Yes, sir.
Q. Do you remember what his name was?
A. No, because there was a bunch of them.
Q. And how -- what was the -- what kind of contact would you have with the safety man at Daniel Construction? Did he come around and talk to y'all and make sure you were doing things?
A. Well, anytime you seen the safety man, he's checking to see when you be wrong or something like that. That's the only time I

Page 94

really see them, you know, because I always try to, you know, stay on the right foot.
Q. Do you know if the safety man that you saw worked for the power plant, or did he work for Daniel Construction?
A. I think he worked for Daniel. I believe he did.
Q. Would the safety man be the person that also ran the safety meetings?
A. No, sir.
Q. Who ran the safety meetings?
A. You -- your supervisor -- I mean, your foreman or your supervisor.
Q. Do you remember the names of -- of any of your foremen or supervisors at Daniel Construction?
A. I'm going to have to think on that one. I don't know for sure.
Q. If you think of their names, will you tell your attorney and tell him to pass the info on to us?
A. Yes, sir.
Q. Do you stay in touch with anybody that you worked with at Daniel Construction?
A. I hadn't talked to nobody since I

Page 95

left from up there.
Q. Do you remember if you saw anybody doing any air monitoring or testing the air levels at Daniel Construction, testing the air quality --
A. What you mean, you know? Like what they -- saying testing and then, you know, I don't know how they test it, you know. You have to kind of explain to me what I need to know for --
MR. FOXWORTH:
Just tell him --
mR. MANUEL:
Q. Do you know -- did -- were you ever told that anybody was in there doing any testing of the quality of the air?
A. No, sir. No, sir.
Q. Okay. Did you ever see anybody from OSHA come out there?
A. Yes, sir.
Q. Well, do you remember what the OSHA people came out to the power plant for?
A. We had a bad accident.
Q. What kind of accident was it?
A. We had a big cable fell and hurt a

Page 96

lot of peoples.
Q. Was that -- the people that got hurt on that accident were Daniel Construction people?
A. Yes, sir.
Q. Is that the only time that you remember seeing anybody from OSHA out there at the power plant?
A. Yes, sir.
Q. While you worked for Daniel Construction, did -- did they have you take physical exams? I mean, you know, did they have you go to see a company doctor on a regular basis or anything like that?
A. Well, the -- the only doctor I seen was the ones on the job. Like I got cement in my eye, got a rebar, you know, in your arm, you know, so far, and you had to go -- they send you to the -- to the doctor.
Q. But as far as like a -- just a regular -- like if they'd say, Mr. McGilberry, it's time for you to go have your regular checkup for Daniel Construction, did they ever do anything like that?
A. No, sir.

Page 97

Q. Did they give you any kind of medical exam when you got hired on at Daniel Construction?
A. No, sir.
Q. Did you work -- and I apologize if I asked this before; I may have, but I'm not sure. Is the power plant in North Carolina the only place that you worked for Daniel Construction?
A. Yes, sir.
Q. And did you work any other jobs besides as a laborer at Daniel Construction?
A. No, sir.
Q. So you never were a supervisor or a foreman?
A. No, sir.
Q. And you described for me the -- the white mask with the -- with the blue strap. Is that the only type of dust mask that you wore while you worked at Daniel Construction?
A. Yes, sir.
Q. All right. Why did you leave Daniel Construction?
A. Cutting back on jobs.
Q. You were laid off from there?
A. Got laid off.

Q. All right. And I meant to ask you the same thing. Why did you stop working with Mr. Pittman -- is that his name?
A. Uh-huh.
Q. Why -- why did you stop working with him?
A. Better job.
Q. Better job.
When we were talking about the stairs that you were sand -- that you -- that you were around the sandblasting of for Pittman, what -- what were those stairs made out of?
A. They was iron stairs. They had the -- the grates like the barbecue pits have on them.
Q. How big were they? I mean, how far up did the stairs go?
MR. FOXWORTH:
Are you talking about how many flights; is that what you're --
MR. MANUEL:
Yeah. I was just curious as to how big of a --
A. I think it might --
MR. MANUEL:

-- flight of stairs they were.
THE WITNESS:
I don't want to guess at it.
MR. MANUEL:
Q. I mean, is it more than one story or --
A. Yeah, it was -- it was higher than one story.
Q. The -- the sandblasting that went on on these stairs, did anybody have to get up in any kind of cherry picker or crane or anything like that to do it?
A. No, sir. We did it right there on the -- you know, it was -- it was still there.
Q. So you just walked up --
A. Yes, sir.
Q. They walked up the steps while they did them?
A. Uh-huh.
Q. Do you -- the next place that I have that you believe you may have been exposed to silica is Gordon Myrick. Where did you do work for Gordon Myrick?
A. We did work in Ellisville. Ellisville, Mississippi. We did work for

Laurel, Mississippi; Collins, Mississippi. We did some work in Stringer -- Stringer, Mississippi.
MR. FOXWORTH:
Did you say Stringer?
THE WITNESS:
Yeah, it's -- it's -- well, the -- it was at the Jones and the Jasper County line, so I'm going to say Stringer. It's -- it's --
MR. FOXWORTH:
Okay.
THE WITNESS:
That's where its office is at.
MR. MANUEL:
Q. That's where Gordon Myrick's office is at?
A. Yes, sir.
Q. And would your supervisor at Gordon Myrick have been Mr. Myrick?
A. That's the one that owned the company.
Q. Okay. What kind of things were y'all working on at these different locations?
A. Putting up buildings, remodeling buildings, pouring concrete.

Q. Were these all commercial buildings, or were any of them houses?
A. Churches. You know, we did churches, remodeled churches, add to them and stuff like that. Worked in the oil, oil field. We did the fence right here (witness indicating), on the other side of the rail, like where you see all the oil wells at. We did that.
We did a lot of buildings at the college in Ellisville.
Q. But no houses, no individ- -- no individual homes or anything like that?
A. Well, the only home we done, that's where I did the sandblasting at.
Q. Okay. Do you remember whose home that was?
A. His.
Q. Oh, Mr. Myrick's home?
A. Uh-huh.
Q. Was it a pretty big house?
A. Yeah.
Q. What -- do you remember when it was that y'all were working on Mr. Myrick's house?
A. No. I don't know what date it was.

Page 102

Q. Okay. Because I -- and I can't remember -- I need to look -- when it was that you worked for Gordon Myrick.
Let's see, from '85 to '87; does that sound right?
A. Yes, something like that.
Q. Do you remember if it was early in the time that you were working for Mr. Myrick?
A. No, it was in a -- it was in a later time.
Q. A later time?
A. Yes.
Q. And is that the only sandblasting that you were around was working on Mr. Myrick's house?
A. Yes, sir.
Q. What were y'all sandblasting at Mr. Myrick's house?
A. He -- well, the wood that we had -- they had built the house with, they had -- it was some old wood. They took it out the school. You know, like off the floor, that tongue and groove wood. And we were sandblasting and taking the -- the wax off of the wood.
Q. Really? Did it tear the wood up at

Page 103

all?
A. Huh-uh.
Q. How long did it take y'all to -- to take the wax off the wood that y'all used to build the house?
A. It was -- it was quite awhile. I'm not for sure what -- how many days or weeks it took, but it was -- it was -- it was quite awhile.
Q. And how many -- what did you do with regard to the blasting of that wood?
A. All I did was tend the pot and sweep the sand and stuff up.
Q. Where were y'all doing the blasting of the wood; was it outside or inside?
A. It was on the inside.
Q. So the -- the wood that -- and this is wood that they pulled up from the floors --
A. Right.
Q. -- of an old school?
A. Right, right, right.
Q. And y'all were using it to put in for the floors of his new house?
A. The whole house, the walls and everything.

Page 104

Q. Really? Did y'all do any of the work on pulling up the floors from the old school?
A. I didn't.
Q. So they framed up Mr. Myrick's house and put the -- put the tongue and groove wood on the -- on the walls. And then, y'all went in and --
A. On the floors.
Q. -- sandblasted?
A. Yes, sir.
Q. Was there a roof on the house at the time?
A. Yes, sir.
Q. The -- do y'all know what kind of material y'all were using to blast with?
A. What kind of sand?
Q. Yeah. Oh, was it -- was it sand; is that what it was?
A. Yeah. It was sandblasting.
Q. Was it always sand that you used?
A. All I know, it was sand.
Q. Did you ever do any of the loading of the pot or the equipment used to sandblast?
A. I had to tend the pot.
Q. Okay. So you had to load it?

Page 105

A. Yes, sir.
Q. Tell me about that pot that y'all used in Mr. Myrick's house.
MR. FOXWORTH:
What?
THE WITNESS:
Give me that book. Let me see your book.
MR. FOXWORTH:
Describe it to him.
THE WITNESS:
Describe it to him?
MR. FOXWORTH:
Yes.
MR. MANUEL:
Q. Would it be easier for you to draw a picture?
MR. FOXWORTH:
You want to draw him a picture?
A. Which one you want first, the pot?
MR. MANUEL:
Q. The pot, yes, sir.
MR. FOXWORTH:
Okay. While he's -- while he's drawing, let's take a break.

Page 106

MR. MANUEL:
Okay.
VIDEO TECHNICIAN:
Off the record. The time is 1:53.
(Off the record.)
VIDEO TECHNICIAN:
Back on record. The time is 1:59.
MR. MANUEL:
Q. Mr. McGilberry, you've done a drawing for us that I'm going to make as Exhibit 4 to this deposition of -- it's a good drawing.
A. Thank you.
Q. -- the --
MR. FOXWORTH:
Let's see who likes it the best.
MR. MANUEL:
Q. Is this -- is this the pot that you worked with in Mr. Myrick's house?
A. Yes, sir.
Q. Okay. I'm going to --
MR. MANUEL:
Let me get this marked as Exhibit 4.
(Exhibit 4 was marked.)
MR. MANUEL:
Q. I'm going to ask you a couple of

Page 107

questions about what -- about your drawing.
Tell me, there on the left side, you've got a -- something sticking out up at the top. Could you tell me what --
A. That's the handle.
Q. It was a handle?
A. Yeah. Where you -- you can -- since they've got the wheels on them, you can, you know, pull it back, and it will roll.
Q. Okay. How -- did you have to move this machine?
A. No, I didn't -- I don't remember moving it.
Q. Could one person move it?
A. I don't think so.
Q. So it would take more than one person to move it?
A. Yes, sir.
Q. Do you remember how tall it was? Was it taller than you?
A. No. Because I -- I can see over in it.
Q. And how tall are you?
A. I'm about 5'11".
Q. And I'm going to ask you that same

Page 108

strange question. If you were to want to grab around that pot, could you have reached all the way around it and touched your fingers on the other side?
A. No, sir.
Q. Okay. Do you remember what color the pot was?
A. No. All I know, it was -- it was a darker color pot.
Q. If -- so the -- the -- when you're looking at the picture on the right -- I mean, on the left side facing the picture, the piece that comes out, that was a handle that was used to move it?
A. Yes, sir.
Q. In the middle of your drawing, you've got an oval shape with a -- what looks like a plus sign in the middle of it?
A. Uh-huh.
Q. Can you tell me what that is?
A. I guess that's how you get inside of it.
Q. Is that a -- a door?
A. Like a door.
Q. Okay. Did you ever open that door on

Page 109

the side of it?
A. Not as I remember, sir.
Q. And you've got a series of dotted lines around the top of it. Tell me what that --
A. Okay. By --
Q. -- shows.
A. -- looking at it, you can't -- you can't see the -- the valley in it (witness indicating). So that's why I put the dotted line like that --
Q. So it --
A. -- hidden lines.
Q. It was -- on the inside of the pot, it was kind of -- it was --
A. Yeah, a valley.
Q. -- cone shaped or --
A. More like a valley type.
Q. A valley. And did it have a lid on it at all?
A. No, sir. It might have. I don't know. I don't know for sure.
Q. Did -- could you -- did you have to turn the pot off to load the sand into it, or could you load it while it was running?

Page 110

A. I load it while it was running because I -- like I say, I never did let it get empty.
Q. Do you know how many people could blast off of that pot at one time?
A. No, sir.
Q. Did you ever see any more than one person blast off of it?
A. No, sir. Just one.
Q. Do you -- off on the right side of the picture, there's a piece that looks to be going down to the floor and up. Can you tell me what that is?
A. That should be the -- the air line.
Q. Is that -- what would that be hooked up to?
A. That's the air line that he uses to -- to sandblast with.
Q. Oh, okay. So there would be a man on that --
A. On that end.
Q. On that end.
Do you know how that line was controlled? Or did you ever see how it was controlled?

Page 111

A. All I remember, it was a pretty big hose. And it -- as it got to the end, it got -- it got narrow, you know, smaller. I never did try to use it.
Q. Do you have any idea how they could control the air/sand mixture on that pot y'all used at Mr. Myrick's house?
A. I'm not for sure did he have the -- the nozzle you mash with your hand or the -- the nozzle you -- you turn. I -- like I say, I'm not for sure.
Q. You said that you didn't let the pot get empty while y'all were in there working. Do you know how much sand the pot would hold?
A. I don't know.
Q. Did -- hold on a second.
Do you remember any writing on the side of that pot?
A. I can't remember.
Q. Did -- do you know if the pot was new, or what condition the pot was in?
A. To me, it looked like it was in good shape.
Q. How was the blasting pot powered?
A. It had a big generator, a compressor,

Page 112

air compressor.
Q. What did the -- what color was the air compressor?
A. It's -- it was a cream color, or either -- either gray or brown, something like that. I'm not for sure. I know that it was -- it was a two-color.
Q. Are the two colors you remember gray and brown?
A. No. It's -- it's -- that cream color is going to be one of the colors.
Q. Okay. I'm sorry. And then, the other color was either gray or brown?
A. Yes, sir.
Q. Do you remember any writing or -- or anything like that on that air compressor?
A. Not right offhand, I don't.
Q. Do you -- how tall was the air compressor? Was it taller than you?
A. Yes, sir. I -- I barely could see on the other side of it.
Q. Okay. So it's just right up to your eye level?
A. Uh-huh. Might be a little bit shorter or something like that.

Page 113

Q. Did it have any wheels on it?
A. Yes, sir.
Q. How many wheels?
A. Two wheels.
Q. Could -- did you ever move the air compressor?
A. Yeah.
Q. So one person could move it?
A. No.
Q. Oh. How many --
A. You didn't want to hurt yourself.
Q. How many people did it take to move it?
A. It would take two or three to move it.
Q. Do you know how the air compressor was powered?
A. Diesel.
Q. And do you know how much air pressure it provided?
A. No, sir. I know it -- it will blow.
Q. Did -- did you ever start the compressor?
A. Yes, sir.
Q. How did it -- what did you use to

Page 114

start it?
A. Well, it's got its own switch and a button to mash.
Q. So you'd switch the on switch --
A. Switch it on and mash the button.
Q. -- and then press the button?
A. I had to pull the choke out.
Q. You had to pull a choke out, too?
A. Uh-huh.
Q. How close was the compressor to the sandblasting pot when y'all were working in the house?
A. Maybe 10 foot.
Q. And when you were tending the pot there in the house, how close were you to the man that was doing the blasting?
A. I don't want to guess at it. I'm not for sure.
Q. Do you know if it was more than 10 feet away?
A. More.
Q. More than 25 feet away?
A. More.
Q. More than 50 feet away?
MR. FOXWORTH:

Page 115

Don't --
A. That's guessing at it.
MR. FOXWORTH:
Yeah.
MR. MANUEL:
Q. Okay.
MR. FOXWORTH:
Don't guess if you don't know.
MR. MANUEL:
Q. But was it more than 25 feet away?
A. Yes, sir.
Q. The pot that you drew for us on Exhibit 4, is that the only type of pot that y'all used out at Mr. Myrick's house?
A. That I know of, yes, sir.
Q. And the compressor that you described with us with the two wheels, was that the only air compressor that y'all used out at Mr. Myrick's house?
A. Yes, sir.
Q. The -- when you were tending pot, what -- when you loaded the sand, what were you loading it out of it? I mean, what -- how would the sand come there to the --
A. It was in bags.

Page 116

Q. In bags. Did you use any sand in Mr. Myrick's house other than that bag sand?
A. No, sir.
Q. And tell me what the bag sand, what the bags looked like that you used for Mr. Myrick's house. What color was the bag?
A. Brown and red.
Q. Brown and red. The -- the bag it -- the bag itself was brown and red?
A. Yes, sir.
Q. Was there any -- what part of it was brown and what part of it was red, I guess I should ask?
A. The reason I'm saying brown and red, a lot of the writing was -- was -- was red, and the bag was brown itself.
Q. All right. Do you know what any of the writing said; do you remember?
A. All it said is sandblasting. I'm not for sure what -- what did it say.
Q. But you do remember it said sandblast on it?
A. Sand.
Q. Do you remember if there were any warnings on the bags?

Page 117

A. Not as I know of.
Q. How big were the bags that you used out there? How many pounds, I guess?
A. I think it was 100 pounds.
Q. Do you know where those 100-pound bags of sand came from that y'all used at Mr. Myrick's house?
A. I don't -- I guess, Walker Jones.
Q. Okay. Well, why -- why do you suppose -- what is Walker Jones?
A. That's one of the places we rent equipment from.
Q. Why do you think that they came from Walker Jones?
A. Usually, if he sells the -- the pot, he's -- he's going to have the sand to go with it, you know. I don't know.
Q. And why do you -- why do you think that the pot came from Walker Jones?
A. That's where we always get tools from, Walker Jones.
Q. When you were working for Mr. Myrick?
A. Gordon Myrick, yes, sir.
Q. Do you remember any other types of bags at Mr. Myrick's house other than the brown

with the red writing on it?
A. No, sir.
Q. Do you remember if there were any pictures on the bags?
A. Not as I know of.
Q. Do you remember if you used any other size bags besides 100-pound bags?
A. I don't know.
Q. Did -- do you know what an MSDS is, material safety data sheet? Do you remember if you've ever seen a -- like a -- a sheet describing the hazards of any materials that you used while you were there at --
A. No, sir.
Q. You never saw anything like that?
A. No, sir.
Q. Who was your supervisor -- did I already ask you this, who your supervisor -- supervisor was at Mr. Myrick's?
A. Red, Red Hardy.
Q. How do you spell that last name; do you know? Hordy?
A. Just like Hardee's, Hardee's, that hamburger place.
Q. Oh, Red Hardy. Okay. Do you know

where Mr. Hardy is these days?
A. He -- he's deceased.
Q. Do you remember any of the other people that you worked with at Myrick's?
A. Bobby Taylor.
Q. Where is Mr. -- is Mr. Taylor still living?
A. Yes, sir.
Q. Where does he live?
A. Ellisville.
Q. Anybody else that you remember working with at Mr. Myrick's?
A. Let me see, Wilson Lindsey.
Q. Wilson Lindsey. Where does Mr. Lindsey live?
A. Ellisville.
Q. Anybody else?
MR. FOXWORTH:
What question are you on?
MR. MANUEL:
Any other co-workers.
A. I know some of the first names, but I can't think of the last names.
MR. MANUEL:
Q. Okay. Give me some, just some of the

first names that you remember.
A. Billy, Tom, Sam.
Q. Any of them have any nicknames that you remember?
A. No, sir.
VIDEO TECHNICIAN:
Excuse me. I need to change out the tape.
Off the record. The time is 2:17.
(Off the record.)
VIDEO TECHNICIAN:
Back on record. The time is 2:17.
THE WITNESS:
Sam. Sam.
MR. MANUEL:
Q. I got Sam. I got -- yeah, I got Sam. I wrote him down.
A. Already wrote down.
Q. Did -- where was -- where is Mr. Myrick's house, the house that y'all were working on?
A. It's right there at the county line, Jones and -- and Jasper County line.
Q. Is it on a -- do you remember what road it's on?

A. 15.
Q. 15?
A. Highway 15 North.
Q. When you were working, when y'all were doing the -- when the blasting of the wood was taking place in Mr. Myrick's house and you were tending the pot, did you wear any protective equipment?
A. I had the mask.
Q. Dust mask?
A. Dust mask.
Q. What -- were there times that you tended the pot that you didn't wear the dust mask?
A. Well, I had it on most all of the time.
Q. Almost all the time. But were there times that you didn't have it on?
A. Besides eating.
Q. Oh, when you had to eat?
A. Yeah.
Q. And you also said that you cleaned up the sand that was used. Did you wear any protective equipment when you were doing the cleanup?

Page 122

A. Well, I still had that mask on because it was pretty dusty.
Q. Was there any time that you did cleanup at Mr. Myrick's house that you didn't wear a mask?
A. Well, then on -- cleanup was on -- you know, doing the sand.
Q. Okay. So sometimes -- and I may -- I may have misunderstood you. You're saying that there -- when you're doing the cleanup with the sand, sometimes you didn't have the mask on?
A. No, huh-uh. I said I had the mask on.
Q. All the time?
A. Uh-huh.
MR. FOXWORTH:
Was that a yes?
THE WITNESS:
Yes, sir.
MR. MANUEL:
Q. What -- tell me about the mask that you wore at Mr. Myrick's house. What color was it?
A. It was white with the ridges.
Q. Which way --

Page 123

A. White string -- (witness indicating) -- or stretch band or whatever, however you want to call it.
Q. Was it only one band?
A. Yes, sir. With the aluminum part on the nose.
Q. The ridges that you talked about, did they go crossways or up and down?
A. Crossways (witness indicating).
Q. Was there anything else on the outside of the mask other than the ridges?
MR. FOXWORTH:
You talked about the nose piece.
A. No, sir.
MR. MANUEL:
Q. The nose piece was on the outside of the mask?
A. Huh?
Q. Was the nose piece on the outside of the mask?
A. No, sir.
Q. The nose piece was on the inside of the mask?
MR. FOXWORTH:
Do you understand --

Page 124

MR. MANUEL:
Q. The metal piece, the piece of aluminum that you were talking about --
A. Oh, the metal piece was on the outside.
Q. Okay. Was there anything else other than the nose piece and the ridges on the outside of the mask?
A. No, nothing -- nothing but the -- the ridges and the -- the piece of aluminum and the -- the two staples that hold the --
Q. Okay. So it was stapled, the strap was stapled on?
A. Right.
Q. Was there any writing on the outside of the mask?
A. No, sir.
Q. If you looked on the inside of the mask, was there anything different about the inside of the mask when you looked in it?
A. It's made the same way as the outside, yes, sir.
Q. Okay. Did you ever see the packaging that those masks that you used at Mr. Myrick's came in?

Page 125

A. No, sir.
Q. Where did you get them? Were they just in the truck, or did Mr. Myrick come give them to you or --
A. I believe we got them off the other job. That's -- you know, like I said, we -- before, we, you know, usually get them in a -- in a -- quite a few. And we -- I think we just got some and took with us. I'm -- I'm not for sure.
Q. Okay. Did -- did you -- when you worked for Mr. Myrick, did you ever help make the decision as to what type of mask to buy or use?
A. No, sir.
Q. You just used what he gave you?
A. Yes, sir.
Q. Did -- and did I understand it was a single white band on the mask that you used at Mr. Myrick's?
A. Yes, sir.
Q. Did -- did you ever get any kind of written instructions on how to use the masks that you used at Mr. Myrick's?
A. No, sir.

Q. Did anybody give you any instructions as to how to fit the mask to your face at Mr. Myrick's?
A. No, sir.
Q. Did anybody do any fit testing of the masks there --
A. No, sir.
Q. -- at Mr. Myrick's? The days that y'all were working in Mr. Myrick's house, how long was the blasting going on?
A. Worked until the -- the guy that was doing the blasting say he was tired.
Q. All right. Was it a couple of hours each day?
A. I'm not for sure how many -- how long was it.
Q. I mean, do you remember any days in which you were working on Mr. Myrick's house in which you went all day that blasting was going on?
A. What you mean, all day, you know, work straight eight hours, or stop, just --
Q. Yes, sir. I'm talking about was there any one day when it was just eight hours long of just blasting?

A. We did a full day of it, but, you know, it was always -- there was some stopping in between it.
Q. Okay. That -- and that's what I was -- I was asking.
A. Okay.
Q. Y'all -- y'all would stop at times and do other work and then go back to blasting?
A. You'd stop, take a break, and then go back.
Q. And the only thing that you did with regard to the blasting was tend the pot at Mr. Myrick's?
A. Yes, sir.
MR. FOXWORTH:
Do you want some more water, John?
THE WITNESS:
Yes, sir.
MR. MANUEL:
Q. And the -- the mask that you just described for us, is that the only type of mask that you remember using while y'all were working on Mr. Myrick's house?
A. Yes, sir.
Q. And did y'all blast anything else out

at Mr. Myrick's house other than the wood?
A. No, sir.
Q. What -- did you do any kind of concrete work while you worked for G. -- for H. Gordon Myrick?
A. Yes, sir.
Q. Did you do any tearing up of concrete?
A. Yes, sir.
Q. Where -- what jobs did you do tearing up of concrete?
A. We did it in Ellisville, Mississippi.
Q. And what were you doing during the tearing up of concrete jobs?
A. Running the chipping gun.
Q. Running the chipping gun?
A. Yes, sir.
Q. Now, is that different than the jackhammer?
A. Chipping gun, chipping hammer, same thing. No, it ain't.
Q. When -- what sort of protective equipment did you wear when you operated the jackhammer while working for Mr. Myrick?
A. Safety glasses and masks.

Q. Was it the same type of masks that you described that you wore while you were in his house?
A. Yes, sir.
Q. Did you use -- during the entire time that you worked for H. Gordon Myrick, did you use any other type of mask than the type of mask you described that you used while working --
A. No.
Q. -- on Mr. Myrick's house?
A. No, sir. Always the same, same type mask.
Q. Okay. And is it true that throughout the entire time you worked for Mr. Myrick, you never saw the packaging that the masks came out of; is that true?
A. No, I never did see it.
Q. You never saw the packaging?
A. No, sir.
Q. And during the entire time you worked for Mr. Myrick, did you ever see any written instructions about how to use the masks that you had?
A. No, sir.
Q. The -- running the chipping gun for

Mr. Myrick, did you do it at -- on any jobs other than there at Ellisville?
A. I did it at the -- the bank in Collins. I did it at the church in Calhoun. I did it at the church in Laurel.
Q. All right. In Ellisville, what -- what building were you working on?
A. At the college.
Q. College?
A. Dormitory.
Q. Was there any time that you were running the chipping gun in which you didn't wear a dust mask?
A. No, sir.
Q. Was there any -- were there any rules while you were working for Mr. Myrick about when you had to wear a mask and when you didn't?
A. He told me that's what he bought them for, to use, so we need to use them.
Q. Were there -- did y'all have any safety meetings while you were working for Mr. Myrick?
A. Not as I remember.
Q. Do you remember if anybody from OSHA ever came out on any of the sites y'all were

working on for Mr. Myrick?
A. Not on none of the ones I had worked on.
Q. At the time you worked for Mr. Myrick, did you have a beard or a mustache?
A. I believe I had a mustache.
Q. Did anybody give you any instructions on how to -- whether a dust mask would fit over a mustache, or how you were supposed to adjust a dust mask with a mustache?
A. Huh-uh.
Q. Is that a no?
A. No. I'm sorry about shaking my head.
Q. No problem.
At any of the places that you worked for Mr. Myrick, do you know if anybody did any -- were you aware of anybody doing any air testing?
A. No, sir.
Q. At any of the places that you worked for Mr. Myrick, did you ever see a written respiratory protection program?
MR. FOXWORTH:
Do you know what that is? If you don't know what that is, John, ask him.

A. I don't know.
MR. MANUEL:
Q. Okay. Did you ever -- did anybody ever give you any kind of written document or any kind of brochure or something that said --
A. No, sir.
Q. -- you know --
A. I'm sorry.
Q. -- what you're supposed to wear and when you're supposed to wear it?
A. No, sir.
Q. Did -- at any of the places that you worked doing either concrete work or were around sandblasting, did anybody ever show you any brochures about protective equipment?
A. No, sir.
Q. Have you ever seen any ads or brochures regarding dust masks?
A. No, sir.
Q. All right. We're getting close.
THE WITNESS:
Can I take a -- can I take a break?
MR. MANUEL:
Yeah.
MR. FOXWORTH:

Yeah.
MR. MANUEL:
You need to take a break? I'm getting real close, so --
VIDEO TECHNICIAN:
Off the record. The time is 2:31.
(Off the record.)
VIDEO TECHNICIAN:
Back on record. The time is 2:46.
MR. MANUEL:
Q. Mr. McGilberry, we've got -- we talked a little bit about working for Mr. Myrick, and you said that y'all had done some blasting in the -- in the house. Do you know who supplied any of the sand that y'all used at Mr. Myrick's? Or did you already answer that? I think --
A. I don't know who he bought it from, but I believe -- like I say, I -- I think he got it from Walker Jones.
Q. Okay. Did y'all use any -- did y'all mix any concrete while y'all were working for Mr. Myrick? On any of the jobs that y'all did, did y'all do any concrete mixing?
A. Like patching, patching and stuff

like that.
Q. Patching?
A. Yes, sir.
Q. And would that be the same process like you described out in Apex, North Carolina, that you would mix the stuff together with a hoe in a trough?
A. Yes, sir.
Q. Did you use anything else to mix the concrete other than a hoe and a trough while you worked for Mr. Myrick?
A. Not as I know of.
Q. Do you know where any of the materials that you used for the patching came from when you worked for Mr. Myrick?
A. Equipment, what you mean, sand --
Q. Yeah, that -- that -- the material that you were using to do the patching.
A. We got the sand from Pine Belt, Pine Belt Ready Mix. They buy it in bulk, you know, like it's --
Q. Uh-huh.
A. It's according to what they're doing on a job. You know, a lot of time, that sand -- sand is already on the job.

Q. Okay.
A. And we usually get it from Pine Belt.
Q. And did I understand you correctly that you said that the only kind of concrete mixing that you did with Mr. Myrick was just the mixing for the patching, correct?
A. Yeah.
Q. So any -- the chipping gun that you used at these various places in Collins and Calhoun and Laurel, y'all would have been chipping concrete that was put down by somebody else?
A. Well, the same crew.
Q. The same crew?
A. Yeah. You know, the -- all of the guys that -- on that construction site was with Gordon Myrick, so.
Q. Okay. So it would have been -- you were chipping -- chipping concrete that was put down for --
A. Well, we -- we'd -- go ahead. Go ahead. Go ahead.
Q. Oh, I was just going to say, you were chipping concrete that had been poured by some -- another crew for Mr. Myrick?

A. He contracted the smoothness out. Somebody else would come in there and smooth it out for him.
Q. Did the finishing part of it?
A. Yeah, the finishing part.
Q. Okay.
A. But, if anything is wrong with it that it -- it needed to be chipped out, we had to do it.
Q. So y'all wouldn't have been involved in the mixing of the concrete that was poured?
A. No, sir.
Q. Do you know who it was that he contracted out with to do the finishing?
A. All I know is the man was named Jessie.
Q. Jessie?
A. Uh-huh.
Q. Now, we've talked about two limited times that you were actually around sandblasting. One was at -- doing the stairs for Mr. Pittman, and the other time was in Mr. Myrick's house. Was that -- did y'all use any other materials to do blasting at either of those sites other than sand?

A. That's the only thing I remember was sand.
Q. And what -- and I apologize if I asked this before, but the work on Mr. Myrick's house, do you remember what year that was?
A. No, sir.
Q. All right. Have you told me everywhere that you worked around sandblasting or did any sandblasting? Have we covered all of those work sites?
A. Yes, sir.
Q. Okay. And have you told me about all the places at which you either did concrete work or any chipping or tearing out of concrete?
A. I believe so.
Q. All right. Were you in the military?
A. No, sir.
Q. Have you ever been a member of a union?
A. A union?
Q. Yes, sir.
A. Yes, sir.
Q. What union were you a member of?
A. IBEW.
Q. Brotherhood of Electrical Workers

or -- I don't even know.
A. IBEW.
Q. Which -- what lodge -- what -- what lodge or whatever it was were you a member of, what local? Do you remember a number?
A. I think, 437.
Q. Where was it based out of?
A. Out of Laurel.
Q. Out of Laurel?
A. Laurel.
Q. Did you ever hold any offices in the union?
A. No, sir.
Q. Did you attend union meetings?
A. Yes, sir.
Q. How often did y'all meet?
A. I'm not for sure how -- how often we met.
Q. Was it once a month or once a year or --
A. I don't know.
Q. How long were you a member of the IBEW?
A. The two years -- the twice -- the two times I worked at Howard.

Q. Did you -- do you remember, while you were a member of the IBEW, if they had any meetings in which y'all discussed asbestos?
A. Not as I know of.
Q. How about silica?
A. No, sir.
Q. All right. How about any meetings in which y'all discussed the wearing of respiratory protection or protective equipment?
A. No, sir.
Q. Did you receive stuff in the mail at all from the union? Newsletters or anything like that?
A. I think we got a monthly -- quarter or monthly newspaper or something like that.
Q. Do you remember anything in the newspaper or the -- whatever -- newsletter that you got talking about silica or asbestos?
A. No, sir.
Q. Do you remember who your shop steward was at Howard?
A. No, sir. Oh, the steward?
Q. Yeah.
A. Let me see. James Dace.
Q. James Dace?

A. Yes, sir.
Q. How do you -- do you remember how to spell that last name?
A. Huh-uh.
Q. D-A-C-E, or something like that?
A. Your guess is as good as mine.
Q. All right. What's your wife's name?
A. Paula.
Q. And what is -- what was her maiden name?
A. Gordon.
Q. How old is she?
A. Forty-four.
Q. All right. You told me about one of your daughters, Courtney, who lives with you right now; is that correct?
A. Yes, sir.
Q. Tell me your other daughters' names.
A. Anita Gordon.
Q. Where does Anita live? Does she live in the state of Mississippi?
A. Yes, she lives on the same street I stay on, McManus.
Q. All right. Who else?
A. Angela McGilberry.

Q. Where does Angela live?
A. North Street.
Q. In Ellisville?
A. Yes, sir.
Q. All right.
A. Christina McGilberry.
Q. Ellisville?
A. Yes, sir.
Q. Okay.
A. Joanie McGilberry.
Q. Ellisville?
A. Ellisville.
Q. Are any of your daughters married?
A. One.
Q. Which one?
A. Angela. She a Clark, Angela Clark.
Q. And what's her husband's name?
A. Greg Clark.
Q. Have you ever worked with Greg?
A. Not on no jobs.
Q. Okay. Have you ever worked with any of your daughters on any of your jobs?
A. No, sir.
Q. Have you ever worked with your wife on any of your jobs?

A. No, sir.
Q. Does your wife smoke?
A. Yes.
Q. How long has she smoked? Since you've been married to her?
A. Yeah.
Q. Does she smoke in the house?
A. No.
Q. What -- what brand does she smoke; do you know?
A. Salem.
MR. FOXWORTH:
What was your question, Will?
MR. MANUEL:
What brand does she smoke.
Q. Salem?
A. Yeah.
Q. Menthol or --
A. Cigarettes is all I know.
Q. Okay. Have you ever smoked?
A. No.
Q. Does your daughter, Courtney, smoke?
A. No.
Q. Do -- I'm going to ask you some questions. They're going to sound like very

personal questions, but I assure you I'm not asking for my own enjoyment.
MR. FOXWORTH:
Oh, don't believe him. Don't believe him.
MR. MANUEL:
Q. Is your father still living?
A. He -- he -- he passed.
Q. Okay. How old -- I mean, what was your father's name?
A. George McGilberry.
Q. When did he pass away?
A. I think, about -- it's been quite awhile. I'm not for sure how many -- how many years it's been.
Q. More than 10 years?
A. Yeah, more than 10.
Q. What did your father do for a living?
A. He was a truck driver.
Q. What did he pass away from?
A. Heart attack.
Q. Did your father smoke?
A. Yes, sir.
Q. Was he smoking while y'all were -- while you grew up?

A. Yes, sir.
Q. All right. How about your mother? Is your mother still living?
A. She's passed.
Q. What was your mother's name?
A. Christine McGilberry.
Q. Was she from there in Ellisville, or Jones County?
A. No. She's originally from Jeff Davis County.
Q. And what did she pass away from?
A. I'm -- I'm not for sure. I wasn't even at home when she passed.
Q. How old was she when she passed away?
A. About -- I'm not for sure.
Q. Does your mother smoke?
A. Yes, sir.
Q. Do you have any brothers and sisters?
A. I had -- it's eleven of us.
Q. Eleven. All right.
MR. FOXWORTH:
Do you want -- do you want to get a new sheet of paper, Will?
MR. MANUEL:
I'm going to see if I can get it all

on the bottom of here.
Q. All right. Let's -- is it the easiest to go from oldest down to the youngest?
A. Yeah, oldest down.
Q. Okay. Who is the oldest?
A. Lamar.
Q. And where does Lamar live?
A. He lives in Ellisville.
Q. Have you ever worked with Lamar at any of your jobs?
A. I worked in the same plant with him, but not with him.
Q. Okay. But which plant would that have been?
A. Howard.
Q. At Howard.
Has your brother got any health problems that you know of?
A. Not as I know of.
Q. All right. Who's the next one down?
A. Larry.
Q. Where does Larry live?
A. Ellisville.
Q. Have you ever worked with Larry?
A. No, sir.

Page 146

Q. Does Larry have any health problems?
A. No, sir.
Q. All right. Who's the next one down?
A. Alene Wigham.
Q. Where does she live?
A. Ellisville.
Q. Y'all don't have to travel far for family reunions.
A. No, you don't.
Q. Have you ever worked with Alene?
A. No, sir.
Q. And what's her husband's name?
A. They're not together.
Q. Oh, they're not?
A. Oh, no.
Q. Okay. Did you ever work with her husband on any of the jobs?
A. No, sir.
Q. Okay. Who's next down?
A. Me.
Q. All right. And then, who's after you?
A. Fannie.
Q. Is Fannie married?
A. She's a Millsap.

Page 147

Q. Okay. Millsap.
A. But she -- she's not married now, but that's what her -- that's her married name.
Q. Where does she live?
A. Laurel.
Q. Have you ever worked with Fannie?
A. No, sir.
Q. Did you ever work with her ex-husband?
A. No.
Q. Has she got any health problems?
A. Nothing but bad knees.
Q. Bad knees?
A. Uh-huh.
Q. How about -- I forgot to ask about Alene. Has she got any health problems?
A. Bad knees.
Q. Bad knees?
A. We all got bad knees.
Q. Oh, really? Is it just --
A. Family.
Q. -- arthritis in the knees or --
A. No, it's family related.
Q. Family related?
A. My daddy had bad knees. My mamma had

Page 148

bad knees.
Q. Do y'all have to take any medication for the bad knees?
A. Huh-uh.
Q. Okay. Who is after Fannie?
A. Jeanie.
Q. What is Jeanie's last name? Is it --
A. Thompson -- Thomas, Thomas -- Thomas.
Q. Where does she live?
A. Ellisville.
Q. And did you ever work with Jeanie or her husband?
A. No, sir.
Q. And does Jeanie have any health problems?
A. No, sir.
Q. She didn't get the knee problem?
A. No, not yet.
Q. Not yet.
I meant to ask you how old -- I mean, how old is Lamar? How many years older is he than you? I guess that's probably the easiest way.
A. He's about five, five years or six years older than I am.

Page 149

Q. Okay. And how about Larry?
A. He's a year after Lamar.
Q. Okay. And Alene?
A. Two years after, Alene. See, I'm 49.
Q. All right. And Fannie, how much younger is she than you?
A. I think, a year.
Q. All right.
A. I ain't for sure. I don't know.
Q. Jeanie?
A. A couple of years. I don't -- I don't know.
Q. And who is after -- well, has Jeanie got any health problems at all?
A. No, sir.
Q. No? Okay.
What's her husband's name?
A. Bobby Charles Thomas -- Thompson -- Thomas.
Q. Is she still married to him?
A. Oh, he -- he died.
Q. Oh, he died?
A. Uh-huh.
Q. Did you ever work with Bobby Charles?
A. No, sir.

Page 150

Q. How about -- who is the next one down from Jeanie?
A. James.
Q. Is James the one that lives here in Laurel?
A. Yeah.
Q. And have you worked with James? Have you worked with him?
A. Yeah, at Howard.
Q. At Howard?
A. Uh-huh.
Q. Is James --
A. And at Southern Touch.
Q. And at Southern Touch?
A. Yeah.
Q. How many years younger is James than you?
A. He should be about -- he ought to be about 45 or 46.
Q. Okay. Has he got any health problems?
A. He's got bad knees.
Q. Any other besides knees?
A. No, sir.
Q. All right. Who's -- let's see, we've

Page 151

got one, two, three, four, five, six, seven, so we've got four more to go.
A. Four more to go?
Q. I think. Lamar, Larry, Alene, you, Fannie, Jeanie, and James. So I've got seven.
A. Rita.
Q. All right. How old would Rita -- how much younger is Rita? Just --
A. Just keep going down --
Q. Younger than James?
A. Yeah, yeah.
Q. Okay. What's Rita's last name?
A. What's her last name? I'm losing my -- I'm not for sure right now.
Q. Okay. What -- does she -- where does she live?
A. She lives in Lucedale, Mississippi.
Q. All right. Have you ever worked with Rita?
A. No, sir.
Q. Does Rita have any health problems?
A. No, sir.
Q. Who's next after Rita?
A. Did I give you Rita?
Q. Huh?

Page 152

A. Rita?
Q. You got Rita.
A. I got Rita?
Q. Uh-huh.
A. Deborah.
Q. Deborah. Now, where does Deborah live?
A. She lives in Laurel.
Q. All right. Is Deborah still a McGilberry, or is she married?
A. She's a McGilberry.
Q. Has she got any health problems?
A. Not as I know of.
Q. All right. Who's after Deborah?
A. I've got two more?
Q. Two more.
A. Barbara.
Q. Barbara. And where does Barbara live?
A. Laurel.
Q. And what's Barbara's last name?
A. McGilberry.
Q. Have you ever worked with Barbara?
A. No, sir.
Q. Does she have any health problems?

Page 153

A. No, sir.
Q. All right.
A. Henry.
Q. Henry. That's the baby?
A. Yeah.
Q. And where does Henry live?
A. Ellisville.
Q. All right. Have you ever worked with Henry?
A. No, sir.
Q. All right. Has he got any health problems that you know of?
A. No, sir.
Q. Do any of your brothers or sisters smoke, that you know of?
A. Rita, Jeanie.
Q. Have any of your brothers or sisters filed a silica lawsuit that you know of?
A. No, not as I know of.
Q. Okay. Did any of them do any sandblasting?
A. Not as I know of.
Q. Have you ever filed any other lawsuits besides the one that we're here about today, the silica lawsuit?

A. Yeah, that asbestos.
Q. Okay. Who represented you on the asbestos lawsuit? Is it the same lawyer?
A. No, sir. I think it's Swartzfager.
Q. Okay. Jon Swartzfager?
A. Out of -- out of --
Q. Laurel?
A. -- Vicksburg.
Q. Out of Vicksburg?
A. That's -- that's the last I heard, Vicksburg --
Q. Do you know if that case is still going on, or is it settled?
A. I don't know.
Q. All right. Do you -- have you received any settlement amounts from that --
A. No, sir.
Q. -- lawsuit? Okay.
Do you know, did you have an asbestos screening done? Did you have an x-ray done?
A. Yes, sir.
Q. Okay. How long ago did you have that done?
A. I'm not for sure how long it's been.
Q. More than two years ago?

A. Yeah, more than two.
Q. Did -- where did you have that x-ray done for the asbestos?
A. I think --
MR. FOXWORTH:
What was your last question?
THE WITNESS:
-- Laurel.
MR. MANUEL:
Where did he have it -- have the asbestos screening done.
THE WITNESS:
In Laurel.
MR. MANUEL:
Q. Did -- did they give you any sort of diagnosis as to what that screening showed? Send you anything in the mail to tell you?
A. I --
MR. FOXWORTH:
You're talking about the asbestos screening?
MR. MANUEL:
Yeah.
THE WITNESS:
I've probably got some information,

but I don't know where it's at.
MR. MANUEL:
Q. Have you had to go see a doctor for anything about asbestos?
MR. FOXWORTH:
Will --
MR. MANUEL:
Okay. Okay. Let's take -- yeah, you want to take just a very short break?
MR. FOXWORTH:
Yes.
MR. MANUEL:
Very short, John.
VIDEO TECHNICIAN:
Off the record. The time is 3:12.
(Off the record.)
VIDEO TECHNICIAN:
Back on record. The time is 3:22.
MR. MANUEL:
Q. Mr. McGilberry, you mentioned an asbestos lawsuit. Have you filed any other lawsuits besides the asbestos lawsuit and this lawsuit?
A. No, sir.
Q. No. Have you ever filed a claim for

workers' compensation benefits?
MR. FOXWORTH:
Have you ever been injured at work where you had to file a workers' comp claim?
A. When I got sick.
MR. MANUEL:
Q. You got sick. Okay. Where did you -- what job were you on that you got sick?
A. I was driving trucks then.
Q. Okay. Is that for SRT?
A. Yeah.
Q. And what -- what was the sickness that you had to claim working for SRT?
A. Shortness of breath.
Q. Any other sickness that you had to claim for workers' comp?
A. No, sir.
Q. Are you receiving --
MR. FOXWORTH:
I think -- I think he's confusing workers' comp with disability.
MR. MANUEL:
Q. Okay. Have you had to file a disability claim with social security? Do you receive social security disability benefits?

Page 158

A. Yeah.
Q. When did you start receiving social security disability benefits?
A. Oh, let me see. I think it's been about a year and a half.
Q. Did you have an attorney help you fill out your social security paperwork?
A. Yes, sir.
Q. Who was that attorney?
A. Edna Collins in Laurel.
Q. Have you ever applied for social security disability and been denied?
A. Yes, sir.
Q. Were you denied more than once?
A. Three.
Q. Three times. Did you have to have a hearing?
A. Yes, sir.
Q. Did y'all do that hearing up in Jackson?
A. Hattiesburg.
Q. Hattiesburg. Was it after the hearing that you started receiving benefits?
A. That's when he put me on disability.
Q. Okay. Okay. What other sources of

Page 159

income do you have now besides your social security?
A. That's all.
Q. Does your wife work?
A. Yes, sir.
Q. Where does she work?
A. Lee Robinson.
Q. The social security application that you filled out, was that -- the shortness of breath that you talked about, was that the sickness that you claimed?
A. Yes, sir.
Q. Did you have to see a doctor with regard to the social security disability?
A. Yes, sir.
Q. Who was the doctor that you saw?
A. My regular doctor is -- is John Neese.
Q. John Neese?
A. No, no. Excuse me. Excuse me. Wait a minute. Lewis, Lewis Neese.
Q. Okay.
A. In Hattiesburg.
Q. Okay. Is that -- you've got on one of the -- on the fact sheet that you -- your

Page 160

lawyers filed said that he -- he had you diagnosed with sarcoidosis; is that correct? Dr. Neese?
A. You'd have to check with him on that one. I'm not for sure.
Q. Okay. Hold on a second.
Have you ever smoked a pipe?
A. No, sir.
Q. Do you drink alcohol?
A. No, sir.
Q. Have you -- I'm going to ask you some conditions and ask you if you've ever had these conditions.
Have you ever had any seizures?
A. Not as I know of.
Q. How about diabetes?
A. Not as I know of.
Q. Do you have any allergies?
A. No, sir.
Q. Do you have any problems smelling odors?
A. Yes, sir.
Q. You do. How long have you had that problem?
A. I don't know. I don't know for sure.

Page 161

Q. Is it something that you've always had ever since growing up or --
A. No, sir.
Q. Okay. Is it within the last five years?
A. Oh, it's less than that.
Q. Less than that?
A. Yes, sir.
Q. Last two years?
A. I'll say about three.
Q. Have you ever had asthma?
A. I think he did say I had asthma. I'm not for sure, though.
Q. How about bronchitis?
A. No, sir.
Q. Emphysema?
A. Well, bronchitis? Bronchitis? I don't know.
Q. Have you ever had pneumonia?
A. Yes, sir.
Q. Okay. How long ago was it that you had pneumonia?
A. Last year.
Q. Did you have to go in the hospital for it?

Page 162

A. Yes, sir.
Q. How long were you in the hospital?
A. I think, four or five days.
Q. Which hospital? Was it Southwest?
A. Laurel.
Q. In Laurel?
A. Yes, sir.
Q. Have you ever had any broken ribs?
A. No, sir.
Q. Have you ever had lung cancer, that you know of?
A. Not as I know of.
Q. Have you -- you talked about having the shortness of breath. How long ago did the shortness of breath start?
A. After he took me off work.
Q. Is the shortness of breath all the time, or is it only when you do activities or --
A. Most of the time when I do a little, you know, activities.
Q. You're on oxygen -- well, I assume it's oxygen today. How long have you had the oxygen tank?
A. '90 -- 2004 -- I had it in --
MR. FOXWORTH:

Page 163

And you're not talking about this tank; you're talking about when did he first get on oxygen?
MR. MANUEL:
Q. Yeah. When did you first start having to do -- use oxygen?
A. '99.
Q. And why did they tell you that you needed to have oxygen?
A. My blood count.
Q. What doctor -- was it Dr. Neese that gave you the oxygen?
A. Yes, sir.
Q. Have you ever had a heart attack?
A. I don't know.
Q. Have you ever had a stroke?
A. No, sir.
Q. Okay. Have you had any kind of swelling in your feet or legs?
A. Yes, my legs.
Q. When did you have swelling in your legs?
A. They're like that all the time.
Q. It's like that all the time?
A. Uh-huh.

Page 164

Q. Do you know when it started?
A. No, I don't know.
Q. You said that you had to be put in the hospital for pneumonia. Have you had to be in the hospital for anything else besides pneumonia?
A. A couple of times in Hattiesburg.
Q. What did you have to go to the hospital in Hattiesburg for?
A. Same thing. Trouble breathing.
Q. Trouble breathing.
When was it that you -- when were those times that you had to go to the hospital in Hattiesburg? How long ago do you think it was?
A. I think both of them -- I think once in '03, and I think once '0- -- '02.
Q. How long -- the times that you -- that you've been at the hospital in Hattiesburg, how long -- did you have to stay overnight, I guess I should say?
A. I think, about -- about four, four or five days.
Q. Have you had any surgeries at all?
A. I had a knee surgery.

Page 165

Q. Is that the only time that you've had surgery?
A. I had a -- a biopsy.
Q. What -- what were they doing a biopsy of?
A. I think they had thought I had cancer.
Q. Was it of your lungs or -- or what part of your body did they do the biopsy on?
A. In here (witness indicating). They did the biopsy right here.
Q. In -- in your chest.
Did they tell you that you had cancer?
A. No, sir.
Q. I'm going to ask you about a couple of doctors that you have listed.
Have you seen a Dr. Harron?
A. I have seen so many doctors, I don't know.
Q. Okay.
A. What's his last name?
Q. Harron, H-A-R-R-O-N.
A. What's his first name?
Q. Ray.

Page 166

A. It's got to --
MR. FOXWORTH:
If you don't know, you don't know.
THE WITNESS:
I don't know.
MR. MANUEL:
Q. How about a -- we've talked about Dr. Neese, and that's who you say is your family doctor?
A. Yes, sir.
Q. And is he located in Laurel?
A. Hattiesburg.
Q. Hattiesburg. And Dr. Parkman?
A. That's -- that used to be my lung doctor.
Q. Your lung doctor?
A. Uh-huh.
Q. And Dr. Reno, what did Dr. Reno see?
A. They all was my lung doctor.
Q. All right. You said that you started on the oxygen in 1999. Is that when you first started having lung problems?
A. You might have to just check with the doctor when I first got the lung problems, had the lung problems.

Page 167

Q. What kind of medications do you take now, like pills or --
A. I take about 17 different pills.
Q. Okay.
MR. FOXWORTH:
You're not going to make him go through them?
MR. MANUEL:
Q. No. I was just going to ask, do you know any off -- I mean, off the top of your head, what you -- what you take?
A. I take Prednisone. I take -- I take the Bayer aspirin, you know, the -- the coat -- the coated. I take a Buspar. I take Zocor. I take a bunch of them. I don't --
Q. Okay.
A. I just can't --
Q. Can you provide your attorney with a list of the medications that you take?
A. Yeah.
MR. MANUEL:
And, John, will you provide that to us?
MR. FOXWORTH:
Just file your request.

Page 168

MR. MANUEL:
Is that a -- should I take that as a no?
Q. Are you --
MR. FOXWORTH:
I'm currently using a suppository. Can I bring that, too? I need some help.
MR. MANUEL:
There's something up there.
Q. The -- did you have a silicosis -- did you go to like have an x-ray for silicosis?
A. I think I had one done, but I don't know whereabout.
Q. Okay. You don't remember where it was?
A. Huh-uh.
Q. Do you -- did -- has anybody told you that you have been diagnosed with a silica-related illness?
MR. FOXWORTH:
In other words, has he -- has he been diagnosed with silicosis?
MR. MANUEL:
Q. Right, or silica-related illness.
A. Yeah.

Page 169

Q. Who told you that?
A. I think that was on that paper that I got back.
Q. The paper that you got?
A. Uh-huh.
Q. Do you know if that paper that you got was from a doctor, or was it from somebody else?
A. I think it was from the folks that did the -- the test on it.
Q. Have you had to see a doctor specifically about your silicosis? Have you been to see a doctor about that?
A. No, sir.
Q. Are you taking any medications right now that are for silicosis?
A. (No verbal response.)
Q. Is that a no?
A. No.
Q. The lung doctors that you described in Hattiesburg, have you talked about your test results from the silica screening with those lung doctors?
A. I hadn't mentioned it to them.
Q. When is the next time that you're

Page 170

scheduled to have an appointment with the lung doctors?

A. Four months.

Q. How did you find out that they were doing a silicosis screening?

A. A friend told me.

Q. Who was that?

A. What was his name?

MR. FOXWORTH:

How much more do you think you have, Will?

MR. MANUEL:

Huh?

MR. FOXWORTH:

How much more do you think you have?

MR. MANUEL:

Not much. Very quickly.

Q. Do you remember who it was?

A. No, I don't know. Or I heard, one, something like that. I don't know.

Q. I'm going to -- I don't want to know what you and your attorney specifically talked about, but we have some fact sheets in which your work history was listed and products that you worked with. And we've got three different

Page 171

ones. Do you -- let me show you these three --

MR. FOXWORTH:

Do you want to know why we kept supplementing?

MR. MANUEL:

Q. Well, I want to know, have you ever seen these documents before today?

MR. FOXWORTH:

Do they have a signature on them?

MR. MANUEL:

This one does. And that's what I was going to ask.

Q. Have you ever -- and let me just ask that question: Have you seen these documents before today?

A. Yeah.

Q. You have? Which ones of them have you seen? There's three different documents here.

MR. FOXWORTH:

Why don't you just ask if he remembers --

MR. MANUEL:

Yeah.

MR. FOXWORTH:

Page 172

-- seeing them all.

MR. MANUEL:

Q. Do you remember seeing any -- I mean, there's the one here that's got your signature on it, which is Exhibit 3 that you signed this morning in front of us. Is that correct?

A. Right.

Q. Okay. Do you -- and then we've got another --

MR. MANUEL:

I'm going to make this Exhibit 5.

(Exhibit 5 was marked.)

MR. FOXWORTH:

Which one does that go with?

MR. MANUEL:

This is --

Q. Was -- is that your signature there on Exhibit Number 5?

A. Yeah.

MR. FOXWORTH:

Which one do you want to put that one with, 1 or 2?

MR. MANUEL:

Do you know which one it's with?

MR. FOXWORTH:

Page 173

It goes with 2.

MR. MANUEL:

It goes with Number 2.

MR. FOXWORTH:

Okay.

MR. MANUEL:

Q. Do you remember signing any other papers besides the one that we've shown with Exhibit 2 and the ones with Exhibit 3?

MR. FOXWORTH:

He just wants to know if those are the only ones you signed.

MR. MANUEL:

Q. Yeah.

A. Yes, them are the only papers I've signed.

Q. That's the only ones you signed.

Did you look through those documents before --

A. Yeah. That's --

Q. -- you signed them?

A. -- when -- when I signed it one time, they left off a job.

Q. Okay.

A. So I imagine that's why they had to

Page 174

redo them, because --

Q. Is that the only difference that you knew of between the two -- the two papers, was that they left off a job?

A. Yeah. They left off some jobs off of them.

Q. Have you ever looked at a -- do you know of anything else that you told them was different between -- or any other problems that they had with --

MR. FOXWORTH:

Don't -- we're not going into any kind of attorney/client communications.

MR. MANUEL:

I know.

MR. FOXWORTH:

You can just ask him if he knows the difference.

MR. MANUEL:

I know. I'm asking -- that's what I'm asking. And let me finish my question before you tell me I'm doing it bad.

MR. FOXWORTH:

No.

MR. MANUEL:

Page 175

Q. Do you -- was there anything else besides leaving off a job that you saw was wrong with the paper that you signed that's Exhibit 2?

Do you remember anything else other than it left off -- that that one left off a job?

MR. FOXWORTH:

If you remember, you remember. If you don't, you don't. It doesn't matter. Just answer his question.

A. I don't remember -- don't remember.

VIDEO TECHNICIAN:

Excuse me. I need to change out the tape.

MR. MANUEL:

Okay.

VIDEO TECHNICIAN:

Off the record. The time is 3:43.

(Off the record.)

VIDEO TECHNICIAN:

Back on record. The time is 3:44.

MR. MANUEL:

Q. Mr. McGilberry, have you looked at any books of pictures in preparation for this deposition?

Page 176

A. Yes.

Q. Okay. When did you look at those pictures? How long ago was it?

A. When we first did them papers.

Q. When you first did the papers is when you looked through them?

A. Uh-huh.

Q. Did you do anything --

A. Well, I think they must have did the papers after -- you know.

Q. After? After you looked at them?

A. Uh-huh.

Q. Did you -- did -- do you know where those pictures came from or -- or how they all got put together?

A. No, sir.

Q. Did you do anything -- and I don't want to know about talking with your attorney, but did you talk to anybody else besides your attorney to prepare for this deposition today?

A. No, sir.

Q. Did you go and look at anything or review anything in preparation for this deposition today?

MR. FOXWORTH:

Page 177

You talking about other than his fact sheet?

MR. MANUEL:

Q. Did you look at your fact sheet?

A. Yeah.

Q. You did. Which one of the three fact sheets did you look at, if you remember?

A. They all look the same.

Q. They all look the same?

A. They're all the same.

Q. Okay. So you couldn't tell which one it would be that you looked at? You just know you looked at a fact sheet; is that right?

A. Uh-huh.

Q. Is that yes?

A. Yes, sir.

Q. Okay. The -- and that one time before -- you've only looked at that picture book one time before this deposition; is that right?

A. Right.

Q. Okay. And was anybody else with you --

A. No.

Q. -- when you looked at it?

A. No.

MR. MANUEL:

I think that's all I have for right now. Do we want to --

MR. FOXWORTH:

What time tomorrow?

MR. MANUEL:

You tell me. Do you want -- do you want to go off the record?

VIDEO TECHNICIAN:

Off the record. The time is 3:47.

(Deposition recessed at 3:47 p.m.)

CERTIFICATE OF COURT REPORTER

I, GERI BETH LADNER, CSR, Court Reporter and Notary Public, in and for the County of Harrison, State of Mississippi, hereby certify that the foregoing pages contain a true and correct transcript of the testimony of the witness, as taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision, to the best of my skill and ability.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal, this the day of , 2004.

GERI BETH LADNER, CSR, #1219

My Commission Expires February 11, 2008

SIGNATURE OF WITNESS

I, ______________________________, do solemnly swear that I have read the foregoing ____ pages and that the same is a true and correct transcript of the testimony given by me at the time and place hereinbefore set forth, with the following corrections:

PAGE: LINE: SHOULD READ: REASON FOR CHANGE:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

____________________________

NOTARIZATION

I, ________________, notary public for the State of Mississippi, ______________ County, do hereby certify that ________________ personally appeared before me this _____ day of ________, 2004, at _____________, Mississippi.

My Commission Expires:

__________________ __________________

(NOTARY PUBLIC)



Page 1

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

GEORGE BUFFINGTON, et al.,
Plaintiffs,
VERSUS CIVIL ACTION NO. 2002-194-CV6
PULMOSAN SAFETY EQUIPMENT, et al.,
Defendants.

VIDEOTAPED DEPOSITION OF JOHN MCGILBERRY
Volume II of II
Taken at the Ramada Inn, 1105 Sawmill Road, Laurel, Mississippi, on Tuesday, April 6, 2004, beginning at 10:29 a.m.

REPORTED BY:

JANNA WHITE, CSR #1312
State-Wide Reporters
764 Water Street
Biloxi, Mississippi 39530
Telephone: (228) 432-0770
Fax: (228) 432-0690

Mailing Address:
Post Office Box 14113
Jackson, Mississippi 39236

Page 2

APPEARANCES:

JOHN A. FOXWORTH, JR., ESQUIRE
Foxworth & Casano, PA
15487 Oak Lane, Suite 200F
Gulfport, Mississippi 39503
Telephone: (228) 328-0202
Fax: (228) 328-0201
ATTORNEY FOR PLAINTIFFS

JENNIFER J. SKIPPER, ESQUIRE
Forman, Perry, Watkins, Krutz & Tardy
Suite 1200, One Jackson Place
188 E. Capitol
Jackson, Mississippi 39201
Telephone: (601) 960-8600
Fax: (601) 960-8613
ATTORNEY FOR CLEMCO INDUSTRIES, INC.; CLARK SAND CO., INC.; CLARK SALES & RENTALS, INC.; CUSTOM AGGREGATE & GRINDING; DEVILBISS AIR POWER CO.; ILLINOIS TOOL WORKS INC., successor by merger to Ransburg Corporation, successor by merger to DeVilbiss Industrial Products Corporation, successor to the Industrial/Commercial division of the DeVilbiss Company; EASTERN SAFETY EQUIPMENT, INC.; HANSON AGGREGATES CENTRAL, INC.; HUEY STOCKSTILL, INC.; HUMBLE SAND CO., INC. D/B/A HUMBLE SAND & GRAVEL, INC.; INGERSOLL-RAND COMPANY; KELCO SALES AND ENGINEERING, a division of Polley, Inc.; LAUREL MACHINE AND FOUNDRY CO.; LOCKHEED MARTIN CORPORATION; MOLDEX-METRIC, INC.; OTTAWA SILICA COMPANY; PANGBORN CORPORATION; PRECISION PACKAGING, INC. F/K/A QUIKRETE MATERIALS, INC.; P.K. LINDSAY COMPANY; SOUTHERN SILICA OF LOUISIANA, INC.; TRUMAN'S, INC.; and U.S. SILICA COMPANY, as successor by merger to Ottawa Silica Company

Page 3

APPEARANCES: (Continued)

MELISSA WILLIAMS, ESQUIRE
Brown, Buchanan & Sessoms
3112 Canty Street
Pascagoula, Mississippi 39567
Telephone: (228) 762-0035
Fax: (228)762-0299
ATTORNEY FOR AIR LIQUIDE; SANSTORM; BIG 3; SURVIVAIR; and RENTAL SERVICE CORPORATION

KRISI ALLEN LEE, ESQUIRE
Watkins & Eager, PLLC
400 East Capitol Street, Suite 300
Jackson, Mississippi 39201
Telephone: (601) 948-6470
Fax: (601) 354-3623
ATTORNEY FOR SHERWIN-WILLIAMS and PINE BELT READY MIX

PAIGE C. JONES, ESQUIRE
Phelps Dunbar
111 East Capitol Street, Suite 600
Jackson, Mississippi 39201
Telephone: (601) 352-2300
Fax: (601)360-9777
ATTORNEY FOR PULMOSAN SAFETY EQUIPMENT CORPORATION and PARMELEE INDUSTRIES, INC.

CHANEY NICHOLS, ESQUIRE
Scott, Sullivan, Streetman & Fox, P.C.
725 Avignon Drive
Ridgeland, Mississippi 39157
Telephone: (601) 977-0102
Fax: (601) 957-0690
ATTORNEY FOR AMERICAN OPTICAL CORPORATION; PTR, INC.; and PEARL JAMES JOINT VENTURE

Page 4

APPEARANCES: (Continued)

JOHN KINARD, ESQUIRE
Dogan & Wilkinson
734 Delmas Avenue
Pascagoula, Mississippi 39567
Telephone: (228) 762-2272
Fax: (228) 762-3223
ATTORNEY FOR SAFETY SUPPLY; SCOTT TECHNOLOGIES; and AMERICAN SAND & GRAVEL

DAN ALEXANDER, ESQUIRE
Allen, Vaughn, Cobb & Hood, P.A.
One Hancock Plaza, 12th Floor
Gulfport, Mississippi 39501
Telephone: (228) 864-4011
Fax: (228) 864-4852
ATTORNEY FOR LOUIS M. GERSON COMPANY, INC.

KEVIN MELCHI, ESQUIRE
Dogan & Wilkinson
734 Delmas Avenue
Pascagoula, Mississippi 39567
Telephone: (228) 762-2272
Fax: (228) 762-3223
ATTORNEY FOR WHEELER PROTECTIVE APPAREL

CHARLES FERGUSON, ESQUIRE
Baker, Donelson, Bearman & Caldwell
4268 I-55 North Meadowbrook Office Park
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Fax: (601) 351-2424
ATTORNEY FOR VULCAN MATERIALS COMPANY

EXHIBIT "I"

1 (Pages 1 to 4)

APPEARANCES: (Continued)

CHIP WILBANKS, ESQUIRE
Wells, Moore, Simmons & Hubbard
4450 Old Canton Road, Suite 200
Jackson, Mississippi 39211
Telephone: (601) 354-5400
Fax: (601) 355-5850
ATTORNEY FOR MINE SAFETY APPLIANCES COMPANY (MSA) and SCHRAMM

RANDI P. MUELLER, ESQUIRE
Page, Mannino, Peresich & McDermott
759 Vieux Marche' Mall
Biloxi, Mississippi 39530
Telephone: (228) 374-2100
Fax: (228) 432-5539
ATTORNEY FOR GREEN BROTHERS GRAVEL COMPANY and appearing specially without waiving any defenses for EMPIRE ABRASIVES EQUIPMENT CORPORATION

DAVID GARNER, ESQUIRE
Sessums, Dallas & Morrison
2829 Lakeland Drive, Suite 1650
Jackson, Mississippi 39212
Telephone: (601) 933-2040
Fax: (601) 933-2050
ATTORNEY FOR VALLEN CORPORATION

TREA SOUTHERLAND, ESQUIRE
Holcomb Dunbar
1217 Jackson Avenue
Oxford, Mississippi 38655-0707
Telephone: (662) 234-8775
Fax: (662) 238-7552
ATTORNEY FOR BOB SCHMIDT, INC.

APPEARANCES: (Continued)

KIMBERLY WALLACE, ESQUIRE
Barfield & Associates
233 East Capitol
Jackson, Mississippi 39201
Telephone: (601) 968-9420
Fax: (601) 968-9425
ATTORNEY FOR LONE STAR INDUSTRIES

WILL MANUEL, ESQUIRE
Bradley, Arant, Rose & White, LLP
Suite 450, One Jackson Place
188 East Capitol Street
Jackson, Mississippi 39215
Telephone: (601) 948-8000
Fax: (601) 948-3000
ATTORNEY FOR MINNESOTA MINING and MANUFACTURING COMPANY (3M)

ABEL K. MANJI, ESQUIRE
Steve A. Bryant & Associates
3618 Mt. Vernon, Suite A
Houston, Texas 77006
Telephone: (713) 526-7474
Fax: (713) 526-7720
ATTORNEY FOR E.D. BULLARD COMPANY

DAVID KRAUSE, ESQUIRE
Daniel, Coker, Horton & Bell, P.A.
4400 Old Canton Road
Suite 400
Jackson, Mississippi 39211
Telephone: (601) 969-7607
Fax: (601) 969-1116
ATTORNEY FOR BLAIN SAND AND GRAVEL

L. IVAN BURGHARD, ESQUIRE
Allen, Allen, Boerner & Breeland, PLLC
214 Justice Street
Brookhaven, Mississippi 39601
Telephone: (601) 833-4361
Fax: (601) 833-6647
ATTORNEY FOR D&B SAND AND GRAVEL

APPEARANCES: (Continued)

BETH WINDHAM, ESQUIRE
Aultman, Tyner & Ruffin, Ltd.
315 Hemphill Street
Hattiesburg, Mississippi 39401
Telephone: (601) 583-2671
Fax: (601) 583-2677
ATTORNEY FOR PHILLIPS BUILDING SUPPLY

CORRIE SCHULER, ESQUIRE
Steen, Dalehite & Pace
401 E. Capitol Street, Suite 415
Jackson, Mississippi 39205-0900
Telephone: (601) 969-7054
Fax: (601) 353-3782
ATTORNEY FOR RENT ALL OF LAUREL, INC.

T-A-B-L-E O-F C-O-N-T-E-N-T-S

| Examination by: | Page |
|---|---|
| Ms. Skipper | 10 |
| Ms. Lee | 42 |
| Ms. Williams | 90 |
| Ms. Wallace | 100 |
| Ms. Mueller | 102 |
| Ms. Jones | 108 |
| Mr. Kinard | 112 |
| Ms. Windham | 120 |
| Mr. Alexander | 127 |
| Mr. Southerland | 130 |
| Ms. Skipper | 131 |
| Mr. Foxworth | 134 |
| Mr. Manuel | 136 |
| Stipulation | 9 |
| Certificate of Reporter | 141 |
| Witness Signature Sheet | 142 |
| Marked Question - Page 39, Line 7 | |

EXHIBITS

Exhibit 6,
Copy of picture of Sanstorm - Bowen Tools sandblast pot 151

STIPULATION

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys of record, that this deposition may be taken at the time and place hereinbefore set forth, by Tina M. Breland, C.S.R., Court Reporter and Notary Public, pursuant to the Mississippi Rules of Civil Procedure, as amended;

That the formality of READING AND SIGNING is specifically NOT WAIVED;

That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until such time as this deposition, or any part thereof, may be used or is sought to be used in evidence.

---

VIDEO SPECIALIST:

Good morning. This is Day 2 of the videotape deposition of John McGilberry taken by counsel for the defendants in the matter of George Buffington, et al, versus Pulmosan Safety Equipment, et al, in the Circuit Court of Jones County, Mississippi, Second Judicial District, Civil Action Number 2002-194-CV6. Today's date is April 6, 2004. The time is 10:29 a.m.

JOHN MCGILBERRY,

having been previously sworn, was examined and testified as follows:

EXAMINATION

BY MS. SKIPPER:

Q. Mr. McGilberry, my name is Jennifer Skipper. And yesterday you were put under oath. And I want you to understand that today that oath is still in effect, and you are testifying as if you were in court.

A. Yes, ma'am.

Q. Do you understand?

A. Yes, ma'am.

Q. As I said, my name is Jennifer. Skipper. I represent a number of defendants. As requested by your attorney, I'll tell you who I

represent. I represent Clemco, Clark, Custom, DeVilbiss, Eastern Safety, Hampton, Hewey Stockstill, Humble, Illinois Tool Works, Ingersoll-Rand, Kelco, Laurel Machine, Lockheed, Moldex, Ottawa Silica, Pangborn, P.K. Lindsay, Precision, Southern Silica, Truman's, and U.S. Silica. With that out of the way, I need to ask you a couple of questions about what you testified to yesterday.

Yesterday you said that you had only blasted with sand. So I'm taking that that you've never used Black Beauty or Steel Grit or Flint to blast with; is that correct?

A. Yes, ma'am.

Q. Okay. At Tom Pittman, what was your shift?

A. 7:00 till we get off.

Q. What time did you usually get off?

A. Around 5:00, 5:30, 6:00.

Q. Okay. Did you have any breaks?

A. Yes, ma'am.

Q. How many breaks did you have?

A. I think three or four breaks a day.

Q. Okay. How long were those breaks?

A. We have a dinner break.

Q. How long was your dinner break?

A. An hour.

Q. Okay.

A. And breaks in between.

Q. Were those just like 15 minutes?

A. 15, 20 minutes, something like that.

Q. Yesterday you talked about a hood that you used at Pittman. Do you know who manufactured that hood?

A. No, ma'am.

Q. Do you know who supplied the hood?

A. No, ma'am.

Q. The sand that you used at Pittman -- and right now until we change, I'm just going to talk about your time at Pittman.

A. Yes, ma'am.

Q. The sand you testified you thought came from Laurel Machine & Foundry. Did you ever go to Laurel Machine and pick anything up?

A. We picked up iron at Laurel Machine & Foundry.

Q. You picked up what?

A. Iron. Angle iron.

Q. Okay.

A. Steel.

Page 13

Q. Did you ever pick up sand at Laurel Machine?
A. I'm not for sure.
Q. Okay. So you wouldn't be able to testify that any of the sand that you used at Pittman actually came from Laurel Machine?
A. I don't know.
Q. Who did you talk to when you went in to get the angle steel from Laurel Machine? Was there anybody you went in to talk to?
A. Well, all I was just -- the other -- I was just a passenger, you know --
Q. Okay.
A. -- other side.
Q. Who would go in and talk to the people at Laurel Machine?
A. Either Tom had called and told them, you know, or either he already done ordered it.
Q. Okay.
A. And the guy usually go in there and say he picking up something for Tom Pittman.
Q. Okay. Who is that person that actually walked in to Laurel Machine and told them that Tom had an order?
A. That he had an order?

Page 14

Q. That Tom had an order. Who would actually go get the steel and bring it back to Pittman's?
A. A couple of times I went with his sons.
Q. And who are his sons?
A. Jeff.
Q. Jerry Pittman?
A. Jeff.
Q. Jeff. Sorry. And is there another son?
A. No. Just one, Jeff.
Q. Okay. Where is Jeff today? Is he still in Laurel?
A. I have no idea.
Q. Okay. You talked about some brown sand bags with red writing at Pittman; is that correct?
A. Yes, ma'am.
Q. Okay. Can you tell me who the miner or manufacturer of that -- those sand bags were?
A. No. I'm not for sure.
Q. Did you ever see any warnings on the sand bags at Pittman?
A. Not as I know of.
Q. Is that a -- you don't remember them?
A. I'm not -- I don't remember.

Page 15

Q. Okay. Did you ever take the time to stop and read the warnings on any of the sand bags that you used?
MR. FOXWORTH:
Objection. He said he didn't remember if he saw any. How can you presume he would or would not take time --
MS. SKIPPER:
I'm just --
MR. FOXWORTH:
-- if he didn't see them?
MS. SKIPPER:
He may not have remembered this warning. I'm asking him over the time he used sand bags if he ever stopped and read the warnings.
MR. FOXWORTH:
He said he didn't recall seeing warnings. He doesn't know.
MS. SKIPPER:
On this sand bag.
MR. FOXWORTH:
Rephrase your question.
MS. SKIPPER:
Okay.

Page 16

Q. Over the time that you used sand in your work history, did you ever stop and read the warnings that were on the bags?
A. No.
Q. Okay. Can you tell me how many pounds that brown bag with red writing was?
MR. FOXWORTH:
Objection. Asked and answered. We did that yesterday. Don't guess. If you know, you know.
A. Hundred pounds.
MS. SKIPPER:
Q. Did you ever see any pictures or logos on the brown bag with red writing?
A. I don't remember.
Q. Did you ever see an MSDS sheet associated with the brown bag with red writing at Pittman?
A. No.
Q. How were the brown bags with red writing delivered? Did they come on like a pallet?
A. I'm not for sure.
Q. Okay. So you couldn't tell me where they came from?

Page 17

A. No.
Q. The -- and I'm still on Pittman. The pot that you described, can you tell me who manufactured that pot?
A. I don't remember.
Q. Do you know who supplied the pot at Pittman?
A. No, ma'am.
Q. You talked about a valley in the top of the pot. Can you describe that to me? I just -- I'm not sure I know what you're talking about.
A. Uh-huh.
MR. FOXWORTH:
You want him to describe the term valley?
MS. SKIPPER:
Uh-huh.
MR. FOXWORTH:
Do you understand what she's asking you?
THE WITNESS:
Yeah, I understand.
A. Well, it's a -- it's shaped just like if you want something to come out, it's -- it's going -- it don't have no choice but -- but to go

Page 18

out.
MS. SKIPPER:
Q. Was there like a funnel that stuck up and then it went down, or did it kind of just --
A. Yeah, something like that.
Q. -- slope down?
A. Just like a slope down.
Q. Okay. Okay. You said that this pot didn't have any wheels. Did it have any legs?
A. Yeah. That one had legs at Tom Pittman.
Q. How many legs did it have?
MR. FOXWORTH:
And don't guess. If you know, you know. Don't guess.
A. I'm not for sure how many.
MS. SKIPPER:
Q. Do you know how many people could work off this pot?
A. What you mean work off of it?
Q. How many people could blast off the pot?
A. I'm not for sure how many can.
Q. How many people did blast off the pot? Just one?

Page 19

A. One.
Q. Did you ever see any logos on the pot?
A. No, ma'am.
Q. Where did the sand hose connect to the pot?
A. Off from the side of it.
Q. When you say the side, are we talking about towards the top, the middle or the bottom?
A. Halfway.
Q. Okay. Where did the air hose connect to the pot?
A. Halfway up with it.
Q. On the side?
A. Yeah, same place.
Q. Okay. So the air hose and the sand hose were right together?
A. Yes, ma'am.
Q. Okay. Did you ever see any plates on this pot, like a metal plate or a tag?
A. A plate?
Q. Uh-huh. Do you know what I mean by plate?
A. Yeah, I understand.
Q. Okay.
A. The only plate I seen was the plate

Page 20

that was on the legs.
Q. Okay. Was -- was there ever a warning on this pot?
A. I don't remember that.
Q. And I'm going to ask you the same question. In working with the pots and equipment that you used while around sandblasting or doing sandblasting, did you ever stop to read the warnings on that equipment?
A. I don't remember that.
Q. You don't remember if you read them, or you don't remember --
A. I don't --
Q. -- if they were --
A. -- remember.
Q. The compressor at Pittman, do you know who manufactured it? I know you couldn't tell us anything about it. But do you know who manufactured it?
A. No, ma'am.
Q. Do you know who supplied it?
A. No, ma'am.
Q. On the pot -- sorry to be jumping back and forth -- how many times did you refill it in a day at Pittman?

A. A bunch of times.
Q. What's a bunch of times?
MR. FOXWORTH:
Don't guess. If you can't give a good honest answer, don't guess.
MS. SKIPPER:
Q. If you could estimate for me?
MR. FOXWORTH:
Which is her fancy way of saying guess. So don't guess.
A. I wouldn't know for sure.
MS. SKIPPER:
Q. Do you think you refilled it more than twice in an average day?
A. Yes, ma'am.
Q. Okay. Do you think you refilled it more than four times in an average day?
A. That's guessing now.
Q. Okay. So maybe more than two, but you can't -- nothing more than two you can tell me; is that right?
MR. FOXWORTH:
That's her "I want you to guess" face. She used to work in the circus guessing weight and height. But then she went to law school because

she's a good guesser.
A. I'm not for sure.
MS. SKIPPER:
Q. The dust mask that you described at Pittman, do you know who the manufacturer was?
A. No, ma'am.
Q. Do you know who -- did you always get the dust mask that you talked about at Pittman from Phillips Building Supply?
A. Yes, ma'am.
Q. You talked about a metal nose clip on this dust mask. Do you know how long that metal nosepiece was?
A. No.
Q. Did it go to the end of the mask?
A. No.
Q. Did it stop just where your nose was?
A. No. It go farther than your nose.
Q. The concrete work that you did at Pittman, you said you did some tearing out of concrete?
A. Yes, ma'am.
Q. The concrete that you tore out, was it concrete that Pittman had laid previously or was this old concrete?

A. A lot of it was old concrete.
Q. Did you ever tear out concrete that had just been laid by somebody from Pittman or yourself or your crew?
A. A couple of times.
Q. Can you tell me who manufactured or mined any of the ingredients that were in the old concrete, the concrete that was not set by Pittman or his crew?
A. So what you're saying is who -- where did it come from or --
Q. Uh-huh.
MR. FOXWORTH:
Right.
MS. SKIPPER:
Q. Uh-huh.
A. Pine Belt. Pine Belt Ready Mix.
Q. When you say Pine Belt, is that for the old concrete that you would tear out?
A. Oh, I don't know.
Q. The kind that was not set by Pittman?
A. Oh, I don't know for sure where it come from.
Q. Okay. Okay. Now, the new concrete that was set by Pittman or his crew or your crew,

where did that concrete come from?
MR. FOXWORTH:
Asked and answered. He just said where he thought it came from. Maybe he was confused on your other question.
MS. SKIPPER:
Q. Do you think that that came from Pine Belt?
A. Yes, ma'am.
Q. Okay. I'm not trying to trick you. I'm just trying to clarify everything. Did you ever go to Pine Belt to pick up the concrete?
A. No.
Q. And we talked about you using a jackhammer. How often in a week would you use a jackhammer at Pittman?
MR. FOXWORTH:
If you don't know, you don't know.
A. I'm not for sure.
MS. SKIPPER:
Q. Did you do it weekly?
A. No, ma'am.
Q. Then in a month, did you only jackhammer maybe a couple of times?
A. Quite a few times.

Q. Okay. Is that more than two?
MR. FOXWORTH:
Objection. Asked and answered. He's already said quite a few. Let's not sit here all day today because I know how it works. You're going to play the guessing game all day. We'll be here all day. Let's not do that. I know you're trying to limit exposure. We all know what you're doing. Just try to find a different way to do it. You'll pull the measuring tape out in a few minutes. We're not doing all that today. Okay?
MS. SKIPPER:
Q. Do you know what quite a few is? Can you tell me a number?
MR. FOXWORTH:
If you know a number that means quite a few in your mind, tell her. If not -- if you don't know, you don't know.
A. I don't know.
MS. SKIPPER:
Q. The step sandblasting that you did while you were at Pittman, how long in total did that take? And that's both your sandblasting and while you were filling and tending the pot. How long did the sandblasting of those steps take in

total?
MR. FOXWORTH:
And don't guess. If you don't know the answer, it's okay to tell her you don't know. Just don't guess.
A. I'm not for sure.
MS. SKIPPER:
Q. Did it take longer than a day?
A. Yes.
Q. But it didn't take a week?
MR. FOXWORTH:
He didn't say that. Are you asking if it took a week?
MS. SKIPPER:
I'm asking him.
MR. FOXWORTH:
Do you recall if it took a week?
THE WITNESS:
No.
MS. SKIPPER:
Q. At Daniel Construction, what time did you get off work?
A. We never did have a certain hour. I said we never did have a certain hour to get off.
Q. Okay. When did you usually get off?

A. When they tell you it's okay to go.
Q. Okay.
A. We had --
Q. I mean, was that -- did you do that regularly at a certain time?
MR. FOXWORTH:
I think he's saying it's kind of like guessing when this depo is going to end. There's no way to know.
MS. SKIPPER:
Q. In an average day, what time did you get off work?
A. If I'm pouring concrete, it's -- it's 24 hours. You're there until you're through.
Q. Did you ever work 24 hours?
A. Yes.
Q. How many times did you work 24 hours?
A. Several.
Q. Okay. Is that two?
A. Oh. A bunch.
Q. Okay. What were you doing during those 24 hours?
MR. FOXWORTH:
Objection.
A. Finishing concrete.

MR. FOXWORTH:
Asked and answered. He said it.
MS. SKIPPER:
Q. Okay. Tell me -- finishing concrete, is that --
MR. FOXWORTH:
She has no idea what you're talking about as far as finishing concrete. She's never even been to a job site. So you're going to have to explain it to her.
A. Concrete, once they pour it, you got to stay there until it's finished.
MS. SKIPPER:
Q. Okay.
A. Until it's ready to walk on. So you cannot leave until it's finished.
Q. Okay. So --
A. If it's --
Q. -- until it set up?
A. Yeah. Right.
Q. Okay. Did you have any breaks when you worked at Daniel Construction?
A. Yes.
Q. Okay. How many breaks did you have?
A. As many that we need to take.

Page 29

Q. Okay. How -- on average, how -- how long were your breaks?
A. Fifteen, 30.
Q. Okay. The dust mask that you described at Daniel -- and right now I'm just going to talk about Daniel until we switch -- do you know who manufactured that dust mask?
MR. FOXWORTH:
While he's thinking, what -- let's kind of get a range of questions. What do you think you have, an hour? (Question directed to other counsel in the room.)
A. I don't know.
MS. SKIPPER:
Q. You don't know?
A. I don't know.
Q. Do you know who supplied the dust mask? Where they got it from?
A. I don't know.
Q. Okay. We talked about sand was brought in by a front loader. Do you know where the sand came from?
A. No.
Q. Do you know who mined or manufactured the sand?

Page 30

A. No.
Q. Can you tell me who supplied the concrete to Daniel Construction?
MR. FOXWORTH:
What was your question? Okay.
A. They did their own concrete.
MS. SKIPPER:
Q. Do you know who supplied or manufactured any of the ingredients that went in to making their own concrete?
A. No.
Q. At Gordon Myrick, we're now on that. So all my questions relate to that. Did you have a shift or a certain work schedule?
A. 7:00 to 5:00.
Q. Do you have any breaks?
A. Yes.
Q. How many breaks did you have?
A. Four.
Q. How long were those breaks?
A. An hour, 15.
Q. So you have one hour and then three 15 minute breaks?
A. I think so.
Q. Okay. The pot that you drew a picture

Page 31

of and we talked about some of it, did you ever know who the manufacturer of that pot was?
A. No, ma'am.
Q. Now, you talked about Walker Jones was where Gordon Myrick got the pot. Did they buy it from Walker Jones, or did they rent it?
A. They rent it.
Q. Okay. Did it have any legs? I thought I saw legs in the picture. We didn't talk about them. Were there legs?
A. Had four legs.
Q. Okay. Were there any logos on the pot?
A. I don't remember.
Q. Were there any pictures on the pot?
A. I don't know.
Q. The air compressor that we talked about, do you know who manufactured the air compressor?
A. No.
Q. Do you know who supplied the air compressor?
A. Walker Jones.
Q. Did the air compressor have any tanks on it?
A. I'm not for sure.

Page 32

Q. The sand that you described, do you know who the miner or manufacturer of the sand was?
A. No, ma'am.
Q. When sand was purchased from Walker Jones, how many bags were purchased at a time?
A. I'm not for sure how many.
Q. How many bags of sand did it take for you to finish the project on Mr. Myrick's house?
A. A bunch.
Q. I don't really know in your mind what a bunch is. Can you help me figure out what a bunch is?
MR. FOXWORTH:
Don't guess. If you know, you know.
A. I'm not for sure.
MS. SKIPPER:
Q. Is there any way you could estimate for me or give me a range, if it's between, you know, 20 and 30 or 30 and 50 or -- something to help me out?
MR. FOXWORTH:
You don't have to guess. If you don't know, you don't know. You don't have to -- you don't have to do the numbers she has. If it's

Page 33

more than what she's saying, you've got to let her know.
A. I'm not for sure on that.
MS. SKIPPER:
Q. Do you know who went and picked up the sand at Walker Jones?
A. It was there when I got there.
Q. Okay. So you never went to Walker Jones and --
A. No.
Q. -- got it? Do you know how often it got delivered or picked up from Walker Jones, or was it just one time?
A. Just that one time. Right.
Q. At Walker Jones, how often -- excuse me. I'm sorry. At Gordon Myrick, how often did you do cleanup?
A. 80 percent of the time.
Q. Okay. So did you do it every day or every other day?
A. Just about every day.
Q. Okay. And tell me how you clean -- you cleaned up the sand. Did you wet it down first?
A. We didn't use sand every day now.
Q. Okay.

Page 34

A. We just used that sand once on the house. And that was it.
Q. Okay. How long did it take to use that sand?
A. I didn't stay until the -- until the job was finished.
Q. Does that mean one day, a week?
A. I worked two days there.
Q. Okay. Did you use a shovel to pick up the sand, or did you -- I'm just asking you how you cleaned up the sand.
A. Shovel and a wheelbarrow.
Q. Okay. The dust mask at Gordon Myrick, do you know who manufactured it?
A. No, ma'am.
Q. Do you know who supplied it?
A. When Walker Jones come around, we got a supply of it.
Q. Okay. So you believe Walker Jones supplied the dust mask --
A. Yes, ma'am.
Q. -- too? All right. You talked about tearing up concrete in Ellisville while you worked for Gordon Myrick?
A. Uh-huh.

Page 35

Q. Do you know where the concrete came from that you were tearing up?
A. Pine Belt.
Q. Where is your wife from?
A. Jones County.
Q. Besides the Gordons and the McGilberrys, what other family names are there in Jones County?
A. Thompson.
Q. Any more?
A. Oh, name all of them?
Q. Uh-huh. Are there a lot?
A. There's a lot of families.
Q. Okay. Are there a lot of last names?
A. Ma'am?
Q. Are there a lot of last names in Jones County that you're related to?
A. Yes.
Q. Okay. You're related to just about half the county? I'm just trying to estimate how long this is going to take us.
MR. FOXWORTH:
Take your time and answer the question. If you know the names, say the names. Don't play -- don't play the game giving estimates as to

Page 36

how many people in the county you're related to. Don't guess on that. Just give the names.
A. Conners. Phillips. Let's see. Clarks. Simpson. Taylor. Millsap. That's enough?
MS. SKIPPER:
Q. Is that all you can remember?
A. That's all I can remember right now.
Q. Okay. When did you first get put on the oxygen tank?
MR. FOXWORTH:
Objection. Asked and answered. We went over that yesterday.
MS. SKIPPER:
I --
MR. FOXWORTH:
Didn't we go over that yesterday, Will?
MR. MANUEL:
1989.
MR. FOXWORTH:
Yeah.
MS. SKIPPER:
I'm sorry. I just missed it.
Q. I don't mean to be asking you the same questions. I'm sorry, Mr. McGilberry. You said

that you had been to a lot of doctors. And we talked about Dr. Neese, Reno, Parkman and you didn't remember Dr. Harron. Are there any other doctors that you can remember you've been to?
A. Dr. Morrison.
Q. Where is Dr. Morrison?
A. Hattiesburg. John -- I think it's -- I don't know.
Q. I want to talk about your silica screening. When you went to the silica screening, did you fill out any paperwork?
A. Do what now?
Q. Did you fill out any paperwork when you went to your silica screening?
A. When I did the screen?
Q. Uh-huh.
A. Yes.
Q. Did you tell them about your work history?
A. Yes.
Q. Did you tell them anything else in that paperwork besides your work history?
A. I'm not for sure.
Q. Okay. When you went to the first screening, did they do a chest x-ray?

A. Yes.
Q. How many x-rays did they take?
A. One.
Q. Did you go somewhere else and do a breathing test?
A. I'm not for sure.
Q. You don't remember doing a breathing test?
A. I did a bunch of breathing tests, but I don't remember --
Q. Okay.
A. -- back when I did this.
Q. Okay. Where all have you had breathing tests?
A. Hattiesburg Clinic.
Q. Is that the only place?
A. Laurel.
Q. Laurel?
A. That's it. Laurel.
Q. Is there a clinic or a hospital?
A. South Central.
Q. Okay. When you went to go take your x-ray, did you know anyone at the screening?
A. No.
Q. Did anyone go with you?

A. No.
Q. How many --
MR. FOXWORTH:
That's all asked and answered, by the way.
MS. SKIPPER:
Q. How many people were at the screening?
MR. FOXWORTH:
What does that have anything to do with this, if you can explain that to me?
MS. SKIPPER:
I'm asking him a question.
MR. FOXWORTH:
And I'm instructing him not to answer at this point. If you can relate to me how that could be reasonably calculated to lead to any discoverable information.
MS. SKIPPER:
Okay. Then we would like to ask that question marked.
MR. FOXWORTH:
Noted. Next.
MS. SKIPPER:
Q. And I don't mean to be prying, and I'm not prying. But have you had any criminal

convictions?
A. One.
Q. What was that for?
A. Assault.
Q. Can you tell me when that was?
A. No.
Q. Was it in the last three years?
A. No.
Q. I want to show you a picture of a product. It's Number 304 from the Walter Weathers book. And I want you to take a look at that picture.
MR. FOXWORTH:
Use your glasses. These are all different -- pictures of different angles, the same thing.
MS. SKIPPER:
Q. It's the same product. Just different points of view. We've talked about all of the dust masks and respiratory protection you've used at all these places. Have you ever used anything that looked like that while you were around sandblasting?
A. No, ma'am.
Q. Okay. Have you ever used a product

that looked like that or that product while you were doing any kind of jackhammering or concrete work?
A. No.
Q. Pictures. Thank you. I have another picture for you. It's picture Number 783 from the Walter Weathers book. We talked about all the sand that you used while you were working around or doing sandblasting. I think we talked about them being in brown bags with red writing. I want you to look at that picture and tell me if you've ever used those bags.
A. I'm not for sure.
Q. Would you be able to testify before a jury under oath that you used a product like this?
A. Testify --
Q. Uh-huh.
A. -- under oath --
Q. Uh-huh.
A. -- that I used that bag?
Q. Uh-huh.
MR. FOXWORTH:
Objection.
A. Like I said, I didn't use it. I don't know.

MS. SKIPPER:
Q. I'm going to show you picture Number 859 from the Walter Weathers book. I want you to take a look at that and tell me if you've ever used a pot that was that small.
A. No.
MS. SKIPPER:
Mr. McGilberry, I appreciate your patience and your time. I thank you very much.
MR. FOXWORTH:
The next person is going to ask questions. Do you want to take a break or go to the restroom before they do that?
THE WITNESS:
Yeah.
VIDEO SPECIALIST:
Off the record. The time is 11:10.
(A short break was taken.)
VIDEO SPECIALIST:
Back on record. The time is 11:25.

EXAMINATION

BY MS. LEE:
Q. Mr. McGilberry, my name is Krisi Lee. And I just have a few questions for you.
MR. FOXWORTH:

Krisi, if you would, let him know who you represent.
MS. LEE:
Okay.
Q. I represent Pine Belt Ready Mix. I want to ask you first some questions about Tom Pittman. Do you know -- is Mr. Pittman in the insurance business now in Jones County?
A. I'm not --
Q. Do you know what he's doing now?
A. No. I don't know.
Q. You don't know what he's doing. Okay. Yesterday you testified that you worked at sites in Hattiesburg, Waynesboro, Raleigh, Laurel, Bay Springs, State Line and Heidelberg. You haven't remembered any other cities where you worked for Tom Pittman since yesterday, have you?
A. Did I have Ellisville on there?
Q. I'm sorry?
A. Did I have Ellisville on there?
Q. I don't believe you had Ellisville at Tom Pittman. Is that all you remember?
MR. FOXWORTH:
I think he's got that on his fact sheet.

MS. LEE:
Okay. Okay. I'm just looking off my notes.
Q. If you would, if you remember -- and if you don't remember, that's okay. But if you remember -- I'm going to go through each of these cities. If you can tell me what you were building, I would appreciate it. In Hattiesburg, do you remember what site you were working on?
A. We did some work at the -- the Western Auto in Hattiesburg.
Q. Was that a new construction, or were you doing repair work there?
A. I think repair.
Q. Do you remember what you were repairing at the Western Auto?
A. I think it's the roof.
Q. The roof?
A. I think so. I'm not for sure. I believe it was.
Q. So were you doing any concrete work at the Western Auto in Hattiesburg?
A. I don't remember.
Q. Okay. And what about in Waynesboro, do you remember where you were working in Waynesboro?

Page 45

A. We did the water system at the lake they had out there.
Q. Do you remember how long that project took?
A. No, ma'am.
Q. And what type of work was involved on the water system? What were -- exactly were you doing on the water system?
A. Laying pipes.
Q. So were you doing any concrete work on the water system?
A. I don't remember on that one.
Q. Okay. And in Raleigh, do you remember where -- where you were working in Raleigh?
A. Yeah. Did a -- poured concrete in Raleigh. All I remember, we was pouring concrete over big pipes.
Q. Over big pipes?
A. Yes, ma'am.
Q. Okay. Do you know how long that job took?
A. Quite a while.
Q. Like weeks or months?
A. I think it was months. It might have been longer.

Page 46

Q. So it was a pretty big project?
A. Yes, ma'am.
MR. FOXWORTH:
Hey, Krisi, I'm going to say something right quick. I noticed on the fact sheet --
MS. LEE:
Uh-huh.
MR. FOXWORTH:
-- where I have Pine Belt Ready Mix --
MS. LEE:
Uh-huh.
MR. FOXWORTH:
-- it shows sand and cement. It should have been sand, cement and concrete. So I want you to know that on the front end that's a typo on my part.
MS. LEE:
Okay.
MR. FOXWORTH:
It's an error on the fact sheet that's my error. So he's claiming exposure for all three if you would.
MS. LEE:
At -- at Pittman and Myrick or --
MR. FOXWORTH:

Page 47

Yeah, with regard to Pine Belt Ready Mix.
MS. LEE:
Okay.
MR. FOXWORTH:
I'll amend it. I'll give you -- what will that be, Will?
Q. So --
MR. MANUEL:
(Inaudible.)
MR. FOXWORTH:
That's right.
MS. LEE:
Q. -- you were in Raleigh for a few months pouring concrete over pipes. You don't recall if that was for the city or a private organization?
A. I believe it was a private organization.
Q. Okay.
A. I'm not for sure. All I know, it was some big pipes.
Q. Okay. And then when you were in Laurel, do you know where -- what site you were working at in Laurel?
A. Ellisville State School.

Page 48

Q. Ellisville State School?
A. Yes, ma'am.
Q. And what were you doing at Ellisville State School?
A. We poured all the wheelchair ramps.
Q. I'm sorry?
A. We poured all the wheelchair ramps.
Q. Wheelchair ramps?
A. Handicap ramps.
Q. Okay. Did you pull up the old ones, or did you just lay new ones?
A. We laid new ones.
Q. So did you do any tearing up of concrete at the Ellisville State School?
A. Some.
Q. How long did that job take?
A. A while.
Q. A few weeks or a few months?
A. A long time.
Q. Okay. And then in Bay Springs, do you remember what job site you were at in Bay Springs?
A. No, ma'am.
Q. Okay. And what about in State Line, Mississippi, do you know what job site you were at at State Line or what you were doing there?

A. What we doing, I don't know.
Q. Okay.
A. Not right offhand.
Q. And in Heidelberg, I believe you said is where you tried the sandblasting?
A. Yes, ma'am.
Q. Do you know who owned the property you were working at in Heidelberg or --
A. I think it's an oil rig. I'm not for sure who owned it.
Q. Okay. Did you do any concrete work in Heidelberg?
A. We poured several slabs up there.
Q. Poured what? I'm sorry.
A. We poured several slabs in Heidelberg.
Q. Several slabs?
A. Several. Several. Not seven. Several. A bunch of them.
Q. Okay. And then in Ellisville, do you know where you were working in Ellisville or what you were doing?
A. Yeah, worked at state school.
Q. Oh, okay. I'm sorry. So you said Laurel, the Ellisville State School?
A. No. Ellisville is Ellisville State

School.
Q. Okay. So do you know what you did in Laurel?
A. Laurel. I don't know.
Q. Okay.
A. I'm not for sure.
Q. You poured, I think, a lot of slabs for Tom Pittman. And you did some wheelchair ramps and some sidewalks. Did you ever mix any of the concrete with Tom Pittman yourself?
A. No.
Q. You didn't?
A. No.
Q. Did anyone that you worked with at Tom Pittman mix it, or did -- was all of it brought in on a truck?
A. It was all brought in on a truck.
Q. The concrete at all of your job sites with Tom Pittman was always brought in on --
A. Yeah.
Q. -- a truck?
A. Yeah, any finishing concrete was.
Q. Okay. So when your fact sheet said that you got sand and cement from Pine Belt Ready Mix, would that not be right?

A. Yeah. We -- when they laid blocks.
Q. Okay. So you weren't buying concrete sand from Pine Belt Ready Mix?
A. Yeah. That's the only place I know where they got it from.
MR. FOXWORTH:
I don't think you understand the term blocks and all that kind of stuff. You need to ask him.
MS. LEE:
Q. Okay. So you were making concrete blocks? What were you using the sand for that you got from Pine Belt Ready Mix? Let me ask it that way.
A. To lay blocks.
Q. Okay. So was it mortar sand?
A. I guess.
Q. Were you laying bricks?
A. Yeah. Bricks and blocks.
Q. And so you were mixing like a gray mortar with the sand that you got from Pine Belt?
A. Yes.
Q. Okay. Was it a real fine grade of sand?
A. Yes.

Q. Okay. And you also got cement from Pine Belt Ready Mix; is --
A. Yes, ma'am.
Q. -- that right? What were you using that cement for, the same purpose, to lay --
A. The one he brought with the trucks, we laid the slabs --
Q. Okay. So you have a --
A. -- sidewalks and handicap ramps.
Q. Okay. When you -- I'm sorry. I want to make sure I have the distinction right between concrete and cement.
A. Uh-huh.
Q. They brought the concrete in on a truck to lay the slabs and to pour the sidewalks?
A. Right.
Q. Okay. When you bought the cement from Pine Belt Ready Mix, what was that used for?
A. Used it for -- it's come in a bag.
Q. Right.
A. For patching. Like we make a bag pour, tear it up, you know, patch it back.
Q. So you would mix little mixtures of concrete with --
A. Yeah, where we need.

Q. -- that cement to patch stuff up?
A. Right.
Q. Okay. I'm sorry. I got us a little confused there. At all of the job sites with Tom Pittman where you did concrete, was Pine Belt always the supplier of the concrete or did you ever get it from anywhere else?
A. You know, Pine Belt got several places. And mostly everywhere we worked at, it was one of their trucks that came.
Q. So that was going to be my next question. Do you know which sites you got your concrete from Pine Belt from?
A. Get -- if we in Ellisville, we get it from Laurel. If we in Heidelberg, I think we get it from either Laurel or Bay Springs, something like that.
Q. Okay. Did you know any of the guys that drove the trucks for Pine Belt?
A. No, ma'am.
Q. Either -- either when you were with Tom Pittman or with Gordon Myrick, you never knew any of the guys that worked for --
A. I knew.
Q. -- Pine Belt?

A. -- a lot of them, but not -- not by a first name basis.
Q. Okay. When you got your sand and your cement from Pine Belt, was that delivered or did somebody go pick it up?
A. It was delivered.
Q. And what kind of trucks was it delivered in, if you remember, a six yard truck or a --
A. I'm -- I'm not for sure what -- what size, six or whatever. It was a red -- red truck.
Q. It was a red truck?
A. They had a red one. And then -- then later on they had a white one --
Q. Do --
A. -- that delivered it.
Q. Do you know if it was a Pine Belt truck or if it was a contractor, somebody that they hired to bring it out to you?
A. It was one of their trucks. Had Pine Belt on the door.
Q. Okay. And --
A. I guess it had Pine Belt on the door.
Q. -- did -- do you know any of the guys that drove those trucks that delivered your sand

and cement?
A. No, ma'am.
Q. Did you ever go to any of the Pine Belt sites when you were working for Tom Pittman or Gordon Myrick?
A. I don't remember.
Q. Do you remember ever talking to anybody from Pine Belt about their concrete or their sand or cement?
A. We always talked, but I, you know --
Q. You said you would pour concrete and then you would go back and chip away to kind of clean it up and make it smooth; is that right?
A. Well, if you -- you mess a pour up or either the wall break or something like that there or something bad, either it's -- if it ain't right, you know, you have to go back and chip it up, you know, if they wanted to seal it. You see what I'm saying?
Q. Right. How long did you usually wait after it was poured before you went back and chipped it up and cleaned it up and made it look right?
A. I'm not for sure.
Q. Like an hour or a day or a week or --

was it usually done in the same day?
A. No.
Q. Is that a dusty process when you would go in and chip it up and --
A. Yes.
Q. -- clean it up? You were always wearing respiratory protection, though; right?
A. Dust mask.
Q. Okay. You said when you were with Tom Pittman, that on a couple of occasions you tore up some concrete that Tom Pittman had poured. Do you remember which site that was at that you tore up concrete that you yourself or someone from Tom Pittman had poured?
A. I don't remember.
Q. Do you know why you would have -- have torn out concrete that you poured? Was it a mess-up or --
A. Well, sometimes it's -- you might have a -- some high than what it supposed to be. You know, you chip it down. Make it smoother. You know, even with the rest of the floor, something like that.
Q. Okay. I'm trying to get an idea of -- of what you were doing with Tom Pittman. When the

concrete truck comes out, the guy in the concrete truck dumps the concrete and lays it out. What -- what did you physically do after the concrete was poured?
A. After the concrete was poured, my job sometimes was to help finish it.
Q. Okay. So y'all didn't contract out the finishing at Tom Pittman like you did at Gordon Myrick?
A. If it's too big, we contract it out. If it's something small that we can handle, we did it ourselves.
Q. Okay. You talked about using a jackhammer and a chipping tool and a hammer. Did you ever use any other kinds of tools in your concrete work?
A. We used a lot of tools. You know, hammers and --
Q. I'm sorry.
A. -- stuff.
Q. Other than the -- the hammer and the jackhammer and the chipping tool?
A. Anything pertaining to tearing up something, chipping up something? What you mean? You know, it's -- tools is a screwdriver and a

hammer and --
Q. I'm sorry. That wasn't clear. With your concrete work, when you were tearing it up or chipping it up or finishing it or cleaning it up or smoothing it out, did you use any other tools?
A. No. I don't remember.
Q. Okay. You said that on one occasion you tore some concrete out from inside a building. Do you remember where that was that you were tearing concrete out inside?
A. I believe it was the state school.
Q. Do you remember what you were tearing out inside?
A. We did some -- I think they made some bad holes on some drains.
Q. On some drains?
A. Drains. You know, it wasn't deep enough.
Q. Was it like in a bathroom or something?
A. Something like that.
Q. And do you know where the concrete came from that you were tearing out inside?
A. From Pine Belt.
Q. Y'all had poured the drains and they weren't deep enough and you had to go back and

redo them?
A. Yes, ma'am.
Q. Okay. How often would the delivery truck from Pine Belt come to your sites at Tom Pittman to bring supplies?
A. We never did have the truck bring supplies.
Q. I'm sorry. I mean, the sand and cement?
MR. FOXWORTH:
Don't guess. If you don't know, you don't know.
A. Cement, what you mean? When the truck bring their already mixed cement or are you talking about the bag cement or --
MS. LEE:
Q. I'm sorry. The bag cement and the sand, you said that was delivered from Pine Belt on a truck?
A. The sand was.
Q. The sand was. The cement wasn't delivered on a truck?
A. Sometimes he -- he might get maybe four or five bags of Portland Cement.
Q. Of Portland Cement?

A. Portland. I think that's the name of it. I'm not for sure. I believe it is Portland. It might be called something else.
Q. What was that used for, the Portland Cement?
A. You can mix it in to make a -- right back in with the concrete.
VIDEO SPECIALIST:
Off the record. The time is 11:43.
(Off the record.)
VIDEO SPECIALIST:
Back on record. The time is 11:44.
MS. LEE:
Q. Okay. Mr. McGilberry, I'm going to move on to your job at Gordon Myrick. And I'm going to do the same thing we did with Tom Pittman, and that is go through the towns that you listed.
A. Yes, ma'am.
Q. Ellisville, Laurel, Collins and Stringer. Do you recall any other cities where you worked with Gordon Myrick?
A. No.
Q. Okay. Do you recall what you were doing in Ellisville with Gordon Myrick?

Page 61

A. We did the library. We did the girls' dormitory. And we did the game room at JC. All of them.
Q. All three of these -- the library, the girls' dorm and the game room -- were all at Jones County Junior College?
A. Right.
Q. And what were you doing at the library -- with the library? Were you building the library?
A. Building a new library.
Q. Were the library, the girls' dorm and the game room all done at the same time, or did you go back three different times --
A. Every time --
Q. -- for different --
A. -- you finish one contract and they bid on a new contract.
Q. So like when you finished the library, did you start on the girls' dorm or did you go to one of these other towns and do a different project and then come back? Do you understand my question?
A. I understand what you're --
Q. Okay.

Page 62

A. -- saying. All I remember, I worked on all -- all the jobs -- all the jobs at the same time. You know, we never was in the same spot all the time. You might be in one spot one week. And you might work two days somewhere else. You might work two days somewhere else and stuff like that.
Q. You're talking about within Jones County Junior College, you might go from one project to another --
A. Right.
Q. -- in the same week? Okay. That answers my question. Thank you. And were all three of these new buildings -- the girls' dorm, the game room and the library? Did you all build those from the ground up?
A. Yeah.
Q. What all were your responsibilities in building these buildings? Did you just do concrete work, or did you do any other kind of construction work?
A. I was a laborer.
Q. What were your duties as a laborer?
A. Mostly grading, cleaning up, chipping.
Q. What did you do in Laurel, Mississippi, for Gordon Myrick?

Page 63

A. We remodeled the -- the church across from the city hall -- I mean, the courthouse, whatever. We did the fence around the oil field out here on 15. We remodeled Phillips Building Supply right now, the new one. It used to be some -- something else.
Q. So it wasn't Phillips Building Supply when you were remodeling it?
A. No. It was something else.
Q. Okay. But that building?
A. Uh-huh.
Q. What type of work were you doing when you were remodeling the church?
A. Chipping --
Q. Chipping concrete?
A. -- tearing -- tearing out bricks and stuff like that.
Q. And at the oil field, I assume you were just building a fence out there?
A. Yeah.
Q. What kind of -- is it a chain link fence or a wooden fence or --
A. Brick and block fence.
Q. Brick and block fence. And then when you were remodeling the building where Phillips

Page 64

Building Supply is located now, what were you doing there?
A. Tearing out and redoing it.
Q. So you were tearing out old --
A. Pouring concrete and stuff like that.
Q. Okay. What were you doing in Collins, Mississippi, for Gordon Myrick?
A. We built Union Planters Bank out there in Collins.
Q. That one right there on 84 across from the Chevron?
A. Right.
Q. Okay. You built that from the ground up?
A. Ground up.
Q. How long did that project take?
A. Quite a while.
Q. A couple of months?
A. No.
Q. Longer than that?
A. Longer.
Q. Six months? Don't guess. I just --
A. Yeah.
Q. The better part of a year?
A. I guess.

Page 65

Q. Okay.
A. I'm not for sure.
Q. And what were your responsibilities with the Union Planters Bank?
A. The same thing. Cleaning up, chipping and grading and --
Q. Approximately how much of your time did you spend chipping as opposed to cleaning up?
A. Fifty.
Q. What were you doing in Stringer, Mississippi, with Gordon Myrick?
A. That's where I did the sandblasting, in Stringer.
Q. No concrete work in Stringer?
A. It was some fences we poured I think what you call it, Quikrete cement.
Q. So the concrete in Stringer didn't come from Pine Belt?
A. I don't know for sure where it come from. It's in bags. I'm not for sure we got concrete or -- it's been so long.
MR. FOXWORTH:
Just for the record on the Quikrete, we're going to add cement as an allegation. We will put that in the fourth amended that Will has

Page 66

had me produce.
MR. MANUEL:
In the court.
MR. FOXWORTH:
That's correct.
MS. LEE:
Q. I want to back up just for a minute to when you were at the junior college in Ellisville. You said you were a laborer. How much time did you spend cleaning up as opposed to chipping and smoothing the concrete?
A. I'd say 70 -- 75 percent of my job was -- was cleaning up and chipping.
Q. What was the other 25 percent?
A. Grading, getting stuff ready to be poured.
Q. And in that 75 percent of cleanup and chipping, can you -- can you separate out what you did more of?
MR. FOXWORTH:
Don't guess. If you know, you know. Tell her if you know, but don't guess.
A. Chipping.
MS. LEE:
Q. You did more chipping?

Page 67

A. Yes, ma'am.
Q. Okay. And then in Laurel when you were remodeling the church, what percentage of the time did you spend chipping as opposed to cleaning up and other -- grading and other duties?
A. 100 percent.
Q. That's all you did was chipping at the church?
A. Yes. Because we had to remodel it, you know. Mostly everything had to be tore out --
Q. Okay.
A. -- with the blocks.
Q. And then when you were remodeling the Phillips building, how much of your time there was spent chipping and tearing out, if any?
A. I'm not for sure.
Q. At the Ellisville, Laurel and Collins work sites, did all of your concrete come from Pine Belt?
A. Yes.
Q. On a truck -- on a --
A. Yeah.
Q. -- concrete mixing truck?
A. Yes.
Q. They brought it out there and would

Page 68

pour it, and then you would go in and clean it up, chip it or whatever --
A. If it needed it, yeah.
Q. -- whatever needed to be done? You testified yesterday that you got sand for mixing concrete for patch jobs from Pine Belt as well. Did that come on the same kinds of truck that it came on with Tom Pittman, the red truck or the white truck?
A. Yes.
Q. Was that always delivered, or did you ever go pick it up?
A. It was delivered.
Q. Did you purchase any other materials from Pine Belt other than the concrete and the sand for mixing the concrete when you were with Gordon Myrick?
A. Pea gravel.
Q. Pea gravel?
A. Pea gravel.
Q. What was the pea gravel used for?
A. We made stepping stones.
Q. Do you remember which job site that was at that you made stepping stones?
A. The college.

Q. Did you do any brick laying or block laying when you were with Gordon Myrick?
A. No.
Q. So you wouldn't have mixed any mortar when you were with Gordon Myrick?
A. No.
Q. Okay.
A. I'm going to have to leave that answer I don't know. I'm not for sure. I don't know.
Q. Okay. Did you ever -- I'm sorry. You already answered -- no, you didn't answer that question. Did you ever tear out any of the concrete that you poured when you were with Gordon Myrick --
A. Yes.
Q. -- like where there was a mess-up?
A. Yes.
Q. Where was that?
A. The college.
Q. Which one of the buildings at the college?
A. It was the -- one of the walls where they -- the coaches -- where they room is going to be at. One of the walls busted.
Q. How many people were on your crew at

Gordon Myrick?
A. More than 12.
Q. And that would be the same for all of the job sites, more than 12 --
A. No.
Q. -- with Gordon Myrick? That was just the --
A. Oh, yeah. Usually we saw them leave one job site, go to another job site.
Q. How about with Tom Pittman, how many people were on your crew at Tom Pittman?
A. About six.
Q. And you can't tell me the name of anybody that worked at Pine Belt either driving the mixing truck or the delivery trucks?
A. No, ma'am.
MS. LEE:
Mr. McGilberry, I think that's all the questions I have. I would like to at this time join in the objection that Mr. Manuel put on the record yesterday.
MR. FOXWORTH:
So let it be written. So let it be done.
MR. MANUEL:

That's fine.
MR. FOXWORTH:
Let's -- let's do a polling on time.
(Discussion amongst counsel.)
MR. WILBANKS:
John, since I wasn't here yesterday, on the record, there was -- there's no claim for wearing respirators; right?
MR. FOXWORTH:
That is correct.
MR. WILBANKS:
Okay. Thank you.
MR. FOXWORTH:
Make sure that's on the record.
(Discussion amongst counsel.)
VIDEO SPECIALIST:
Off the record. The time is 11:59.
(A lunch break was taken.)
VIDEO SPECIALIST:
Back on record. The time is 12:40.
MS. LEE:
Q. Mr. McGilberry, while we were on our lunch break, your lawyer told us that you remembered a few more job sites. And I'm going to go through those with you. I think you remembered

some from Tom Pittman and from Gordon Myrick?
A. Right.
Q. Let's start with Tom Pittman. If you would, tell me the job sites that you remembered in the break from Tom Pittman.
A. Okay. Heidelberg Academy --
Q. Uh-huh.
A. -- we did a gym. And then still in Heidelberg, we did the -- the grocery store in Heidelberg. It's on the outside of town.
Q. Okay. Those are the two things that you remember from Heidelberg?
A. They were with Tom Pittman.
Q. With Tom Pittman?
A. Uh-huh.
Q. When you did the gym at Heidelberg Academy, was that a new building or were you --
A. Yeah, new building.
Q. -- remodeling?
A. New building.
Q. A new building. How long did that project take?
A. I'm not for sure how long it took.
Q. And what were your responsibilities in building the gym at Heidelberg Academy?

A. Grading, cleaning up and chipping.
Q. Was that a block building or a brick building, or was it a metal building?
A. I think it's a metal building.
Q. So you just basically had the slab with the gym and everything else was metal?
A. I believe so. I'm not for sure.
Q. And do you know who supplied the concrete for the gym at Heidelberg Academy?
A. Pine Belt.
MR. FOXWORTH:
Pine Belt Ready Mix?
THE WITNESS:
Yes, sir.
MS. LEE:
Q. And you did the grading work prepping it up to have the concrete poured for the gym?
A. Yes, ma'am.
Q. And then you did cleanup?
A. Yes, ma'am.
Q. Did you do any other work on the gym besides -- like putting the walls up and --
A. Yes, ma'am.
Q. -- actually doing the building?
A. Yes, ma'am.

Q. How much time do you think you spent doing the actual chipping on the slab?
A. We had a bunch of spots that didn't -- didn't come out right. So we had to -- on timewise, I'm not for sure.
Q. Okay. Was that just a small part of the overall responsibilities you had when you built the gym, though?
A. Some of it.
Q. So Pine Belt came in and they poured the slab for the gym, and there was a lot of places you said that weren't right you had to go back and fix?
A. Yes, ma'am.
Q. How long after they poured that slab did you go back and fix all the chinks and mistakes?
A. I'm not for sure.
MR. FOXWORTH:
That's okay. This doesn't have to be on.
(Off the record.)
MS. LEE:
Q. Did you have to wait for the concrete to set up before you go in and fix it, or do

you -- do you fix the mess-ups while it's still wet?
A. Most of the time we did it when it was -- or when they found out it was messed up.
Q. Uh-huh.
A. It was dry.
Q. Okay. And was that usually when the concrete was still somewhat wet?
A. No. It -- it was -- it was solid dry.
Q. Oh, it was dry. Okay. And then you did the grocery store in Heidelberg; is --
A. Yes, ma'am.
Q. -- that right?
A. Right -- right across from the academy.
Q. Across from the academy?
A. Right.
Q. Do you know the name of that grocery store?
A. I'm not for sure what's the name of it now.
Q. Was that a new building?
A. Yes, ma'am.
Q. And what were your responsibilities with the grocery store in Heidelberg?
A. Mostly the same thing. Grading,

getting the building up and cleaning up and chipping.
Q. What kind of building was it? Was it a brick building, or was it a --
A. Metal building.
Q. -- metal building? So the only concrete work involved with the grocery store was pouring the foundation?
A. Yes, ma'am.
Q. And who supplied the concrete for that job?
A. Pine Belt Ready Mix.
Q. How much of the time on the grocery store did you spend chipping as opposed to cleaning up and grading and other construction work?
A. I remember we had to chip out because where the lines for the -- the coolers, they wasn't where they supposed to be at. So we had to chip out, and they had to redo it.
Q. The plumbing lines?
A. I don't know if you call it the plumbing lines or what. I think -- I don't --
Q. How long did the construction of the grocery store take?

MR. FOXWORTH:
If you know, you know. Don't guess.
A. I'm not for sure how many months.
MS. LEE:
Q. And for the time that you were there building the grocery store -- for the entire time you worked on the grocery store, how much of the time would you say was spent doing the foundation work and laying the foundation and chipping as opposed to completing the rest of the building?
A. Say that again.
Q. For the entire time that you were building the grocery store, how much time was spent laying the foundation and getting all of the -- the kinks worked out and fixing all the mistakes as opposed to completing the rest of the building, putting the walls up, doing the rest of the building? Did you do the rest of the building? Did y'all build the whole grocery store?
A. Yeah. We did the whole thing.
Q. Okay.
A. I'm not for sure, but seems like you're asking several questions in that -- that one answer, you know, that you're giving. I'm not --

I can't -- I really don't understand.
MR. FOXWORTH:
She'll rephrase her question.
MS. LEE:
Q. Yeah, I can rephrase.
A. Okay.
Q. Hypothetically, you were at the grocery store for four months. How much of that four months would have been working on the foundation as opposed to putting the walls up and doing any other kind of work, grading work that you were doing?
MR. FOXWORTH:
If you know --
MS. LEE:
Q. How long did it take to actually pour the foundation and get all the -- the chinks and kinks worked out?
MR. FOXWORTH:
If you know, you know.
A. I would say about a couple of weeks.
MS. LEE:
Q. Okay. Okay. And then you said you remembered some job sites when you were with Gordon Myrick?

A. Yes, ma'am.
Q. What did you remember working with Gordon Myrick?
A. We did a little small shopping center in Collins off of 49. It was a grocery store. And I think it was a dollar store. I think it -- that's what it was.
Q. And that was a new construction?
A. Yes, ma'am.
Q. Were those metal buildings also?
A. No, ma'am. This here was brick -- I mean, block building with concrete floor.
Q. Who supplied the concrete for the floor of that shopping center, if you know?
A. Pine Belt. They out of Collins.
Q. And what about the blocks for the building, do you know where they came from?
A. No, ma'am.
Q. They didn't come from Pine Belt, though?
A. No. They didn't have blocks.
Q. When you were working on the shopping center in Collins, did you mix any of your own concrete?
A. No, ma'am.

Q. Did you mix the mortar to lay the -- the blocks?
A. No, ma'am.
Q. Do you know where the mortar came from where you laid the blocks -- that you laid the blocks with?
A. No. They came with the -- where the blocks came.
Q. Do you know how long the shopping center in Collins took to build?
A. I'm not for sure.
Q. And how much of the time spent on the shopping center was spent chipping concrete as opposed to grading and other construction?
A. I would say grading may be 25 percent and concrete and chipping about 75 both together.
Q. And that's just of the total time that you spent on the foundation. That wouldn't be of the whole project. You didn't do concrete for 75 percent of the whole project; right?
A. Well, that's all it was. See, it was blocks and concrete and -- and a top on it.
Q. Did you actually build the building, or did you just do the foundation for the shop?
A. We did the foundation. And I did the

Page 81

cleaning up and --
Q. Someone else came in and laid the blocks?
A. Yeah. Another -- another crew come in and lay --
Q. Okay.
A. -- the blocks.
Q. So your crew didn't actually build the building?
A. No.
Q. Okay. Just the --
A. We -- we was there from finish to -- to start.
Q. When you were at Heidelberg with Tom Pittman and in Collins at the shopping center with Gordon Myrick when you were doing the chipping, were you wearing respiratory protection?
A. Dust mask.
Q. Would this be the same dust mask that you've describing --
A. Yes, ma'am.
Q. -- during your work?
MR. FOXWORTH:
Asked and answered.
MS. LEE:

Page 82

Q. Are these the only job sites that you remember --
A. I have two more.
Q. -- Mr. McGilberry?
A. A couple more.
Q. Oh, you have a couple more?
A. Yes, ma'am.
Q. What else do you remember?
A. We did a -- we did a big addition for Southern Touch in Ellisville at the industrial park.
Q. Southern Touch?
Q. Yes, ma'am.
Q. What is Southern Touch?
A. It used to be the place they made the apple juice. But I think somebody else got the building now.
Q. And what was involved in the addition to Southern Touch in Ellisville at the industrial park?
A. A lot of concrete. It was a metal building.
Q. So you were actually adding on to the building?
A. Yes, ma'am.

Page 83

Q. And it was only a concrete slab. The rest of the building was metal?
A. Yes, ma'am.
Q. Were you involved in putting up the metal walls for the building?
A. No, ma'am.
Q. Just the concrete portion?
A. Yes, ma'am. And cleaning up.
Q. Who supplied the concrete for the Southern Touch addition?
A. Pine Belt Ready Mix.
Q. Did you mix any of your own concrete for that addition?
MR. FOXWORTH:
When you say his own, you mean something --
MS. LEE:
Q. I'm sorry. With Gordon Myrick, did you mix any concrete or was it all premixed?
A. The only mix I mixed was on the patching. Patching the holes.
Q. Did you do that more than once? Did you mix a batch of concrete to patch holes more than once at the industrial park?
A. Had quite a few holes.

Page 84

Q. And that mixing would have all been done on separate occasions?
A. Yes, ma'am.
Q. Where did you get the materials used to mix that concrete?
MR. FOXWORTH:
What do you mean by materials?
MS. LEE:
The components of the concrete. He mixed his own concrete.
Q. Where did you get the materials that --
MR. FOXWORTH:
Talking about like the sand, mortar and all that?
MS. LEE:
Whatever it takes.
A. Portland Cement from Phillips.
MR. FOXWORTH:
Phillips what?
THE WITNESS:
Phillips Building Supply.
A. And I'm not for sure on the sand.
MS. LEE:
Q. And would you mix this the same way you mixed that concrete you've told us about

previously?
A. Yes, ma'am.
Q. Do you remember how long this job took at Southern Touch?
A. Took quite a while. I'm not for sure.
Q. I apologize if you've already answered this question, Mr. McGilberry. But when you were moving from job site to job site with Gordon Myrick, were the -- your coworkers the same at all these job sites?
A. Sometimes.
Q. Have you already told us the names of all the people you remember working with?
A. A lot of them -- they just weren't from Ellisville. They was -- you know, some of them from the Coast where Gordon Myrick is out of. That's where -- they got an office in Gulfport. And --
Q. Were there any particular folks that you worked with on all your jobs or on a large majority of your jobs?
A. Do what now?
Q. Were there any guys that you worked with on all your jobs for Gordon Myrick that went with you from job to job?

A. A lot of time I went to job to job when I went because the way I work. And he always take me to job to job, and they just hire people from somewhere else. And I know what to do. And we didn't have to take the whole crew with us. We always hire people off of the streets and stuff.
A. So you were kind of his right-hand man. He took you and then he would hire people whenever he got to a location?
A. Sometimes.
Q. Okay. What was the next job site that you remember, Mr. McGilberry?
A. We closed some -- some docks in up in Laurel up at -- let me see. They called it -- up here in Hoy, Mississippi. It's called Hoy, but that's -- that's where we did the job at.
Q. Heart?
A. Hoy.
Q. Hoy?
A. Hoy.
Q. H-O-Y?
A. I guess. It's a little small community home.
Q. And you were closing docks?
A. Yeah. We -- the docks we made where

the truck can back inside the building.
Q. Right.
A. And we closed it up where the trucks couldn't back inside. The only -- just could be inside was just the doors.
Q. So you -- where there's a big roll door where the truck backs up to a building, you took that door out and you closed it in and made it a wall there?
A. No. We poured concrete in the floor, closed it up. You know, concrete --
Q. Okay.
A. -- that up and -- and fix it where you couldn't just back into it. That's -- that was it.
Q. Okay. How long did that job take?
A. About two weeks.
Q. And do you know who supplied the concrete to that job?
A. Pine Belt.
Q. How many times did Pine Belt come out there with concrete in that two week period? More than once?
A. Which job?
Q. At Hoy. I'm sorry.

A. I'm not for sure how many trucks came.
Q. Did you mix any of your own concrete at Hoy?
A. No, ma'am.
Q. Did you do any chipping at Hoy?
A. We drilled some holes with a drill and stuck rods in them.
Q. Stuck rods?
A. Yeah. We stuck the rods in them so the concrete could bond in to the -- to that.
Q. Did you use some kind of special concrete drill for that?
A. Yes, ma'am.
Q. Any other chipping or patching did you do there?
A. Well, that -- that -- that type drill, it -- it -- it's just like a -- it -- it kind of make noise like a chipping gun, but it's -- it be, you know, pretty dusty when -- when -- when you drill it.
Q. Okay. You were drilling the concrete that you had poured or --
A. Yes, ma'am.
Q. -- that Pine Belt had poured?
MR. FOXWORTH:

Is that a yes?
THE WITNESS:
Yes.
A. Not with -- no. Not the concrete we poured. But the concrete was already there. What we did was drilled a hole and stuck rods in it when we got ready to pour the concrete in there.
Q. So you drilled the old concrete and put rods in and then poured new concrete over the rods --
A. Right.
Q. -- to bond?
A. Right.
Q. I got you. And this job with Hoy, that was with Gordon Myrick also; right?
A. Yes, ma'am.
Q. Okay. The new concrete that was poured at the docks -- on the docks, did you do any drilling or chipping on it?
A. I'm not for sure.
Q. Okay. Do you remember any more job sites?
A. Yes, ma'am.
Q. Okay. I want to go back. I just forgot to ask you. With Tom Pittman in Heidelberg

at the gym and at the grocery store, did you mix any of your own concrete at either of those places?
A. On the places that we had to repatch, we -- we remixed some.
Q. Would that be at the gym or the grocery store?
A. The grocery store.
Q. At the grocery store. Do you know who supplied the materials to mix that concrete?
A. I'm not for sure.
Q. And then at the shopping center in Collins, did you mix any concrete there?
A. I don't know.
MS. LEE:
If that's all the job sites you remember, Mr. McGilberry, then that is all the questions I have.
EXAMINATION
BY MS. WILLIAMS:
Q. Good afternoon, Mr. McGilberry. My name is Melissa Williams, and I represent several of the defendants in this case. I have a couple of questions for you today about a few different things. And I'm going to try to isolate them

to -- to be quick. Okay?
A. Okay.
Q. Okay. I want to ask you just now about when you were working for Tom Pittman. Okay?
A. Yes, ma'am.
Q. I understood from my notes that you don't know who the supplier of the pot was. But do you know if Tom Pittman owned the pot or if he rented the pot?
MR. FOXWORTH:
And I apologize. Did you state on record who you represented?
MS. WILLIAMS:
No.
MR. FOXWORTH:
If you would.
MS. WILLIAMS:
Sure. Air Liquide, Big 3, Sanstorm, Survivair, Rental Service Corporation.
MR. FOXWORTH:
Okay.
MS. WILLIAMS:
Q. Do you remember my question?
A. I'm not for sure who -- who he rented it from or who it -- whether it was his or not.

Q. You don't know if it was owned or rented?
A. No, ma'am.
Q. Okay. Now, let me ask you this. From your product ID list or your fact sheet that I had a chance to look at this morning, I noted that you identified Sanstorm under your work at Tom Pittman. What do you associate the name Sanstorm with, or do you associate it with any product?
A. Sanstorm, that was the -- the sandblasting bags.
Q. I'm sorry. Say that again.
A. Sandblasting.
Q. Okay. But what piece of equipment or what type of material do you associate the name Sanstorm with with regard to sandblasting?
A. It was on the bag.
Q. On the bag?
A. Uh-huh.
Q. Okay. Let me move now to your time at Gordon Myrick.
A. Yes, ma'am.
Q. Okay? I believe you testified earlier that Gordon Myrick had rented a pot from Walker Jones?

Page 93

A. Yes, ma'am.
Q. Okay. How often did Gordon Myrick rent a pot from Walker Jones?
A. That one time I know of.
Q. One occasion?
A. Yes.
Q. And how do you know that it was Walker Jones that Gordon Myrick rented the pot from?
A. That's the only place I know he rented equipment from, Walker Jones.
Q. Okay. While you were at Gordon Myrick?
A. Yes, ma'am.
Q. Okay. And I understand that answer, but let me just ask this question. How do you know that it was Walker Jones? How did you first come to know it was Walker Jones that you rented the equipment from or that Gordon Myrick did?
MR. FOXWORTH:
I'm going to object. Asked and answered.
MS. WILLIAMS:
I understand that he knows that's what it was, but I'm just trying to find out how he knew.
Q. If you know. If you know, if you knew.

Page 94

A. Like I said a while ago, that's -- that's the only place I know we got equipment from.
Q. Okay.
A. That's the best I can do.
Q. Okay. That's all I'm asking for. That's all I'm asking for. Let me ask you a little bit about the equipment specifically that Gordon Myrick got from Walker Jones. Okay? Earlier I heard you talk about air compressors, pots, sand and dust masks. Is there any other equipment that was purchased from Walker Jones?
A. Chipping guns. Air lines.
Q. Wait. You said air lines?
A. Yes, ma'am.
Q. Okay.
A. Drill bits.
Q. Anything else?
A. Backhoes. Saws. Different kind of jacks that we needed.
Q. Do you remember specifically the types of jacks?
A. No.
Q. Okay. Is that it?
A. Packer, what you pack the dirt with.

Page 95

Q. Okay. When you talked about the air compressor earlier --
A. Yes, ma'am.
Q. -- from Walker Jones, was that purchased or rented from Walker Jones?
A. I'm not for sure.
Q. The items that you just listed, I'm going to just call them out one by one and ask you if you know if they were rented or purchased. The packer for the dirt, was that rented or purchased from Walker Jones?
A. Rented.
Q. The jacks?
A. Rented.
Q. Chipping guns?
A. Rented.
Q. Air lines?
A. Rented.
Q. Drill bits?
A. Rented.
Q. Backhoes?
A. Rented.
Q. Saws?
A. Rented.
Q. How often did Gordon Myrick rent or purchase equipment and materials from Walker Jones, if you know?
A. Now, what was the question?
MS. WILLIAMS:
What was the question?
(Whereupon court reporter read back the last question.)
MR. FOXWORTH:
Don't guess. But if you know, you know.
MS. WILLIAMS:
Q. Once a month?
A. No. Huh-uh.
Q. Is it more than once a month or less than once a month?
A. Sometimes twice a week. The man come by.
Q. Okay. That's my next question. Did you ever go to Walker Jones to rent equipment for Gordon Myrick?
A. No.
Q. Did you ever go to Walker Jones to purchase equipment for Gordon Myrick?
A. No.
Q. Okay. Again, while you worked at

Page 96

Gordon Myrick, you talked about -- excuse me. On your fact sheet, you listed Sanstorm. Would that be the same product that you already told me about with regard to Tom Pittman?

MR. FOXWORTH:

On his fact sheet?

MS. WILLIAMS:

Yes.

MR. FOXWORTH:

Why don't you read on his fact sheet what -- what it's listed as?

MS. WILLIAMS:

Well, didn't he fill out his fact sheet?

MR. FOXWORTH:

With the help of me.

MS. WILLIAMS:

I don't know where it is in here. If you want to find it. But before he looks, I would like to know if it was the same product, Sanstorm.

A. I don't know if it was the same one that we used at Tom Pittman. I don't know.

MS. WILLIAMS:

Q. Okay. When you hear the name Sanstorm at Gordon Myrick, what do you associate it with?

MS. WILLIAMS:

Before he looks.

A. What do I associate it with?

Q. Yes.

MR. FOXWORTH:

He doesn't understand your question.

MS. WILLIAMS:

I'll rephrase it.

Q. What product or piece of equipment do you think of when you hear the name Sanstorm while you were employed at Gordon Myrick?

MR. FOXWORTH:

She's talking about everything from compressors --

MS. WILLIAMS:

Uh-huh.

MR. FOXWORTH:

-- bags of sand, to pots, to whatever.

MS. WILLIAMS:

Q. If you don't know, that's okay, too. You can just tell me that.

A. I'm not for sure.

Q. Okay. A few moments ago I understood you to say that you blasted at -- at the Stringer job for Gordon Myrick?

A. I was an attendant.

Q. Attendant. Thank you. How long was the Stringer job?

MS. SKIPPER:

Objection. Asked and answered.

MS. WILLIAMS:

I didn't write it down. Would you tell me how long it was?

MR. FOXWORTH:

We try to do the best to take notes for you.

MS. WILLIAMS:

I appreciate that.

MR. FOXWORTH:

You're welcome.

MS. WILLIAMS:

Yes.

MR. FOXWORTH:

Asked and answered.

MS. WILLIAMS:

Let's go off the record for a minute.

VIDEO SPECIALIST:

Off the record. The time is 1:13.

(Off the record.)

VIDEO SPECIALIST:

Back on record. The time is 1:13.

MS. WILLIAMS:

That's all the questions that I have for you today. I appreciate your time.

MR. FOXWORTH:

Who's next?

EXAMINATION

BY MS. WALLACE:

Q. Mr. McGilberry, my name is Kimberly Wallace. And I represent Lone Star Industries.

MS. WALLACE:

Can I see his fact sheet, John?

MR. FOXWORTH:

Yes, you may. Since Will stole the one from yesterday. It's a 3M tactic.

MS. WALLACE:

Q. Mr. McGilberry, I have not heard you mention Lone Star Industries or Texblast either yesterday or today. But I see that it is indicated on your fact sheet. Is that something that you recall working with or around, or is that a mistake on your fact sheet?

A. Well, I can't say. I would have to see a picture of it, or it might have been just something I seen and wrote yes down.

Page 101

MR. FOXWORTH:
Could you show him the pictures? It would probably help.
MS. WALLACE:
No, I didn't. Did you?
MR. FOXWORTH:
Could you?
MS. WALLACE:
Sure. In just a minute, I will.
Q. But as you sit here today, you don't have a recollection of ever working with Lone Star --
A. Like I said, I'm not --
Q. -- or Texblast?
A. I can't -- I can't say. I don't -- you know, just by that word, you know, I'm blank. But if I can see a picture of it, you know, maybe I -- I might have seen it or I worked with it or whatever. I don't know.
Q. So those words don't mean anything to you?
A. Not right now.
MS. WALLACE:
Can we go off the record just a minute?
VIDEO SPECIALIST:

Page 102

Off the record. The time is 1:15.
(Off the record.)
VIDEO SPECIALIST:
On the record. The time is 1:15.
MS. WALLACE:
That's all the questions I have. Thank you.
MR. FOXWORTH:
Who's next?
EXAMINATION
BY MS. MUELLER:
Q. Good afternoon, Mr. McGilberry. My name is Randy Mueller. And I represent Green Brothers and Empire Abrasive Equipment Corporation. And I've just got a couple of questions for you. Earlier you were talking about a product called -- or you mentioned the name Portland Cement. Is that a type of cement?
A. Portland Cement?
Q. Yes.
A. Yes, that's a type of cement.
Q. Okay. So that is not like a building supply store where you would go to buy cement?
A. No.
Q. Okay.

Page 103

MS. MUELLER:
Is this the correct fact sheet, John?
MR. FOXWORTH:
That's the one that Will adulterated and produced today.
MS. MUELLER:
All right.
MR. MANUEL:
I'm going to count how many times my name is in this record.
MR. FOXWORTH:
I just like the fact that your clients read these.
MS. MUELLER:
To make it entertaining for them?
MR. FOXWORTH:
Yes.
MS. MUELLER:
Q. Mr. McGilberry, I haven't heard you mention any Empire products during your deposition today. Without looking at any pictures, can you tell me that you ever worked with any Empire products? Does the name sound familiar?
A. The name mean a lot, but --
Q. I understand.

Page 104

A. I don't --
MR. FOXWORTH:
I know you get frustrated because we're on the second day. But just relax and answer the questions. You want to take a break? Answer her question and we'll take a break. Ask him again.
MS. MUELLER:
Q. Do you remember ever working with any products manufactured by Empire?
A. I don't remember.
Q. Okay.
MS. MUELLER:
Do you want to take a break now and come back?
MR. FOXWORTH:
Take a short break and then come back.
MS. MUELLER:
Okay.
VIDEO SPECIALIST:
Off the record. The time is 1:18.
(Off the record.)
VIDEO SPECIALIST:
Back on record. The time is 1:34.
MS. MUELLER:
Q. Mr. McGilberry, I've got a couple more

Page 105

questions for you. Yesterday you testified that while you worked for Tom Pittman, you wore a hood on that one time where you sandblasted a little bit?

A. Uh-huh.

Q. You said that the hood was dark in color?

A. Yes, ma'am.

Q. Do you remember if the hood was one color? Was it a solid color?

A. I think so.

Q. Okay. And what do you consider to be dark colors?

A. Brown, green.

Q. On your fact sheet, you've identified a hood made by Empire that's red and blue. Would you think that would be a mistake since you just testified that the hood was one color and it was brown or green?

A. Do what now?

Q. Your fact sheet identifies a red and blue hood.

MR. FOXWORTH:

Does it say red and blue on the fact sheet?

Page 106

MS. MUELLER:

It does.

MR. FOXWORTH:

It says red and blue?

MS. MUELLER:

It says red and blue.

MR. FOXWORTH:

Do you have a copy of the picture?

MS. MUELLER:

No, I don't.

Q. Would you say that that would be a mistake that you testified that the hood that you wore was brown and green -- brown or green and it was one color?

A. I'm not for sure. I'm not -- I'm not -- not for sure.

Q. So you're not for sure if it was red and blue, or you're not for sure it was brown and green -- brown or green?

A. Red and blue. Red and blue, I don't.

Q. Okay. So you can't testify today that you wore a red and blue hood? You can't say that you did because you don't remember; is that correct?

MR. FOXWORTH:

Page 107

Do you have the picture so we can show it to him? Anyone?

A. Don't remember.

MS. MUELLER:

Q. Okay. And that's fine. Your fact sheet also identifies several different kinds of blasting machines, pots. But during your deposition testimony, you've only talked about two pots that you've ever worked with or around. When your fact sheet was filled out, do you remember looking through a picture book?

A. Yes.

Q. And is that what you used to fill out your fact sheet?

A. Yes.

Q. Okay, sir. And when you looked at the picture book, did you see all kinds of different things? Some of them looked alike, very similar?

A. Yes.

Q. So the things that are on your fact sheet, you can't testify today that you're positive that that is the product that you worked with, but it just kind of looks like it; is that correct?

A. Kind of looks like it.

Page 108

Q. Okay.

MS. MUELLER:

I believe that's all the questions I've got. Thank you.

EXAMINATION

BY MS. JONES:

Q. Good afternoon, Mr. McGilberry. My name is Paige Jones. I represent Parmalee Industries and Pulmosan Safety Equipment Corporation. I have some questions for you about the hood that you wore at Tom Pittman. Do you know if Mr. Pittman owned that hood or if it was rented from somewhere?

A. I'm not for sure.

Q. Was the Heidelberg site where you used it the only job site where you saw that hood on the premises?

A. Yes, ma'am.

Q. So that was the only time it was ever used by anybody was on that site --

A. That's the only --

Q. -- that you know?

A. -- time I remember.

Q. Okay. Did that hood have any vents? Do you know what I mean by a vent?

A. Yeah, I know what you mean. Air vents. I'm not for sure.
Q. You're not sure. Okay. The faceplate that you looked out of --
A. Yes, ma'am.
Q. -- did it have a screen or any sort of mesh screen type looking thing in -- in front of or behind the -- the glass?
A. What you mean, holding it on or just in front of it or --
Q. Either. Was there any sort of mesh type material in front of or behind the glass or plastic?
A. Not as I remember.
Q. Okay. Did you wear anything underneath the hood? I know you testified you wore a baseball cap. But did you wear anything over your mouth or your nose underneath that hood?
A. I don't believe I took my dust mask off.
Q. Okay. So you think you may have worn your dust mask underneath there?
A. Yes, ma'am.
Q. Okay. Did that hood have a drawstring where you could secure it around your neck, if you

remember?
A. I don't remember.
Q. Okay. Do you remember if it had a hanging hook or anything on the very top where you could hang the hood?
A. No, ma'am. Don't remember that.
Q. You don't remember. Okay. I know you testified that the hood was dark in color. Was that on the outside or the inside or both? I guess my question is: Do you recall if the inside of the hood was the same color as the outside?
A. I'm not for sure.
Q. If you were wearing the hood and I was looking at you, could I see your chin?
MR. FOXWORTH:
Objection. Asked and answered. Yesterday he described the size of the faceplate.
MS. JONES:
Are you instructing him not to answer?
MR. FOXWORTH:
No.
MS. JONES:
Okay.
MR. FOXWORTH:
I'm just saying it's already been done.

MS. JONES:
Okay.
MR. FOXWORTH:
Just don't beat the horse.
MS. JONES:
Okay.
Q. Could I see your chin?
A. No.
Q. Did the hood have a bill?
A. Do what now?
Q. Did the hood have a bill? Do you know what I mean by a bill, like a bill on a baseball cap?
A. No.
Q. It didn't have a bill?
A. No.
Q. Have you ever worn a hood that was light brown or khaki?
A. I don't remember.
Q. But the hood that you wore at Tom Pittman, that's the only hood you've ever worn; is that right?
A. Yes.
Q. Okay.
MS. JONES:

That's all I have.
EXAMINATION
BY MR. KINARD:
Q. For the record, my name is John Kinard. I represent American Sand & Gravel, Scott Technologies, Scott Aviation, Wheeler Protective Apparel. Mr. McGilberry, how are you today?
A. Fine.
Q. You hanging in there?
A. Oh, yes.
Q. Good. I notice you come to and fro with the aid of a cane a little bit. Is that to help you out with those weak knees you were telling us about?
A. Yeah. Kind of help me, you know, stand up a little straight.
Q. Okay. You're a little unstable on your feet without that?
A. Oh, yes. I have fell a couple of times.
Q. Okay. And that's due to the weak knees you say kind of run in your family?
A. I'm not for sure.
Q. Okay. You had any surgery on your knees?

Page 113

A. Once.
Q. Okay. And the oxygen that you've been using since '99, you say that's for a low blood count or to keep your blood count up?
A. Low blood -- blood count. I think that's what he said.
Q. Okay.
A. I went without it. And it -- it was too low. So that's why I had to -- they put me on it. I don't know. I think that's what it is.
Q. Do you use that 24 hours a day?
A. Yes. I have a machine at the house.
Q. Okay. Do you use it when you're sleeping?
A. Yes, sir.
Q. Okay. How long have you been doing it around the clock?
A. Talking about daily or since I been on it?
Q. Well, how long -- how many years or months or --
MR. FOXWORTH:
No, sir. How long -- how many years -- how long has it been since you've been doing it 24 hours a day? That's what he's asking.

Page 114

A. Oh, I've been 24 since I've been on it.
MR. KINARD:
Q. Okay. The whole time?
A. No. No.
Q. Okay. You started using it in '99?
A. Yeah.
Q. Were you using it sort of a few hours a day then and gradually got up to 24 hours?
A. Yeah. It had got where I had to use it all the time.
Q. Okay. When you don't use it, does it affect your breathing?
A. Lots.
Q. Okay. You can't breathe very well without it?
A. Unless I'm moving around a lot, it -- it affect -- affect my breathing. But sitting still, I'm okay.
Q. Okay. So if you were just sitting here like you are right now, you could probably do without it?
A. Yeah. If I'm not talking or where it's making me constantly breathe and stuff like that there --
Q. Uh-huh.

Page 115

A. -- or making me -- making me tired.
Q. Has any doctor ever told you that you need it both for that low blood count and to assist any kind of breathing problem, respiratory problem?
A. Say that again now.
Q. I said has any doctor ever told you you needed the oxygen for any reason other than the low blood count?
A. You would have to check with my doctor on that.
Q. Okay. You described earlier in your testimony about these brown bags that the -- that the cement came in that had red writing on it?
A. Yes, sir.
Q. Have you ever --
MR. FOXWORTH:
I think he was talking about sand, John.
MR. KINARD:
Sand. Okay.
Q. Was it sand or cement, the brown bags with the red writing?
A. The sand the Portland Cement is in, I think is in brown and -- and green, I think it is.

Page 116

Q. Okay. Do you remember any other colors of bags that any sand came in other than the brown with the red writing?
A. I don't remember.
Q. Okay. What was the color of that sand? Was it different than any sand you see at a playground or on the beach, or was it dark brown or reddish or did it have any color to it?
A. Yeah. It had a color to it.
Q. Tell us about that.
A. It wasn't -- it's not white as the sand that's on the beach. And it's a little bit darker than the -- than the -- the sand they bring out from the yard.
Q. Okay. So the sand that comes in bulk is delivered -- that you used with the front-end loader and all is a little bit darker --
A. Lighter.
Q. Lighter than comes in the bags?
A. Yes.
Q. Okay. Did you use the sand that came in the bags for anything other than mixing it to make the finished cement? In other words, was it used for blasting and mixing for cement?
A. I never did use, you know, the sand

that's in the bag --
Q. Okay.
A. -- to mix. Not mix cement with.
Q. Okay. That was blasting sand?
A. Yes, sir.
Q. Okay. You finished 12th grade in school?
A. Yes, sir.
Q. Okay. You still read pretty well. I noticed you looking at the documents and all.
A. I can read.
Q. Read and write?
A. Yeah.
Q. Okay. Have you ever heard of the name American Sand & Gravel?
A. I hauled sand out of there.
Q. All right. Where was that?
A. And rocks.
Q. Where was that located?
A. In Hattiesburg. Down at -- what do they call it? It's out from Hattiesburg. Glendale.
Q. Okay. Was it a pit?
A. Yes, sir.
Q. Okay. And the name of the pit was

American Sand & Gravel?
A. I think so, yes, sir.
Q. Do you know who operated that?
A. I'm not for sure who own it.
Q. You said you had an occasion to haul some sand and gravel out of there?
A. Yeah. I work -- I drove for Bush. Bush Construction.
Q. Okay. Truckdriver for them?
A. Yes, sir.
Q. What period of time was this? What years?
A. After I left Southern Touch. I'm not for sure what year was it.
Q. Okay. And where were you hauling the sand and gravel?
A. Back to the Bush yard up here in Laurel at the asphalt plant.
Q. Okay. But you don't remember who the owners of that --
A. No, sir.
Q. -- pit were?
A. No, sir.
Q. And where exactly was it?
A. I believe it was in Glendale.

Q. Glendale?
A. I think that's the name of it.
Q. Okay. Is that the only place you associate that name with, American Sand & Gravel, is that pit in Glendale?
A. I hauled from another pit down there, but it was out from Petal.
Q. Okay.
A. I'm not for sure what's the name of it now and what was the name of it then. All I know is they give me the direction how to get there.
Q. Okay.
A. Or you'll follow somebody there.
Q. Did they have a sign out front that said American Sand & Gravel?
A. I'm not for sure. It's pretty dusty down through there.
Q. Right.
A. I'm not for sure.
Q. If there was no sign posted, then I was just curious as to how you knew that was the name of the company.
A. Well, you can see the sand from the road. You know, it's -- I'm -- I'm with some more drivers. I'm not the only driver was --

Q. Right.
A. -- was down there, going there.
Q. Okay.
A. So see what I'm saying. If you following somebody, you -- you going to the right place.
Q. Right. They'd say, We're going to American Sand & Gravel. So you go over there and --
A. Go with --
Q. -- get a load?
A. Go with the rest of them or ever how many need to go and you go.
Q. Got you. But during your work history, you don't remember seeing that name on any other product that you worked with or machinery --
A. No, sir.
Q. -- or anything else?
A. No, sir.
Q. Okay.
MR. KINARD:
That's all I have. Thank you.
EXAMINATION
BY MS. WINDHAM:
Q. Mr. McGilberry, my name is Beth

Windham. And I represent Phillips Building Supply. When you were working for Tom Pittman, you said you went to purchase some dust masks from Phillips Building Supply?
A. No, I did not. I said we got dust masks from Phillips. I didn't say I went and got them.
Q. How would you get them from -- from Phillips Building Supply? Were they delivered in?
A. Well, like I told you before, either --
MR. FOXWORTH:
Don't get frustrated. Just take your time and answer the question.
A. Either the guy that was driving the truck went and got it, or either it was already in the truck. I'm not for sure how it was.
MS. WINDHAM:
Q. Did you ever go with the guy who drove the truck that went and got them? Were you ever in the truck with him when he stopped by?
A. Well, I'm always in the truck when we go by there, you know, when we going. So either we getting dust masks or we getting something else. I'm not for sure what all we was getting.
Q. And this was in Laurel and Ellisville?

A. They had two places in Laurel. And I believe Ellisville, yes.
Q. Do you know how they paid for the masks?
A. No.
Q. How often did you go with them to Phillips Building Supply when you were in the truck? Do you remember how many times?
A. Well, usually sometimes when we leave the yard, if we need equipment or something, we need something from the store, bolts and nuts or whatever, we went by as we're leaving.
Q. So you went many times?
A. Something like that.
Q. Would you say once a week?
A. Something like that.
Q. And you mentioned nuts and bolts and the masks. Were there any other products you got from Phillips Building Supply just when you were working for Tom Pittman?
A. We got wood from them, nails. You know, all according. You know, different -- different things we got from Phillips.
Q. Do you remember anything else besides nails and bolts?

A. That Quikrete cement. That's what we called our -- you know, it's got the sand and gravel and -- and the rocks all mixed together, come all -- all at once.
Q. And do you know what job site you used that Quikrete cement at?
A. No, I'm not for sure.
Q. Would that have been when you were working for Mr. Myrick at the Stringer job site?
A. We did get some from -- from there for Myrick.
Q. Did -- did that Quikrete come from Phillips Building Supply?
A. Yes, ma'am.
Q. Can you describe that bag for me? Do you remember what it looked like?
A. I don't want to guess at it.
Q. That's fine.
A. I don't know.
Q. Other than that one job site, can you tell me of any other sites you may have used that Quikrete from Phillips at?
MR. FOXWORTH:
You mean specific name sites?
MS. WINDHAM:

Uh-huh.
A. I don't remember.
Q. That's fine. Going to Mr. Myrick's work sites. When you were working on the building that Phillips Building Supply is in now --
A. Uh-huh.
Q. -- do you know who owned that building when you were working on it?
A. I'm not for sure what was the name of it then.
Q. And is it -- is it the same building that Phillips is in right now, or is it just the same site?
A. It's the same site and a lot of -- a lot of new stuff on it. A lot of tin -- new tin and stuff like that.
Q. We talked about the concrete work you did at that site. What were your other job duties there? Was it all concrete work?
A. Cleaning up, tearing down, moving things around.
Q. And were y'all just laying the foundation, or were you actually putting the building up, too?
A. Well, the foundation was already there.

They didn't just tear the whole building down. They just remodeled it.

Q. Do you remember what areas of the building you cleaned up in?

A. The new building was -- was all the -- the screws and bolts. At the -- at the main new part of the building. And left for the other new building, we clean that up.

Q. You also mentioned that you used some Portland Cement from Phillips Building Supply when you were working on that addition for Southern Touch?

A. Uh-huh.

Q. Was that the only job site you used Portland Cement from Phillips at?

A. The college.

Q. Was that cement delivered?

A. I'm not for sure.

Q. So you don't know if anyone had to go pick it up or not?

A. No, ma'am.

Q. How much of that cement do you remember seeing at the Southern Touch site? Do you remember how many bags?

A. No, ma'am.

Q. And at the college, do you remember how many bags?

A. I don't know.

Q. I think you testified at the Southern Touch site, you had to mix that cement?

A. Yeah, to patch with.

Q. How many times did you mix it? Do you have any idea?

MR. FOXWORTH:

Don't guess if you don't know.

A. I'm not for sure how many times.

MS. WINDHAM:

Q. That's fine. And do you know how many times you might have mixed it at the college job site?

A. I thought that's what you just asked me.

Q. Oh, I'm sorry. At Southern Touch?

A. I'm not for sure.

Q. Okay. Can you tell me what a bag of Portland Cement looks like?

A. It's a brown bag. It's got green writing on it.

Q. Do you remember any symbols or logos on that bag?

A. No.

Q. Do you remember how many pounds those bags were?

MR. FOXWORTH:

And don't guess if you're not sure.

A. Seventy.

MS. WINDHAM:

Q. And going to that Quikrete cement that was at the Stringer job site, do you remember if it was delivered?

A. Say that again.

Q. The Quikrete cement that we talked about that was at the Stringer --

A. Uh-huh.

Q. -- job site that came from Phillips Building Supply, do you remember if it was delivered?

A. No, I don't remember.

MS. WINDHAM:

I think that's all I have. I appreciate it.

EXAMINATION

BY MR. ALEXANDER:

Q. Mr. McGilberry, I know it's been a long couple of days. I'm going to make this real

brief. I basically just have two questions for you. My name is Dan Alexander. I represent Louis M. Gerson, Incorporated. Before I ask my question, I want to kind of recap what I have in my notes here just to make sure that I understood you correctly. I'm not going to ask you over again. Correct me if what I have down is wrong. I have written down that when you were at Tom Pittman, you used a dust mask which was white, had ridges on it, had an aluminum colored nosepiece and a white strap that was stapled to it; is that correct?

A. The aluminum, it didn't have no color. It was just -- just like -- like an aluminum can with no writing on it, no color.

Q. Okay.

A. It was just like that. Just aluminum.

Q. Well, I mean, it wasn't like -- it wasn't -- what do you -- describe aluminum color. Is that like silver, though, or what do you mean by no color?

A. Well, it -- it might be made out of aluminum. It might be had a color on it.

Q. Okay.

A. But it was that color like aluminum.

Q. Just the color that aluminum --
A. Yeah.
Q. -- is?
A. Uh-huh.
Q. Okay. Now, I also have -- for Gordon Myrick, I have basically that same exact description written down. White, with the ridges, with the aluminum nosepiece and the white strap stapled on it; is that correct?
A. Yes, sir.
Q. Now, do you think those were the same masks that you were using at Tom Pittman that you used at Gordon Myrick?
MR. MANUEL:
Object to form.
MR. FOXWORTH:
You've exceeded two questions.
MR. ALEXANDER:
Okay.
Q. Well, I mean -- to phrase it differently, do you remember anything different about those two masks?
A. Nothing different.
Q. As far as you recall, they were exactly the same?

A. Yeah.
Q. Okay. Well, one more. Now, when you say stapled on -- so that mask couldn't be adjusted; is that correct? I mean, it was -- it was elastic, but it couldn't --
A. Yeah.
Q. You know, you couldn't make it smaller --
A. No.
Q. -- or bigger?
A. Huh-uh.
Q. Okay.
MR. ALEXANDER:
Thank you, sir. That's all I have.
EXAMINATION
BY MR. SOUTHERLAND:
Q. Mr. McGilberry, my name is Trey Southerland. And I represent Schmidt Manufacturing, Inc., and Bob Schmidt, Inc. You've been asked some questions today about your employment at Gordon Myrick?
A. Yes.
Q. And in relation to your testimony, you made reference to a rented pot being used on one occasion; is that right?

A. Yes, sir.
Q. Okay. Other than that one rented pot when you were working with or for Gordon Myrick, did you use or were you around any other pots than that one rented pot?
MS. SKIPPER:
Objection. Asked and answered.
A. That was the only pot.
MR. SOUTHERLAND:
Q. Okay. Do you have any idea who made that rented pot?
MS. SKIPPER:
Objection. Asked and answered.
A. No.
MR. SOUTHERLAND:
Q. I'm sorry?
A. I don't know.
MR. SOUTHERLAND:
Thank you. That's all I've got.
MR. FOXWORTH:
Anyone else have anything?
EXAMINATION
BY MS. SKIPPER:
Q. Mr. McGilberry, I promise I'm going to be quicker than the first time. I just need some

information about those Quikrete cement bags. What exactly were you using the Quikrete cement at Stringer for in the fencing? Was it to hold the fence posts down?
A. Yes, ma'am.
Q. Okay. And that's the only thing you used the -- the Quikrete cement for at the Stringer site?
A. Yes, sir -- yes, ma'am.
Q. I know I cut my hair, but -- now, Ms. Windham asked you if you can remember any other job sites that you used Quikrete for. And you couldn't remember anything but the Stringer site. Could you tell me anything that you used Quikrete for at any other place besides Stringer?
A. I would say at Tom, but I'm not for sure what site we used it. But I remember -- I remember using some.
Q. Okay. At Tom --
MR. FOXWORTH:
You say Tom.
MS. SKIPPER:
Q. -- Pittman?
MR. FOXWORTH:
What do you mean by Tom?

Page 133

A. Pittman.

MS. SKIPPER:

Q. Okay. What did you use the Quikrete for at Tom Pittman?

A. I'm not for sure what -- what --

MR. FOXWORTH:

Do you mean on the job site, or what it was used for?

MS. SKIPPER:

No. What it was used for, the actual cement.

MR. FOXWORTH:

The application?

MS. SKIPPER:

Uh-huh.

A. Usually we pour it in a hole when like you putting up a post or something.

Q. Somewhat like the fencing job, just putting it in -- in a hole?

A. Yes, ma'am.

Q. Okay. Would you ever have an occasion to chip or hammer a Quikrete cement application?

A. Not as I know of.

Q. Okay.

MS. SKIPPER:

Page 134

That's all I have.

EXAMINATION

BY MR. FOXWORTH:

Q. Mr. McGilberry, I'm going to show you a picture.

MR. FOXWORTH:

We'll attach a copy of this picture as Exhibit Number 1 -- 6.

Q. In this picture, do you -- do you see in -- represented in this picture the sandblasting pot that you used when you worked for Gordon Myrick? Which would have been the one that you drew on your exhibit number -- what was that yesterday? -- 4 yesterday.

A. It look just like the one.

Q. That's the one here? When you say the one, you're referring -- if you would for the camera, point to the picture, please.

A. This one right here.

Q. Thank you very much.

MR. FOXWORTH:

We'll attach a photocopy of it as an exhibit and also for the benefit of Will.

Q. I'm going to show you a picture from the Walter Weathers book, which is picture

Page 135

Number 214. It's a 3M 8500 nuisance dust mask.

MR. MANUEL:

Can I look at it real quick, please?

MR. FOXWORTH:

Yes, you may.

MS. WILLIAMS:

I want to look at that one, too.

MR. FOXWORTH:

And y'all have got a copy of that.

MR. MANUEL:

What number did you say it was, John?

MR. FOXWORTH:

It's picture Number 214.

MR. FOXWORTH:

Q. Mr. McGilberry, the picture or the dust mask represented in the picture, which is picture Number 214 from the Walter Weathers photograph books, is that the dust mask that you had described as being the one that you used when you worked for Daniel Construction?

A. I believe that's the one.

Q. Was it common when you would change out those dust masks or remove the dust mask from your face that you would have sand in your nose and mouth?

Page 136

MR. MANUEL:

Object to form.

MR. FOXWORTH:

Q. You can answer. He's just doing the same thing I did. Did you understand my question?

A. Say it again.

Q. Was it common when you would use these dust masks, like this 80 -- this 3M 8500 at Daniel Construction, when you would remove that dust mask from your face to get a new one, that you would have sand in your mouth? It would have gotten through the mask?

MR. MANUEL:

Same objection.

A. Yes.

MR. FOXWORTH:

That's all I have.

EXAMINATION

BY MR. MANUEL:

Q. Mr. McGilberry, I've just got a quick question. Mr. Foxworth just asked you some questions about having sand in your nose or mouth while working at Daniel Construction. What kind of jobs were you doing when you would have sand in your nose or mouth?

Page 137

A. I don't know if it be sand. It probably just be a buildup of dust.
Q. Dust. Okay. And what kind of jobs would you be doing that you would have a buildup of dust?
A. A lot of chipping.
Q. Chipping of what?
A. Concrete.
Q. And what sort of tools were you using to chip the concrete at Daniel Construction?
A. Chipping gun.
Q. A chipping gun?
A. Yes, sir.
Q. And what is the -- is the chipping gun a pneumatic gun? Is it an air powered gun or --
A. Yes, sir, air powered.
Q. How long would it take for dust to build up in your mouth when you worked at Daniel Construction? How long would it -- when you were using the chipping gun, how long would it take?
A. I'm not for sure.
Q. It would -- would this just be over all day and at the end of the day it would be like that, or was it within five minutes of wearing a --

Page 138

MR. FOXWORTH:
If you know, tell him. But don't guess.
MR. MANUEL:
He's heard that advice enough, I think he knows.
MR. FOXWORTH:
He likes to hear it. I like to say it.
A. I'm not for sure.
MR. MANUEL:
Q. Okay. Did you ever complain to any of your supervisors or the safety man when you were working on the power plant for Daniel Construction about the buildup of dust in your mouth?
A. No.
Q. Did you ever ask to have a different mask provided to you or any other type of respiratory protection equipment?
A. No, sir.
Q. Did you regularly change out the masks that you used while you worked at Daniel Construction, use more than one mask a day?
A. Yes, sir.
Q. And would you change it out -- I think we talked a little bit about that at least one of

Page 139

the sites, but I can't remember. How would you know when you needed to change out the mask that you were using at Daniel Construction?
MR. FOXWORTH:
I just object. Asked and answered. But he can answer.
MR. MANUEL:
Okay.
Q. I mean, what would happen with the mask to make you say, I've got to go change and get another mask?
A. Well, for one reason, if I ever went to get some water, when I did get some water, you know, your mouth kind of feel real dry and dusty.
Q. So when you would take a break and maybe get water, you would change out a mask?
A. It don't even have to be a break, you know. Just you want to get some water, you know, just sometime like that.
Q. Did -- did you ever have any problems at Daniel Construction with the number of masks that you wanted to use during the day? Did anybody say you can only use two masks a day or anything like that?
A. No, sir.

Page 140

Q. So you could get as many masks as you wanted?
A. Yes, sir.
Q. And it was up to you to make the decision as to when you wanted to change out your mask during the day; is that correct? When you -- when you felt comfortable to want to change it, you -- you just went and changed it?
A. Yes, sir.
MR. MANUEL:
That's all the questions I have. Thank you, Mr. McGilberry.
(Deposition concluded at 2:15 p.m.)

CERTIFICATE OF COURT REPORTER

I, Janna White, CSR #1312, do hereby certify that the foregoing pages contain a true and correct transcript of the testimony of the witness as taken by me at the time and place heretofore stated and later reduced to typewritten form by computer-aided transcription under the authority vested in me by the State of Mississippi to testify to the truth and nothing but the truth in this cause and was thereupon carefully examined upon this oath.

I further certify that I am neither attorney or counsel for nor related to or employed by any of the parties to the action in which this deposition is taken and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Witness my signature, this the ________ day of ____________ 2004.

STATE-WIDE REPORTERS

______________________
Janna White, CSR #1312

SIGNATURE OF WITNESS

I, ______________ do solemnly swear that I have read the foregoing ______ pages and that the same is a true and correct transcript of the testimony given by me at the time and place hereinbefore set forth, with the following corrections:

PAGE: LINE: CORRECTION:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________
John McGilberry

NOTARIZATION

I, ________________ notary public for the State of Mississippi, ____________ County, do hereby certify that ________________ personally appeared before me this the _____ day of _________ 2004, at ______________ Mississippi.

______________________
Notary Public

My Commission Expires:

______________________

37 | 535

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN McGILBERRY PLAINTIFF

v. CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, et al. DEFENDANTS

AGREED INITIAL DISCOVERY ORDER

This matter comes before the Court on the motion of the parties requesting an Initial Discovery Order and this Court having considered the agreement of counsel finds that an Initial Discovery Order should be, and is, granted.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Plaintiff shall not be required to respond to any discovery propounded prior to the entry of this Order except the Master Set, as discussed below;

**IT IS FURTHER ORDERED AND ADJUDGED** that all Defendants shall jointly propound to Plaintiff an Initial Master Set of Interrogatories and Requests for Production of Documents, in the form attached as Exhibit "A".

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants shall have sixty (60) days from the date of this order to respond to written discovery requests that have previously been propounded by Plaintiff to each Defendant.

**IT IS FURTHER ORDERED AND ADJUDGED** that any Defendant may seek to compel responses to the Defendants' Master Set as each deems appropriate.

**IT IS FURTHER ORDERED AND ADJUDGED** that each Defendant shall be allowed to propound an additional twenty (20) non-duplicative Interrogatories to Plaintiff. This number shall not be exceeded absent agreement of the parties or upon a showing of good cause to this Court. Defendants may also propound additional Requests for Production of Documents and Requests for Admissions as allowed under the Mississippi Rules of Civil Procedure.

FILED
DEC 17 2007
LARRY D. ISHEE
CIRCUIT CLERK
JONES COUNTY, MS

EXHIBIT
"J"

37/536

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff will have sixty (60) days to respond to Defendants' Master Set after production of same once this order has been entered. Extensions shall be allowed under this order upon agreement of Plaintiff's and/or Defendants' counsel as each deems appropriate.

SO ORDERED this the 12th day of December, 2007

CIRCUIT COURT JUDGE

AGREED TO:

EDWIN S. GAULT, JR., MSB No. 10187
JENNIFER J. SKIPPER, MSB No. 100808
Attorney for Certain Defendants
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 Lamar Street
City Centre Building, Suite 100
Jackson, Mississippi 39201-4099
Telephone: (601) 960-8600
Facsimile: (601) 960-8613

R. ALLEN SMITH, JR, ESQ., MSB No. 99984
Attorney for Plaintiff
THE SMITH LAW FIRM
681 Towne Center Blvd., Suite B
Ridgeland, MS 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

STATE OF MISSISSIPPI
COUNTY OF JONES
1 JUDICIAL DISTRICT
I, LARRY ISHEE, Circuit Clerk, in and for said County and State, do hereby certify that the above and foregoing is a true and correct copy of the above instrument as same appears of record on file in the office of the Circuit Clerk at Jones County, Mississippi
Given under my hand and official seal this the 19 day of Dec. A.D., 2007
LARRY ISHEE, Circuit Clerk
Jones County, Mississippi
By Cohomia [illegible] D.C.

IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL DISTRICT
OF JONES COUNTY, MISSISSIPPI

JOHN MCGILBERRY PLAINTIFF

VS. CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. DEFENDANTS

---

PLAINTIFF'S RESPONSE TO
DEFENDANTS' MASTER SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF

---

COMES NOW, Plaintiff, by and through his attorneys of record, and files this his response to Defendant's Master Set of Interrogatories and Request for Production of Documents as follows, to wit:

1. Provide the following information:

   a. Plaintiffs full name,
   b. Date and place of birth,
   c. Social Security number,
   d. Drivers license number, including and identification of the state that issued the drivers license,
   e. Present address and length of time at address,
   f. All prior addresses, listed in chronological order, over the past twenty (20) years,
   g. A list of persons who live(d) at each such address with you and their relationship to you, if any,
   h. If plaintiff is currently, or has ever been, known by any other name at any other time, please state all such former names,
   i. Plaintiffs present weight and height.

RESPONSE: To the best of my recollection at this time:

a. John Elman McGilberry
b. [redacted]
c. [redacted]
d. [redacted]
e. [redacted] the past 8 years

EXHIBIT
"K"

f. [redacted] from 1992 until 2000

g. Paula McGilberry (wife), Anita Gordon (daughter), Jonathan McGilberry (grandson), Jasmine Gordon (granddaughter), Jemarry McGilberry (grandson), Angela McGilberry (daughter), Greg Clark (grandson), Gary Clark (grandson), Keisha Clark (granddaughter), Christina McGilberry (daughter), Frederick Carol (grandson), Faquita Carol (granddaugter), Frekayla Carol (granddaughter), Frekyra McGilberry (granddauther), Courtney McGilberry (daughter), Brand Hathorne (grandson), Joni McGilberry (daughter), Marcus McGilberry (grandson), Jaquan McGilberry (grandson), Daron McGilberry (grandson)

h. Not applicable.

i. 5'10", 228 pounds

2. Identify each person who answers or assists in answering these Interrogatories (including persons who supply information for your answers) and fully describe each such persons relationship to, or authority to answer for, Plaintiff.

**RESPONSE:** To the best of my recollection at this time, myself and my attorneys.

3. Provide the following information:

a. Name of Plaintiffs current spouse, spouses date of birth, Social Security Number, place of marriage, and length of marriage;

b. Former spouse(s), if any, current address if known, and length of marriage; and

c. Names, date of birth, current addresses and Social Security number of any and all natural or adopted children;

d. Name, relationship to Plaintiff, and Social Security number of any other dependant including but not limited to, children, parents, in-laws, relatives, or other individuals; for each such person state the extent to which such person is dependent upon you for financial support and maintenance.

**RESPONSE:** To the best of my recollection at this time, the Plaintiff married Paula McGilberry ([redacted]) and has been married to Paula for the past 30+ years. The Plaintiff has the following children: 1) Anita Gordon (daughter) [redacted]; 2) Angela McGilberry (daughter) [redacted] 3) Christina McGilberry (daughter) [redacted] 4) Courtney McGilberry (daughter) [redacted], and, 5) Joni McGilberry (daughter) [redacted].

4. State whether you have ever been convicted of or pleaded guilty to any crime, felony, offense, or misdemeanor involving moral turpitude; whether you have ever been in jail or prison, and if so, give the name and location of any jail or prison in which you were confined. State whether you are presently on probation or parole, and if so, the name and location of your probation or parole officer.

**RESPONSE:** To the best of my recollection at this time, no.

5.     Provide Plaintiffs educational and vocational training background.

**RESPONSE:** To the best of my recollection at this time, Plaintiff graduated from South Jones High School.

6.     Are you currently engaged in any gainful employment or other income producing activity? If so, please state: (a) the nature/type of employment or income producing activity; (b) the dates you have been engaged in this employment or income producing activity; (c) each employers name and address; (d) your monthly wage or income from the employment or income producing activity; (e) the name of your immediate supervisor; (f) the name of any co-workers; and (g) please attach all documents which contain information utilized in providing your answers to these interrogatories.

**RESPONSE:** To the best of my recollection at this time, no. Not applicable.

7.     List the name, address and telephone number of each of plaintiffs employers from the time he started working until the present, including any service in any branch of the United States Military, and for each employment, please state: (a) the dates of employment; (b) how the employment was obtained; (c) the name, address and telephone number of his immediate supervisor(s); (d) the capacity or capacities in which he worked during the term of employment; (e) the reason for termination of his employment, including, but not limited, to whether such termination was for health related reasons, and whether such termination was voluntary or involuntary, and whether any discharge from any military service was honorable or on some other basis; and (f) the name, address and telephone number of each and every co-worker during said term of employment.

**RESPONSE:** Plaintiff has executed authorizations of defense to obtain his social security earnings statement. Plaintiff has never been in the military. To the best of my recollection at this time, Plaintiff worked as a laborer, cleaning up, sandblasting and mixing cement at H. G. Myrick in Laurel, Mississippi from 1985 until 1989. The Plaintiff also worked for Howard Industries as a core lacer and sandblaster in Laurel, Mississippi from 1974 until 1981. The Plaintiff worked from Tom Pittman as a laborer, cleaning up, sandblasting and mixing cement from 1972 until 1974. The Plaintiff has also been employed by Sanderson Farms where he picked up eggs in the chicken houses and then also Southern Touch in Ellisville, Mississippi.

8.     For each employer or contractor in whose employ or service you believe you were exposed to silica, state the employers/contractors full business name, address, telephone number and dates of service.

**RESPONSE:** Plaintiff has executed an authorization for the Social Security Administration. Please refer to his social security earnings statement. Also, please see attached work history.

9.    Has Plaintiff, or someone on his behalf, made application for employment with any prospective employer since the filing of this lawsuit? If so, please state the following:

    a.    The name(s) of the prospective employers;
    b.    The dates any such application(s) was made;
    c.    They type of work applied for;
    d.    The address and telephone number of each prospective employer where the application was made.

**RESPONSE:** No.

10.    If any of your employers/contractors or prospective employers/contractors either required or made available physical examinations for employees, state the frequency, dates and locations of such examinations, whether you were examined, and whether chest x-rays were taken of you at such examinations.

**RESPONSE:** To the best of my recollection at this time, no physical exams were required or offered. No chest x-rays.

11.    If Plaintiff has ever been a member of a union, please state the following:

    a.    The name of each such union;
    b.    The name and address of each local that Plaintiff has been a member;
    c.    The dates Plaintiff belonged to each such union and local;
    d.    Whether Plaintiff held any elected positions in the union, and if so, describe all positions you held and for what periods of time you held such position.

**RESPONSE:** To the best of my recollection at this time:

    a.    IBEW
    b.    Laurel, Mississippi
    c.    1979-1987
    d.    Not applicable.

12.    State whether Plaintiff possesses or has possessed a license issued by any agency (governmental or non-governmental) or other person, to perform any profession, trade, or occupation. If so, please state:

    a.    The name, address, and telephone number of the entity issuing the license(s);

      b. The date the license(s) was issued;
c. The profession, trade, occupation the license(s) was issued for.

**RESPONSE:** No. Not applicable.

13. Has Plaintiff ever smoked? If so, describe plaintiffs smoking history, including the approximate dates he smoked and the identity of what plaintiff smoke (product and brand name) and how many packs per day.

Note: Smoking is broadly defined to include the use of any form of tobacco product, including cigarette smoking, cigar smoking, and pipe smoking. It also includes the use of smokeless tobacco including the use of snuff and the use of chewing tobacco. Finally, it includes the smoking of any other substance or chemical, whether legal or illegal in nature.

**RESPONSE:** The Plaintiff is a lifelong non-smoker.

14. Has Plaintiff ever used, inhaled, injected, or ingested any legal or illegal drugs or narcotic agents including, but not limited to cocaine, crack cocaine, heroin, PCP, hallucinogens, barbiturates, or amphetamines? If so, describe Plaintiffs history regarding the use of such drugs or narcotic agents, including the approximate dates on which such usage occurred and the identity of what drugs or narcotic agents were used, inhaled, injected, or ingested.

**RESPONSE:** No.

15. Please describe all claims you have had (including but not limited to this lawsuit) for Damages for personal injuries or emotional injuries against any individual, partnership or corporation. For each such claim, please indicate the following:

a. The style of the lawsuit, cause number and court in which the lawsuit was filed;
b. A description of the injuries claimed in the lawsuit;
c. The date the claim was filed;
d. The name and address of the attorney who represented you in the matter;
e. Any resolution, judgment or settlement of the claim including the date and amount of such judgment, resolution or settlement with respect to each individual defendant in that case.

**RESPONSE:** Objection. Without waiving said objection, Plaintiff was involved in an asbestos lawsuit.

16. Has Plaintiff ever filed a claim for disability with the Veterans Administration or the Social Security Administration? If so, state for each such claim:

a.   The file number or other identifying number of the claim;
b.   The address of the office where the claim was filed;
c.   The date the claim was filed; and
d.   The name and address of each medical practitioner who tested, treated, or examined Plaintiff in connection with each such claim.

**RESPONSE:**   To the best of my recollection at this time, yes, Social Security Disability. However, the Plaintiff does not recall the details of this claim at this time.

17.   Has Plaintiff ever filed a claim for workers compensation? If so, state for each such claim:

a.   Name of insurance company;
b.   Name of Plaintiffs employer for each claim, the date of each claim, nature/ injury of claim, and the file number for reach claim filed with the Industrial Accident Board;
c.   The amount of money paid for each claim;
d.   If a lawsuit was filed concerning any such claim, the style of the lawsuit, cause number, and court in which the lawsuit was filed;
e.   The claim number assigned by the IAB or new workers compensation authority;
f.   If the claim involved the injuries at issue in this lawsuit, state whether the claim has been settled and, if so, the date and amount of the settlement;
g.   The name and address of each medical practitioner who tested, treated, or examined Plaintiff in connection with each such claim.

**RESPONSE:** To the best of my recollection at this time, yes, back in 1982. However, the Plaintiff does not recall the details of this claim at this time.

18.   If any report(s) or claim(s) based on your alleged exposure to or use of the products which you allege caused the personal injury made the basis of this lawsuit were made to any insurance company, please state the name, address and telephone number of each insurance company, the name, address and telephone number of the insurance agent through whom you made any such claim, the date of each claim, the insurance policy number(s) and any claim number(s) assigned to your claim(s) by each insurance company.

**RESPONSE:** No.

19.   Aside from the claims made in the proceeding, has Plaintiff ever been involved in any other accident or incident in which he sustained a personal injury or has he sustained any personal injury as the result of any exposure to any chemicals, fumes, gases, fibers, particles or dusts? If so, state (a) the place and date of each such accident, incident or exposure; (b) the circumstances, nature, location and extent of the injuries; (c) the nature of Plaintiffs activity at the time said injury was sustained; (d) the names and addresses of each and every physician who examined or treated Plaintiff for such injury

and the names and addresses of each and every hospital or other medical facility at which he was treated for that injury; (f) whether he made a formal or informal claim for such injury and the amount and date of any award or payment received; (g) whether a lawsuit, workers compensation claim or other administrative claim was filed as result of such injury and, if so, the court, cause number, caption and disposition.

RESPONSE: No.

20. If Plaintiff has any family history of cancer, state the name of the family member(s) diagnosed as having cancer, the family members age when diagnosed, the family members relationship to Plaintiff, the type(s) of cancer diagnosed, the name and address of the treating doctor or hospital where the family member was treated, and if the family member is now deceased, the date of their death and whether they died of the aforementioned cancer or from another cause.

RESPONSE: To the best of my recollection at this time, Plaintiff's mother died from cancer. However, the Plaintiff does not recall the date or even year of her death at this time.

21. What specific diseases(s), illness or illnesses or medical condition(s) does the plaintiff attribute to his use of the defendants products? For each disease, illness or medical condition, please identify the date the disease, illness or medical condition began, the name of any medications prescribed by any doctor for the treatment of any such disease, illness or medical condition, the name and address of the doctors who have diagnosed and/or treated plaintiff for this disease, illness or medical condition and the date and type of treatment received.

RESPONSE: Objection. This interrogatory requires expert testimony.

22. Identify each medical practitioner or medical facility by whom or at which Plaintiff was examined, or by whom or at which plaintiff was treated, at any time during his life. For each medical practitioner or medical facility identified, state:

a. The date(s) of examination or treatment;

b. Each illness or injury for which each such medical practitioner or medical facility treated or examined Plaintiff;

c. Whether Plaintiff has had any x-rays, CAT, MRI, scans, PFTs, Arterial Blood Gas tests, Bronchoscopies, Bronchioalveolar Lavage or other non-invasive imagining diagnostic chest pictures taken or lung tests performed;

e. The dates such x-rays, CAT, MRI, scans, PFTs, Arterial Blood Gas tests, Bronchoscopies, Bronchioalveolar Lavage or other non-invasive imagining diagnostic chest pictures were taken or lung tests performed; and

f. Whether any other tests or procedures were performed on Plaintiff and, if so, the nature of such tests or procedures.

**RESPONSE:** Objection. This interrogatory is over broad and unduly burdensome in asking the Plaintiff to recall every practitioner and medical facility he may have been in throughout his life. Subject to and without waving these objections, you are being furnished medical authorization to obtain all medical records of the Plaintiff. Without waiving said objection, see Plaintiff's medical records. To the best of my recollection at this time, Plaintiff has been treated at the Dr. Louis Niece and Dr. John Partman, Hattiesburg Clinic, Hattiesburg, Mississippi; 2) South Central Regional Hospital in Laurel, Mississippi; and 3) Forrest General Hospital in Hattiesburg, Mississippi.

23.     Please identify every psychiatrist, psychologist, therapist, counselor, other mental health care provider, clergyman or other person from whom any Plaintiff has sought counseling, diagnosis, testing, treatment, advice or other care which you allege resulted from the illness of any Plaintiff.

RESPONSE: None.

24.     With respect to any screening or testing in which you may have participated for a silica or asbestos related disease, conditions, or other injuries, state:

    a.     the dates(s) of each such testing or screening;
    b.     the name and address of each clinic, laboratory or facility at which such testing or screening was performed;
    c.     the medical tests or diagnostic method used during each testing or screening (e.g., pulmonary function tests, chest x-ray(s), etc.);
    d.     the name of each person with whom you had direct contact as part of each testing or screening (e.g., clerical personnel, technicians, and/or physicians);
    e.     how you learned of the availability of each testing or screening (e.g., newspaper, radio or television advertising; word of mouth; fliers or pamphlets) and specifically identify the source; and
    f.     whether you paid for, or have been billed for such testing or screening services, and the amount of any such payment or billing.

**RESPONSE:** Objection. Screening is not a defined term; therefore this interrogatory is vague and ambiguous.

25.     Please identify each and every examination or test you have been given by any physician(s), psychologist(s), or paramedical personnel selected or recommended by any of your attorneys, including but not limited to, any x-rays, PFTs, CT scans, arterial blood gas tests, Bronchoscopies, or Bronchoalveolar Lavages.

**RESPONSE:**   Objection. This interrogatory seeks information that is privileged.

26.     Will you agree to submit to an independent medical examination, including a x-ray, CT scan and/or a PFT, at the expense of the Defendants?

**RESPONSE:** Objection, there are a myriad of products manufactured, distributed and sold which contributed to the plaintiff's disease. As such, this interrogatory is over broad and unduly burdensome. Without waiving this objection, the plaintiff would state that sand is unreasonably dangerous for use in abrasive blasting. Sand may also be unavoidably dangerous. Exposure to free silica leads to silicosis both for person actually performing the work of sandblasting and for persons who are in the vicinity of sandblast operations. The degree of exposure to free silica in sandblasting is so ultra hazardous that even the best respiratory protective equipment may not sufficiently protect those in the work environment. Many respiratory protective devices or devices sold for use in the sandblasting industry were also unreasonably dangerous by virtue of their design. Non-air supplied hoods and dust masks were inadequate forms of protection for respirable silica. Neither the non-air supplied hoods nor the dust masks could provide protection against inhaling the particles generated by the sandblasting process. Application equipment was also unreasonably dangerous since it fractured the sand to respirable size. Application equipment failed to have adequate warnings for many years even into the present time. Even approved air supplied hoods fail to provide adequate protection in actual working conditions. The plaintiff maintains in this lawsuit that sand should not be used for abrasive blasting, that substitute abrasives should be used. The plaintiff also maintains that the application equipment helped to create the danger by reducing the sand particle to respirable size. The plaintiff claims that all products that he used were unreasonably dangerous either because of their inherent nature, their design, and/or their lack of an adequate or suitable warning. The products supplied by Defendants failed to warn the plaintiff of the nature and extent of the dangers associated with using high silica containing abrasives in abrasive blasting. Defendants also failed to inform the plaintiff of the best methods to avoid the dangers associated with abrasive blasting. Defendant failed to provide use limitations with their products and often misrepresented the protection provided by said products. Lastly, the response to this interrogatory may be better developed through deposition of Plaintiff's co-workers.

30. With respect to each Respiratory Protection Device that you/your decedent have/had ever worn, if you contend that you/your decedent sustained injuries or damages, in whole or in part, due to the use of said Respiratory Protection Device, describe in detail:

a. The brand name, generic description and/or other identifying description of said Respiratory Protection Device, including but not limited to, color of product; number and color of straps/bands, if any; and what part of the face was covered; the type of material the mask/respirator/hood was made of, e.g. cloth/paper, vinyl, plastic, rubber, leather, etc; and, whether there was a name on the mask/respirator/hood

b. The type of packaging in which the Respiratory Protection Device came;

c. The name of the defendant which you contend designed, manufactured, sold or distributed each Respiratory Protection Device;

d. Your/your decedent's employer and the specific job site or sites during each which said Respiratory Protection Device was used;

  e.  The activity being performed while each Respiratory Protection Device was being worn;

  f.  The inclusive dates of use of each Respiratory Protection Device;

  g.  All instructions given to you/your decedent by your/your decedent's employer or any other person relating to the use of each Respiratory Protection Device;

  h.  Whether any changes or modifications were made to any Respiratory Protection Device used or worn by you/your decedent, by your employer or any other person prior to or subsequent to such devices' use;

  i.  If applicable, the type of filter used in any Respiratory Protection Device worn or used by you, and how often, if ever, the filter was changed; if there was a filter, was it a cartridge and if so, was there more than one cartridge and where was the cartridge(s) located on the mask

  j.  The age and condition of the Respiratory Protection Device when used by you/your decedent;

  k.  The approximate percentage of time you/your decedent wore each Respiratory Protection Device;

  l.  The identity of persons with knowledge of your/your decedent's use of any Respiratory Protection Device; and

  m.  Specifically how you contend that any Respiratory Protection Device used or worn by you was defective.

**RESPONSE:** Plaintiff objects to this request as being over broad and unduly burdensome. Plaintiff was never warned about the hazards of using high silica abrasives in abrasive blasting. Plaintiff followed all safety rules and guidelines of his employers and used the equipment provided to him by his employers. In addition, the response to this interrogatory may be better developed through the deposition of Plaintiff and Plaintiff's co-workers.

 31. For each of the Defendants products to which you were exposed or to which you contend contributed to your exposure during your employment history, state the following:

  a.  The precautions you took during the times of exposure to the product;

  b.  The precautions your employer/contractor suggested, recommended or required to be taken to minimize or eliminate your exposure to or inhalation of the product or the effects of such exposure;

  c.  What did you do in response to each such suggestion, recommendation or requirement by your employer;

  d.  The precautions or warnings which accompanied the product;

  e.  Whether you were exposed to the product while using it or while others were using it, or both;

  f.  The purpose for, and the manner in which, the product was being used during each of the times of your exposure;

  g.  The duration of your exposure to the product;

    h.     Whether your exposure was indoors or outdoors; and a description of the container or packaging in which each product was stored when not in use; and

    i.     A description of the container or packaging in which each product was stored when not in use.

**RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome in asking Plaintiff to recall each and every product he may have been exposed to over his entire work life. Subject to and without waiving these objections, the response to this interrogatory may be better developed through the deposition of Plaintiff and Plaintiff's co-workers.

32.    If any of your employers/contractors ever suggested, recommended or required that you should use any device to reduce your possible exposure to, or inhalation of, silica identify each such employer when the suggestion, recommendation or requirement was first made, the type, make and model of each device referred to in each suggestion, recommendation or requirement and what you did in response to each such suggestion, recommendation or requirement.

**RESPONSE:** Objection. This interrogatory may be better developed through the deposition of the Plaintiff and Plaintiff's co-workers.

33.    Describe each area for each respective employer/contractor in which you believe you used an abrasive blasting product or Respiratory Protection Device manufactured by Defendants at any time including but not limiting to:

    a.     The size and location of such area;

    b.     Whether such areas were open and exposed to free flow of air;

    c.     Whether such areas were enclosed or indoors;

    d.     Whether ventilation or other respiratory protection was provided and the nature and origin of such ventilation or other respiratory protection (e.g. exhaust fans, open doors, open windows, forces air, respirators, hoods, etc.);

    e.     If provided, the type of respiratory protection provided and whether and how often you used such respiratory protection;

    f.     Other activities taking place in and around such area where abrasive blasting was taking place; and

    g.     The number and identity of other blasters, pot tenders, and other workers in such areas.

**RESPONSE:** Objection, this request is over broad and unduly burdensome in asking that the Plaintiff to recall the requested information for his entire work life. Subject to and without waiving these objections, please see any employment records from the Plaintiff's employers.

34.    Describe any abrasive blasting instruction and training you received, including but not limited to: (a) any certification(s) obtained by the plaintiff and any blasting process or processes for

which such certification(s) was obtained and provide the date(s) when any such certification(s) was obtained; (b) the courses or areas covered by any classroom instruction; (c) field or apprenticeship instructions; (d) the nature of the instruction or training regarding the use of abrasive-blasting; (e) the nature of the instruction or training regarding the potential danger of inhalation of dust particles during the blasting process and (f) the identity of any instructor involved in providing any such training, instruction or certification.

**RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome. Subject to and without waiving these objections, the response to this interrogatory may be better developed through deposition of Plaintiff and Plaintiff's co-workers.

35.    Please identify each and every local, state, national or industrial code or standard and any specific provision thereof that you contend any defendant failed to comply with in the manufacture or sale of any abrasive blasting material, equipment, or product to which you contend you were exposed or contributed to your exposure of any allegedly harmful dust and/or particulate.

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, see Plaintiff's response to Interrogatory No. 29. See Plaintiff's latest complaint on file in this case. For documents evidencing unsafe characteristics, see Plaintiff's Exhibit List, which will be filed under separate cover. Also, this interrogatory requires expert testimony.

36.    Do you contend that Plaintiff was exposed to any toxic, hazardous, or injurious product(s), chemical, compound, mineral, fume, or other substance manufactured, distributed, or sold by a person or entity other than the defendants in this lawsuit which caused, contributed to, produced, or aggravated Plaintiffs alleged silicosis, asbestosis or other interstitial lung disease? If so, state:

   a.    The name of description of each such product;
   b.    The date(s) on which you contend Plaintiff was exposed to each such product; and
   c.    The name, address, telephone number, employer, and occupation of each person who may testify as to Plaintiffs alleged exposure to each such product.

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving said objection, all known defendants that may be responsible for Plaintiff's condition have been named.

37.    State whether you claim that you were exposed to silica while performing work as a subcontractor or independent contractor or as an employee of a subcontractor or independent contractor at a facility owned by a third party. If so, please state (a) the name of your employer while you were performing this work, (b) the work sites at which you performed this work, including the specific location within the work site where you performed this work, (c) the dates on which you performed this work, (d) the specific task you were performing during this work and (e) whether you filed a claim for workers compensation as a result of your exposure to silica while performing this work.

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff was never employed by subcontractor or independent contractor.

38. State whether you, either directly or through counsel, have at any time made an agreement or reached an understanding(s) (either tentative or final) with any current or former defendant or defendants regarding either the ultimate outcome of your claims against such defendant or defendants or the manner in which these cases, or some of them, will be tried. Your answer should include but not be limited to: settlement agreements, contingent settlement agreements, partial settlement agreements, releases, covenants not to sue, covenants not to execute, "Mary Carter" agreements, "high/low agreements, loan receipt agreements, sliding scale agreements, guaranteed verdict agreements and any similar agreements or understanding. Your answer specifically should include agreement(s) and/or understanding(s) in which you agreed to waive claims against any participating current or former defendant or defendants (for example, a claim for punitive damages) or in which any participating defendant agreed not to raise one or more defenses or not to contest certain elements of alleged liability, or in which the participating parties agreed to minimum and maximum amounts of compensatory liability, or in which the participating parties agreed not to disclose the terms of such agreements or understandings.

RESPONSE: Objection. This interrogatory seeks privileged information.

39. Please state the total amount of all damages for which you will seek recovery for by reason of the occurrence made the basis of this lawsuit.

**RESPONSE:** Plaintiff objects to Interrogatory number 39 in so far as it requests an itemization in each and every category of injury or damage and a maximum amount of damages sought for each category. Said interrogatory is unduly burdensome and overly broad. The purpose of this interrogatory is to attempt to foreclose plaintiff's proof of any element of legally recognized damages by failure to itemize such in answer to this interrogatory. Therefore, it is anticipatory and is merely calculated to form a basis for a later exclusion of proof. As time goes on, the development of damages will change and this aspect of this interrogatory is unduly burdensome in regard to the fact that it will require constant supplementation. Further, the plaintiff would show that certain items of damages are intangible and are not capable of exact calculation. Such elements of damages such as pain, suffering, mental anguish and the lie are best evaluated and best determined by the jury who will ultimately decide this case. Without waiving said objection, Plaintiff is seeking $1,000,000 or the maximum allowed by law for past, present and future mental and physical suffering. In addition, the Plaintiff is seeking medical expenses and other economic damages to be developed throughout the litigation of this case.

40. If you have missed any work since the time of the incident in question, what days were missed and how much salary did you lose, insofar only as said loss of time was made necessary by the accident in question?

**RESPONSE:** Not applicable.

41. Please identify the verbatim content and design of any warning, caution, or instruction which Plaintiff contends should have been provided with each abrasive blasting product/Respiratory Protection Device manufactured or sold by any defendant to which plaintiff claims he was exposed or used, and which Plaintiff contends contributed to any disease, illness, or medical condition for which he seeks compensation in this cause. For each warning identified, specify the manner in which any such warning, caution, or instruction should have been provided, that is whether it should have been provided on the product itself, on the product packaging, or in a separate document or insert.

**RESPONSE:** Objection. This interrogatory requires expert testimony.

42. State for each picture, slide, film or videotape produced in response to the Request for Production the name of the photographer and the date the picture, slide, film or videotape was made.

**RESPONSE:** Objection. Overly broad and unduly burdensome. This interrogatory is anticipatory and is being directed to the plaintiff at this time merely in an effort to later exclude information that may be relied upon which is not listed or furnished in response to this request. This interrogatory is motivated by an exclusionary motive. Without waiving the above and foregoing objection, the plaintiff would state that an effort is being made to itemize information, which is responsive to this interrogatory, and to file the same in the form of an exhibit list, which will be filed under separate cover at a later date.

43. Identify each person (and include in your identification the employer of each such person) whom you believe, or whom you have been told, may have previously contracted silicosis or any other physiological condition, respiratory limitation, illness or injury allegedly caused, contributed to, produced, or aggravated while performing the same or similar job duties as those that gave rise to your claims in this Lawsuit.

> Note: The information sought in this Interrogatory is not dependent upon whether or not any such person may offer testimony at any deposition or at the trial of this cause. It is likewise not dependent upon whether or not any such person has sued any party, and is not dependent on whether or not such person has received any monetary recovery.

**RESPONSE:** Objection. Overly broad and unduly burdensome. The plaintiff objects to this interrogatory in so far as it requests an identification of each person who may have contracted the same occupational disease while performing the same or similar job duties without qualification as to whether or not these prior victims may have worked for the same employers at the same time the plaintiff so worked. The plaintiff further objects to that portion of the interrogatory which states that he would be required to identify each person he may have been told, previously contracted silicosis. This part of the interrogatory invades the attorney/client privilege as counsel of record may have extensive knowledge

regarding persons who have contracted silicosis who either worked for the same employers or in similar exposures.

44. Please identify (1) the substance of each and every complaint made by you or anyone else to your knowledge, prior to the filing of this lawsuit, regarding any abrasive blasting material, equipment or product manufactured or sold by any defendant to which plaintiff claims he was exposed and/or which he contends contributed to any disease, illness, or medical condition for which he seeks compensation in this cause, (2) the form in which any such complaint was made, that is whether it was oral or in writing, (3) the identity of each and every person to whom any such complaint was made, and (4) the date(s) of each and every such complaint.

**RESPONSE:** Plaintiff never made any complaints. Plaintiff used the equipment provided to him by his employers and followed all safety guidelines and rules of his employer.

45. State, in the form of an itemized list, special damages alleged in this action including, but not limited to, hospital charges, medical card provider charger, prescription/medicine charges, lost wages, etc. and identify the person or entity to whom each item of expense was paid or is owed.

**RESPONSE:** Plaintiff objects to interrogatory number 45 in so far as it requests an itemization in each and very category of injury or damage and a maximum amount of damages sought for each category. Said interrogatory is unduly burdensome and overly broad. The purpose of this interrogatory is to attempt to foreclose plaintiff's proof of any element of legally recognized damages by failure to itemize such in answer to this interrogatory. Therefore, it is anticipatory and is merely calculated to form a basis for a later exclusion of proof. As time goes on, the development of damages will change and this aspect of this interrogatory is unduly burdensome in regard to the fact that it will require constant supplementation. Further, the plaintiff would show that certain items of damages are intangible and are not capable of exact calculation. Such element of damages such as pain, suffering, mental anguish and the lie are best evaluated and best determined by the jury who will ultimately decide this case. The Plaintiff further objects as the Defendants mischaracterized and/or improperly defined the term special damages.

46. If you are making a claim for loss of earnings or impairment of earning power or capacity because of your alleged medical condition, describe the basis for that claim.

**RESPONSE:** Not applicable.

47. Please describe the date, place and circumstances under which you first became aware of the illness or personal injury which you are claiming in this lawsuit or any symptom of such illness or injury, and how you became aware of such illness, personal injury or symptom, including but not limited to, the specific identity of each source of information providing to or leading to such awareness, any in change in your behavior, lifestyle or work habits.

**RESPONSE:** Objection. This interrogatory will be better developed through Plaintiff's deposition.

48. Identify by name, address and telephone number all persons who assisted you in identifying the products to which you claim exposure or use or who will provide information about which products you claim exposure or use.

**RESPONSE:** Please see answer to interrogatory no. 2.

49. If you are answering as the personal representative for a deceased person, state thedate, city and state in which the decedents death occurred; the immediate and all contributing causes of death; whether an autopsy was performed; and, the city and state where there death certificate was completed. In lieu of an answer you may attach a legible, true and correct copy of the death certificate.

**RESPONSE:** Not applicable.

50. Identify each person you may call as a witness at trial and provide for each the full name, last known address and phone number.

**RESPONSE:** Objection. This interrogatory will be supplemented at the appropriate time.

51. Describe all dusts, chemicals, sprays, pesticides or other air borne materials to which you believe you have been exposed in your lifetime and for each exposure, give the date, the employer/contractor and the circumstances of each exposure.

**RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome in asking the plaintiff to identify all chemicals, etc. he may have been exposed to during his entire lifetime.

52. Identify each person who you expect to call as an expert witness at trial, and for each such witness please give the following:

(a) The subject matter on which the expert is expected to testify;
(b) The substance of the facts and opinions to which the expert is expected to testify;
(c) A summary of the grounds for each opinion;
(d) The defendant against whom the experts testimony will be used;
(e) Whether any expert has tested an asbestos- and/or silica-containing product at your request and, if so, please state (1) the specific product tested, (2) the manufacturer of such product, and (3) the result and/or opinion of this expert.

**RESPONSE:** Objection. This interrogatory will be supplemented at the appropriate time.

53. Identify all persons, including fact witnesses, whom you know or believe have knowledge of facts relevant to the issues in this lawsuit.

**RESPONSE:** Objection. This interrogatory seeks privileged information. However, without waiving said objection, Larry McLawrence, James Barnes, Tyrone Hicks, Linda Chapman, James Hayes, Leanden Gavin, John McLaurin, Red Hardy, Sam Love, John Cole, Bobby Taylor, Tom Pittman, and Fred Pittman.

54. State whether the you attended a screening, meeting, testing or evaluation for the purpose of determining or assessing whether you had been exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.

**RESPONSE:** Objection. Screening is not a defined term; therefore, this interrogatory is vague and ambiguous.

55. For each and every time you attended a screening, meeting, testing or evaluation (collectively "screening) for the purpose of determining or assessing whether you had an asbestos and/or silica related injury, please identify the following:

a. the date the screening took place;
b. the location of the screening;
c. whether the screening was for determining whether plaintiff has an asbestos related injury or a silica related injury or both;
d. the entities (including without limitation law firms, screening companies, clinics, physicians, physicians offices or hospitals) involved in the screening; and
e. how you knew about the screening.

**RESPONSE:** See response to Interrogatory No. 54.

56. Identify all health care providers who have authorized, prescribed or ordered x-rays, biopsies and/or pulmonary function tests which you contend serve as a basis for this lawsuit. Please include the type of the tests and the dates such tests were authorized, prescribed or ordered.

**RESPONSE:** Plaintiff has attached executed medical authorizations. Plaintiff has been treated at the Dr. Louis Niece and Dr. John Partman, Hattiesburg Clinic, Hattiesburg, Mississippi; 2) South Central Regional Hospital in Laurel, Mississippi; and 3) Forrest General Hospital in Hattiesburg, Mississippi.

57. For every health care provider who you believe has expressed an opinion regarding whether the injuries or damages you are claiming in this lawsuit were caused by or related to exposure to asbestos and/or silica, identify those health care providers and all reports and/or tests that he/she has relied upon to formulate those opinions.

**RESPONSE:** Objection. This interrogatory seeks information that is privileged.

58. If you assert privilege or immunity from discovery as grounds for refusal to answer any interrogatory or request for production of documents set forth herein, please name the privilege or immunity asserted, provide a generic description of any documents as to which privilege or immunity is claimed, and explain in detail the grounds upon which said claim of privilege or immunity is based.

**RESPONSE:** This response will be supplemented.

**REQUESTS FOR PRODUCTION**

1. All sales literature, advertising, promotional material, technical literature, warnings, material safety data sheets, labels, product records, shipping records, invoices, purchase orders, marketing records, NIOSH or OSHA documents, sales, records, internal memoranda, internal reports, minutes of meetings, or other documents of any defendant, any employee, any employer or any supplier which relate to and harmful dusts or particulate to which Plaintiff claims he was exposed, and/or to protective equipment or abrasive blasting equipment Plaintiff allegedly used.

**RESPONSE:** Plaintiff objects to this request as being over broad and unduly burdensome. There are literally thousands of pages of documents potentially responsive to this request. Please see Plaintiffs Exhibit List that will be filed under separate cover at a later date.

2. All photographs, slides, films, or videotapes that, in whole or in part, relate to the illness, disease, or condition in question or damages that are made the basis of this Lawsuit, including, but not limited to, any photographs portraying in any manner and to any extent any fact which Plaintiff contends proves the cause of such illness, disease, or condition or any element of damage alleged in this action. For each photograph, slide, film, and videotape, provide all documents which will reveal the date of the foregoing items and the person or entity shooting or making the same.

**RESPONSE:** Plaintiff has no documents responsive to this request at this time.

3. All documents and tangible things concerning any other lawsuit which you have on file or are aware of arising out of the same factual circumstances as this Lawsuit, including the parties to such lawsuit, the Court in which such lawsuit is filed, and the substance of the claim in such lawsuit.

**RESPONSE:** Plaintiff has no documents responsive to this request.

4. Please produce all prior depositions of the above referenced Plaintiff, including but not limited to depositions taken in Plaintiffs silica lawsuit. (This does not include the deposition taken in this case).

**RESPONSE:** Not applicable.

5. All documents which refer or relate to use of nicotine or smoking by Plaintiff, whether such smoking involved tobacco, snuff, marijuana, cigarettes, cigars, or other substances.

**RESPONSE:** Plaintiff does not have any documents responsive to this request at this time. Plaintiff is providing medical authorizations to order any additional medical records. This authorization is being provided solely upon the condition that any records obtained with this authorization be provided to plaintiffs counsel within 10 days of receipt of records.

6. All documents which refer or relate to the use, inhalation, injection, or ingestion by Plaintiff of any legal or illegal drugs or narcotic agents, including, but not limited to, cocaine, crack cocaine, heroin, PCP, hallucinogens, barbiturates or amphetamines.

**RESPONSE:** Plaintiff does not have any documents responsive to this request.

7. All documents and tangible things which refer or relate to in any way Plaintiff having been accepted for, or declined for, tuned down, or rated by any company for accident, health, or life insurance for a period beginning five (5) years prior to the date of his alleged first exposure to the Alleged Toxic Materials.

**RESPONSE:** Plaintiff does not have any documents responsive to this request.

8. All documents which will reveal each license Plaintiff possesses or has possessed, whether issued by any agency (governmental or non-governmental) or other person, to perform any profession, trade, or occupation, including, but not limited to, documents which will disclose the date the license was issued, the name and address of the agency which issued the license, and the profession, trade, or occupation in which the license was issued.

**RESPONSE:** Plaintiff does not have any documents responsive to this request.

9. All documents reflecting any information regarding Plaintiffs work history, including names of employers, names of co-workers, dates of employment, places of employment, and/or job description, including but not limited to copies of all Plaintiffs payroll, personnel, or union records.

**RESPONSE:** See Plaintiff's authorization to obtain Social Security earnings records. Plaintiff is also providing counsel with an authorization to obtain payroll/personnel records from his employers. This authorization is being provided solely upon the condition that any records obtained with this authorization be provided to plaintiff's counsel within 10 days of receipt of records.

10. A copy of any application for employment signed, prepared, or filed by Plaintiff, or on his behalf, with any prospective employer since the occurrence made the basis of this Lawsuit.

**RESPONSE:** Please see response to No. 9.

11. All documents or tangible things of any kind whatsoever which evidence, show, or set forth Plaintiffs specific job duties for each of his employers.

**RESPONSE:** Plaintiff is providing counsel with an authorization to obtain payroll/personnel records from his employers. This authorization is being provided solely upon the condition that any records obtained with this authorization be provided to plaintiffs counsel within 10 days of receipt of records.

12. A copy of any application signed, prepared, or filed by Plaintiff with the Mississippi Employment Commission for purposes of obtaining unemployment benefits after the occurrence made the basis of this Lawsuit.

**RESPONSE:** Plaintiff does not have any documents responsive to this request at this time.

13. All documents which reflect that Plaintiff was employed at any time by any of the defendants, or worked at any time on any job site owned by or under the control of any of the defendants.

**RESPONSE:** The Plaintiff was not employed by any of the Defendants. See Plaintiffs authorization to obtain Social Security earnings records attached with these interrogatory responses. This authorization is being provided solely upon the condition that any records obtained with this authorization be provided to plaintiff's counsel within 10 days of receipt of records.

14. All documents which support Plaintiffs allegations that he was exposed to silica dust from abrasive blasting materials or equipment, including, but not limited to, any defendants products.

**RESPONSE:** Plaintiff does not have any documents responsive to this request at this time. As discovery is in its infancy, this request will be supplemented after the deposition of Plaintiff and deposition of co-workers, supervisors, and purchasing agents. This response requires expert testimony. Also see Plaintiff's medical records.

15. All documents which support Plaintiffs contention that he has been disabled as a result of any disease, illness or medical condition allegedly caused or contributed to by any of the defendants products.

**RESPONSE:** See response to Request for Production No. 14.

16. All documents which support Plaintiffs allegations that abrasive materials and/or abrasive blasting equipment was used on any job site where the plaintiff claims to have been exposed to silica dust.

**RESPONSE:** Plaintiff does not have any documents responsive to this request at this time. As discovery is in its infancy, this request will be supplemented after the deposition of Plaintiff and deposition of co-workers, supervisors, and purchasing agents.

17. All documents which support Plaintiffs allegation that he worked with, around or in the immediate vicinity of abrasive blasting, or that plaintiff wore any Respiratory Protection Device (e.g. mask, respirator, air supplied hood) or other respiratory protective device in such an environment.

**RESPONSE:** Plaintiff does not have any documents responsive to this request at this time. As discovery is in its infancy, this request will be supplemented after the deposition of Plaintiff and deposition of co-workers, supervisors, and purchasing agents.

18. All documents, literature, manuals, and/or pictures evidencing Plaintiffs use of abrasive blasting equipment and any abrasive blasting materials.

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff does not have any documents responsive to this request at this time. As discovery is in its infancy, this request will be supplemented after the plaintiff's deposition, depositions of co-workers, and depositions of supervisors.

19. All documents evidencing Plaintiffs use of protective equipment, including but not limited to Respiratory Protection Devices when exposed to silica dust or other allegedly harmful particulate.

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff does not have any documents responsive to this request at this time. As discovery is in its infancy, this request will be supplemented after the plaintiff's deposition, depositions of co-workers, and depositions of supervisors.

20. All photographs, electronic recordings, videotapes, or diagrams of Plaintiffs work site or any products which Plaintiff alleges he used.

**RESPONSE:** Plaintiff does not have any information responsive to this request.

21. All documents or tangible things of any kind whatsoever regarding any training, instruction or warning provided to Plaintiff with respect to the use of abrasive blasting materials, protective or abrasive blasting equipment including, but not limited to, all manuals, pamphlets,

booklets, literature, correspondence, and other written documents or tangible things providing for or relating to any such instructions.

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff does not have any information responsive to this request.

22. All documents or tangible things of any kind whatsoever regarding any warnings or instruction given to Plaintiff with respect to exposure to silica dust and/or other allegedly harmful particulate, and the use of protective clothing and/or equipment and abrasive blasting equipment for use when exposed to the abrasive blasting materials. This also includes, but is not limited to, any and all warnings, labels, or other instructions that you have in your possession that were place upon any Respiratory Protection Device or other equipment.

**RESPONSE:** Objection, overly broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff does not have any information responsive to this request.

23. Any document, manual, pamphlet, and/or brochure evidencing a written or oral safety program, HAZCOM program, respiratory program at any of Plaintiffs employers or used at any work site where plaintiff worked and at which he claims exposure to harmful dusts and/or particulate. If no such program existed for any of the employers whom or job sites where plaintiff worked, please indicate this as well.

**RESPONSE:** Plaintiff does not have any information responsive to this request.

24. All documents that include any advice, suggestions or recommendation of techniques, methods or equipment which would serve to reduce or guard against the allegedly harmful exposure any dust and/or particulate generated during the blasting process.

**RESPONSE:** Plaintiff does not have any information responsive to this request.

25. All documents or tangible things regarding any complaints made by or on behalf of Plaintiffs to any of the Defendants, Plaintiffs employers, or to other persons, firms, organizations or corporations, at any time whatsoever with respect to the allegedly harmful dust and particulate and/or protective or abrasive blasting equipment including, without limitation, all correspondence, records of telephone conversations, meetings, discussions, or conferences, and all other documents or tangible things which evidence, show or may show, or which may set forth the nature of any complaints, when such complaints were made, to whom such complaints were directed, and the nature of any remedies recommended or performed, and whether such remedies were made, whether such documents and tangible things contained all or some of the foregoing, in whole or in part.

**RESPONSE:** Plaintiff does not have any information responsive to this request.

26. All documents or tangible things of any kind whatsoever which evidence, show, or set forth the levels or concentrations of exposure to silica dust and/or other allegedly harmful particulate which Plaintiff contracted at each of his employers, and the dates and lengths of time for each such exposure.

**RESPONSE:** Plaintiff does not have any information responsive to this request.

27. All documents received by you, or generated in connection with, any screening or testing for disease, illness or medical condition allegedly due to exposure to dusts or particulate, including: appointment forms or letters; questionnaires; work, exposure or medical history forms; correspondence; pulmonary function test results; x-ray reports, MRI reports, PET scam reports; CAT scan reports; diagnostic reports; billing or payment records; and contract between any attorney(s) and the testing entities.

**RESPONSE:** Plaintiff is providing counsel with a medical authorization to obtain additional records. This authorization is being provided solely upon the condition that any records obtained with this authorization be provided to plaintiff's counsel within 10 days of receipt of records.

28. All medical questionnaires or forms completed by Plaintiff for any employer.

**RESPONSE:** Objection, overly broad and unduly burdensome. Subject to and without waiving prior objections, if there is any information responsive to this request it may be obtained from plaintiff's employer by requesting personnel records with the authorization being provided by plaintiffs counsel. This authorization is being provided solely upon the condition that any-records obtained with this authorization be provided to plaintiffs counsel within 10 days of receipt of records.

29. All documents completed by Plaintiff for any insurance company that requested information regarding plaintiffs medical history.

**RESPONSE:** Plaintiff does not have any information responsive to this request.

30. All documents generated by any physician which indicate, refer to, relate to or evidence the physicians opinion that exposure to any product, substance or agent caused or contributed, in any way to Plaintiffs injuries, disease, illnesses or death that are the basis of this lawsuit.

**RESPONSE:** See Plaintiff's medical records. Plaintiff has executed medical authorizations.

31. If chest x-rays, CAT, MRI, NMR, or PET scans or other non-invasive imaging diagnostic pictures were taken of Plaintiffs chest at any time beginning ten (10) years prior to the date of his alleged first exposure to silica dust and/or any other allegedly harmful particulate, provide each x-ray, scan, or other diagnostic picture and all documents which refer to or will disclose the name and address

of the person who took the x-ray, scan, or other diagnostic picture, the dates each were taken, and what each disclosed.

**RESPONSE:** Objection, this request is over broad and unduly burdensome in asking Plaintiff about every medical exam and/or treatment 10 years prior to the first date of his alleged exposure to silica dust. Subject to and without waiving prior objections, see the attached medical records. Plaintiff is also providing counsel with a medical authorization to obtain additional records.

32.     All pathology specimens, and other records, documents or tangible things generated or maintained by any medical practitioner or medical facility which treated or cared for Plaintiff for a period beginning ten (10) years prior to the date of his alleged first exposure to silica dust and/or any other allegedly harmful particulate.

**RESPONSE:** Objection, this request is over broad and unduly burdensome in asking Plaintiff about every medical exam and/or treatment he has had 10 years prior to the date of his alleged first exposure to silica dust. Subject to and without waiving prior objections, see the attached medical records. Plaintiff is also providing counsel with a medical authorization to obtain additional records.

33.     All reports and other documents from each medical practitioner who examined, counseled or treated Plaintiff in connection with any claim for Social Security Disability, state disability, Social Security insurance, major medical insurance, Blue Cross, or any similar group.

**RESPONSE:** Plaintiff does not have any documents responsive to this request at this time.

34.     All reports and other documents concerning treatments received by Plaintiff for any nervous breakdown, mental illness, or other psychiatric illness during the period of time beginning five (5) years prior to the date of his alleged first exposure to silica dust and/or any other allegedly harmful particulate, and continuing to the present.

**RESPONSE:** Not applicable.

35.     All documents and tangible things which support your claim, if any, for loss, injury, or damage to consortium (defined as any alleged impairment or damage to affection, solace, comfort, companionship, society, assistance, sexual relations, emotional support, love, and felicity necessary to support a successful marriage).

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff is providing you with an authorization to obtain medical/payroll records. These authorizations are being provided solely upon the condition that any records obtained with this authorization are to be provided to Plaintiffs counsel within 10 days of receipt of said records at no expense to Plaintiffs counsel.

36. All documents and tangible things which support your claim, if any, for loss or damage to household services (defined as any alleged impairment of the performance of household and domestic duties by a spouse to the marriage).

**RESPONSE:** Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff is providing you with an authorization to obtain medical/payroll records. These authorizations are being provided solely upon the condition that any records obtained with this authorization are to be provided to Plaintiffs counsel within 10 days of receipt of said records at no expense to Plaintiffs counsel.

37. A copy of Plaintiffs marriage certificate.

**RESPONSE:** Not Applicable.

38. All documents including, but not limited to, statements, invoices, bills, insurance claims and records of payment for medical examination, treatment, testing or diagnosis that form part of Plaintiffs claim for actual damages in this action.

**RESPONSE:** Objection, overly broad and unduly burdensome. Subject to and without waiving prior objections, Plaintiff does not have any documents responsive to this request at this time. However, Plaintiff is providing counsel with a medical authorization to obtain the requested information.

39. All documents which will reveal any out-of-pocket expenses which you claim resulted from the incidents which are the basis of this Lawsuit.

**RESPONSE:** Plaintiff is providing you with an authorization to obtain billing records, which will provide this information. This authorization is being provided solely upon the condition that any records obtained with this authorization are to be provided to Plaintiffs counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

40. All documents which indicate, refer to, relate to or evidence your allegations that Plaintiff experienced a loss of earning capacity as a result of the illness made the basis of this lawsuit.

**RESPONSE:** The only documents responsive to this request are the Plaintiff's Social Security Earnings records, employment records, and medical records. You are being furnished authorizations to obtain these records. These authorizations are being provided solely upon the condition that any records obtained with these authorizations are to be provided to Plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

41. All documents which will reveal any days of work missed by Plaintiff and the earning loss resulting from such lost work time which you claim resulted from the illness, injury, or condition made the basis of this lawsuit.

**RESPONSE:** Plaintiff is providing you with authorizations to obtain payroll/personnel records and income tax records, which will provide this information. This authorization is being provided solely upon the condition that any records obtained with this authorization are to be provided to Plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

42. A copy of any applications or claim forms filed by Plaintiff or on his behalf with any health insurance company for reimbursement or payment of any medical or funeral expenses incurred as a result of the injury or disease made the basis of this Lawsuit.

**RESPONSE:** Objection. This information is not discoverable due to the collateral source rule. The extent of insurance coverage is not relevant, nor is it likely to lead to discoverable information.

43. Copies of all insurance policies, documents, or memoranda evidencing coverage of, or payment for, any damages allegedly arising from the occurrence made the basis of this lawsuit. This request is intended to include, but is not limited to Social Security Insurance, major medical insurance, Blue Cross, or any similar group.

**RESPONSE:** Objection, overly broad and unduly burdensome. Subject to and without waiving prior objections, the extent of insurance coverage is not relevant, nor is it likely to lead to discoverable information.

44. Plaintiffs federal and state income tax returns for each of the past ten years.

**RESPONSE:** Plaintiff is providing an authorization to obtain said tax records. This authorization is being provided solely upon the condition that any records obtained with this authorization are to be provided to Plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

45. All documents reflecting any payments from a non-party that have been made to you for any of the damages you allege you suffered from the alleged toxic materials.

**RESPONSE:** Objection. This response seeks privileged information.

46. Any and all settlement agreements, contingent settlement agreements, partial settlement agreements, releases, covenants not to sue, covenants to execute, Mary Carter agreements, "high/low" agreements, loan receipt agreements, sliding scale agreements, guaranteed verdict agreements and any similar agreements and understanding. You specifically should include agreements or understanding in which you agree to waive claims against any participating current or former

defendant or defendants (for example, a claim for punitive damages) or in which any participating defendant agrees not to raise one or more defenses or not to contest certain elements of alleged liability, or in which the participating parties agreed to minimum and maximum amounts of compensatory liability or which the participating parties agree not to disclose the terms of such agreements or understanding.

**RESPONSE:** Objection. This response seeks privileged information.

47. All documents referring to, relating to or evidencing communications between any of the defendants and plaintiffs.

RESPONSE: Objection. This response seeks privileged information.

48. All documents referring to, relating to or evidencing information provided by any of the defendants to plaintiffs.

**RESPONSE:** Objection. This response seeks privileged information.

49. All documents generated by or from any of the defendants as well as all documents created by any of the defendants which are in the Plaintiffs possession, custody or control or which are within the possession, custody and control of any agent or representative of the Plaintiffs regardless of from whom these documents were obtained.

**RESPONSE:** Objection. This response seeks privileged information.

50. Produce all documents you have relating to any Respiratory Protection Devices you contend you wore when you were exposed to Alleged Toxic Material, including the device itself.

RESPONSE: Objection. This response seeks privileged information.

51. Produce all documents relating to each and every defect you contend existed in any Respiratory Protection Devices at the time you contend you used it and was exposed to the Alleged Toxic Material.

**RESPONSE:** Objection. This response seeks privileged information.

52. Produce all documents relating to how any alleged inadequate warnings caused or contributed to your alleged injuries or damages.

**RESPONSE:** Objection. This response seeks privileged information.

53.     For each Plaintiff original, fully executed authorizations in the form attached to allow defendants to obtain social security records; education records; workers compensation records; military records; tax records; medical and history records; tissue specimens and/or tissue slides; x-rays, CT scans, MRI scans, PET scans, PFT reports, or any other medical tests (plus reports of interpretations of the same) payroll pension and personnel records; union records; and Veteran Association records.

**RESPONSE:**  Please see attached authorizations. These authorizations are being provided under the condition that any records obtained with these authorizations are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

54.     Any and all reports, papers, records, statistics, literature, or other document on which any of your expert witness will base any part of his or her opinion(s) to be offered in this case.

**RESPONSE:**  Objection. Overly broad and unduly burdensome. This Request is merely anticipatory and is being directed to the plaintiff at this time merely in an effort to later exclude information that may relied upon by Plaintiff's expert witnesses which is not listed or furnished in response of this request. This request is motivated by an exclusionary motive. Without waiving the same, the plaintiff would state that this information may be better discovered through oral depositions of the plaintiffs experts. Without waiving the above and foregoing objection, the plaintiff would state that an effort is made to itemize information, which is responsive to this request, and to file the same in the form of an exhibit list. Plaintiff exhibit list will be filed under separate cover.

55.     Any and all documents, writings, and/or tangible things, including but not limited to all summaries, charts, video tapes, and/or visual aids which you intend to use at trial or offer into evidence at the trial of this matter.

**RESPONSE:**  Plaintiff will supplement in accordance with the Mississippi Rules *of* Civil Procedure.

56.     Any films, photographs, pictures, video tapes, audio tapes, or other recording made in connection with any examination, testing or diagnosis of the plaintiffs.

**RESPONSE:**  Objection, over broad and unduly burdensome. Subject to and without waiving prior objections, plaintiff does not have any information responsive to this request.

57.     To the extent not otherwise requested herein, all documents, as to each defendant, which Plaintiff identified in his responses to the Interrogatories.

**RESPONSE:**  Objection. Overly broad and unduly burdensome, and repetitive of other requests. Without waiving said objection, see all items referenced in plaintiffs exhibit list which will filed under separate cover at a later date. Plaintiff would further object to this request because it does

not refer to a particular class or type of document. Plaintiff further objects to this request to the extent it may invade the attorney work product privilege.

58. All documents that reflect any claim for disability, injury or physical condition arising out of Plaintiffs military service.

**RESPONSE:** Not applicable.

59. All documents provided plaintiff by any labor union or organization that included information about silicosis or any other silica-related condition and or asbestosis or any other asbestos-related condition.

**RESPONSE:** See response to Request for Production No. 59.

60. All packaging materials or photographs, video tapes, or slides of packaging materials the Plaintiff alleges were used in packaging silica or asbestos products to which Plaintiff allegedly was exposed.

**RESPONSE:** Other than the CSR Litigation Book, Plaintiff does not have any documents responsive to this request.

61. Resumes of all experts Plaintiff expects to call as witnesses at the trial of the action or that were specifically employed or retained in connection with this civil action and are not expected to be called as witnesses.

**RESPONSE:** Plaintiff will supplement resumes pursuant to the Mississippi Rules of Civil Procedure.

62. All documents reflecting any information regarding Plaintiffs work history, including names of employers, names of co-workers, dates of employment, places of employment, or job description.

**RESPONSE:** Plaintiff is providing counsel with an authorization to obtain payroll/personnel records from his employers. This authorization is being provided solely upon the condition that any records obtained with this authorization be provided to plaintiffs counsel within 10 days of receipt of records.

63. All documents which support Plaintiffs contention that he has been disabled as a result of any condition allegedly caused or contributed to by any of the defendants.

**RESPONSE:** Objection. See medical records that Plaintiff has provided authorization for herein. In addition, this response requires expert testimony.

64. Any product or respiratory protection devise ever used by Plaintiff in the process of sandblasting still in the possession of the Plaintiff, or member of the Plaintiffs family.

**RESPONSE:** Objection, over broad and unduly burdensome. *Subject* to and without waiving prior objections, Plaintiff does not have any respiratory equipment in his possession.

65. Any and all documents, letters, reports, or other materials identified in your answers to the foregoing Interrogatories.

**RESPONSE:** Objection. See documents attached.

66. Any and all documents created, used or reviewed at any screening, meeting, testing or evaluation listed in Interrogatory 2, including but not limited to occupational and/or medical questionnaires, A-sheets, x-ray films, pulmonary function test reports, B-reader reports, x-ray review reports, x-ray prescriptions, PFT prescriptions, diagnostic/prognostic reports, exposure history reports, "sign in or "sign out" sheets, PFT logs, PFT calibration records, attorney selection sheets, or waivers.

**RESPONSE:** Please see attached authorizations. These authorizations are being provided under the condition that any records obtained with these authorizations are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

67. All documents which you or anyone on your behalf received from any testing entity, clinic, physician, physicians office or hospital who has performed or reviewed x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you for the purpose of determining or assessing whether you have been exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.

**RESPONSE:** See response to Request for Production No. 66.

68. All documents which you have received from any lawyer or law firm regarding any occupational and/or medical questionnaires, x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you for the purpose of determining or assessing whether he was exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.

**RESPONSE:** Objection. This requests seeks privileged information. Without waiving said objection, see response to Request for Production No. 66.

69. All documents (including but not limited to occupational and medical questionnaires and/or histories) provided to you, filled out or answered for any testing entity, clinic, physician, physicians

office or hospital who performed or reviewed x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you to determine or assess whether you had been exposed to asbestos and/or silica or have an asbestos and/or silica related disease.

**RESPONSE:** Please see attached authorizations. These authorizations are being provided under the condition that any records obtained with these authorizations are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

70. All orders, prescriptions or authorizations signed by a healing arts practitioner or physician who authorized, ordered or prescribed any x-ray, biopsy or pulmonary function test which you contend serves as a basis for your lawsuit.

**RESPONSE:** No such documents exist.

71. Any and all documents regarding and/or identifying all persons who attended any screening, meeting, testing or evaluation listed in Interrogatory 2, including but not limited to occupational and/or medical questionnaires, A-sheets, x-ray films, pulmonary function test reports, B-reader reports, x-ray review reports, x-ray prescriptions, PFT prescriptions, diagnostic/prognostic reports, exposure history reports, "sign in or "sign out sheets, PFT logs, PFT calibration records, attorney selection sheets, or waivers.

**RESPONSE:** Objection. This request seeks privileged information. Without waiving said objection, Plaintiff does not have any documents related to this request at this time.

72. All invoices and payment records pertaining to any screening, meeting, testing or evaluation listed in Interrogatory 2.

**RESPONSE:** See response to Request for Production No. 71.

This, the 13th day of August, 2008.

Respectfully submitted,

**JOHN MCGILBERRY, PLAINTIFF**

JOHN MCGILBERRY

As to All Objections and Responses to Requests for Production of Documents:

By: ______________________
TIMOTHY W. PORTER, *Attorney for Plaintiff*

Of Counsel:

Timothy W. Porter, MSB No. 9687
Patrick C. Malouf, MSB No. 9702
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, Mississippi 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr., MSB No. 99984
THE SMITH LAW FIRM, P.L.L.C.
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

STATE OF MISSISSIPPI

COUNTY OF Jones

Personally came and appeared before me the undersigned in and for the jurisdiction aforesaid, the within named, JOHN MCGILBERRY, who being by me, first duly sworn, and states on oath that the matters facts and things alleged contained and set forth in the above and foregoing instrument are true and correct as therein stated.

This, the 13th day of August, 2008.

John McGilberry
JOHN MCGILBERRY

SWORN AND SUBSCRIBED before me this, the 13th day of August, 2008.

BART GAVIN, Circuit Clerk

(*Seal*)

Charlotte Holifield, D.C.
NOTARY PUBLIC

My Commission Expires:

My Commission Expires 1st Monday, Jan. 2012

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI

SECOND JUDICIAL DISTRICT

JOHN MCGILBERRY

VERSUS NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL

---

THE FOLLOWING IS A TRUE AND CORRECT TRANSCRIPT OF THE MOTION HEARING HELD IN THE ABOVE STYLED AND NUMBERED CAUSE BEFORE THE HONORABLE BILLY JOE LANDRUM, CIRCUIT JUDGE FOR THE EIGHTEENTH CIRCUIT COURT DISTRICT OF THE STATE OF MISSISSIPPI, ON THE 17TH DAY OF AUGUST, 2009.

---

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

John T. Givens, Esquire
Porter & Malouf, P.A.
P.O. Box 12768
Jackson, MS 39236

ON BEHALF OF THE DEFENDANTS:

Clyde L. "Chaney" Nichols, III, Esquire
Scott Sullivan Streetman & Fox, P.C.
P.O. Box 13847
Jackson, MS 39236

Katherine McKee Surkin, Esquire
Page Mannino Peresich & McDermott, PLLC
P.O. Box 166450
Jackson, MS 39236

EXHIBIT "L"

MR. NICHOLS: Good afternoon, Your Honor. Chaney Nichols on behalf of American Optical Corporation. And we're going forward with our motion for summary judgment.

MS. SURKIN: Katherine Surkin on behalf of Empire Abrasive Equipment Corporation, and we also have a motion for summary judgment.

THE COURT: Why was I handed this reply brief in McGilberry --

MR. NICHOLS: Your Honor, it was filed today --

THE COURT: McGilberry versus Pangborn?

MR. NICHOLS: Yes, sir. That's our reply brief in support of our motion. We filed it today after receiving the response to our motion Friday.

THE COURT: This is the case coming up?

MR. NICHOLS: Yes, sir.

THE COURT: Okay. Go ahead.

MR. NICHOLS: If it please the Court, Your Honor?

THE COURT: Speak up.

MR. NICHOLS: Okay, sir. I'll start with the procedural history in this case. This is a silicosis case that was originally filed by Mr. McGilberry in a multi-plaintiff action styled George Buffington versus Pulmosan Safety Equipment Corporation that was filed on September 6th, 2002.

While a plaintiff in the Buffington matter, Mr. McGilberry was deposed on April 5th and April 6th of 2004 regarding his alleged exposure to silica-containing products during his work history. At his deposition Mr. McGilberry was questioned at great length about a fact sheet that was provided to the defendants in the case prior to his deposition as well as his product usage throughout his work history.

I attended Mr. McGilberry's deposition on behalf of American Optical Corporation, a company that manufactured safety equipment and respiratory protection devices. And over the course of two days of deposition testimony, Mr.

McGilberry testified that only one type of product was used by him for respiratory protection at each of his work sites. This product was described by Mr. McGilberry as a disposable dust mask with a single strap attached to it. Mr. McGilberry testified that he did not know who manufactured the dust mask that he used. And further, over the two days of testimony Mr. McGilberry failed to identify American Optical as the manufacturer of any of the products that he allegedly used.

Based upon his failure to identify an American Optical product during his deposition, I requested a voluntary dismissal of Mr. McGilberry's claims. Before that was achieved, however, the George Buffington case was dismissed pursuant to the *Canadian National* decision It was dismissed on May 15th, 2006. Mr. McGillberry's claims were re-filed a year later on May 14, 2007 in the instant case. In this case Mr. McGilberry alleges exposure to silica at the same work sites

that he testified to back in April of 2004.

Plaintiff will argue to the Court today that very little discovery has been conducted in this matter since it was filed two years ago and that the plaintiff has not even been deposed yet in this matter. But, Your Honor, this is because Mr. McGilberry has already been deposed at great length over the course of two days regarding his alleged silica exposure at the exact same work sites that are in the instant case.

Now based upon that testimony I filed this motion for summary judgment as Mr. McGilberry clearly testified in his deposition that he only used a dust mask with a single strap. Further, he testified that he didn't know who manufactured that mask that he used.

Now, Your Honor, there are multiple manufacturers on the market who make dust masks with these single straps, however, American Optical is not one of them. And attached to my motion is an affidavit from

our corporate rep stating that American Optical has never manufactured a single strap dust mask.

Now, plaintiff's counsel will come before you today, Your Honor, and say that perhaps plaintiff was mistaken on confused during his deposition. But, Your Honor, we would submit that it's clear from his deposition testimony that he was not. He was specifically asked about the number of straps on the dust mask for each and every site in his deposition.

THE COURT: Well, why would he argue that if that's what he said? Y'all can't resolve these kinds of things between yourself if a man says one thing and you going to argue about what he says?

MR. NICHOLS: Well, it didn't become an issue, and I had to file my motion because he wouldn't voluntary dismiss me. We received their response on Friday with a new affidavit. And I'll address the affidavit, Your Honor. But numerous allegations were raised for the first time Friday in the plaintiffs' response,

however, it doesn't comport with the plaintiff's deposition testimony of five years ago.

Now, we filed this motion back on June 9th. The plaintiff didn't respond until Friday when I received his response and an attached affidavit wherein plaintiff now claims that he used American Optical products as specified in the sworn facts sheet from his prior case. But, Your Honor, what was in the plaintiff's prior fact sheet is totally irrelevant because we deposed plaintiff after receiving that sheet, and he testified that he only used single strap dust masks and he didn't know who manufactured them. So, it doesn't matter what was in the fact sheet from his prior case because his subsequent deposition testimony is the best evidence in this case.

Now, Your Honor, it's our motion that the affidavit that's attached to the plaintiff's response should be stricken because it's improper and contrary to Mississippi law, as well as established in

Mississippi case law that a non-movant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts without explanation its previous testimony. That's from the Mississippi Supreme Court case of *Foldes versus Hancock Bank.*

Now this exact topic is also discussed in Professor Jeffrey Jackson's treatise on Mississippi Civil Procedure which I cite in my rebuttal. As it notes, in determining whether an affidavit inconsistent with prior deposition testimony should be allowed, quote, the crux of the issue is whether the inconsistency is a sham. If so, the attempt at correcting the deposition testimony should be disregarded. This issue arises when the affiant's deposition testimony contains a significant weakness that is revealed when the moving party's motion for summary judgment relies on the testimony. The non-moving party then attempts to correct the testimony in an affidavit. If the affidavit is found by

the trial court to be a sham, it should disregard the affidavit and consider only the earlier testimony.

Now, Your Honor, I would submit that this is exactly what is occurring here. Upon plaintiff's discovery that American Optical did not make a single strap dust mask, as set forth in our summary judgment motion, plaintiff simply manufactured an affidavit the day before the hearing stating that American Optical products were used as specified in the fact sheets.

Now, Your Honor, the deposition testimony of Mr. McGilberry, which came after the fact sheets, demonstrated that that is just not so. And we would request that the Court strike this affidavit as it is improper and irrelevant, and instead rely on Mr. McGilberry's sworn deposition testimony which is the best evidence in this case. We would ask that our summary judgment be deemed proper.

THE COURT: Is that the only issue? The strap issue, is that the only issue?

MR. NICHOLS: Yes, sir.

THE COURT: All right.

MR. GIVENS: May it please the Court, John Givens with Porter and Malouf law firm here on behalf of Mr. McGilberry.

What the defendant wants to do in this case is pick the testimony that's beneficial to him and ignore the testimony that's not. As he clearly states in his argument, we have sworn fact sheets, and that's sworn affidavit testimony, that he used American Optical products. And then at the deposition he was never specifically asked about American Optical. Counsel here sat there for two days straight and didn't ask one single question about American Optical products, even though numerous products were identified throughout these plaintiff's facts sheet, which are sworn to. And therefore, his justification for that is, well, he never identified what could have been one of my products. Just -- and is based solely on the fact that the plaintiff said the mask he used only had one strap.

We believe at this time the motion in this case --

THE COURT: What does your affidavit say?

MR. GIVENS: Your Honor?

THE COURT: What does your affidavit say.

MR. GIVENS: My affidavit says that he used American Optical masks and respirators while sandblasting or while being exposed to respirable silica and as identified in his facts sheets that were executed in 2004.

THE COURT: How do you identify it in the -- previously?

MR. GIVENS: Your Honor, that's part of the issue we have in this case and the summary judgment being brought when it is. At that time another attorney was litigating on behalf of the plaintiff primarily, and so we weren't responsible for the deposition prep and the product identification at that time.

THE COURT: Do you have a copy of the deposition.

MR. GIVENS: Do I have a copy of the deposition?

THE COURT: You said that it was not -- he's talking about a strap. You're talking about somebody identifying something or not identifying because no one asked him.

MR. GIVENS: Yes, sir, Your Honor.

THE COURT: I asked you what did he say previously about how he identified it? You don't have that in your deposition? You don't have that in your fact sheet?

MR. GIVENS: Your Honor, I don't know how they executed those facts sheets.

THE COURT: Well, y'all come back when you find out then. You come up here not prepared to answer questions that I ask you.

MR. GIVENS: Well, Your Honor --

THE COURT: I mean, you're arguing -- he's arguing that he should have a dismissal because of one strap. You say that the guy says that he used the product, but you can't tell me how he in fact identified the fact that he did use

the product, that product, because you said that some other lawyer was handling it.

MR. GIVENS: He identified it in his sworn fact sheets that were provided to the defendants before the depositions.

THE COURT: How did he identify it? Show me the fact sheet.

MR. GIVENS: The fact sheet was attached to my motion, Your Honor, and it was attached to his -- may I approach?

THE COURT: Do you have it?

MR. GIVENS: Yes, sir, Your Honor. That's the sworn fact sheet and that's where he identifies American Optical products. That's just in the amended fact sheet. In the original fact sheet, which I don't know if it's supplemented or not or if it's overtaken, he identifies other American Optical products in that fact sheets. I don't understand how that fact sheet was generated, Your Honor.

THE COURT: I don't either. There's nothing on here to show where it came from. That's just a statement by someone.

MR. GIVENS: And it's signed -- after that he signs it under oath that that is true and correct.

THE COURT: All right. That's his point also that -- all right.

Do you have any other issues today? Is that all you have?

MR. GIVENS: Yeah, and I have this affidavit.

THE COURT: Do you have anything else?

MR. NICHOLS: Well, Your Honor, if I could just clear up a little bit about these amended fact sheets.

THE COURT: Go ahead.

MR. NICHOLS: These fact sheets were submitted in discovery responses prior to his deposition. We had the fact sheet going into the deposition. When we take his deposition Mr. McGilberry is unable to identify any of the product that are listed in there. It was proven inaccurate.

THE COURT: How did you approach him in trying to get him to identify?

MR. NICHOLS: Your Honor, there were over 10 defense lawyers in the room, and one person took the lead in the deposition and asked him questions about all of the respiratory protection that he used, and he only identified a mask with a single strap consistently in his testimony, which is attached to my motion.

THE COURT: Did you show him a mask of any kind?

MR. NICHOLS: No, sir, because we don't manufacture a single strap mask.

THE COURT: Did you show him any kind of mask?

MR. NICHOLS: No, sir, I didn't have anything --

THE COURT: So he just says it was single strap.

MR. NICHOLS: He said it was a single strap. And we asked him, do you know who made it, who --

THE COURT: Okay. So you didn't show him one of yours and say, okay, can you identify this? It's got three straps on it, six straps, no straps?

MR. NICHOLS: No, sir.

THE COURT: Okay. Overruled. Motion is overruled.

Do y'all have anything else.

MS. SURKIN: Your Honor, I have the same type motion.

THE COURT: Same argument?

MS. SURKIN: It's a different defendant, but it's the same facts.

THE COURT: Overruled.

MR. GIVENS: Thank you, Your Honor.

(HEARING CONCLUDED)

COUNTY OF JONES

STATE OF MISSISSIPPI

C E R T I F I C A T E

I, Elizabeth Barlow, Official Court Reporter for the Eighteenth Circuit Court District of the State of Mississippi, do hereby certify that I have reported the proceedings had and done in the foregoing styled cause to the best of my skill and ability and that the above pages contain a true, full and correct transcript of my stenographic notes taken in said proceedings.

This the 14th day of September, 2009.

ELIZABETH BARLOW, CSR #1008
Official Court Reporter

**IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

**JOHN MCGILBERRY** **PLAINTIFF**

**V.** **CAUSE NO. 2007-16-CV5**

**PANGBORN CORPORATION, ET AL.** **DEFENDANTS**

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Court, upon Motion for Summary Judgment filed by the Defendant, Empire Abrasive Equipment Corporation's, and after reviewing same and hearing argument thereon, is of the opinion that said Motion is not well-taken and should be denied.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Motion for Summary Judgment filed by the above-named Defendant be, and the same is hereby denied.

SO ORDERED AND ADJUDGED this 26th day of August, 2009.

CIRCUIT COURT JUDGE

FILED
AUG 28 2009
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

EXHIBIT
"M"

**IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

| | |
|---|---|
| **JOHN MCGILBERRY** | **PLAINTIFF** |
| **V.** | **CAUSE NO. 2007-16-CV5** |
| **PANGBORN CORPORATION, ET AL.** | **DEFENDANTS** |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Court, upon Motion for Summary Judgment filed by the Defendants, American Optical Corporation and Mississippi Valley Silica Company, and after reviewing same and hearing argument thereon, is of the opinion that said Motion is not well-taken and should be denied.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Motion for Summary Judgment filed by the above-named Defendants be, and the same is hereby denied.

SO ORDERED AND ADJUDGED this 26th day of August, 2009.

CIRCUIT COURT JUDGE

FILED

AUG 28 2009

BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

Serial: 158721

**IN THE SUPREME COURT OF MISSISSIPPI**

FILED
NOV 04 2009
OFFICE OF THE CLERK
SUPREME COURT
COURT OF APPEALS

**No. 2009-M-01521-SCT**

***EMPIRE ABRASIVE EQUIPMENT CORPORATION*** — ***Petitioner***

***v.***

***JOHN MCGILBERRY*** — ***Respondent***

**ORDER**

This matter came before a panel of this Court consisting of Waller, C.J., Chandler and Pierce, JJ., on the petition for interlocutory appeal filed by the Petitioner. After due consideration, the panel finds that the petition should be denied.

IT IS THEREFORE ORDERED that the petition for interlocutory appeal is hereby denied.

SO ORDERED, this the 4 day of November, 2009.

RANDY GRANT PIERCE, JUSTICE

Serial: 158650

**IN THE SUPREME COURT OF MISSISSIPPI**

**No. 2009-M-01522-SCT**

FILED
NOV 04 2009
OFFICE OF THE CLERK
SUPREME COURT
COURT OF APPEALS

***AMERICAN OPTICAL CORPORATION*** ***Petitioner***

***v.***

***JOHN MCGILBERRY*** ***Respondent***

**ORDER**

This matter came before a panel of this Court consisting of Waller, C.J., Chandler and Pierce, JJ., on the petition for interlocutory appeal filed by American Optical Corporation. After due consideration, this Court finds that this appeal should be dismissed. Mississippi Rule of Appellate Procedure (M.R.A.P.) 5 provides that an interlocutory appeal may be sought by filing a petition with the clerk within 21 days after the entry of the trial court's order. Further M.R.A.P. 25 provides that "Filing may be accomplished by mail addressed to the clerk, but filing shall not be timely unless the papers are received by the clerk within the time fixed for filing..." Therefore, the petition filed on September 21, 2009, was untimely filed and should be dismissed.

IT IS THEREFORE ORDERED that the petition for interlocutory appeal is hereby dismissed.

SO ORDERED, this the 4th day of November, 2009.

David A. Chandler

DAVID A. CHANDLER, JUSTICE

**IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI**
**FIRST JUDICIAL DISTRICT**

**JOHN MCGILBERRY** **PLAINTIFF**

**VS.** **CIVIL ACTION NO. 2007-16-CV5**

**PANGBORN CORPORATION, ET AL** **DEFENDANTS**

**MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO DISCOVERY**

Ash Grove Cement Company, Clark Sand Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc. (hereinafter "defendants") move this Court pursuant to Mississippi Rule of Civil Procedure 37(a) to compel plaintiff to more fully and completely respond to discovery.

1. Plaintiff and defendants entered into an agreed initial discovery order on December 17, 2007, allowing plaintiff to respond to one set of discovery being propounded for all defendants. Ex. 1.

2. Plaintiff responded on August 13, 2008, nearly eight months after the order was signed and over four years after plaintiff had been deposed. Ex. 2.

3. Plaintiff's responses fail to comply with the letter or spirit of Rule 33, which requires each interrogatory to be answered "separately and fully" unless objected to, in which event the "reasons for the objection" shall be stated and an answer should be provided to the extent no objectionable. Miss. R. Civ. P. 33(b)(1). The Rule goes on to state that "[a]ll grounds for an objection to an interrogatory shall be stated with specificity [and] [a]ny ground not stated in a timely

EXHIBIT "N"

objection is waived" unless excused by the court for good cause shown. Miss. R. Civ. P. 33(b)(4).

4. In an effort to resolve the discovery dispute defense counsel wrote plaintiff's counsel on March 26, 2010, requesting supplementation of certain discovery requests. Ex. 3. There was no response by the plaintiff.

5. As trial is set for August 3, 2010, and plaintiff has executed affidavits in contradiction to his testimony from four years ago, as well as his counsel's assertion that defendants did not know what would be testified to at trial. Ex.4, transcript p. 9. It is necessary that defendants receive full and complete responses to the requested discovery in sufficient time to prepare for trial.

6. Defendants request that plaintiff supplement the following interrogatories:

> **Interrogatory No. 15:** Please describe all claims you have had (including but not limited to this lawsuit) for damages for personal injuries or emotional injuries against any individual, partnership or corporation. For each such claim, please indicate the following:
>
> a. The style of the lawsuit, cause number and court in which the lawsuit was filed;
> b. A description of the injuries claimed in the lawsuit;
> c. The date the claim was filed;
> d. The name and address of the attorney who represented you in the matter;
> e. Any resolution, judgment or settlement of the claim including the date and amount of such judgment, resolution or settlement with respect to each individual defendant in that case.
>
> **RESPONSE:** Objection. Without waiving said objection, plaintiff was involved in an asbestos lawsuit.

Plaintiff failed to state the objection being lodged and also failed to state any of the information requested. The information requested in this interrogatory is relevant to the claims and defenses in this matter, and as such is discoverable.

**Interrogatory No. 17:** Has Plaintiff ever filed a claim for worker's compensation? If so, state for each such claim:

a. Name of insurance company;
b. Name of Plaintiff's employer for each claim, the date of each claim, nature / injury of claim, and the file number for reach claim filed with the Industrial Accident Board;
c. The amount of money paid for each claim;
d. If a lawsuit was filed concerning any such claim, the style of the lawsuit, cause number, and court in which the lawsuit was filed;
e. The claim number assigned by the IAB or new workers' compensation authority;
f. If the claim involved the injuries at issue in this lawsuit, state whether the claim has been settled and, if so, the date and amount of the settlement;
g. The name and address of each medical practitioner who tested, treated, or examined Plaintiff in connection with each such claim.

**RESPONSE:** To the best of my recollection at this time, yes, back in 1982. However, the plaintiff does not recall the details of this claim at this time.

Defense counsel has attempted to locate information related to a workers' compensation claim for the plaintiff without success. Defendants request plaintiff to supplement this response with any information related to where plaintiff was working, what the injury was for, or any other information which may help in locating the records.

**Interrogatory No. 24:** With respect to any screening or testing in which you may have participated for a silica or asbestos related disease, conditions, or other injuries, state:

a. the dates(s) of each such testing or screening;
b. the name and address of each clinic, laboratory or facility at which such testing or screening was performed;
c. the medical tests or diagnostic method used during each testing or screening (e.g., pulmonary function tests, chest x-ray(s), etc.);
d. the name of each person with whom you had direct contact as part of each testing or screening (e.g., clerical personnel, technicians, and/or physicians);
e. how you learned of the availability of each testing or screening (e.g., newspaper, radio or television advertising; word of mouth; fliers or

pamphlets) and specifically identify the source; and

f. whether you paid for, or have been billed for such testing or screening services, and the amount of any such payment or billing.

**RESPONSE:** Objection. Screening is not a defined term; therefore this interrogatory is vague and ambiguous.

As referenced in the interrogatory, defendants used an alternative term of testing. Further, screening is a term of art and practice that has been memorialized in Judge Janis Graham Jack's opinion from the silica MDL 1553. Screening has also been used throughout the litigation in MDL 875. One or both of plaintiff's attorneys were, or are, participants in those MDLs. Defendants request plaintiff supplement his response for each time he has been screened.

**Interrogatory No. 25:** Please identify each and every examination or test you have been given by any physician(s), psychologist(s), or paramedical personnel selected or recommended by any of your attorneys, including but not limited to, any x-rays, PFTs, CT scans, arterial blood gas tests, Bronchoscopies, or Bronchoalveolar Lavages.

**RESPONSE:** Objection. This interrogatory seeks information that is privileged.

Although plaintiff has interposed an objection, plaintiff has not stated what privilege on which he is relying. Defendants request plaintiff either produce the requested information or specifically state the privilege and produce a corresponding privilege log. Only then can defendants go forward to explain why there may be an exception to any claimed privilege.

**Interrogatory No. 29:** Identify by brand name and generic description, each abrasive material, product or Respiratory Protection Device you contend you used which you claim contributed to the cause of any disease, illness or medical condition for which you seek compensation in this case, including but not limited to, (a) the name or identifying description of the product, (b) a physical description of the product; and the package, if any, containing the product; (c) the date or period of time during which each material, product or device was used,(d) whether a Respiratory Protection Device was worn (e) the type of job and work site upon which each different material, product, or Respiratory Protection Device was used, (f) the manufacturer(s) of each

of the materials, product, or Respiratory Protection Devices, (g) any instructions or warnings contained on any material, product or Respiratory Protection Device used, and (e) the names, addresses and telephone numbers of all other persons present at the time of your alleged exposure.

**RESPONSE:** Objection, there are a myriad of products manufactured, distributed and sold which contributed to the plaintiffs disease. As such, this interrogatory is over broad and unduly burdensome. Without waiving this objection, the plaintiff would state that sand is unreasonably dangerous for use in abrasive blasting. Sand may also be unavoidably dangerous. Exposure to free silica leads to silicosis both for person actually performing the work of sandblasting and for persons who are in the vicinity of sandblast operations. The degree of exposure to free silica in sandblasting is so ultra hazardous that even the best respiratory protective equipment may not sufficiently protect those in the work environment. Many respiratory protective devices or devices sold for use in the sandblasting industry were also unreasonably dangerous by virtue of their design. Non-air supplied hoods and dust masks were inadequate forms of protection for respirable silica. Neither the non-air supplied hoods nor the dust masks could provide protection against inhaling the particles generated by the sandblasting process. Application equipment was also unreasonably dangerous since it fractured the sand to respirable size. Application equipment failed to have adequate warnings for many years even into the present time. Even approved air supplied hoods fail to provide adequate protection in actual working conditions. The plaintiff maintains in this lawsuit that sand should not be used for abrasive blasting, that substitute abrasives should be used. The plaintiff also maintains that the application equipment helped to create the danger by reducing the sand particle to respirable size. The plaintiff claims that all products that he used were unreasonably dangerous either because of their inherent nature, their design, and/or their lack of an adequate or suitable warning. The products supplied by Defendants failed to warn the plaintiff of the nature and extent of the dangers associated with using high silica containing abrasives in abrasive blasting. Defendants also failed to inform the plaintiff of the best methods to avoid the dangers associated with abrasive blasting. Defendant failed to provide use limitations with their products and often misrepresented the protection provided by said products. Lastly, the response to this interrogatory may be better developed through deposition of Plaintiff s coworkers.

Plaintiff's response is non-responsive. Plaintiff's objection is that "there are a myriad of products....which contributed to the plaintiffs (sic) disease" and because of that the interrogatory is overly broad and unduly burdensome. The heart of this case, like most mass tort cases, is product usage/exposure. This interrogatory seeks to illicit from plaintiff the brand name and generic

description of the products he intends to claim at trial he used. Although plaintiff was deposed for two days and stated with specificity what products he actually used - - none of which are currently pending in this litigation - - plaintiff fails to cite a single product name or description in response to this interrogatory. Defendants are entitled to know before trial what plaintiff's claims will be and whose products he intends to testify he used. Defendants deposed plaintiff in 2004, but since that time plaintiff has executed a contradictory affidavit and his counsel has asserted in this court that defendants do not know what he will say at trial. Therefore, to avoid trial by ambush, defendants request plaintiff produce the information requested in this interrogatory.

> **Interrogatory No. 30:** With respect to each Respiratory Protection Device that you/your decedent have/had ever worn, if you contend that you/your decedent sustained injuries or damages, in whole or in part, due to the use of said Respiratory Protection Device, describe in detail:
>
> a. The brand name, generic description and/or other identifying description of said Respiratory Protection Device, including but not limited to, color of product; number and color of straps/bands, if any; and what part of the face was covered; the type of material the mask/respirator/hood was made of, e.g. cloth/paper, vinyl, plastic, rubber, leather, etc; and, whether there was a name on the mask/respirator/hood
> b. The type of packaging in which the Respiratory Protection Device came;
> c. The name of the defendant which you contend designed, manufactured, sold or distributed each Respiratory Protection Device;
> d. Your/your decedent's employer and the specific job site or sites during each which said Respiratory Protection Device was used;
> e. The activity being performed while each Respiratory Protection Device was being worn;
> f. The inclusive dates of use of each Respiratory Protection Device;
> g. All instructions given to you/your decedent by your/your decedent's employer or any other person relating to the use of each Respiratory Protection Device;
> h. Whether any changes or modifications were made to any Respiratory Protection Device used or worn by you/your decedent, by your employer or any other person prior to or subsequent to such devices' use;
> i. If applicable, the type of filter used in any Respiratory Protection Device worn or used by you, and how often, if ever, the filter was changed; if there was a filter, was it a cartridge and if so, was there more than one cartridge and

where was the cartridge(s) located on the mask

j. The age and condition of the Respiratory Protection Device when used by you/your decedent;

k. The approximate percentage of time you/your decedent wore each Respiratory Protection Device;

l. The identity of persons with knowledge of your/your decedent's use of any Respiratory Protection Device; and

m. Specifically how you contend that any Respiratory Protection Device used or worn by you was defective.

**RESPONSE:** Plaintiff objects to this request as being over broad and unduly burdensome. Plaintiff was never warned about the hazards of using high silica abrasives in abrasive blasting. Plaintiff followed all safety rules and guidelines of his employers and used the equipment provided to him by his employers. In addition, the response to this interrogatory may be better developed through the deposition of Plaintiff and Plaintiffs co-workers.

Again, although this interrogatory is meant to illicit names and information related to the products plaintiff will claim he used for respiratory protection, there is not a name, description or other product-related information in this response. Obviously, the request is related to the claims and defenses in this matter. During plaintiff's prior deposition, it was expressly stated that he wore no respirator and no respirator claims were being made. Ex. 5, p.71. Yet, plaintiff's complaint lists respirator claims against two different defendants. Further, although plaintiff testified he wore one kind of mask through his entire working career, he executed a contradictory affidavit subsequent to his deposition testimony contradicting that assertion. Defendants, once again, seek information as to the products plaintiff will claim he used when he was exposed to silica to avoid any surprises at trial.

**Interrogatory No. 31:** For each of the Defendants' products to which you were exposed or to which you contend contributed to your exposure during your employment history, state the following:

a. The precautions you took during the times of exposure to the product;

b.    The precautions your employer/contractor suggested, recommended or required to be taken to minimize or eliminate your exposure to or inhalation of the product or the effects of such exposure;

c.    What did you do in response to each such suggestion, recommendation or requirement by your employer;

d.    The precautions or warnings which accompanied the product;

e.    Whether you were exposed to the product while using it or while others were using it, or both;

f.    The purpose for, and the manner in which, the product was being used during each of the times of your exposure;

g.    The duration of your exposure to the product;

h.    Whether your exposure was indoors or outdoors; and a description of the container or packaging in which each product was stored when not in use; and

i.    A description of the container or packaging in which each product was stored when not in use.

**RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome in asking Plaintiff to recall each and every product he may have been exposed to over his entire work life. Subject to and without waiving these objections, the response to this interrogatory may be better developed through the deposition of Plaintiff and Plaintiffs co-workers.

The information requested is relevant to the claims and defenses as it seeks information related to the protection or precautions taken by the plaintiff during the time when he claims he was exposed to respirable silica. Obviously, what plaintiff was told to do, what he actually did and the type of exposure is relevant and discoverable. Plaintiff's suggestion that the response may be better developed through the plaintiff's deposition or his co-workers is not a proper response. Further, plaintiff has been deposed, and defense counsel has requested co-worker names and deposition dates for months without a response. The request is proper and should be supplemented.

**Interrogatory No. 32:** If any of your employers/contractors ever suggested, recommended or required that you should use any device to reduce your possible exposure to, or inhalation of, silica identify each such employer when the suggestion, recommendation or requirement was first made, the type, make and model of each device referred to in each suggestion, recommendation or requirement and what you

did in response to each such suggestion, recommendation or requirement.

**RESPONSE:** Objection. This interrogatory may be better developed through the deposition of the plaintiff and plaintiff's co-workers.

Plaintiff's response is not proper under the rules. Regardless of what plaintiff feels is the better mode of discovery, the question has been posed and under the rules a response is due. What plaintiff's employers recommended or required to reduce possible exposure (if any) to silica is related to the claims and defenses in this case. If plaintiff intends to rely on the information provided in his deposition defendants would request plaintiff to state the page and line of the testimony that he will adopt.

**Interrogatory No. 34:** Describe any abrasive blasting instruction and training you received, including but not limited to: (a) any certification(s) obtained by the plaintiff and any blasting process or processes for which such certification(s) was obtained and provide the date(s) when any such certification(s) was obtained; (b) the courses or areas covered by any classroom instruction; (c) field or apprenticeship instructions; (d) the nature of the instruction or training regarding the use of abrasive-blasting; (e) the nature of the instruction or training regarding the potential danger of inhalation of dust particles during the blasting process and (f) the identity of any instructor involved in providing any such training, instruction or certification.

**RESPONSE:** Objection, this interrogatory is overly broad and unduly burdensome. Subject to and without waiving these objections, the response to this interrogatory may be better developed through deposition of the plaintiff and plaintiff's co-workers.

This response is not proper under the rules. Defendants did depose the plaintiff, and they have repeatedly requested co-worker depositions. Regardless of whether plaintiff would rather be deposed again or have his co-workers deposed, the question has been properly submitted and thus deserves an answer. If plaintiff intends to rely on his prior testimony defendants request the page and line on which plaintiff will rely. Otherwise, supplementation is proper.

**Interrogatory No. 39**: Please state the total amount of all damages for which you will seek recovery for by reason of the occurrence made the basis of this lawsuit.

**RESPONSE:** Plaintiff objects to Interrogatory number 39 in so far as it requests an itemization in each and every category of injury or damage and a maximum amount of damages sought for each category. Said interrogatory is unduly burdensome and overly broad. The purpose of this interrogatory is to attempt to foreclose plaintiffs proof of any element of legally recognized damages by failure to itemize such in answer to this interrogatory. Therefore, it is anticipatory and is merely calculated to form a basis for a later exclusion of proof. As time goes on, the development of damages will change and this aspect of this interrogatory is unduly burdensome in regard to the fact that it will require constant supplementation. Further, the plaintiff would show that certain items of damages are intangible and are not capable of exact calculation. Such elements of damages such as pain, suffering, mental anguish and the lie (sic) are best evaluated and best determined by the jury who will ultimately decide this case. Without waiving said objection, Plaintiff is seeking $ 1,000,000 or the maximum allowed by law for past, present and future mental and physical suffering. In addition, the Plaintiff is seeking medical expenses and other economic damages to be developed throughout the litigation of this case.

Trial of this matter is less than four months away, yet defendants have been given no information on what damages plaintiff intends to seek. Defendants would submit that it is time for such, and, as provided for in the rule, supplementation is both appropriate and proper should new damages arise. However, it is not proper to hold the information until the last minute - - or even at trial - - to surprise the defendants. The response should be supplemented.

**Interrogatory No. 45:** State, in the form of an itemized list, special damages alleged in this action including, but not limited to, hospital charges, medical card provider charger, prescription/medicine charges, lost wages, etc. and identify the person or entity to whom each item of expense was paid or is owed.

**RESPONSE:** Plaintiff objects to interrogatory number 45 in so far as it requests an itemization in each and very category of injury or damage and a maximum amount of damages sought for each category. Said interrogatory is unduly burdensome and overly broad. The purpose of this interrogatory is to attempt to foreclose plaintiffs proof of any element of legally recognized damages by failure to itemize such in answer to this interrogatory. Therefore, it is anticipatory and is merely calculated to

form a basis for a later exclusion of proof. As time goes on, the development of damages will change and this aspect of this interrogatory is unduly burdensome in regard to the fact that it will require constant supplementation. Further, the plaintiff would show that certain items of damages are intangible and are not capable of exact calculation. Such element of damages such as pain, suffering, mental anguish and the lie are best evaluated and best determined by the jury who will ultimately decide this case. The Plaintiff further objects as the Defendants mischaracterized and/or improperly defined the term special damages.

Defendants are certainly entitled to know what special damages plaintiff will seek at any trial of this matter. Absolutely no information has been produced by the plaintiff, and with trial less than four months away it is imperative that defendants begin preparing for trial. Supplementation is proper.

**Interrogatory No. 47:** Please describe the date, place and circumstances under which you first became aware of the illness or personal injury which you are claiming in this lawsuit or any symptom of such illness or injury, and how you became aware of such illness, personal injury or symptom, including but not limited to, the specific identity of each source of information providing to or leading to such awareness, any in change in your behavior, lifestyle or work habits.

**RESPONSE:** Objection. This interrogatory will be better developed through plaintiff's deposition.

Defendants respectfully seek a response to this request. If plaintiff intends to rely on his prior testimony, please state by page and line the testimony.

**Interrogatory No. 50:** Identify each person you may call as witness at trial and provide for each the full name, last known address and phone number.

**RESPONSE:** Objection. This interrogatory will be supplement at the appropriate time.

Defendants submit that this is the appropriate time. Defendants stand less than four months from trial, and although defense counsel has sent numerous requests for the names of plaintiff's witnesses all have gone without a response.

> **Interrogatory No. 53:** Identify all persons, including fact witnesses, whom you believe have knowledge of facts relevant to the issues in this lawsuit.
>
> **RESPONSE:** Objection. This interrogatory seeks privileged information. However, without waiving said objection, Larry McLawrence, James Barnes, Tyrone Hicks, Linda Chapman, James Hayes, Leanden Gavin, John McLaurin, Red Hardy, Sam Love, John Cole, Bobby Taylor, Tom Pittman, and Fred Pittman.

Plaintiff has interposed an objection related to privilege but does not state what privilege nor did he produce a privilege log for any information being withheld. Further, the definition in the discovery requests states that "identify" includes more information than just the fact witnesses' name. Specifically, "[t]he term 'identify', when referring to a person, as above defined, means to state such information as is reasonably necessary to lead to the location of said person, including the person's name, present address or, if same unknown, the last known address, the person's telephone number or, if same unknown, the last known telephone number, and the person's business address and telephone number." Defendants request supplementation with sufficient information to locate these individuals.

> **Interrogatory No. 54:** State whether the you attended a screening, meeting, testing or evaluation for the purpose of determining or assessing whether you had been exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.
>
> **RESPONSE:** Objection. Screening is not a defined term; therefore, this interrogatory is vague and ambiguous.

As listed in the interrogatory the alternative terms of meeting, testing or evaluation were used. Furthermore, the term screening is regularly used in this and other mass tort litigation and has a meaning known to all. The information requested is relevant and discoverable and should be supplemented.

**Interrogatory No. 55:** For each and every time you attended a screening, meeting, testing or evaluation (collectively "screening") for the purpose of determining or assessing whether you had an asbestos and/or silica related injury, please identify the following:

1. the date the screening took place;
2. the location of the screening;
3. whether the screening was for determining whether plaintiff has an asbestos related injury or a silica related injury or both;
4. the entities (including without limitation law firms, screening companies, clinics, physicians, physician's offices or hospitals) involved in the screening; and
5. how you knew about the screening.

**RESPONSE:** See response to Interrogatory No. 54.

Defendants would request plaintiff supplement for reasons stated above.

**Interrogatory No. 57:** For every health care provider who you believe has expressed an opinion regarding whether the injuries or damages you are claiming in this lawsuit were caused by or related to exposure to asbestos and/or silica, identify those health care providers and all reports and/or tests that he/she has relied upon to formulate those opinions.

**RESPONSE:** Objection. This interrogatory seeks information that is privileged.

Although plaintiff has claimed a privilege, none is stated. As Rule 33(b)(4) states any ground not stated in a timely objection is waived unless excused by the court for good cause. Defendants would request the objection be waived, as plaintiff's response continuously interpose objections without stating the grounds. If the court finds there is good cause for plaintiff to fail to state the grounds of his objection, defendants request the plaintiff be made to state what privilege he is relying on and produce a privilege log so that defendants may evaluate whether to proceed with requesting the information from the Court.

**Interrogatory No. 58:** If you assert privilege or immunity from discovery as grounds for refusal to answer any interrogatory or request for production of documents set

forth herein, please name the privilege or immunity asserted, provide a generic description of any documents as to which privilege or immunity is claimed, and explain in detail the grounds upon which said claim of privilege or immunity is based.

**RESPONSE:** This response will be supplemented.

Defendants request the supplementation at this time.

7. In response to the requests for production, plaintiff produced no documents other than authorizations signed by the plaintiff - - which were included in the discovery. So there were no independent documents produced by the plaintiff whatsoever. As plaintiff has been an asbestos plaintiff with the same counsel that now represents him in this case, there certainly are additional documents which are responsive to the requests for production within his possession, custody and control. If such documents are being withheld under privilege then a privilege log should be produced.

8. Defendants specifically request supplementation of the following requests for production:

**Request for Production 37:** A copy of plaintiff's marriage certificate.

**RESPONSE:** Not applicable.

Plaintiff stated in interrogatory responses that he is married. Defendants would have to propound additional interrogatories, expend additional monies and fill out certain state forms to independently receive the marriage certificate. Defendants would, therefore, request plaintiff produce a copy of his marriage license.

**Request No. 44:** Plaintiffs federal and state income tax returns for each of the past ten years.

> **RESPONSE:** Plaintiff is providing an authorization to obtain said tax records. This authorization is being provided solely upon the condition that any records obtained with this authorization are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to plaintiff's counsel.

The state of Mississippi has responded to defendants' request with information that plaintiff has not filed tax returns for the years 2005, 2006 or 2007. As Mississippi only provides information related to the prior 3 years, defendants would request supplementation. If plaintiff has not filed taxes within the last ten years, defendants request plaintiff state as much. Likewise, the federal government only produces records for the last three years, and their records show plaintiff filing only in 2007. Because the information requested is outside of the Defendants' power to receive and within the possession custody and control of the plaintiff, defendants request production of the documents.

> **Request 66:** Any and all documents created, used or reviewed at any screening, meeting, testing or evaluation listed in Interrogatory 55 including but not limited to occupational and/or medical questionnaires, A-sheets, x-ray films, pulmonary function test reports, B-reader reports, x-ray review reports, x-ray prescriptions, PFT prescriptions, diagnostic/prognostic reports, exposure history reports, "sign in" or "sign out" sheets, PFT logs, PFT calibration records, attorney selection sheets, or waivers.
>
> **RESPONSE:** Please see attached authorizations. These authorizations are being provided under the condition that any records obtained with these authorizations are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to plaintiff's counsel.

Authorizations are of no use to defendants in requesting these records as plaintiff has failed to state any information related to the screening(s), meeting(s), testing(s) or evaluation(s) he has attended. The requested documents are within the possession custody and control of the plaintiff as his counsel would have these documents for both asbestos and silica. Defendants seek

supplementation of this request.

> **Request 67:** All documents which you or anyone on your behalf received from any testing entity, clinic, physician, physician's office or hospital who has performed or reviewed x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you for the purpose of determining or assessing whether you have been exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.
>
> **RESPONSE:** See response to Request For Production No. 66.

Defendants would incorporate their justification cited for Request 66 above.

> **Request 68:** All documents which you have received from any lawyer or law firm regarding any occupational and/or medical questionnaires, x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you for the purpose of determining or assessing whether he was exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.
>
> **RESPONSE:** Objection. This requests (sic) seeks privileged information. Without waiving said objection, see response to Request for Production No. 66.

Again, plaintiff wholly failed to state a ground for his objection. Defendants do not know what privilege he has asserted, if any, and certainly are not privy to any privilege log to make any argument to this Court. The documents are relevant and discoverable and should be produced. Defendants request supplementation of this request.

> **Request 69:** All documents (including but not limited to occupational and medical questionnaires and/or histories) provided to you, filled out or answered for any testing entity, clinic, physician, physician's office or hospital who performed or reviewed x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you to determine or assess whether you had been exposed to asbestos and/or silica or have an asbestos and/or silica related disease.
>
> **RESPONSE:** Please see attached authorizations. These authorizations are being provided under the condition that any records obtained with these authorizations are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to plaintiff's counsel

Authorizations provided are not of assistance to defendants in this scenario and are not a substitute for production of documents which are within the possession, custody and control of the plaintiff. Plaintiff's counsel represents McGilberry in both silica and asbestos and the documents should be readily available for production.

> **Request 71:** Any and all documents regarding and/or identifying all persons who attended any screening, meeting, testing or evaluation listed in Interrogatory 55, including but not limited to occupational and/or medical questionnaires, A-sheets, x-ray films, pulmonary function test reports, B-reader reports, x-ray review reports, x-ray prescriptions, PFT prescriptions, diagnostic/prognostic reports, exposure history reports, "sign in" or "sign out" sheets, PFT logs, PFT calibration records, attorney selection sheets, or waivers.
>
> **RESPONSE:** Objection. This request seeks privileged information. Without waiving said objection, Plaintiff does not have any documents related to this request at this time.

Defendants request either waiver of the objection or plaintiff to state the grounds of the objection/privilege. If plaintiff has the documents requested within his possession, custody or control, they should be produced.

9. Trial of this case is less than four months away. Defendants request this court order plaintiff to supplement with the requested information expeditiously. Defendants request the production of both information and documents within five (5) days of this court's order.

WHEREFORE, defendants request plaintiff to fully and completely respond to the discovery requests outlined herein within five (5) days of this court's order and any other relief which they may be so entitled.

This the 13th day of April, 2010.

Respectfully submitted,

Edwin S. Gault, Jr., MSB No. 10187
Jennifer J. Skipper, MSB No. 100808

Attorneys for Certain Defendant

OF COUNSEL:
FORMAN PERRY WATKINS KRUTZ & TARDY, LLP
200 South Lamar St. 100
Jackson, Mississippi 39201
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, on behalf of defendants, do hereby certify that I have served by United States mail, postage prepaid, and via email and/or facsimile, a true and correct copy of the above and foregoing document, to plaintiff's counsel of record and have provided written notice via email and/or facsimile of such service to all other known counsel of record.

THIS, the 13th day of April, 2010.

Jennifer J. Skipper

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF JONES COUNTY, MISSISSIPPI**

**JOHN MCGILBERRY** — **PLAINTIFF**

**VS.** — **CIVIL ACTION NO. 2007-16-CVS**

**PANGBORN CORPORATION, ET AL.** — **DEFENDANTS**

---

**DEFENDANT AMERICAN OPTICAL CORPORATION'S JOINDER IN AND ADOPTION OF CERTAIN DEFENDANTS' MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO DISCOVERY**

---

COMES NOW, Defendant American Optical Corporation and hereby joins in and adopts Certain Defendants' Motion to Compel Supplemental Responses to Discovery filed on or about April 13, 2010, and attached hereto as Exhibit "A."

Respectfully submitted,

AMERICAN OPTICAL CORPORATION, Defendant

BY: [signature]
Robert B. Ireland, III

**OF COUNSEL:**
Walter T. Johnson (MSB #8712)
Michael O. Gwin (MSB #5086)
Joseph G. Baladi (MSB #100286)
Robert B. Ireland, III (MSB #100708)
WATKINS & EAGER PLLC
Post Office Box 650
Jackson, MS 39205
Phone: 601-965-1900
Fax: 601-965-1901

FILED
MAY 11 2010
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

**CERTIFICATE OF SERVICE**

I, the undersigned attorney of record, hereby certify that I have this day caused to be forwarded via U.S. mail a true and correct copy of the foregoing document to the following counsel of record:

R. Allen Smith, Jr.
THE SMITH LAW FIRM, P.L.L.C
681 Towne Center Blvd., Suite B
Ridgeland, MS 39157

Timothy W. Porter
Johnny T. Givens
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, MS 39236

All known defense counsel have been served via electronic mail,

This 10th day of May, 2010.

Robert B. Ireland, III

IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL DISTRICT
OF JONES COUNTY, MISSISSIPPI

JOHN MCGILBERRY — PLAINTIFF

VS. — CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. — DEFENDANTS

---

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANTS' MASTER SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF**

---

**COMES NOW,** Plaintiff, by and through his attorneys of record, and files this his supplemental responses to Defendant's Master Set of Interrogatories and Request for Production of Documents, pursuant to Miss.R.Civ.P. 26 and 33 as follows, to-wit:

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

Plaintiff's Responses to each of these Interrogatories incorporates this Preliminary Statement and these General Objections.

1. The Plaintiff objects to these Interrogatories to the extent that they seek information subject to the attorney-client privilege or which constitutes protected work product.

2. The Plaintiff objects to any discovery request that purports to impose upon it any obligation not expressly set forth in the *Mississippi Rules of Civil Procedure.*

3. The Plaintiff objects to any discovery request to the extent that the time periods referenced therein are not limited in scope.

4. The Plaintiff objects to any discovery request to the extent it seeks to require Plaintiff to provide information which is equally available to the Defendant.

5. The Plaintiff objects to any discovery request to the extent that it seeks disclosures of information generated by persons other than Plaintiff or Plaintiff's counsel that has come into the possession of Plaintiff or Plaintiffs' counsel during the course of discovery and trial preparation in asbestos-related litigation.

6. The Plaintiff objects to any discovery request to the extent that it improperly calls for a legal, medical, or scientific opinion or conclusion which Plaintiff is not qualified to render.

7. The Plaintiff does not concede that any response to any discovery request is or will be admissible evidence at a trial of this action.

8. The Plaintiff objects to these Interrogatories to the extent that they are overly broad, vague and duplicative.

EXHIBIT "O"

**INTERROGATORIES**

15. Please describe all claims you have had (including but not limited to this lawsuit) for Damages for personal injuries or emotional injuries against any individual, partnership or corporation. For each such claim, please indicate the following:

a. The style of the lawsuit, cause number and court in which the lawsuit was filed;
b. A description of the injuries claimed in the lawsuit;
c. The date the claim was filed;
d. The name and address of the attorney who represented you in the matter;
e. Any resolution, judgment or settlement of the claim including the date and amount of such judgment, resolution or settlement with respect to each individual defendant in that case.

**RESPONSE:** Objection. Without waiving said objection, Plaintiff was involved in an asbestos lawsuit.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any previous objections, and in a good faith effort to respond to said interrogatory, Plaintiff was mistaken in his previous response to this Interrogatory. Plaintiff has only had and continues to have one (1) lawsuit pending and it is this one regarding his silicosis case.

a. *John McGilberry v. Pangborn Corporation, et al.*; In the Circuit Court for the First Judicial District of Jones County, Mississippi; C.A. No. 2007-16-CV5
b. The Plaintiff's alleged injury is lung disease, silicosis, caused by exposure to respirable crystalline silica while working at Pittman Construction in Ellisville, Mississippi from 1972 to 1974; while working at Howard Industries in Laurel, Mississippi from 1974 to 1981; while working at Daniel Construction Company in Apex, North Carolina from 1982 to 1984; and while working at H.G. Myrick Construction in Laurel, Mississippi from 1985 to 1989.
c. The Plaintiff's Complaint was originally filed in a multi-plaintiff case styled *George Buffington, et al. v. Pulmosan Safety Equipment, et al.*, civil action number 2002-194-CV6, in the Circuit Court of Jones County, Mississippi, Second Judicial District. On or about May 15, 2006, an Order was entered by the Circuit Court of Jones, Mississippi, Second Judicial District, pursuant to *Canadian National v. Smith, et al.*, 926 So.2d 839 (Miss. 2006) whereby the Plaintiff's Complaint was dismissed with a one (1) year tolling agreement to re-file the Plaintiff's cause of action in a proper venue according to new law in Mississippi. This case was filed on May 14, 2010, within the one (1) year time frame allowed by *Canadian National v. Smith, et al.*
d. Timothy W. Porter, Patrick C. Malouf, John T. Givens, PORTER & MALOUF, P.A., Post Office Box 12768, Jackson, Mississippi 39236 and R.

Allen Smith, Jr., R. Allen Smith, Jr., THE SMITH LAW FIRM, P.L.L.C., 681
Towne Center Boulevard, Suite B, Ridgeland, Mississippi 39157
e.     The current silica case has not been resolved.

In addition, the Plaintiff previously had an asbestos lawsuit(s). He is not aware of the style,
cause number, or court in which the lawsuit was filed. The Plaintiff claimed in the lawsuit that he
had asbestosis. The Plaintiff does not recall when the claim was filed. As previously testified to, the
Plaintiff was represented by Jon Swartzfager out of Laurel, Mississippi. The Plaintiff is not aware of
the resolution of that case at this time. The Plaintiff would state that this information could best be
obtained from his asbestos counsel. The Plaintiff has answered this interrogatory to the best of his
knowledge.

17.     Has Plaintiff ever filed a claim for workers compensation? If so, state for each such
claim:

a.     Name of insurance company;
b.     Name of Plaintiffs employer for each claim, the date of each claim, nature/
       injury of claim, and the file number for reach claim filed with the Industrial
       Accident Board;
c.     The amount of money paid for each claim;
d.     If a lawsuit was filed concerning any such claim, the style of the lawsuit,
       cause number, and court in which the lawsuit was filed;
e.     The claim number assigned by the IAB or new workers compensation
       authority;
f.     If the claim involved the injuries at issue in this lawsuit, state whether the
       claim has been settled and, if so, the date and amount of the settlement;
g.     The name and address of each medical practitioner who tested, treated, or
       examined Plaintiff in connection with each such claim.

**RESPONSE:** To the best of my recollection at this time, yes, back in 1982. However, the
Plaintiff does not recall the details of this claim at this time.

**SUPPLEMENTAL RESPONSE:** Plaintiff was mistaken in his previous response to this
Interrogatory. Plaintiff has never filed a claim for workers compensation. He has only filed for
Social Security Disability for shortness of breath back in the early 2000's. He was seeing Dr. Lewis
Neese located in Hattiesburg, Mississippi, at the time. Plaintiff hired attorney, Edna Collins, located
in Laurel, Mississippi, at the time to represent him in that matter. Plaintiff is not aware of any of the
specifics of this matter except that he was approved for Social Security Disability benefits.

24.     With respect to any screening or testing in which you may have participated for a
silica or asbestos related disease, conditions, or other injuries, state:

a.     the dates(s) of each such testing or screening;

b.      the name and address of each clinic, laboratory or facility at which such testing or screening was performed;

c.      the medical tests or diagnostic method used during each testing or screening (e.g., pulmonary function tests, chest x-ray(s), etc.);

d.      the name of each person with whom you had direct contact as part of each testing or screening (e.g., clerical personnel, technicians, and/or physicians);

e.      how you learned of the availability of each testing or screening (e.g., newspaper, radio or television advertising; word of mouth; fliers or pamphlets) and specifically identify the source; and

f.      whether you paid for, or have been billed for such testing or screening services, and the amount of any such payment or billing.

**RESPONSE:** Objection. Screening is not a defined term; therefore this interrogatory is vague and ambiguous.

**SUPPLEMENTAL RESPONSE:** Objection. Screening is not a defined term; therefore this interrogatory is vague and ambiguous. Without waiving said objection, John McGilberry has participated in medical evaluations conducted by physicians. At this time, the Plaintiff does not recall the specific dates, but believes that would be found on any B-read report or medical evaluation report produced. The Plaintiff does not recall the addresses of any medical evaluation site. The Plaintiff believes an X-ray was taken. There may have been other tests performed such as a PFT but the Plaintiff does not specifically recall at this time. The Plaintiff does not recall the names of the persons involved with the medical evaluation. At this time the Plaintiff does not recall how he learned of the availability of the medical evaluation but it could have been from a co-worker, friend, and/or advertisement. The Plaintiff does not believe he paid for the medical evaluation. This answer will be supplemented and/or further developed through the deposition of the Plaintiff. However, without waiving said objections:

a.      March 11, 2002

b.      A traveling trailer in Laurel, Mississippi

c.      Chest x-rays

d.      John Foxworth

e.      Does not remember how he initially heard about screening.

f.      I did not have to pay any monetary amount out my own pocket for the chest x-rays that were taken on that date.

Further, the Plaintiff participated in a testing for asbestos. He does not recall the date of that testing. It was done in Laurel, Mississippi. The Plaintiff believes an x-ray was done at this testing but does not recall if any other tests were done at this time. Again, the Plaintiff does not recall how he heard about the testing. The Plaintiff does not believe he paid for the testing. This information could best be obtained from Jon Swartzfager who represented the Plaintiff in the asbestos lawsuit.

25.     Please identify each and every examination or test you have been given by any physician(s), psychologist(s), or paramedical personnel selected or recommended by any of your

attorneys, including but not limited to, any x-rays, PFTs, CT scans, arterial blood gas tests, Bronchoscopies, or Bronchoalveolar Lavages.

      **RESPONSE:**   Objection. This interrogatory seeks information that is privileged.

      **SUPPLEMENTAL RESPONSE:** Subject to and without waiving any previous objections, and in a good faith effort to respond to said interrogatory, please see Plaintiff's medical records from The Hattiesburg Clinic, Jefferson Medical Associates, Forrest General Hospital and South Central Regional Medical Center which you obtained through use of Plaintiff's medical authorization on February 5, 2010 and February 17, 2010. Also, Plaintiff does recall having the following examinations and/or tests performed: chest x-rays, PFTs and CT scans but is unsure as to the others mentioned in this interrogatory. The dates and results of these tests can best be obtained from the medical records that Defendants have previously requested and received.

      29.    Identify by brand name and generic description, each abrasive material, product or Respiratory Protection Device you contend you used which you claim contributed to the cause of any disease, illness or medical condition for which you seek compensation in this case, including but not limited to, (a) the name or identifying description of the product, (b) a physical description of the product; and the package, if any, containing the product; (c) the date or period of time during which each material, product or device was used,(d) whether a Respiratory Protection Device was worn (e) the type of job and work site upon which each different material, product, or Respiratory Protection Device was used, (f) the manufacturer(s) of each of the materials, product, or Respiratory Protection Devices, (g) any instructions or warnings contained on any material, product or Respiratory Protection Device used, and (e) the names, addresses and telephone numbers of all other persons present at the time of your alleged exposure.

      **RESPONSE:** Objection, there are a myriad of products manufactured, distributed and sold which contributed to the plaintiff's disease. As such, this interrogatory is over broad and unduly burdensome. Without waiving this objection, the plaintiff would state that sand is unreasonably dangerous for use in abrasive blasting. Sand may also be unavoidably dangerous. Exposure to free silica leads to silicosis both for person actually performing the work of sandblasting and for persons who are in the vicinity of sandblast operations. The degree of exposure to free silica in sandblasting is so ultra hazardous that even the best respiratory protective equipment may not sufficiently protect those in the work environment. Many respiratory protective devices or devices sold for use in the sandblasting industry were also unreasonably dangerous by virtue of their design. Non-air supplied hoods and dust masks were inadequate forms of protection for respirable silica. Neither the non-air supplied hoods nor the dust masks could provide protection against inhaling the particles generated by the sandblasting process. Application equipment was also unreasonably dangerous since it fractured the sand to respirable size. Application equipment failed to have adequate warnings for many years even into the present time. Even approved air supplied hoods fail to provide adequate protection in actual working conditions. The plaintiff maintains in this lawsuit that sand should not be used for abrasive blasting, that substitute abrasives should be used. The plaintiff also maintains that the application equipment helped to create the danger by reducing the sand particle to respirable size. The plaintiff claims that all products that he used were unreasonably dangerous either because

of their inherent nature, their design, and/or their lack of an adequate or suitable warning. The products supplied by Defendants failed to warn the plaintiff of the nature and extent of the dangers associated with using high silica containing abrasives in abrasive blasting. Defendants also failed to inform the plaintiff of the best methods to avoid the dangers associated with abrasive blasting. Defendant failed to provide use limitations with their products and often misrepresented the protection provided by said products. Lastly, the response to this interrogatory may be better developed through deposition of Plaintiff's co-workers.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any previous objections, upon information and belief and in a good faith effort to respond to said interrogatory, the Plaintiff's exposure to silica occurred at the same worksites and years as testified in his previous deposition. At this time, the Plaintiff is not claiming any additional worksites at which he was exposed. Further, the Plaintiff is specifically claiming exposure to the following:

(a) Clark Sand during the times he sandblasted and was around sandblasting as previously testified to. Empire pots on the occasions he sandblasted and was around sandblasting as previously testified to. American Optical 1010 and 1050 disposable dust masks which he wore while sandblasting, around sandblasting and doing concrete work as previously testified to. In addition, the Plaintiff wore 3M disposable masks during the same time periods. I also used a non-airfed hood on one occasion as previously testified to.

(b) The Clark Sand came in a brown bag with red writing. It came in 100 pound bags. The AO 1010 dust mask was white with a metal piece over the nose part. It had two straps that were yellow. Further it had red writing on the bottom of the mask. The AO 1050 was a white mask that looked kind of like a duck bill. It could fold flat. It was white. The 3M masks were white and had ridges and usually only had one strap with the metal piece on the nose part. All the masks I wore were made out of what I believe to be some type of paper. The Empire pots used were the same as described in my deposition. To the best of my recollection the pots were green when I used them.

(c) The dates and periods of when the products were used remains the same as testified to in my previous deposition. The AO 1050 was used during the 1970's while the AO 1010 was used in the 1980's. The 3M masks were used in the 1970's and 1980's.

(d) Besides the non-air fed hood I wore, the respiratory protection devices I wore have been identified in this Interrogatory response.

(e) The type of job and worksites remain the same as my previous deposition.

(f) Previously stated.

(g) The Clark sand bag had a warning on the bag which I read prior to loading the bags in the Empire pots. The dust masks I used did not have warnings on the mask, but the packages that I saw on occasion did have some type of warning on there, but it did not warn about the danger of using the

masks around sandblasting. The Empire pots had various writing on them one of which I believe to be a warning. But it did not tell me sandblasting could cause permanent injury or death.

(h) The Plaintiff has previously identified all individuals that he could recall in his deposition. This has not changed since the deposition.

30.   With respect to each Respiratory Protection Device that you/your decedent have/had ever worn, if you contend that you/your decedent sustained injuries or damages, in whole or in part, due to the use of said Respiratory Protection Device, describe in detail:

a.   The brand name, generic description and/or other identifying description of said Respiratory Protection Device, including but not limited to, color of product; number and color of straps/bands, if any; and what part of the face was covered; the type of material the mask/respirator/hood was made of, e.g. cloth/paper, vinyl, plastic, rubber, leather, etc; and, whether there was a name on the mask/respirator/hood

b.   The type of packaging in which the Respiratory Protection Device came;

c.   The name of the defendant which you contend designed, manufactured, sold or distributed each Respiratory Protection Device;

d.   Your/your decedent's employer and the specific job site or sites during each which said Respiratory Protection Device was used;

e.   The activity being performed while each Respiratory Protection Device was being worn;

f.   The inclusive dates of use of each Respiratory Protection Device;

g.   All instructions given to you/your decedent by your/your decedent's employer or any other person relating to the use of each Respiratory Protection Device;

h.   Whether any changes or modifications were made to any Respiratory Protection Device used or worn by you/your decedent, by your employer or any other person prior to or subsequent to such devices' use;

i.   If applicable, the type of filter used in any Respiratory Protection Device worn or used by you, and how often, if ever, the filter was changed; if there was a filter, was it a cartridge and if so, was there more than one cartridge and where was the cartridge(s) located on the mask

j.   The age and condition of the Respiratory Protection Device when used by you/your decedent;

k.   The approximate percentage of time you/your decedent wore each Respiratory Protection Device;

l.   The identity of persons with knowledge of your/your decedent's use of any Respiratory Protection Device; and

m.   Specifically how you contend that any Respiratory Protection Device used or worn by you was defective.

**RESPONSE:** Plaintiff objects to this request as being over broad and unduly burdensome. Plaintiff was never warned about the hazards of using high silica abrasives in abrasive blasting.

Plaintiff followed all safety rules and guidelines of his employers and used the equipment provided to him by his employers. In addition, the response to this interrogatory may be better developed through the deposition of Plaintiff and Plaintiff's co-workers.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this request as being over broad and unduly burdensome. Plaintiff was never warned about the hazards of using high silica abrasives in abrasive blasting. Plaintiff followed all safety rules and guidelines of his employers and used the equipment provided to him by his employers. Without waiving said objection the Plaintiff responds as follows:

a.    See Response to Interrogatory No. 29.

b.    See Response to Interrogatory No. 29. Usually the masks were not in their packaging.

c.    See Response to Interrogatory No. 29.

d.    See Response to Interrogatory No. 29. Further, this remains the same as previously testified to.

e.    See Response to Interrogatory No. 29. Further, this remains the same as previously testified to.

f.    See Response to Interrogatory No. 29. Further, this remains the same as previously testified to. The Plaintiff's deposition has been scheduled for May 26, 2010 and this will be further developed through his testimony.

g.    Plaintiff was never warned about the hazards, including but not limited to permanent lung injury and death, of using high silica abrasives in abrasive blasting. Plaintiff followed all safety rules and guidelines of his employers and used the equipment provided to him by his employers.

h.    No changes were made except bending the metal bar on the dust masks to make them shape to my face.

i.    N/A

j.    The dust masks I used were always new. When they would get too dirty, I would get another new one. I am not aware of the age of the non-airfed hood I used.

k.    If I was performing sandblasting, around sandblasting, or doing concrete work, I wore a dust mask at all times while performing those duties. I can not give an exact percentage.

l.    I have already identified all co-workers I could in my previous deposition.

m.    The respiratory devices were defective because they did not protect from exposure to respirable silica. Further, they were defective because they failed to warn that they were not to be used around sandblasting or concrete work.

31.    For each of the Defendants products to which you were exposed or to which you contend contributed to your exposure during your employment history, state the following:

a.    The precautions you took during the times of exposure to the product;

b.    The precautions your employer/contractor suggested, recommended or required to be taken to minimize or eliminate your exposure to or inhalation of the product or the effects of such exposure;

c.     What did you do in response to each such suggestion, recommendation or requirement by your employer;

d.     The precautions or warnings which accompanied the product;

e.     Whether you were exposed to the product while using it or while others were using it, or both;

f.     The purpose for, and the manner in which, the product was being used during each of the times of your exposure;

g.     The duration of your exposure to the product;

h.     Whether your exposure was indoors or outdoors; and a description of the container or packaging in which each product was stored when not in use; and

i.     A description of the container or packaging in which each product was stored when not in use.

**RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome in asking Plaintiff to recall each and every product he may have been exposed to over his entire work life. Subject to and without waiving these objections, the response to this interrogatory may be better developed through the deposition of Plaintiff and Plaintiff's co-workers.

**SUPPLEMENTAL RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome in asking Plaintiff to recall each and every product he may have been exposed to over his entire work life. Subject to and without waiving these objections, the response to this interrogatory may be better developed through the deposition of Plaintiff on May 26, 2010.

a.     The Plaintiff is not sure what is meant by precautions taken. Various employers of plaintiff required that he always wear a dust mask which he did. If the Plaintiff was around sandblasting, sandblasting, or doing concrete work, he wore a dust mask.

b.     The Plaintiff employers just required him to wear a dust mask. He does not recall them ever warning him about the harmful effects of breathing silica.

c.     I always followed the instructions of my employer whatever they may be.

d.     See response to Interrogatories No. 29 and No. 30.

e.     While I was using it, and in regards to Clark Sand, while others were sandblasting and on the occasion(s) I personally sandblasted.

f.     Clark Sand was being used for sandblasting, while the dust masks were used to protect me from breathing dust including silica dust while sandblasting, being around sandblasting, and doing concrete work.

g.     See Response to Interrogatories No. 29 and No. 30, further this remains the same as previously testified to.

h.     My exposure was primarily outdoors. I was exposed indoors while being around sandblasting of the floors and any concrete work I did indoors. Further, this remains the same as previously testified to.

i.     The dust masks were disposable and thrown away after use.

32.     If any of your employers/contractors ever suggested, recommended or required that

you should use any device to reduce your possible exposure to, or inhalation of, silica identify each such employer when the suggestion, recommendation or requirement was first made, the type, make and model of each device referred to in each suggestion, recommendation or requirement and what you did in response to each such suggestion, recommendation or requirement.

**RESPONSE:** Objection. This interrogatory may be better developed through the deposition of the Plaintiff and Plaintiff's co-workers.

**SUPPLEMENTAL RESPONSE:** See responses to Interrogatories No. 29, No. 30, and No. 31.

34.      Describe any abrasive blasting instruction and training you received, including but not limited to: (a) any certification(s) obtained by the plaintiff and any blasting process or processes for which such certification(s) was obtained and provide the date(s) when any such certification(s) was obtained; (b) the courses or areas covered by any classroom instruction; (c) field or apprenticeship instructions; (d) the nature of the instruction or training regarding the use of abrasive-blasting; (e) the nature of the instruction or training regarding the potential danger of inhalation of dust particles during the blasting process  and (f) the identity of any instructor involved in providing any such training, instruction or certification.

**RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome. Subject to and without waiving these objections, the response to this interrogatory may be better developed through deposition of Plaintiff and Plaintiff's co-workers.

**SUPPLEMENTAL RESPONSE:** Objection, this interrogatory is over broad and unduly burdensome. Subject to and without waiving these objections, the Plaintiff does not recall ever receiving blasting instruction except for doing as told by his employers.

39.      Please state the total amount of all damages for which you will seek recovery for by reason of the occurrence made the basis of this lawsuit.

**RESPONSE:**     Plaintiff objects to Interrogatory number 39 in so far as it requests an itemization in each and every category of injury or damage and a maximum amount of damages sought for each category.  Said interrogatory is unduly burdensome and overly broad.  The purpose of this interrogatory is to attempt to foreclose plaintiff's proof of any element of legally recognized damages by failure to itemize such in answer to this interrogatory.  Therefore, it is anticipatory and is merely calculated to form a basis for a later exclusion of proof.  As time goes on, the development of damages will change and this aspect of this interrogatory is unduly burdensome in regard to the fact that it will require constant supplementation.  Further, the plaintiff would show that certain items of damages are intangible and are not capable of exact calculation.  Such elements of damages such as pain, suffering, mental anguish and the lie are best evaluated and best determined by the jury who will ultimately decide this case.  Without waiving said objection, Plaintiff is seeking $1,000,000 or the maximum allowed by law for past, present and future mental and physical suffering.  In addition,

the Plaintiff is seeking medical expenses and other economic damages to be developed throughout the litigation of this case.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any previous objections, and in a good faith effort answer this interrogatory, Plaintiff is seeking past and future lost wages. Plaintiff's expert is the process of doing this calculation and this will be provided upon receipt of the same. The Plaintiff has requested certified copies of all relevant medical bills and will produce same upon receipt. Further, plaintiff's expert Dr. Stogner is in the process of performing a future medicals calculation. That will be produced upon receipt of same. The Plaintiff is claiming $3,000,000 for past and future mental and physical suffering. The Plaintiff is also seeking punitive damages to be determined by a jury. This response will be supplemented shortly.

45.     State, in the form of an itemized list, special damages alleged in this action including, but not limited to, hospital charges, medical card provider charger, prescription/medicine charges, lost wages, etc. and identify the person or entity to whom each item of expense was paid or is owed.

**RESPONSE:** Plaintiff objects to interrogatory number 45 in so far as it requests an itemization in each and very category of injury or damage and a maximum amount of damages sought for each category. Said interrogatory is unduly burdensome and overly broad. The purpose of this interrogatory is to attempt to foreclose plaintiff's proof of any element of legally recognized damages by failure to itemize such in answer to this interrogatory. Therefore, it is anticipatory and is merely calculated to form a basis for a later exclusion of proof. As time goes on, the development of damages will change and this aspect of this interrogatory is unduly burdensome in regard to the fact that it will require constant supplementation. Further, the plaintiff would show that certain items of damages are intangible and are not capable of exact calculation. Such element of damages such as pain, suffering, mental anguish and the lie are best evaluated and best determined by the jury who will ultimately decide this case. The Plaintiff further objects as the Defendants mischaracterized and/or improperly defined the term special damages.

**SUPPLEMENTAL RESPONSE:** See Response to Interrogatory No. 39. This response will be supplemented with an exact damage calculation once the calculations can be received from Plaintiff's experts.

47.     Please describe the date, place and circumstances under which you first became aware of the illness or personal injury which you are claiming in this lawsuit or any symptom of such illness or injury, and how you became aware of such illness, personal injury or symptom, including but not limited to, the specific identity of each source of information providing to or leading to such awareness, any in change in your behavior, lifestyle or work habits.

**RESPONSE:** Objection. This interrogatory will be better developed through Plaintiff's deposition.

**SUPPLEMENTAL RESPONSE:** Objection. This interrogatory may be better developed through Plaintiff's deposition. Without waiving said objection, Plaintiff became aware that he was

injured at some point following acquiring the B-read Report of Ray Harron, M.D. on June 26, 2002. This B-read has already been previously produced. Due to Plaintiff's shortness of breath, he has become limited in the activities he can perform or the length of time he can participate in activities. Further, Plaintiff's medical records will further document plaintiff's symptoms. The Plaintiff is currently on oxygen.

50.     Identify each person you may call as a witness at trial and provide for each the full name, last known address and phone number.

**RESPONSE:** Objection. This interrogatory will be supplemented at the appropriate time.

**SUPPLEMENTAL RESPONSE:** Objection. At this time, the Plaintiff would anticipate that he would testify, the experts identified in his expert designation will likely testify, and possibly his wife. It is not anticipated that any co-workers will testify. This has not been determined at this time. This interrogatory will be further supplemented.

53.     Identify all persons, including fact witnesses, whom you know or believe have knowledge of facts relevant to the issues in this lawsuit.

**RESPONSE:** Objection. This interrogatory seeks privileged information. However, without waiving said objection, Larry McLawrence, James Barnes, Tyrone Hicks, Linda Chapman, James Hayes, Leanden Gavin, John McLaurin, Red Hardy, Sam Love, John Cole, Bobby Taylor, Tom Pittman, and Fred Pittman.

**SUPPLEMENTAL RESPONSE:** Objection. This interrogatory seeks privileged information. However, without waiving said objection, Larry McLawrence, James Barnes, Tyrone Hicks, Linda Chapman, James Hayes, Leanden Gavin, John McLaurin, Red Hardy, Sam Love, John Cole, Bobby Taylor, Tom Pittman, and Fred Pittman. Some of these individuals are deceased, and I do not know their addresses or telephone numbers. Further, please see my previous deposition testimony.

54.  State whether the you attended a screening, meeting, testing or evaluation for the purpose of determining or assessing whether you had been exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.

**RESPONSE:** Objection. Screening is not a defined term; therefore, this interrogatory is vague and ambiguous.

**SUPPLEMENTAL RESPONSE:** Objection. Screening is not a defined term; therefore, this interrogatory is vague and ambiguous. With waiving said objection, see response to Interrogatory No. 24.

55. For each and every time you attended a screening, meeting, testing or evaluation (collectively "screening) for the purpose of determining or assessing whether you had an asbestos and/or silica related injury, please identify the following:

   a.   the date the screening took place;
   b.   the location of the screening;
   c.   whether the screening was for determining whether plaintiff has an asbestos related injury or a silica related injury or both;
   d.   the entities (including without limitation law firms, screening companies, clinics, physicians, physicians offices or hospitals) involved in the screening; and
   e.   how you knew about the screening.

**RESPONSE:** See response to Interrogatory No. 54.

**SUPPLEMENTAL RESPONSE:** See response to Interrogatories No. 24 and No. 54.

57. For every health care provider who you believe has expressed an opinion regarding whether the injuries or damages you are claiming in this lawsuit were caused by or related to exposure to asbestos and/or silica, identify those health care providers and all reports and/or tests that he/she has relied upon to formulate those opinions.

**RESPONSE:** Objection. This interrogatory seeks information that is privileged.

**SUPPLEMENTAL RESPONSE:** The Plaintiff is currently being treated for his lung disease of silicosis. The information sought by this interrogatory can be obtained from Plaintiff's medical records that Defendants have in their possession.

58. If you assert privilege or immunity from discovery as grounds for refusal to answer any interrogatory or request for production of documents set forth herein, please name the privilege or immunity asserted, provide a generic description of any documents as to which privilege or immunity is claimed, and explain in detail the grounds upon which said claim of privilege or immunity is based.

**RESPONSE:** This response will be supplemented.

**SUPPLEMENTAL RESPONSE:** Not applicable except as stated above.

## REQUESTS FOR PRODUCTION

37.   A copy of Plaintiffs marriage certificate.

**RESPONSE:** Not Applicable.

**SUPPLEMENTAL RESPONSE: See Attached.**

44.     Plaintiffs federal and state income tax returns for each of the past ten years.

**RESPONSE:**  Plaintiff is providing an authorization to obtain said tax records. This authorization is being provided solely upon the condition that any records obtained with this authorization are to be provided to Plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

**SUPPLEMENTAL RESPONSE:** The Plaintiff has been on Social Security disability since the early 2000's.  Plaintiff has provided an authorization to obtain said tax records. This authorization is being provided solely upon the condition that any records obtained with this authorization are to be provided to Plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel. Although, the Defendants have information that the Plaintiff filed in 2007 this may have been a joint tax return with his wife. The Plaintiff does not believe he has filed tax returns since going on disability. If the Plaintiff is able to find any tax returns, the same will be produced to the Defendants. The Plaintiff would further state that the only relevant tax returns would be prior to him going on disability. The Defendants are not entitled to a set off for Social Security Disability payments made by the government because this would be subject to the collateral source rule.

66.     Any and all documents created, used or reviewed at any screening, meeting, testing or evaluation listed in Interrogatory 2, including but not limited to occupational and/or medical questionnaires, A-sheets, x-ray films, pulmonary function test reports, B-reader reports, x-ray review reports, x-ray prescriptions, PFT prescriptions, diagnostic/prognostic reports, exposure history reports, "sign in or "sign out" sheets, PFT logs, PFT calibration records, attorney selection sheets, or waivers.

**RESPONSE:**  Please see attached authorizations. These authorizations are being provided under the condition that any records obtained with these authorizations are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

**SUPPLEMENTAL RESPONSE:** Plaintiff's counsel has produced any B-read reports from testings that are in their possession. The other B-read reports and materials can be obtained from Jon Swartzfager. The Plaintiff is not aware that any of the other information exists. If any is discovered, it will be produced subject to any privileges that may or may not apply to the requested documents. After a diligent search, none has been located at this time.

67. All documents which you or anyone on your behalf received from any testing entity, clinic, physician, physicians office or hospital who has performed or reviewed x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you for the purpose of determining or assessing whether you have been exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.

**RESPONSE:** See response to Request for Production No. 66.

**SUPPLEMENTAL RESPONSE:** See response to Request for Production No. 66.

68. All documents which you have received from any lawyer or law firm regarding any occupational and/or medical questionnaires, x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you for the purpose of determining or assessing whether he was exposed to asbestos and/or silica and/or have an asbestos and/or silica related disease.

**RESPONSE:** Objection. This requests seeks privileged information. Without waiving said objection, see response to Request for Production No. 66.

**SUPPLEMENTAL RESPONSE:** Objection. This requests seeks privileged information. Without waiving said objection, see response to Request for Production No. 66.

69. All documents (including but not limited to occupational and medical questionnaires and/or histories) provided to you, filled out or answered for any testing entity, clinic, physician, physicians office or hospital who performed or reviewed x-rays, pulmonary function tests, B-reads, x-ray reviews, biopsies and/or physical examinations on you to determine or assess whether you had been exposed to asbestos and/or silica or have an asbestos and/or silica related disease.

**RESPONSE:** Please see attached authorizations. These authorizations are being provided under the condition that any records obtained with these authorizations are to be provided to plaintiff's counsel within 10 days of receipt of said records at no expense to Plaintiff's counsel.

**SUPPLEMENTAL RESPONSE:** See Response to No. 66.

71. Any and all documents regarding and/or identifying all persons who attended any screening, meeting, testing or evaluation listed in Interrogatory 2, including but not limited to occupational and/or medical questionnaires, A-sheets, x-ray films, pulmonary function test reports, B-reader reports, x-ray review reports, x-ray prescriptions, PFT prescriptions, diagnostic/prognostic reports, exposure history reports, "sign in or "sign out sheets, PFT logs, PFT calibration records, attorney selection sheets, or waivers.

**RESPONSE:** Objection. This request seeks privileged information. Without waiving said objection, Plaintiff does not have any documents related to this request at this time.

**SUPPLEMENTAL RESPONSE:** Objection. This request seeks privileged information. Without waiving said objection, Plaintiff does not have any documents related to this request at this time.

This, the 15th day of May, 2010.

This, the 14th day of May, 2010.

Respectfully submitted,

**JOHN MCGILBERRY, PLAINTIFF**

JOHN MCGILBERRY

As to All Objections and Responses to Requests for Production of Documents:

By: ______________________
TIMOTHY W. PORTER, *Attorney for Plaintiff*

Of Counsel:

Timothy W. Porter, MSB No. 9687
Patrick C. Malouf, MSB No. 9702
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, Mississippi 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr., MSB No. 99984
THE SMITH LAW FIRM, P.L.L.C.
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

STATE OF MISSISSIPPI

COUNTY OF Jones

Personally came and appeared before me the undersigned in and for the jurisdiction aforesaid, the within named, JOHN MCGILBERRY, who being by me, first duly sworn, and states on oath that the matters facts and things alleged contained and set forth in the above and foregoing instrument are true and correct as therein stated.

This, the 14th day of May, 2010.

John McGilberry
JOHN MCGILBERRY

SWORN AND SUBSCRIBED before me this, the 14th day of May, 2010.

(*Seal*)

Molly M. Shorter
NOTARY PUBLIC

My Commission Expires:

May 26, 2011

STATE OF MISSISSIPPI
MOLLY M. SHORTER
ID No 69964
NOTARY PUBLIC
Comm Expires
May 26, 2011
COPIAH COUNTY

IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL DISTRICT
OF JONES COUNTY, MISSISSIPPI

**JOHN MCGILBERRY** **PLAINTIFF**

**VS.** **CIVIL ACTION NO. 2007-16-CV5**

**PANGBORN CORPORATION, ET AL.** **DEFENDANTS**

---

## PLAINTIFF'S RESPONSES TO CLARK SAND COMPANY, INC.'S REQUESTS FOR ADMISSIONS, REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES

---

**COMES NOW,** Plaintiff, by and through his attorneys of record, and files this his responses to Clark Sand Company's Inc.'s Requests for Admissions, Requests for Production of Documents and Interrogatories, pursuant to the *Mississippi Rules of Civil Procedure* as follows, to-wit:

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

Plaintiff's Responses to each of these Interrogatories incorporates this Preliminary Statement and these General Objections.

1. The Plaintiff objects to these Interrogatories to the extent that they seek information subject to the attorney-client privilege or which constitutes protected work product.
2. The Plaintiff objects to any discovery request that purports to impose upon it any obligation not expressly set forth in the *Mississippi Rules of Civil Procedure.*
3. The Plaintiff objects to any discovery request to the extent that the time periods referenced therein are not limited in scope.
4. The Plaintiff objects to any discovery request to the extent it seeks to require Plaintiff to provide information which is equally available to the Defendant.
5. The Plaintiff objects to any discovery request to the extent that it seeks disclosures of information generated by persons other than Plaintiff or Plaintiff's counsel that has come into the possession of Plaintiff or Plaintiffs' counsel during the course of discovery and trial preparation in asbestos-related litigation.
6. The Plaintiff objects to any discovery request to the extent that it improperly calls for a legal, medical, or scientific opinion or conclusion which Plaintiff is not qualified to render.
7. The Plaintiff does not concede that any response to any discovery request is or will be admissible evidence at a trial of this action.
8. The Plaintiff objects to these Interrogatories to the extent that they are overly broad, vague and duplicative.

EXHIBIT
"P"

## REQUESTS FOR ADMISSIONS

1. Admit John McGilberry was a plaintiff in the following lawsuit wherein he claimed damages from occupational exposure to asbestos:

*Jake Newell, et al. v. Minnesota Mining and Manufacturing Company, et al.*, Cause No. 2002-27-CV7, In the Circuit Court of Jones County, Mississippi, First Judicial District.

Copies of the *Newell* complaint and amended complaint are attached as Exhibit 1 and 2, respectively, for your convenience. (Hereinafter referred to as either "*Newell*" or "asbestos complaint.")

**RESPONSE:** Based upon information and belief, admitted that Mr. McGilberry was a plaintiff and was subsequently dismissed.

2. Admit that counsel for the *Newell* complainants/plaintiffs was Porter & Malouf, P.A.

**RESPONSE:** Based upon information and belief, admitted that Porter & Malouf, P.A. signed the complaint.

3. Admit that the individual counsel from Porter & Malouf, P.A. listed as representing the *Newell* plaintiffs were Timothy W. Porter and Patrick C. Malouf.

**RESPONSE:** Based upon information and belief, admitted that Patrick Malouf signed the complaint.

4. Admit that the *Newell* complaint was first filed June 27, 2002.

**RESPONSE:** Based upon information and belief, admitted.

5. Admit that John McGilberry's asbestos complaint alleged he was exposed to and inhaled or otherwise ingested significant quantities of asbestos. (For reference see page 3 of exhibits 1 and 2.)

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

6. Admit that John McGilberry's asbestos complaint alleged because of his exposure to, inhalation of or other exposure to asbestos he received injuries, both physically and mentally, such as asbestosis, pulmonary and bronchogenic carcinoma, mesothelioma, reduced lung volume, pleural plaques, interstitial lung fibrosis and cardiac and circulatory disease, and increased physical and mental anguish associated with the increased susceptibility to one of the foregoing diseases; and ultimately death. (For

reference, see page 3 of exhibits 1 and 2.)

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

7.      Admit that John McGilberry claimed damages for physical and mental pain and anguish, lost wages, lost wage earning capacity, loss of consortium, loss of society and companionship, medical and pharmaceutical expenses and the continuation of damages for physical and mental pain and anguish, disability, and loss of enjoyment of life as a direct and proximate result of inhaling, ingesting or otherwise being exposed to asbestos. (For reference see page 4 of exhibit 1 and page 3 of exhibit 2.)

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

8.      Admit that John McGilberry claimed in the asbestos complaint that use of 3-M Corporation's respiratory protection proximately caused him injury. (For reference see pages 10-11 in exhibit 1 and pages 9-10 in exhibit 2.)

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

9.      Admit that John McGilberry's damages as a direct and proximate result of the *Newell* defendants' breaches of duty were the contraction of an asbestos-related injury, disease and/or condition, pain and suffering, medical treatment, medical expenses, past disability, impairment of wages, and a diminution in quality of life, including mental anguish, fear, and severe emotional distress associated with knowing there is no cure for the illness or disease. (For reference, see page 17 of exhibit 1 and 15 of exhibit 2.)

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

10.     Admit that John McGilberry's asbestos complaint pled injuries caused or contributed to by exposure to asbestos in the asbestos lawsuit.

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

11. Admit that John McGilberry's asbestos complaint pled an asbestos-related injury, meaning an injury related to exposure to an asbestos-related product.

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

12. Admit that John McGilberry's asbestos complaint sued the defendant companies for their asbestos-related product(s).

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

13. Admit that John McGilberry did not sue any defendant in the *Newell* complaint for silica or silica-related product(s).

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

14. Admit that John McGilberry did not make any allegation in the *Newell* complaint against any defendant for selling sand for sandblasting.

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied.

15. Please admit that John McGilberry did not sue any company in the asbestos complaint that is also a defendant in this suit.

**RESPONSE:** Denied, the Plaintiff sued American Optical in both cases.

16. Admit that the following doctor evaluated John McGilberry for an asbestos-related condition:

Dr. Jay Segarra 10/9/04.

Attached as Exhibit 3.

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself. Further the Plaintiff does not specifically recall seeing a Dr. Segarra. Without waiving said objection, neither enough information to admit or deny, so denied.

17. Admit that Dr. Segarra's October 9, 2004 report reflects the correct name, address, date of birth and social security number for John McGilberry.

**RESPONSE:** Admitted.

18. Admit that Dr. Segarra's October 9, 2004 report cited that John McGilberry had been exposed to sandblasting "on two occasions."

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself. Without waiving said objection, admitted that the document states this, but it is not admitted that this is a true and correct statement.

19. Admit that Dr. Segarra's October 9, 2004 report reflects a "long history of pulmonary sarcoidosis" which was established by biopsy.

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself. The Plaintiff further objects to this Request as it seeks to verify Dr. Segarra's opinions through the Plaintiff's response. Therefore, this is an improper Request for Admission. As such, it is denied.

20. Admit that Dr. Segarra concluded in his October 9, 2004 report that there is "no convincing evidence for pneumoconiosis, either asbestosis or silicosis."

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself. The Plaintiff further objects to this Request as it seeks to verify Dr. Segarra's opinions through the Plaintiff's response. Therefore, this is an improper Request for Admission. As such, it is denied.

21. Admit that John McGilberry filed for benefits under Titles II and XVI of the Social Security Act (referred to as a "disability claim") on April 20, 2001.

**RESPONSE:** Admitted.

22. Admit that John McGilberry alleged he became disabled as of February 27, 2001.

**RESPONSE:** Admitted.

23. Admit that John McGilberry's disability claim was sarcoidosis, asthma, asbestosis, carpal tunnel syndrome, high blood pressure, chest and back pain. (For reference, see bates SSA36)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

24. Admit that John McGilberry affirmed that his claimed illness, injury or condition first

began to bother him on January 10, 1986. (For reference, see bates SSA88-96)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

25. Admit that John McGilberry's disability claim was initially denied on August 17, 2001.

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

26. Admit that John McGilberry requested reconsideration of the denial. (SSA00039)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

27. Admit that a hearing was held before an Administrative Law Judge on May 8, 2002. (SSA00009)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

28. Admit that the hearing before the Administrative Law Judge took place on May 8, 2002. (SSA00009)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

29. Admit that the medical evidence that John McGilberry submitted to the Social Security Administration in support of his disability included, but was not limited to the following documents:

(a) the claim that McGilberry was totally unable to work due to sarcoidosis, asthma, asbestosis, carpal tunnel syndrome, high blood pressure, chest and back pain (see SSA00036; 00010);

(b) medical record from Dr. Lewis W. Neese from John McGilberry's visit of March 11, 2002 diagnosing McGilberry with Sarcoidosis, stage III, COPD and bronchitis (see SSA00111-113; 00010);

(c) medical record from Forrest General Hospital from October 11, 2001 in

which John McGilberry was diagnosed with "chronic obstructive pulmonary disease exacerbation Stage 3 sarcoidosis" (see SSA00132-134; 00010);

(d) medical record from Hattiesburg Clinic dated August 22, 2001 wherein John McGilberry saw Dr. Mark Marrow who diagnosed him with Stage III sarcoidosis (see SSA00137-138; 00010);

(e) correspondence from Dr. Lewis W. Neese to the Social Security Administration wherein Dr. Neese stated that he "would consider [McGilberry] to be medically disabled and unable to engage in continued long term employment." (see SSA 00272; 00010); and

(f) correspondence from Dr. Lewis W. Neese to the Social Security Administration wherein Dr. Neese asked for reconsideration on denial of benefits for the plaintiff because he has been treating John McGilberry for stage III sarcoidosis with associated severe chronic obstructive pulmonary disease which, in Dr. Neese's opinion, qualifies the plaintiff as disabled. (see SSA 00273; 00010).

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

30. If you do not admit Request for Admission No. 29, please admit that John McGilberry submitted as evidence in support of his disability claim a statement that he was totally unable to work due to sarcoidosis, asthma, asbestosis, carpal tunnel syndrome, high blood pressure, chest and back pain. (see SSA00036; 00010)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

31. If you do not admit Request for Admission No. 29, please admit that John McGilberry submitted as evidence in support of his disability claim medical records from Dr. Lewis W. Neese from John McGilberry's visit of March 11, 2002 diagnosing McGilberry with Sarcoidosis, stage III, COPD and bronchitis. (see SSA00111-113; 00010)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

32. If you do not admit Request for Admission No. 29, please admit that John McGilberry submitted as evidence in support of his disability claim medical records from Forrest General Hospital from October 11, 2001 in which John McGilberry was diagnosed with "chronic obstructive pulmonary disease exacerbation Stage 3 sarcoidosis." (see SSA00132-134; 00010)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

33. If you do not admit Request for Admission No. 29, please admit that John McGilberry submitted as evidence in support of his disability claim medical records from Hattiesburg Clinic dated August 22, 2001 wherein John McGilberry saw Dr. Mark Marrow who diagnosed him with Stage III sarcoidosis. (see SSA00137-138; 00010)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

34. If you do not admit Request for Admission No. 29, please admit that John McGilberry submitted as evidence in support of his disability claim correspondence from Dr. Lewis W. Neese to the Social Security Administration wherein Dr. Neese stated that he "would consider [McGilberry] to be medically disabled and unable to engage in continued long term employment." (see SSA 00272; 00010)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

35. If you do not admit Request for Admission No. 29, please admit that John McGilberry submitted as evidence in support of his disability claim correspondence from Dr. Lewis W. Neese to the Social Security Administration wherein Dr. Neese asked for reconsideration on denial of benefits for the plaintiff because he has been treating John McGilberry for stage III sarcoidosis with associated severe chronic obstructive pulmonary disease which, in Dr. Neese's opinion, qualifies the plaintiff as disabled. (see SSA 00273; 00010).

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

36. Admit that on June 26, 2002, Administrative Law Judge Nancy L. Brock rendered a decision on behalf of the Social Security Administration in which she made the following findings:

(a) John McGilberry is insured under Title II of the Social Security Act through December 2005;

(b) John McGilberry has not engaged in substantial gainful activity since

February 27, 2001;

(c) The medical evidence establishes that the claimant has the medically determinable severe impairment of sarcoidosis, stage II, with chronic obstructive pulmonary disease;

(d) the severity of the claimant's impairment meets the requirements of section 3.02A Chronic Obstructive Pulmonary Disease, Appendix 1, Subpart P of the Social Security regulations; and

(e) John McGilberry has been under a disability, as defined in the Social Security Act, since February 27, 2001. (see SSA 00011-12)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

37. Based upon the Administrative Law Judge's findings of fact, the decision entitled John McGilberry to disability commencing February 27, 2001 and to disability insurance benefits. (see, SSA 00012)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. Further, the documents speak for themselves.

38. Admit that on July 27, 2002 the Social Security Administration granted John McGilberry disability based on Judge Brock's findings. (see, SSA 00001)

**RESPONSE:** Since the documents referenced were not produced along with these Requests for Admissions, neither enough information to admit or deny, so denied. It is admitted that the Plaintiff receives Social Security Disability benefits. Further, the documents speak for themselves.

39. Admit that John McGilberry has been receiving disability payments since 2002.

**RESPONSE:** Admitted.

40. Admit that John McGilberry did not file for disability based on a silica-related disease.

**RESPONSE:** This response calls for expert medical testimony and is therefore an improper request. Without waiving said objection, denied.

41. Admit that John McGilberry did not file for disability based on silicosis.

**RESPONSE:** This response calls for expert medical testimony and is therefore an improper request. Without waiving said objection, denied.

42.     Admit John McGilberry was a plaintiff in *George Buffington, et al. v. Pulmosan Safety Equipment, et al.*, Civil Action No. 2002-194-CV6 In the Circuit Court of Jones County, Mississippi, Second Judicial District.

Attached are copies of the *Buffington* complaint and amended complaint as Exhibits 4 and 5, respectively.

**RESPONSE:** Admitted.

43.     Admit that the *Buffington* case was originally filed on June 14, 2002.

**RESPONSE:** Admitted.

44.     Admit that John McGilberry sought damages related to exposure to silica in *Buffington*.

**RESPONSE:** Admitted.

45.     Admit that the following defendant/companies were sued in the *Buffington* case: Air Liquide America Corporation successor by merger of Big Three Industries, Inc., Baroid Drilling Fluids, Inc., Big Three Industries, Inc., Binks Manufacturing Company, Bowto Inc., f/k/a Bowen Tools, Inc., Bowen Tools, Inc. and its division, Sanstorm Company, Briggs-Weaver Company, D & B Sand & Sand & Gravel Company, Inc., Dalloz Safety Inc. f/k/a WGM Safety Corporation d/b/a Willson Safety Products, Graco Enterprises, Guardian Safety Equipment Company, Homes Technical Sand, Inc., Jet Sands, Inc., Louis M. Gerson, Inc., Minnesota Mining & Manufacturing, Pearl River Sand & Gravel Co., Inc., Schramm, Inc., Scott Aviation, a division of Scott Technologies, Siebenorth, Inc., Sandair MS, Inc., Standard Sand Company, Sullair Corporation, Survivair, Inc., Tab Industries, Technical Sand Company, U.S. Silica Company, formerly Pennsylvania Glass Sand Corporation, Vallen Safety Supply, Wheeler Protective Apparel, Inc., Gulf States Supply Company, Inc., National Welding Company, f/k/a National Welding Supply Company, Inc., Rent All of Laurel, Inc., Pine Belt Ready-Mix Concrete, Inc., Phillips Building Supply of Laurel, Inc., individually and as successor by merger of Laurel Building Supply, and as successor by merger of Green and Harris Building Supply, H & L Pump & Supply, Inc. (Baxter Division), f/k/a Heidleberg Pump & Supply Company, Inc. (Baxter Division), Haliburton Energy Services, Inc., f/k/a Haliburton Company, Laurel Oil and Supply Company, Inc., American Sand and Gravel Company, individually and as successor by merger of Hattiesburg Brick Works, Bush Construction Company, Inc., Lowery Sand & Gravel, Inc., W.J. Runyon & Son, Inc., individually and as successor by merger of Runyon Construction Company, as successor by merger of Diamond Island Sand & Gravel Co., Inc., and as successor by merger of Runyon Equipment Company, Inland Manufacturing, Jebco Abrasives, Inc., John Barton, Individually and d/b/a John Barten Company and JB Industries

Sand, J.J. Ferguson Sand & Gravel Inc., Lockheed Martin Corporation, successor in interest to Martin Marietta Corporation (successor to Wedron Silica Company), Martin Marietta Materials, Inc., individually and successor in interest to R & S Haulers and Distributors, Inc., 3M Company, f/k/a and/or a/k/a Minnesota Mining & Manufacturing Company (3M), Norton Company (Safety Products Division - USA Norton Company), individually and as successor in interest to Welsh and Welsh, a division of Textron, Oglebay Norton Industrial Sands, Inc., f/k/a Texas Mining Company, Ottawa Silica Company, Louisiana Partnership Pearl/James Joint Venture, Phillips Building Supply of Laurel, Inc., individually and as successor by merger of Laurel Building Supply, and as successor by merger of Green and Harris Building Supply, PTR Inc., d/b/a H.S. Cover Company, Rental Service Corporation, a/k/a and/or f/k/a Rental Service Corporation USA, Inc., individually and as successor by merger of Walker Jones Equipment Inc., Sanstorm, Inc. d/b/a Delaware Sanstorm, Inc. (a division of Bowen Tools, Inc.), Sherwin-Williams Company, Siebe North Inc., n/k/a North Safety Products, Inc., Textron Inc., individually and as successor in interest to Welsh and Welsh, The Vallen Corporation, Vulcan Materials Company, Wedron Silica Company, Wheelabrator-Frye, Inc., Wheeler Protective Apparel, Inc.

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself and is nothing more than a notice pleading with yet to be proven allegations. Without waiving said objection, neither enough information to admit or deny, so denied. Further, the Plaintiff sued John Doe Defendants.

46. Admit that John McGilberry swore he used products manufactured or sold by the following companies: Phillips Building Supply, American Sand and Gravel, Sullair, Gerson, Specialty Sand Company, Lone Star Industries, Ottawa Silica Company, Pine Belt Ready Mix, Air Liquide, Sanstorm, Pauli & Griffin, Walker Jones Equipment Rental, 3M, Standard Sand & Silica Co., Unimin, Norton, Oxwall, Bondo, Dupont, Texas Mining Company, and Oglebay Norton.

**RESPONSE:** The Plaintiff objects to this request as the document speaks for itself. The Plaintiff admits that he filled out several fact sheets in consultation with former counsel. Without waiving said objection, neither enough information to admit or deny, so denied.

47. Admit that John McGilberry continues to believe that he used products manufactured or sold by: Phillips Building Supply, American Sand and Gravel, Sullair, Gerson, Specialty Sand Company, Lone Star Industries, Ottawa Silica Company, Pine Belt Ready Mix, Air Liquide, Sanstorm, Pauli & Griffin, Walker Jones Equipment Rental, 3M, Standard Sand & Silica Co., Unimin, Norton, Oxwall, Bondo, Dupont, Texas Mining Company, and Oglebay Norton.

**RESPONSE:** Denied except as to 3M. Further, the Plaintiff's deposition testimony speaks for itself.

48.     Admit that John McGilberry believes he was harmed by the use of products manufactured or sold by: Phillips Building Supply, American Sand and Gravel, Sullair, Gerson, Specialty Sand Company, Lone Star Industries, Ottawa Silica Company, Pine Belt Ready Mix, Air Liquide, Sanstorm, Pauli & Griffin, Walker Jones Equipment Rental, 3M, Standard Sand & Silica Co., Unimin, Norton, Oxwall, Bondo, Dupont, Texas Mining Company, and Oglebay Norton.

**RESPONSE:** Denied except as to 3M. Further, the Plaintiff's deposition testimony speaks for itself.

49.     Admit that John McGilberry received settlement money from certain defendant companies sued in the *Buffington* case.

**RESPONSE:** Objection as this Request seeks information that is confidential. Further, objection is made as this information may only be relevant when and if a verdict is obtained in this case. The Plaintiff will admit that he received settlement money from one defendant in the *Buffington* case.

50.     Admit that John McGilberry accepted the settlement money from certain companies in the *Buffington* case because he believed he had been harmed by their product(s).

**RESPONSE:** See response to Request No. 49. Neither enough information to admit or deny, so denied.

51.     Admit that John McGilberry accepted the settlement money from certain companies in the *Buffington* case because he believed he used or was exposed to their product(s).

**RESPONSE:** See response to Request No. 49. Neither enough information to admit or deny, so denied.

52.     Admit that John McGilberry received settlement money from certain defendant companies sued in the *Newell* case.

**RESPONSE:** Denied.

53.     Admit that John McGilberry accepted the settlement money from certain companies in the *Newell* case because he believed he had been injured by their product(s).

**RESPONSE:** See Response to Request No. 52. Denied.

54.     Admit that John McGilberry accepted settlement money from certain companies in the *Newell* complaint because he believed he used or was exposed to their product(s).

**RESPONSE:** See Response to Request No. 52. Denied.

55.   Admit that John McGilberry swore that he has an asbestos-related condition.

**RESPONSE:** The complaint is nothing more than a notice pleading that is not sworn to under oath by the Plaintiff so denied.

56.   Admit that John McGilberry believes he has an asbestos-related condition.

**RESPONSE:** The Plaintiff's belief is not relevant, only expert medical testimony is relevant. Therefore, denied.

57.   Admit that John McGilberry has an asbestos-related condition.

**RESPONSE:** Denied.

58.   Admit that John McGilberry swore he has coal workers pneumoconiosis.

**RESPONSE:** The complaint is nothing more than a notice pleading that is not sworn to under oath by the Plaintiff so denied.

59.   Admit that John McGilberry believes he has coal workers pneumoconiosis.

**RESPONSE:** The Plaintiff's belief is not relevant, only expert medical testimony is relevant. Therefore, denied.

60.   Admit that John McGilberry has coal worker pneumoconiosis.

**RESPONSE:** Denied.

61.   Admit that John McGilberry believes he has sarcoidosis.

**RESPONSE:** The Plaintiff's belief is not relevant, only expert medical testimony is relevant. Therefore, denied.

62.   Admit that John McGilberry has sarcoidosis.

**RESPONSE:** This response calls for expert medical testimony and is therefore an improper request. Without waiving said objection, denied.

63.   Admit that John McGilberry believes he has COPD.

**RESPONSE:** The Plaintiff's belief is not relevant, only expert medical testimony is relevant. Therefore, denied.

64. Admit that John McGilberry has COPD.

**RESPONSE:** This response calls for expert medical testimony and is therefore an improper request. Without waiving said objection, denied.

## REQUESTS FOR PRODUCTION

1. If you deny any of the foregoing requests for admissions, please produce all documents which support the denial.

**RESPONSE:** None to produce at this time. This response will be supplemented with Dr. Haber's report and deposition testimony.

2. Please produce any and all information you have regarding any settlements of the lawsuits listed in the requests for admissions.

**RESPONSE:** Objection as this seeks information that is confidential and only relevant upon a verdict being obtained in this matter.

3. Please produce all documents within your possession, custody or control which relates to any of the lawsuits listed in the aforementioned requests for admissions.

**RESPONSE:** Already produced.

## INTERROGATORIES

1. If you deny any request for admission, please explain your denial, the basis of the denial and all proof to support your denial.

**ANSWER:** The Plaintiff objects to this Interrogatory as being beyond the scope of discovery, overly broad, and unduly burdensome, and is simply intended to harass the Plaintiff and Plaintiff's counsel. Further, see responses to Requests for Admissions.

2. Has John McGilberry or anyone on his behalf filed any other lawsuits other than the suits listed in the foregoing Requests for Admissions and the underlying cause?

**ANSWER:** None to Plaintiff's or Plaintiff's counsel knowledge except any other lawsuits that may have been referenced in Mr. McGilberry's prior depositions.

3. Has John McGilberry had any other civil lawsuits filed against him?

**ANSWER:** None to Plaintiff's or Plaintiff's counsel knowledge except any other lawsuits

that may have been referenced in Mr. McGilberry's prior depositions.

4. Please list the name/style of the case, date filed, lawyers or law firms involved, the type of lawsuit, and the county filed in for any lawsuit filed on behalf of or against John McGilberry.

**ANSWER:** See Response to Interrogatories No. 2 and 3.

This, the 23rd day of June, 2010.

Respectfully submitted,

**JOHN MCGILBERRY, PLAINTIFF**

By: ______________________________
JOHN T. GIVENS, *Attorney for Plaintiff*

Of Counsel:

Timothy W. Porter, MSB No. 9687
Patrick C. Malouf, MSB No. 9702
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, Mississippi 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr., MSB No. 99984
THE SMITH LAW FIRM, P.L.L.C.
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

**CERTIFICATE OF SERVICE**

I, JOHN T. GIVENS, hereby certify that I have this day caused a true and correct copy of the above and foregoing instrument to be electronically delivered to all known counsel of record.

This, the 23rd day of June, 2010.

JOHN T. GIVENS

1

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF JONES COUNTY, MISSISSIPPI

JOHN MCGILLBERRY PLAINTIFF

VERSUS NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. DEFENDANTS

*******************************************************

DEPOSITION OF JOHN MCGILLBERRY

*******************************************************

Deposition Taken at the Instance of Plaintiff
In the Offices of Hortman & Harlow
Laurel, Mississippi
On May 26th, 2010
Commencing at 9:24 a.m.

REPORTED BY: CARRIE L. BENOIST
Certified Shorthand Reporter
CSR #1744

BOND & BENOIST
Post Office Box 1576
Madison, Mississippi 39130
bondreporters@gmail.com

2

APPEARANCES:

JOHN GIVENS, ESQUIRE
Porter & Malouf
825 Ridgewood Road
Ridgeland, Mississippi 39157

REPRESENTING PLAINTIFF

HALL ROACH, JR., ESQUIRE
Willingham, Fultz & Cougill LLP
808 Travis, Ste. 1608
Houston, Texas 77002

REPRESENTING KELCO, BOB SCHMIDT, INC., AND SCHMIDT MANUFACTURING

CHANEY NICHOLS, ESQUIRE
Scott, Sullivan, Streetman & Fox
725 Avignon Drive
Ridgeland, Mississippi 39157

REPRESENTING PULMOSAN

ROBERT IRELAND, ESQUIRE
Watkins & Eager, PLLC
Post Office Box 650
Jackson, Mississippi 39205-0650

REPRESENTING AMERICAN OPTICAL

JENNIFER SKIPPER, ESQUIRE
Forman, Perry, Watkins, Krutz & Tardy
Post Office Box 22608
Jackson, Mississippi 39225-2608

REPRESENTING CLARK SAND, INC.

MARK EDWARDS, ESQUIRE
Page, Mannino, Peresich & McDermott
460 Briarwood Drive, Ste. 415
Jackson, Mississippi 39236

REPRESENTING EMPIRE

3

THOMAS MCHALE, ESQUIRE
Steve Bryant & Associates
3618 Mt. Vernon
Houston, Texas 77006

REPRESENTING E.D. BULLARD

ALSO PRESENT: DENISE HEBERT, VIDEOGRAHPER

4

Table of Contents:

Style.......................................... 1
Appearances.................................. 2
Table of Contents............................ 3
Examination by Mr. Givens.................. 6
Exhibit 1 marked.......................... 8
Exhibit 2 marked..........................10
Exhibit 3 marked..........................14
Exhibit 4 marked..........................19
Examination by Mr. Ireland....................32
Examination by Ms. Skipper....................104
Exhibit 5 marked..........................114
Exhibit 6 marked..........................116
Exhibit 7 marked..........................119
Exhibit 8 marked.......................... 121
Exhibit 9 marked..........................122
Exhibit 10 marked.........................133
Further Examination by Mr. Givens..............179
Certificate of Reporter.........................191

EXHIBIT "Q"

THE VIDEOGRAPHER: This is the videotaped deposition of John McGillberry taken in the matter of *John McGillberry v. Pangborn Corporation, et al.*, Civil Action No. 2007-16-CV5 in the Circuit Court of the First Judicial District of Jones County, Mississippi.

The date is May 26, 2010. The location is 414 West Oak Street, Laurel, Mississippi. The time, as indicated on the video screen, is 9:24 a.m. My name is Denise Hebert. I'm a certified legal video specialist with the Dancel Group. Will counsel please introduce themselves?

MR. GIVENS: Johnny Givens for the plaintiff.

MR. MCHALE: Thomas McHale for E.D. Bullard.

MR. ROACH: Hall Roach for Kelco and Bob Schmidt.

MR. IRELAND: Robert Ireland for American Optical.

MR. NICHOLS: Chaney Nichols for Pulmosan.

MR. EDWARDS: Mark Edwards for Empire.

MS. SKIPPER: Jennifer Skipper for Clark Sand, Inc.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

(Witness sworn)

EXAMINATION

BY MR. GIVENS:

Q John, we're here today to take your testimony under oath, and you've sworn to tell the truth, the whole truth and nothing but the truth. What I do want to tell you is if you don't understand a question I ask, please ask me to rephrase it. And if you ever -- if you need to take a break at anytime, you just let us know and we'll stop and go off the record and then come back on the record.

A Yes, sir.

Q Can you tell the jury your name?

A John Elman McGillberry.

Q And what's your birthday, John?

A [redacted]

Q And that makes you how old?

A Fifty-six.

Q And, John, where do you live?

A I live in [redacted]

Q How long have you lived in Ellisville, Mississippi?

A Practically all of my life.

Q And so have you been a Mississippi resident

your whole life?

A Yes, sir.

Q And, John, tell the jury a little bit about your family.

A Well, I have five girls. I'm married. I've just got some wonderful kids and...

Q How many grandkids do you have?

A I've got 16 grandkids.

Q And you have how many kids?

A Five girls.

Q Five girls.

And how long have you been married to your wife?

A About 38 years.

Q Okay. And, John, can you tell the jury about what year you approximately -- what year approximately you started first getting sick with your lungs?

A Around '94 and -- between '94 and '95.

Q And can you tell the jury, John, approximately what year that you quit working, that you were no longer able to work?

A It was in 2000.

Q And, Mr. McGillberry, I'm going to hand you what I want marked as Plaintiff's Exhibit 1.

Can you -- can you identify that document for the jury, please?

A It's my job history.

Q And does that job history appear to be accurate, to the best of your recollection?

A Yes, sir.

(Exhibit 1 marked)

MS. SKIPPER: Do you have copies?

MR. GIVENS: I'm -- I'm about to.

MS. SKIPPER: Perfect.

BY MR. GIVENS:

Q And let me -- let me clear something up, John, on -- in regards to your work history. Are those the sites where you're claiming exposure --

A Yes, sir.

Q -- to respirable silica?

A Yes, sir.

Q You did have other jobs besides those jobs, didn't you?

A Yes, sir.

Q Okay. Thank you.

Now, what's the first work site listed on that document?

A Tom Pittman.

Q And what years do you recall working there,

based on that document?
A Around '94 and '95.
Q You mean -- you said --
A I mean, '74 and '75. My mistake.
Q Okay. And while you were working there, did you have any opportunity to sandblast?
A Yes, sir.
Q Or be around sandblasting?
A Yes, sir.
Q And do you recall how long this sandblasting job lasted?
A A day and a half.
Q And do you recall what y'all were sandblasting?
A Some steps.
Q And did you -- did you have an opportunity to see any of the bags of sand that were being used?
A Yes, sir.
Q And can you -- can you tell the jury the name on that bag of sand?
A Clark.
Q And can you describe that bag that the sand came in?
A Brown bag with red letters.
Q Okay. And I'm going to show you what I'm

going to mark as Plaintiff's Exhibit 2, of a picture of a sandbag.
Is that the Clark sandbag that you were around or used?
A Yes, sir.
MS. SKIPPER: Just for the record, we're objecting to authentication.
MR. GIVENS: Okay. That's fine.
(Exhibit 2 marked)
BY MR. GIVENS:
Q And were you exposed to this sand while working at Tom Pittman?
A Yes, sir.
Q And do you recall if this bag -- whether this bag had a warning on it?
A Yes, sir.
Q And if the bag had a warning on it, did you read that warning?
A Yes, sir.
Q And to your recollection, did that warning state the word "silicosis"?
A Yes, sir.
Q And at that time when you were using that sand, did the word "silicosis" mean anything to you?
A No, sir.

Q Were you aware that silicosis was a -- is a disabling and incurable lung disease?
A No, sir.
Q And if you had known that silicosis was a disabling and incurable lung disease, what would you have done?
A I wouldn't have used it.
Q And if this bag said something about a delayed lung injury, would that have meant anything to you?
A No, sir.
Q And if you knew that a delayed lung injury could cause you to be disabled or eventually die, what would you have done?
A I wouldn't have -- I wouldn't have used it.
Q Now, based on Exhibit 1, where is the next place that you worked at? Where --
A Daniel Construction, Apache, North Carolina.
Q And that's where it was located? That's where the job site was?
A That's where the job site was.
Q Okay. And what hours did you typically work in a day at Daniel Construction?
A Go in at seven, get off at three. Unless we're pouring concrete, we have to stay until the job

was finished.
Q Okay. And so what were some of your -- what was your job title there?
A Well, I was a laborer and a cement finisher.
Q And can you describe for the jury what a cement finisher and concrete work involved?
A It was finishing the concrete and pouring it.
Q Would the concrete work ever require you to do any chipping?
A Yes. And when you messed up a pour, you did a -- what they call a honeycomb. You have to go back in and chip it out and patch it back.
Q And do y'all ever have to do any jackhammering?
A Yes, sir.
Q Doing the concrete work, doing the -- the chipping and the jackhammering, did you do this inside and outside?
A Ninety percent of it was inside, and it's -- it was a lot of outside, too.
Q Okay. And were you ever informed at that time that breaking up concrete could expose you to respirable silica?
A No, sir.

Q And was -- did you ever wear anything over your face while performing the concrete work?
A Yes, sir.
Q Okay. And isn't it true that you were required -- what did you wear? I'm sorry.
A The dust mask we used, it was the kind that it -- it folds down, you know, when it's -- you know, you can lay it down and it'll be -- it'll be flat. Then once -- once you use it, just open it up and you put it on. It's got two straps on it.
Q Okay. And isn't it true that you're required to wear a dust mask at all times at this job site?
A Yes, sir.
Q And would you get in trouble if you didn't?
A Yes, sir.
Q Can you tell the jury the -- one type of the dust mask you wore there?
A AO.
Q AO. How did you know this was an AO mask?
A It was printed on it, on the mask.
Q And did you wear this mask at various times from 1979 to 1981?
A Yes, sir.
Q And I'm going to show you a picture, which

I'll have marked as Exhibit 3. And I'm going to ask you if -- is that the AO dust mask you recall wearing at Daniel Construction?
A Yes, sir.
(Exhibit 3 marked)
BY MR. GIVENS:
Q And would that mask lay flat when you weren't using it?
A Yes, sir.
Q And would you -- were you able to put that mask into your pocket when you weren't using it?
A Yes, sir.
MR. IRELAND: Object to the form.
BY MR. GIVENS:
Q With these dust masks, did you ever have an opportunity to see or read any of the warnings or instructions that -- that came with these masks?
A Yes, sir.
Q And can you tell the jury why you would wear these masks?
A It was required to wear dust masks.
Q Was it your belief that these dust masks were protecting you from the -- the dust that you were creating from your jobs?
A Yes, sir.

Q And if the mask had obtained or included an instructional warning that said, "Do not use this product in or around jackhammering because it did not provide adequate protection," what would you have done?
MR. IRELAND: Object to the form.
A I wouldn't have used it.
BY MR. GIVENS:
Q And did the warnings or instructions that came with this product tell you not to use it around concrete work?
A No, sir.
Q And if the instructions or warnings on these masks -- or that came with these masks said not to use in or around concrete work, what would you have done?
MR. IRELAND: Object to the form.
A I wouldn't have used it.
BY MR. GIVENS:
Q Now, the next job where you were exposed to respirable silica, I believe, is Gordon Myrick?
A Yes, sir.
Q And based on Exhibit 1, what years did you work at Gordon Myrick?
A '96 -- I mean, '86 to '91.
Q Okay. And how long would a typical workday

be there?
A If we're not pouring the concrete, it's eight hours. If we're pouring the concrete, we have to stay until it's finished.
Q Okay. And were you ever around sandblasting while there?
A Yes, sir.
Q And where was that at?
A At H. Gordon Myrick's house.
Q And what was being sandblasted?
A He had put some tongue and groove board down and it had wax on it and we had to sandblast the wax off of it.
Q And do you recall how long this particular job lasted?
A Approximately four days.
Q And what were you doing --
A Somewhere around four days.
Q And what were you doing as part of the sandblasting process?
A My job was the pot attendant.
Q And do you recall what the bags of sand you were using looked like at this job site?
A Yes, sir.
Q Can you describe that to the jury?

A It was brown bags with red letters.
Q Was it the same type sand that you were using at Tom Pittman?
A Yes, sir.
MS. SKIPPER: Object to the form.
BY MR. GIVENS:
Q Can you state the -- for the jury what the name of the -- on the bag of sand was?
A Clark Sand.
Q And did these bags that you used at this time, did they have a warning on it, to the best of your recollection?
A Yes.
MS. SKIPPER: Object to the form.
BY MR. GIVENS:
Q And would you have had the opportunity to read the warning on these bags?
A Yes, sir.
Q If the warning stated the word "silicosis" at this time, would that have meant anything to you at that time?
A No, sir.
MS. SKIPPER: Object to the form.
BY MR. GIVENS:
Q And at that time, were you aware that

silicosis was a disabling -- is a disabling and incurable lung disease?
MS. SKIPPER: Object to the form.
A Can you repeat the question again?
BY MR. GIVENS:
Q At that time in the late -- when you used this in the late 1980s, that Clark Sand, were you aware that silicosis is a disabling and incurable lung disease?
MS. SKIPPER: Object to the form.
A No, sir.
BY MR. GIVENS:
Q And if you had known that silicosis was a disabling and incurable lung disease, what would you have done?
A I wouldn't have used it.
Q And if this bag said something about delayed lung injury, if that -- would that have meant anything to you at that time?
A No, sir.
Q And if you knew that the delayed lung injury could cause you to be disabled or eventually die, what would you have done?
MS. SKIPPER: Object to the form.
A I wouldn't have used it.

BY MR. GIVENS:
Q Now, was anything worn over your face while you were around the sandblasting?
A Yes, sir.
Q Did the mask you used at this time, would it cup up or lay flat?
A It'd cup up.
Q Okay. Can you tell the jury what you wore?
A It was a cup-up mask. It had like a silver thing on the top, and it had two straps on it. It had AO on the bottom of it.
Q Okay. And so that's -- how do you know it was an AO mask?
A It had it printed on it.
Q Okay. And I'm going to hand you what I want marked as Plaintiff's Exhibit 4. This will be like the other exhibit.
Was this the dust mask that you wore while y'all were sandblasting at that site?
A Yes, sir.
MR. EDWARDS: John, is that two pages or --
MR. GIVENS: Yeah. It's two pages. It will be one exhibit.
(Exhibit 4 marked)
BY MR. GIVENS:

Q And with this dust mask, did you ever have the opportunity to see or read any of the warnings or instructions that came with these masks?
A Yes, sir.
Q And did you wear these masks because it was your belief that they were protecting you from the dust?
A Yes, sir.
Q Now, when you took these masks off -- or would you take these masks off on occasion?
A Yes, sir.
Q And when you took them off, what would you see?
A Well, there's -- dust come out of them. You had, you know, sand on your face and, you know, it looked like a dark, dark spot inside of it.
Q So are you saying you'd have sand underneath --
A Yes, sir.
Q -- where the mask was?
A Yes, sir.
Q Now, if these masks had contained or included an instructional warning that said, "Do not use this product in or around sandblasting because it did not provide adequate protection," what would you

have done?

MR. IRELAND: Object to the foundation or the form.

A I wouldn't have used it.

BY MR. GIVENS:

Q Did the warnings or instructions that you saw with these masks, did it ever tell you not to use them around sandblasting?

A No, sir.

Q If the mask contained or included a warning that said, "Do not use this product in or around sandblasting because it did not provide adequate protection," what would you have done?

MR. IRELAND: Object to the foundation.

A We wouldn't have used it.

MR. GIVENS: Hold on. Let me stop. I just established the foundation. Why is your objection still there?

MR. IRELAND: My objection is you haven't established the time frame, so it's been three times. I don't know what the warning said. I'm objecting to the foundation you used.

BY MR. GIVENS:

Q Do you recall what year you did the sandblasting job in? Was it the first half you worked

at Gordon Myrick or the second half of the time frame you worked there?

A Say the question again.

Q Do you recall about what year you performed this sandblasting job at Gordon Myrick in? Was it in the first half of the time you worked there?

MR. IRELAND: Object to the form.

A It was the second half.

BY MR. GIVENS:

Q Okay. What else did you do while working at Gordon Myrick?

A Well, we put up buildings, cleaned up. You know, it's a lot of the stuff we did in construction.

Q Did y'all do any concrete work?

A Yes, sir.

Q And how often would you do concrete work at Gordon Myrick?

A Sometimes two or three days.

Q Out of a week?

A A week -- out of a week, we'd usually do it.

Q So is it your testimony, on average, y'all would do concrete work anywhere from two to three times a week?

A Yes, sir.

Q And that was over the whole time you worked

there?

A Yes, sir.

Q And tell the jury one type of dust mask you wore while performing concrete work.

A It's an AO.

Q AO. And is it the same dust mask that we talked about here in Exhibit 4?

A Yes, sir.

Q And did you have occasion to wear that mask -- did you wear that mask on occasion from 1986 to 1991?

A Yes, sir.

Q And how often do you think you would wear that mask in comparison to other dust masks?

A Most of the time.

Q Okay. And now, we established earlier that you read the instructions or warnings that came with this mask. If this mask had contained or included an instructional warning that said, "Do not use this product in or around jackhammering because it did not provide adequate protection," what would you have done?

MR. IRELAND: Object to the form.

A I wouldn't have used it.

BY MR. GIVENS:

Q And did the warnings or instructions that came with this product state not to use around -- in or around concrete work?

A No, sir.

Q And if the instructional warning on these masks said not to use in or around concrete work, what would you have done?

A I wouldn't have used it.

Q I'm not sure; I may have already asked you this, John, but I'm going to ask you again to make sure the record's clear.

Has anybody ever told you that the dust from breaking up concrete could expose you to respirable silica?

A No, sir.

Q All right. John, we touched on this briefly, but can you remind the jury of when you first started having breathing problems?

A Ninety -- '95, 1995.

Q And, John, have you been declared disabled?

A Yes, sir.

Q And do you know approximately when you were declared disabled?

A In 2000.

Q Okay. And were you declared disabled due to

your lungs?
A Yes, sir.
Q Would it be your preference to still be working today?
A Yes, sir.
Q But you're unable to. Right?
A Yes, sir.
Q Now, the jury will notice from this video that you've got some tubes going into your nose and around your ears. Can you tell the jury what that is?
A I've got oxygen to help me.
Q To help you what?
A To help me breathe.
Q And how often do you have to use this oxygen?
A I'm on it 24/7.
Q Can you tell the jury some of the things that your lung injuries have caused you not to be able to do anymore?
MS. SKIPPER: Object to the form.
A I just can't do like I used to do before I got sick. I used to do everything. You know, I hardly ever do anything right now, but I -- I guess I do a lot of stuff in the community trying to help my grandkids at sports.

BY MR. GIVENS:
Q Yeah. Do you have -- do you ever have any recurring problems --
A Yes, sir.
Q -- from your lung injuries?
A Yes, sir.
Q Can you tell the jury about some of those?
MS. SKIPPER: Object to the form.
A It -- it make me -- make it hard to breathe during the summertime. The wintertime is -- it's pretty good because it's cooler. And it's pretty -- you know, when it's hot, it's -- it's kind of hard for me.
BY MR. GIVENS:
Q Yeah. How often do you go see a doctor?
A I see my lung specialist twice a year, unless when I get sick, I, you know, maybe see him in between.
Q Okay. And how often do you go into the hospital?
A Average, about once a year.
Q And how long are you usually in the hospital for when you do go?
A Between four and five days.
Q And why is it that you have to go to the

hospital?
A I have -- my lungs, they have a lot of spermine inside of it, and they usually keep me there to get rid of all of it before they let me come home.
Q Are you saying that your lungs flare up? Is that what you're saying?
A Yes, sir.
Q And what -- how does that affect you?
A It affects me a lot.
Q Does it make it very difficult to breathe?
A Yes, sir.
Q Does your -- do your lung injuries cause you any physical pain?
A Yes, sir.
MS. SKIPPER: Object to the form.
BY MR. GIVENS:
Q Can you describe what -- the physical pain you associate with your lung injuries?
MS. SKIPPER: Object to the form.
A Well, for one thing, it's -- you know, I just -- just can't do like I used to. You know, get tired quicker. And over the years, it -- it's starting -- starting to get worse and worser (sic).
BY MR. GIVENS:
Q Does it give you any problems sleeping at

night?
A Well, I -- no, I sleep. When I have to get to the doctor, he gives me some pills I take every night, you know, just to sleep because it was hard sleeping.
Q And why was it hard sleeping?
A I just couldn't fall asleep because it was hurting so bad.
Q And, John, you testified earlier you've got 16 grandchildren. Does the fact that you have an incurable lung disease, does that cause you any stress or anxiety over not being able to see those -- your grandchildren grow up?
A Yes, sir.
MS. SKIPPER: Object to the form.
MR. IRELAND: Same objection.
BY MR. GIVENS:
Q And does that -- now, John, we -- I met with you -- how long ago was it that I met with you for the first time?
A About a week ago.
Q About a week ago.
And did I -- what did I bring with me? Where did we meet at?
A We met at the Law Library.

Q And what did I bring with me to the Law Library for you to look at?
A A bunch of binders.
Q And how long did we sit there and you go through those binders?
A About two and a half hours.
Q And what did you do when you went through those binders?
A I went through it and looked at a lot of pages and -- and some of the stuff that I did use.
Q And these pictures that we put here today, are these the products that you picked out on your own?
A Yes, sir.
Q And, John, you were previously deposed in your other case that was dismissed, and that was -- you were deposed for approximately two days back in 2004. Is that correct?
A Yes, sir.
Q And now, during that deposition, you were asked a lot of questions, were you not?
A Yes, sir.
Q And were you nervous during that deposition?
MS. SKIPPER: Object to the form.
A A lot nervous.

BY MR. GIVENS:
Q And are you nervous today a little bit?
A I'm nervous today.
Q You were asked, you know, some questions on occasions throughout that deposition at various times whether or not you read any of the warnings or instructions during that deposition. And at that time, you either said "I don't remember" or "no." And today, you said you did read some warnings and instructions.
A Yes, sir.
Q Can you tell the jury why back in 2004 you said you didn't?
MS. SKIPPER: Object to the form.
A I didn't understand your question.
BY MR. GIVENS:
Q And were you confused at times during that deposition?
A Yes, sir.
Q When you were doing -- when you're doing concrete work, John, is that a -- does that create a lot of dust when you're doing the breaking up and the chipping of concrete?
A It's a lot of dust.
MR. GIVENS: That's all the questions I

have. The rest of y'all are welcome to stay, but you're free to go, too. I'm not going to let you ask any questions, Mark, Chaney, Hall and Tom.
MS. SKIPPER: You're not going to let them ask any questions?
MR. GIVENS: Nope.
MS. SKIPPER: Are they dismissed from the lawsuit?
MR. GIVENS: They will be.
MR. EDWARDS: With the representation from Mr. Givens that Empire will be dismissed, Empire will not be asking any questions.
MR. ROACH: Hall Roach for Kelco and Schmidt, we have that same agreement?
MR. GIVENS: Yeah.
MR. ROACH: Okay.
MR. NICHOLS: Chaney Nichols on behalf of Pulmosan. Pulmosan has the same agreement?
MR. GIVENS: Yeah. Let's take a short recess.
THE VIDEOGRAPHER: We're going off the record. The time now is 9:49.
(Off record)
THE VIDEOGRAPHER: We are back on the record. The time now is 10:07 a.m.

BY MR. GIVENS:
Q Mr. McGillberry, I just had a couple more questions for you.
What activities, if any, do you do with your grandchildren?
A I -- since I don't work, I just help coach them playing sports, football and basketball.
Q And -- and why do you do this?
A You know, I guess it eases my mind.
Q And what does it ease your mind from?
A Well, I know what I got, ain't no cure for it, and -- and it's always on my mind.
MR. GIVENS: Okay. That's all the questions I have at this time.

EXAMINATION

BY MR. IRELAND:
Q Mr. McGillberry, my name's Robert Ireland.
A Yes, sir.
Q And I've got some questions for you here today.
If I'm looking at Exhibit 1 correctly, you've identified three employers over the course of your career where you're claiming, you know, some exposure in this case. That's right, isn't it?
MR. GIVENS: If you don't understand the

question, you can ask him to rephrase it.
A Yeah. Re- -- repeat the question.
BY MR. IRELAND:
Q Sure.
A I thought you were just ask -- you know, talking to me --
Q Sure.
A -- not asking a question.
Q Remind me -- remind me how you came about putting together Exhibit 1. And I don't want to be into any attorney-client privilege. I'm just trying to figure out exactly what Exhibit 1 is.
MR. GIVENS: I -- I'm going to object to that question. He -- well, I'll just clarify for the record, he didn't put together Exhibit 1. Exhibit 1 was put together from his previous testimony and my review of the records. And I verified with him if those were the correct work sites and dates. And based on his previous deposition testimony, those are the only work sites that he claimed exposure to respirable silica.
MR. IRELAND: Okay. So Exhibit 1 -- and I'm -- I'm fine with you -- just so that we understand Exhibit 1. Exhibit 1 is the only three places where he's claiming being exposed to respirable silica?

MR. GIVENS: That's what -- we've established that. Yes, it is.
BY MR. IRELAND:
Q All right. Now, during the times that you worked with Tom Pittman, do I understand correctly that the only time that you did any sandblasting or were around any sandblasting was during a one-and-a-half-day period?
A Yes, sir.
Q Okay. What were your primary duties at Tom Pittman?
A Well, it was a small construction company, you know. Do everything, you know. If -- whatever we was doing. And -- and my job was that, you know.
Q Where did you learn how to -- to use the jackhammer? Was that at Tom Pittman?
A Yes, sir. We chipped out concrete.
Q Did you actually use the sandblasting machine during the one and a half -- you know, one-and-a-half-day period of time when you're claiming this exposure?
A I was attending the pot.
Q I'm sorry. Say that again.
A You asked me what I -- I did?
Q Did you actually do the sandblasting

yourself?
A No, sir.
Q Okay. You were around it?
A Yes, sir.
Q Okay. And what was your job during that one-and-a-half-day period of time?
MR. GIVENS: Objection. Asked and answered.
A To put the sand in the pot.
BY MR. IRELAND:
Q Okay. And during that one-and-a-half-day period of time, were you sandblasting all day long or was that just a small portion of -- of that job?
A No. It was just that day and a half right there on that job, you know, did the work for them.
Q Yes, sir. And I understand. I'm -- I'm just trying to figure out whether that day and a half you sandblasted for 30 minutes or you sandblasted for several hours. I'm -- I'm just trying to get a sense.
A Several hours.
Q Okay. And -- and your job was to fill the pot?
A Yes, sir.
Q Explain to me what "fill the pot" means.
A Get the bag, filling the pot up, keeping the sand in it.

Q Okay. How many times did you have to fill the pot up?
A A bunch of times.
Q All right. Now, what kind of -- what kind of -- what size bags were you pouring into the -- the pot?
A I don't know if it was 75 pounds -- I mean, 70 pounds or something like that.
Q Okay. And would you say that you loaded more or less than five bags in the pot during that time?
A It was more.
Q Was it more or less than ten?
A Less than ten.
Q Okay. And your job was -- was just pouring the sand in?
A Yes, sir.
Q All right. What were you doing during that one-and-a-half-day period other than pouring sand into the -- the pot?
A We was forming up other stuff on the job from where we was working at.
Q Help me understand what this -- what this job was. Was it a residence?
A No, sir. It was in the oil field.

Q Now, I'm talking about Tom Pittman. And I -- and I promise you, I'm not trying to confuse you.
A Yes, sir.
Q I thought that that was when you did the sandblasting on some steps.
A It was -- it was steps. Steps that goes up that big tank.
Q Okay. Fair enough.
Other than sandblasting the steps, help me understand. I -- I just don't understand what you do on a job at the oil fields working for Tom Pittman, other than the sandblasting that you've talked about.
A Well, Tom Pittman was a contractor.
Q Yes, sir.
A And I guess they just got him to do the job because he -- he did a lot of -- he did a lot of work up there.
Q Yes, sir. And I'm just trying to understand. You were there for a day and a half, and you loaded the pot less than -- or around about ten times. I'm just trying to figure out what you did during that one-and-a-half-day period other than loading the pot. That's all.
A Okay. Yeah. We -- we -- we formed up some steps and -- and were ready to pour some concrete on

them.
Q Okay. Were those steps -- where were those steps in relation to the -- the sandblasting that was going on, the ones that you were forming up that you said?
A Now --
Q Yeah. And, yes, sir. I -- and that's fine. I'm -- I'm just trying to get an understanding. And I promise you you're not the first person that has been confused by a question of mine.
You said that -- that other than sandblasting some steps --
A Yes, sir.
Q -- you formed the concrete and formed some -- some other steps?
A Yes, sir. We -- well, we did -- getting the pour and stuff ready for the concrete. You know, you've got to build the -- the wall where the concrete is going to go around.
Q Were you anywhere near the sandblasting when you were doing that activity?
A Well, after we got so far with it, he had us do something else.
Q Yes, sir.
A And we went back and did it -- did it again.

Q So most of your work over that one-and-a-half-day period -- most of the time that you spent over --
A Yes, sir.
Q -- that one-and-a-half-day period wasn't loading the pots, it was doing something else. Right?
A Yes, sir.
Q And what you were doing wasn't necessarily right close to where you felt the sandblasting was taking place?
A It was -- it was pretty close to it.
Q Okay. Well, help me understand what the work site looked like. I -- I haven't been on that oil field and I probably should, but help me understand what it looked like, please, sir.
A Well, it was just -- it's a big tank that had a bunch of steps on it. And I think the reason we did sandblast the steps of it, it had oil on it, you know, stuck on it.
Q Rolling up, I drove by some tanks that I think look like the ones you're describing, but don't let me put words in your mouth. Just let me -- help me understand.
Is this one of those real big tanks where the steps sort of go all the way up and around the

sides until you get to the top?
A Yes, sir.
Q How many people can go up those steps at a time?
A Well, it's -- it's either one way up or one way down. And, you know, two can't -- two can't go up it. I mean, one can't go up and another can't come down.
Q All right.
A It's going to be, you know...
Q And -- and you were loading a pot. Where was the pot? Was it on the ground?
A It was on the ground.
Q All right. And so there was a hose that went from the pot to wherever the -- the fellow that was doing the sandblasting was doing it?
A Yes, sir.
Q And it was a one-way street, so to speak, up the steps to where the sandblasting was?
A Yes, sir, because nobody couldn't go up it while we're working.
Q How tall was the -- the tank?
A I would say --
Q Three stories or more?
A No. About 60 foot.

Q Okay. That's big. Did y'all -- did -- was the -- did the sandblasting all the steps from -- from the ground floor to, you know, 60 or so feet?
A Yes, sir.
Q All right. The other steps that -- that y'all were forming the concrete for, what was that for -- or where were those in relation to the -- to the steps that we just talked about?
A Well, we formed up another -- another slab where we were -- where they was going to set the tank on.
Q And that was on the ground?
A That was on the ground.
Q Who -- how many folks were on your crew that were out there during this day-and-a-half period?
A Me and him and his son.
Q It's Tom Pittman and Tom Pittman's son around you?
A Yes, sir.
Q Did -- did the oil field have a name -- I mean, which one was it?
A I don't -- I don't remember.
Q Okay. Fair enough. Was it in Laurel?
A No. It was in Heidelberg.
Q Okay. And so -- so tell me, during that

one-and-a-half-day period -- just so I understand, you said here today you didn't -- you didn't wear a dust mask at Tom Pittman. Right?
MR. GIVENS: Objection. That's not what he said.
MR. IRELAND: Well, I'm -- I'm -- we can go off the record.
MR. GIVENS: You can just ask him.
MR. IRELAND: I need to figure out what it was.
MR. GIVENS: I mean, you can ask him whether or not he wore one. Don't presume that he didn't.
MR. IRELAND: Well, I thought he didn't. I'm -- I promise you, I'm not trying to confuse anything. I -- I didn't think that I wrote down that he did.
MR. GIVENS: I just prefer, instead of asking him questions where you presume, I mean, just because I've been asking him about that, just ask him whether or not he wore a dust mask.
MR. IRELAND: Okay.
MR. GIVENS: I mean, that's all I'm saying. I don't necessarily have a problem with the way you're doing it. I just thought that was a bad question.
MR. IRELAND: Fair enough.

BY MR. IRELAND:
Q Did you wear a dust mask?
A Yes, sir.
Q Okay. I -- I missed the description, and that's fair enough. Can you tell me what the dust mask looked like?
A It was flat when you -- when you -- when you lay it down. You know, it's -- I mean, it's flat. It had the two straps on it.
Q What color was it?
A White.
Q What color were the straps?
A Yellow.
Q Okay. Did you wear any -- during this one-and-a-half-day period that -- that was -- that was the one that you wore that day?
A Yes, sir.
Q I mean, that -- that time period? Yes, sir?
A Yes, sir.
Q Okay. Thank you.
All right. You didn't wear one that was cupped, as opposed to being flat?
A At that time, I just wore that one on that -- but we used both of them.
Q And so the mask, it -- it didn't have ridges

in the front of it. Is that --
A What?
Q Do I understand that the flat mask that you're describing didn't have any ridges in the front of it?
A At the time, that one didn't. It was just -- it was just a flat mask --
Q Okay.
A -- on that site.
Q And tell me about -- I believe you said it was yellow straps. How many straps were there?
A Two.
Q And the straps weren't blue or white. They were yellow?
A Yellow.
Q What did it look like when you had it on? I mean, I know you weren't -- weren't looking in the mirror out there, but was the mask horizontal or vertical or what -- what did it ---
A Well, it -- it ran this way (indicating) because it -- it -- it was like that. It covered your mouth and the nose.
Q And you were indicating with your hands horizontal when you had it on?
A Yes, sir.

Q Okay. You don't remember wearing a 3M mask out there?

A Not on that job site.

MR. GIVENS: Are you talking about the day and a half, Robert?

MR. IRELAND: Yes. Thank you, John.

MR. GIVENS: I'm just -- okay. Just making sure.

BY MR. IRELAND:

Q Now, it -- it sounds like you spent the majority of your time working up the concrete and mixing the concrete and things of that nature. Did you -- did you wear the dust mask when you were mixing the concrete or just when you were dumping the sand in?

A Well, the concrete is already mixed, you know.

Q Yes, sir. I understand. I'm just trying to figure out when during that one-and-a-half-day period you actually wore them. What tasks did you wear the mask?

A Okay. That -- that day and a half, I used the mask when we was -- we were pouring the sand, doing the sandblasting.

Q Okay. Didn't wear it when you were doing

the other jobs off -- out there during that day and a half, just --

A Not -- not during that job.

Q Okay. Who picked the mask that you used, if you -- if you remember? The -- and this is, again, during that day-and-a-half period at Tom Pittman.

A I don't know who picked the mask.

Q Well -- and I'm not trying to be tricky. I mean, did you get it out of the truck or -- I mean, I'm just trying to figure out how you came about having a mask to wear that day.

A Well, we got stuff out of the toolbox, you know, like a game box. You get what you need when you get on the job, once we get started.

Q Was it in the back of a truck? I -- I promise you, I'm not trying to be confusing. I'm just trying to figure out how it worked.

A It was in a box.

Q Okay. The mask was in a box?

A Yes, sir.

Q All right. And you went to get the mask. It wasn't given to you. Is that what I understand?

A No, sir, it wasn't. I went and got it.

Q Okay. What did the packaging look like? You know, you just said the box. What did -- what did

the box look like, packaging? That's all I'm talking about.

A The box that the mask came in?

Q Yes, sir. Yes, sir.

MR. GIVENS: It's okay to say you don't -- if you don't remember, it's okay to answer.

A I don't remember.

BY MR. IRELAND:

Q You remember that it was in a box, but you don't remember what the box looked like? I -- I think that that's what Johnny was -- was saying for you there.

A Okay. It's -- it's in a box. And inside that box, it was in a bag.

Q Okay.

MR. GIVENS: I think that the confusion is he said a toolbox, is what he first said. I think he's thinking that when you say "box," he's thinking a toolbox.

MR. IRELAND: Okay.

MR. GIVENS: So you may want to clear that up.

MR. IRELAND: Sure. I'm -- I'm happy to.

BY MR. IRELAND:

Q I'm trying to figure out whether this --

this mask was individually packaged in something when you went to get it out of wherever it was that you got it from. It sounds like maybe it was in a toolbox.

A Well, I got it out the toolbox and it was in the bag with the rest of them. I just got me one of them.

Q Individually wrapped or -- or together?

A They're all together.

Q So several masks in one --

A Yes, sir.

Q What was the color of the packaging?

A I'm not for sure what color the box was. Are you -- you talking about the -- what color the dust mask is or what? What you mean?

Q I know it was a long time ago, but I'm just -- well, we'll just ask you to help us.

MR. GIVENS: The package you got the mask out of, what color -- he's asking you to describe that package, is what he's asking you to describe.

MR. IRELAND: Thank you, Johnny.

A I am not for sure what color it was.

BY MR. IRELAND:

Q Do you remember what shape it was?

A It was a long box.

Q And I'll just ask again since my notes

aren't terribly clear on it. Was there any writing on the box?

A Yeah, there was writing on the box, but I didn't -- I didn't pay no attention to the box. I mean --

MR. GIVENS: Actually, he's already testified that there was writing on the box, and he read any warnings or instructions on it.

MR. IRELAND: Johnny, I -- I'm --

MS. SKIPPER: Object to the testifying for the witness.

MR. IRELAND: Yeah. I'm objecting to the testifying, too.

BY MR. IRELAND:

Q And help me understand. Now, you answered that question and I just didn't hear it over all the talking. All three of us were talking, and I apologize for that.

There was writing on the box?

A Yes, sir.

Q Did it have a product name on it, as best you recall?

A Yes, sir.

Q Okay. What did that -- what did that look like? What did that say?

A A big 'ol A and an O on it.

Q And you don't recall the -- the color of it?

A No, sir.

Q Okay. Were there any instructions or warnings on the box?

A Yes, sir.

Q Okay. But -- but as you sit here today, you don't recall exactly what it said?

A Yes, sir.

Q Now, in response to Mr. Givens' questions, you said -- you testified as to some things the warnings didn't include. And I'm just asking, do you have any idea what the warnings and instructions did say? And "I don't know," is a fine answer if you don't know, but I'm just trying to figure out what you do remember.

A You want what -- what was described on the box, whether it said warning, this is --

Q Whatever you remember with respect to warnings and instructions that were on the box.

A Well, I remember on the top of it, it had A -- AO on the top of it. It had some more writing on it, but I'm not for sure what all it said.

Q Okay. Now, when you weren't wearing it during that day and a half, what did you do with it,

put it in your pocket?

A Yes, sir.

Q Y'all went home and spent the night and came back the second day, I mean, obviously?

A Yes, sir. Yes, sir.

Q Did you take it home with you and then bring it back?

A Well, I got a new one the next day.

Q So all -- everything that we've talked about with respect to getting the mask the first day, you did it again the second day?

A Yes, sir.

Q Okay.

A Yes, sir.

Q Thank you.

A Okay.

Q Do you still have any of those masks, by chance, that --

A No, sir.

Q Either that one or any of the ones that you -- other ones you've talked about today?

A No, sir.

Q Okay. And with respect to this one, you didn't -- you didn't purchase it. Right?

A No, sir. The company --

Q Did you purchase any of your own ones, just to make it --

A I didn't. The company did all of that.

Q Did you ever see any of the marketing materials? And I'm not even sure I know what that means. Maybe a brochure, flyers?

A No, sir.

Q Okay. The straps, did you have to tie them on the back of your head?

A No, sir. They -- they were like a -- like a big rubber band.

Q Okay. I see you wear a -- a mustache today. Did you have any facial hair back then?

A You said -- repeat.

Q Did you have any facial hair in the '70s? I see you -- you wear a mustache today, and it looks good.

A No, sir, not -- not -- it wasn't this thick, but I had some. Something like yours, you know. It's a -- it's a -- you know, it looks like you got something right there. It wasn't, you know, nothing big.

Q Okay. Fair enough. It wasn't as substantial as the one you have now?

A No, sir, it wasn't.

Q Thank you.

Did you ever -- well, did you do anything to make sure the mask fit before you put it on? Did you -- was there anything to adjust or anything?

A No, sir. That thing, one size fit all.

Q Okay. All right. We -- we'll move to -- to Daniel Construction. That -- is that -- that's the North Carolina position. Right?

A Yes, sir.

Q Okay. And were you in North Carolina the whole time between -- what I'm looking at is September 12, 1979, to March 1981?

A Yes, sir.

Q I'll tell you, I haven't jackhammered very much, but you jackhammer the ground or what's below it. Right?

A Yes, sir.

Q And what -- and you were -- you were building buildings out there?

A Building a power plant.

Q Fair -- fair enough.

What was the -- what was the floor or what have you? What -- what was that made out of?

A Concrete.

Q Okay. Was there any finishing on it or

anything, or it was just -- was it just regular?

A It was -- it was finished.

Q All right. What -- what do you mean by "finished"?

A It's -- it just -- what I mean by finished, it -- it's finished. You're through with that -- that spot there. Go to the next -- next spot. It's ready.

Q When I think of jackhammering, I think of tearing something down, not building something. And I may have put words in your mouth, but were y'all building stuff and tearing stuff down out there at Daniel Construction?

A Well, when you're -- when you're pouring concrete, if -- if it messed up or honeycombed, if you -- if you see the rocks in it, they make you tear it up and repatch it, put -- put -- put it back to normal.

Q Do you start from scratch or do you just get the -- the imperfections, so to speak?

A No, you don't start back from scratch. You just get some mud and -- and finish it up. But if it's big, you have to pour concrete on it.

Q What -- what portion of the time were you jackhammering versus other activities out there at the job?

A Most of the time, I was, you know, jackhammering, cleaning up, stuff like that. Like I said, when I was over there -- when I started, I was a laborer and then I went to a cement finisher.

Q What was the difference between the job duties of a laborer and a cement finisher?

A A dirt job.

Q Well, I -- I understand. I'm just trying to figure out what you did differently as a laborer than you did as a cement finisher.

A Labor, you clean up, chip. Concrete, you finish concrete.

Q Okay.

A That's the difference.

Q Tell me what finishing concrete is. I -- I wish I had done it growing up. I don't have a clue what you're talking about. I'm just trying to understand what -- what finishing concrete is.

A Finishing concrete is when you -- when you got the slab ready, 100 percent ready. That's -- that's finishing concrete.

Q What are the last steps of -- of finishing? I -- I'm just -- I understand the pouring the slab part. I don't understand what else is involved.

A Well, you have to have -- take the machine

and dry the -- and dry the -- that mud. Make sure there's no rocks showing.

Q Okay. But that's not jackhammering?

A No, sir.

Q All right. Did you mix the something -- the concrete before it got poured?

A If it's a small pour, we can just patch it. They have a guy to mix it, and we just gets it and finish it -- finish it up.

Q What's in the mix, just a water and concrete mix?

A Sand and concrete.

Q And water?

A Yeah.

Q But I -- as to the big pours, what -- what's in the concrete that y'all didn't mix the --

A I don't -- I don't -- I don't know what they put in it when they -- when they mix it like that. I don't know.

Q Okay. Y'all got the concrete from somewhere else?

A We did. We got it from a plant on shift -- on site.

Q Okay. Now, the jackhammering that you've talked about, was that -- did you do that inside or

outside?

A Outside and inside.

Q All right. Now, I read your earlier deposition and I -- what I understood -- and I may be -- is you did some jackhammering outside. But when you jackhammered inside, it was -- it was actually outside, but it was under a tarp. And is that --

A No. It's just like in a room.

Q Okay. How dusty would it get when you were chipping outside?

A On the inside, you know, all the dust is on you when you're chipping. On the outside, it gets -- you'll get some of it on you. But, you know, you get that wind on the outside. But when you're in the inside, you don't get no wind.

Q Did -- what did your employers tell you as to safety precautions when, you know, doing the work? And I'm talking specifically about wearing dust masks and other protective activities like that.

A They didn't -- they didn't ever explain to us nothing about the dust mask.

Q Okay.

A You just had to use them.

Q How did you come to -- how did you come to use them, I guess, out -- out at Daniel Construction?

A If you didn't use a dust mask when you're working, you would get fired.

Q Okay. So you were going to wear them. It's because you didn't want to get fired?

A Uh-huh.

Q What -- what protective equipment -- and I'm talking about dust masks. What -- tell me what it looked like, the ones that you used at Daniel Construction.

A It was a -- like a dome. It had the ridges on it, had the straps on it and had the little silver piece in the front of it.

Q Did it look anything like the one you used at Tom Pittman?

A We used both of them on the -- on the oil out there at Daniel.

Q You're saying at Daniel, you used one similar to the one you used at Tom Pittman and you used the one that was cupped?

A I have used both of them out there.

Q All right. Now, with respect to the one that was flat -- well, let me just ask this: How -- what percentage of the time did you wear the flat one versus the cupped one?

A Fifty percent of the time.

Q You split it evenly, wore -- wore one half the time, the other one half the time?

A Say that again, now.

Q You wore one half the time and the other one half the time?

A Yes, sir. You know, it's like this (indicating). And whatever -- whatever's there, you know. It might be one day you've got this, and the next day you might have that.

Q The one that was cupped, what -- tell me what the ridges on the front looked like that I -- I saw you indicating.

A It just had like little humps on it.

Q Okay. Do they go across or up and down or --

A They went across.

Q Was it in any sort of a pattern like a diamond or circle or square or anything?

A Yeah, because like in the middle, it's longer than it is at the bottom. And as it go down, it gets smaller. Same way as it go up, it gets smaller.

Q So sort of like a diamond shape?

A Yes, sir.

Q And -- and with respect to the one that was

cupped, you said there were two straps?

A Yes, sir.

Q What -- and what color were the straps there?

A Some of them were two straps, some of them were one strap, you know, but it's just about the color of, you know, like a rubber band.

Q Well, some of the ones that you wore that were cupped had one strap and some were two straps?

A Yes, sir.

Q What colors were the ones that were one strapped -- I mean, excuse me. What color were the straps on the cupped mask that had one strap? What color was -- was the strap?

A What color is the -- the average rubber band? It was that color. I'm not -- it wasn't blue. It wasn't red. It was -- I can't --

Q You can't say for sure?

A Well, it -- it was -- 90 percent of the time, they were just about the same color.

Q But do you -- do you know the color of the straps on the model that had two straps?

A It was yellow.

Q Okay. What did the -- when you went to go get, let's say, the cupped mask that had two straps,

when you went to go get that one at the beginning of the day or whenever you got it, what did the packaging look like for that particular one, if you can remember?

A When they kept it in the game box, all they did is took it out of the box and set the whole bag in -- in the game box, and I went -- went and got one out of the box. I don't know what the -- what the box looked like.

Q Fair enough. I mean, were they -- were they individually packaged or were they all together?

A All together.

Q And don't know what the -- what the all together package was?

A No, sir, I don't.

Q Any writing on the -- the package that we've talked about?

MR. GIVENS: Now, you're -- you're talking about the cupped mask at this time?

MR. IRELAND: I'm talking about the cupped mask that had the two straps.

A You said what -- what -- what color writing was on it or, I mean, which name that was on it?

BY MR. IRELAND:

Q I'm asking -- you've talked about three

different kinds of -- of masks. And with respect to each one, I'm going to ask you what the packaging looked like and what writing was on it that you can remember and what warnings were on it that you can remember and what instructions were on it that you can remember. And this is with respect to the cupped masks that had the two straps, you said they came all together in one package. I'm trying to ask you first --

A Yes, sir.

Q -- what that package looked like.

A The one I put on my -- my face or all of them, what -- what come in the box? I don't understand.

Q Yeah. I -- listen, I -- I apologize.

Do you remember seeing any instructions or warnings on -- on any of the materials, the packaging materials?

A Yeah. It was -- it was -- it was AO on the -- on the bottom of it or top of it, however. And it had some -- some writing on it.

Q Okay. Now, is that your description with respect to all of the packaging that you used?

A Yes, sir.

Q Okay. The mask that had two straps -- the

cupped mask that had two straps, the cupped mask that had one strap, and this flat mask that you're talking about?

MR. GIVENS: I'll stipulate for the record that in the discovery responses and I'll stipulate here that he used 3M masks on occasion. If you want to ask him if he used 3M masks, that's fine. He used 3M masks. We're not shying away. I didn't ask him about that, but we're not saying that the only mask he ever used there was an AO mask. I just want to make that clear. That -- that's not what we're alleging.

MR. IRELAND: I'm just trying to figure out what the packaging looked like. And we were struggling through it, so I was trying to ask a -- a broad question that he could answer.

BY MR. IRELAND:

Q It sounds to me like you don't know exactly what all the packaging looked like for the masks that you used our there. Is that -- I mean, is that fair?

A Well, if I'd have -- if I'd have seen the box, I'd know what I used. But some of the masks did have 3 -- 3M on it. And some of the masks had AO on it.

Q Okay. Now, before you -- you met with Mr. Givens -- and -- and I don't want to know anything

that y'all talked about because that's privileged. But before you met with him, did you know the model number of the masks that we've talked about here today?

A No, sir.

Q Did you know who made the masks?

A No, sir.

Q And -- and when I say "who made," I'm talking about 3M, American Optical, the names of the folks that...

A I figured what name was on the -- on -- on the thing, that was the name. I don't know. That's what I seen on the --

Q Yes, sir. I was just trying to figure out, before you met with Mr. Givens, did you know who made the masks that you used? That's all I'm trying -- that's all my question is.

A Unh-unh.

Q What did you do with the -- the cupped masks at the end of the day?

A We threw them away.

Q Do you know -- can you -- do you have any way of saying here today what percentage of the time you wore the cupped mask with the two straps versus the one with the one strap?

A What specific time?

Q Yeah. Which one did you wear -- or how -- and how often did you wear each one? That's all I'm -- that's all I'm asking, if you know.

A Just like I stated a while ago, whatever was in that box that day, that's what you used. You come back the next day, and they're all gone. It's a different brand in there. That's what you used.

Q Is it -- so it's hard to say how much you used any particular mask. You just used what they had, and we talked about some of the ones that you think you remember using out there, right, at Daniel Construction?

A I used the AO most of the time.

Q What is that based on, sir?

A What percentage, you're talking about?

Q I'm just -- what -- we've been talking about it for a while. And I'm just trying to figure out why it is you think you wore AO most of the time.

A It had it on it.

THE WITNESS: I need to take a break.

MR. IRELAND: Sure, no problem.

THE VIDEOGRAPHER: We're going off the record. The time now is 10:49 a.m.

(Off record)

THE VIDEOGRAPHER: We're back on the record. The time now is 11:05 a.m.

BY MR. IRELAND:

Q Mr. McGillberry, you didn't do any sandblasting at Daniel Construction. Correct?

A No, no, sir.

Q And did anybody do any sandblasting out there? Were you ever around it, maybe is a better question?

A No, sir.

Q When you were jackhammering, did you wear any safety protection on your eyes?

A Yes, sir. I had safety glasses.

Q Okay. Goggles or like the -- the hard plastic?

A The hard plastic glasses.

Q Okay. Did the employer provide those or did you bring those from your home?

A They give you a pair -- pair when you -- when they hire you.

Q Okay. What kind of cement -- when y'all mixed the cement at Daniel Construction -- Daniel Construction, do you know what kind of cement that was?

A No, sir.

Q All right. I think you said you don't know what kind of cement or -- y'all used to -- to pour the --

A No, sir. I don't know what -- what kind of cement.

Q Did it come in a concrete truck or -- I mean, I -- do you know?

A They bring the cement in the -- in the truck.

Q Okay.

A The -- well, the cement you're going to pour is in the truck.

Q Okay. The mask that you used out at Daniel Construction that you've talked about today, what -- what was the material made out of, as best you recall?

A I'm not for sure what kind of material it was made out of.

Q Okay.

A It's white.

Q Now, the -- the AO mask that was flat, I think you talked about, how were the straps attached to the mask part? How were they affixed to the mask?

A I guess it was -- it was stapled to the side of it.

Q Okay. Same with the other two types of

masks?

A Yes, sir. They were -- they were stapled on.

Q Okay. And you talked about -- well, let me ask you this: Which mask was it that you used when you said you could take it off and there was a dark spot on the inside?

A The cupped one.

Q I -- we've talked about two cupped ones, one with one strap and one with two straps. Do you -- do you remember which one?

A No, sir.

Q Was it -- could it have been both?

A It could have been.

Q Okay. What -- what color was the dark spot?

A It's just a dark spot.

Q Where on the inside of the mask? Right --

A Right dead in the center of it. Just like right here (indicating). Wherever I had my mouth at.

Q Did -- did it have a shape to it?

A No, sir.

Q So as I appreciate it, the -- the -- the spot was coming right through the middle of the mask?

A Yes, sir.

Q What -- you -- you testified a couple of

times with respect to both the masks that Mr. Givens asked you about that you used at Daniel Construction and at Tom Pittman. And that if -- if the warnings had contained certain information, I think he used the term "delayed injury." And I wrote down you wouldn't have worn them or wouldn't have worn it.

Do you recall?

A Well, I know that it --

MR. GIVENS: I think that, actually, I'm going to object to that as a mischaracterization of my question. You're talking about the bag of sand as opposed to the mask. If you want to rephrase it in regards to what I asked about the mask, then that's fine. But -- or you can have the court reporter read it back.

MR. IRELAND: Well, I'm not sure -- I'm -- I don't have the question right. I'm not sure how to ask it.

MR. GIVENS: You just asked whether or not I asked him about the mask saying anything about delayed lung injury. I never asked -- I didn't ask -- I didn't ask anything about a delayed lung injury in regards to the mask; that was in regards to the sand.

BY MR. IRELAND:

Q Are there -- let's see. How do I ask this?

If there had been certain information on the -- the warnings and instructions provided with the dust masks -- I'm not sure how to ask it. I apologize.

Just generally speaking, I think you testified that if certain information had been provided with respect to the warnings on the dust mask, that you wouldn't have used the dust masks. Is that correct?

A You're kind of dragging your -- your answer.

Q You're right.

A I can't --

Q You're right.

A You start and you stop, and you start and you stop. So could you repeat the question?

Q Sure. I believe you testified earlier that if there had been certain information provided on the instructions and warnings for the dust masks that you wouldn't have used them. I believe that's right.

A Okay. If I knew it was going to make my health worse than what it is, I wouldn't have worn it.

Q Okay. What would you have done?

MR. GIVENS: He just answered your question.

BY MR. IRELAND:

Q If -- if presented with the information, you said you wouldn't have worn the masks. I'm asking you

what you would have done instead of wearing the dust mask.

A I would have -- I would have asked the supervisor about it.

MR. GIVENS: I'm sorry, what did you say?

THE WITNESS: I would have asked the foreman about this mask.

MR. GIVENS: Okay.

THE WITNESS: If it, you know, endangered my life.

MR. GIVENS: Okay.

BY MR. IRELAND:

Q With respect to the work you did at Gordon Myrick, I understood you to say that you were exposed to respirable silica during the course of one job in a -- in a house. Is that right?

A Yes, sir.

Q And that was the job where there was some sandblasting inside of some wood floors?

A Yes, sir.

Q What -- what was your role during that job?

A I cleaned the pot. And I -- and I cleaned it up after we got through inside.

Q Okay. Were -- were you hanging around in the room while the sandblasting was going on, or were

you doing something else while --

A I was attending the pot to make sure it -- it didn't run off.

Q Yes, sir. You weren't pouring the sand all day long, though, were you? I mean, I'm just trying to figure out what you were doing in between the times that -- when you were pouring the sand.

A You're working with a sandblaster, your job is there until it's through. You can't leave and go somewhere else. You have to stay there and make sure you've got sand in it. And that's what my job was.

Q Yeah.

A To keep -- keep the sand in it.

Q All right. You wouldn't clean in another room?

A No, sir.

Q Okay. You're just standing there in the room with the -- with the sandblaster?

A Just like I told you a while ago, my job was to tend the pot, keep it full. Then when we got through, we cleaned the sand out of the there, swept it out.

Q Yes, sir. Where was the sand kept? Where did you run back and forth from?

A The sand, it was right next to the pot. So

we didn't have to go too far with it. Reach down and pick up your bag, put it in the pot.

Q Okay. And which mask did you wear during that four-to-five-day period?

A The cupped one.

THE VIDEOGRAPHER: We have to do a tape change.

MR. GIVENS: Thanks.

THE VIDEOGRAPHER: We're going off the record. The time now is 11:16.

(Off record)

THE VIDEOGRAPHER: We're back on the record. The time now is 11:17.

BY MR. IRELAND:

Q How did you learn to -- or how did you come about needing to -- let me strike that.

Why did you use the dust mask at this particular job for Gordon Myrick? Did somebody tell you to use it or...

A Well, you just kind of have to wear it if you're around a lot of dust or either you're going to -- full of dust in your mouth.

Q Did -- did your employer -- did somebody tell you to wear it? That's all -- that's all I'm asking.

A Yes, sir.

Q Okay. Who was your supervisor on -- on that particular job?

A Red Hardy.

Q Red Hardy?

A Yes, sir.

Q And is he still living, to your knowledge?

A No, sir. He died. He done passed.

Q How many folks were on that crew?

A It's a bunch on that -- our crew. But on that -- the job where I did the sandblasting, it was me and another guy that was in the house.

Q Okay. Just the two of y'all. What was the other fellow's name?

A Sam Love.

Q Sam Love. Is he still living, to your knowledge?

A No, sir. Most everybody I worked with is dead.

Q Is -- was he from Ellisville like you?

A No, sir.

Q Where was he from?

A I think he was from up around Bay Springs, that area.

Q Okay. What other -- when -- when you --

when your company was asked to do the job at the house, the Gordon Myrick job at the house, what other activities were you asked to do? Were you just asked to do the sandblasting of the wood or was there something else?

A At that time, it was just the sandblasting on that job.

Q Okay. You said you wore a -- a cupped mask. What color were the straps, or how many straps?

A Some of them had two straps, some of them had one strap.

Q So during -- during that four-to-five-day period, you wore two different kinds of masks, two straps and one strap?

MR. GIVENS: Now, he's not talking about the whole thing. Are you listening to him? He's just talking about that four-to-five-day sandblasting period is what he's asking you about right now. He'll get to the rest of your stuff there.

BY MR. IRELAND:

Q That's right. I was just --

A Which number of straps did I wear that day, or are you saying --

Q Yeah. I'll -- I'll repeat my question.

The -- the exposure you've identified at

Gordon Myrick that was over a four-to-five-day period, which cupped mask did you wear during that four-to-five-day period?

A The one that had the two straps on it, sir.

Q And what color were those straps?

A They're about the color of your -- your paper right there (indicating) in front of you.

Q Okay. You're pointing out the yellow notebook paper?

A Something like that.

Q What about the ridges or -- let me ask, were there --

A It was just this white mask.

Q Did they have any ridges in the front?

A Yes, sir.

Q All right. Can you describe them, how -- what they -- what -- the appearance of the ridges?

A The ridges went straight across. Every one of them got shorter. The further it got down, they was smaller.

Q Okay.

A Like a diamond.

Q Okay. Did it have any writing on the cup?

A Up under the bottom of it or the top of it, wherever it was, it had writing on it.

Q Okay. And have we talked about -- well, I'll just ask again. Tell me -- tell me again what writing was on the cup.
A AO was on the cup.
Q What were the -- what were the work conditions like in the rooms while you were doing the sandblasting or -- excuse me, let me -- let me just rephrase -- while you were tending the pot?
A Well, it -- it -- when you opened the -- the sand, you know, usually it just -- it's just dusty when you open it up. And -- and all you do is pour it down. You know, and as you're pouring, you're just getting more and more dust out of it.
Q Well, during the actual sandblasting, what did the -- what did the work space look like, air quality wise, air condition?
A Well, I was outside. I'm not for sure what the -- what the air quality was inside. I was on the outside.
Q Okay. How did you go about getting the dust masks that you used at the Gordon Myrick job? Where were they -- were they, what kind of packaging, as best you can remember?
A It was in a skinny package, and it was a bunch of dust masks in there. Just got me one, but

they. But they -- it had -- it had writing on the -- on the bag.
Q It was a bag or box? I apologize. I thought you said both.
A It's in a bag. They probably come in a box, but it was in a bag when I got mine.
Q Okay. And did you bring them to the work site or did --
A No. They -- they furnish everything.
Q Okay. And who was -- I apologize. Would that have been your supervisor out there, Red Hardy?
A Well, on that job, it was at the boss man's house. The house he built on his lake. It was just me and the sandblaster that was on that job.
Q I'm just trying to figure out where the dust mask was.
MR. GIVENS: Well, you were just asking about the supervisor. I mean, what are you -- ask one question at a time. I mean, you're changing your question.
BY MR. IRELAND:
Q I'm just trying to figure out where the dust masks were. You said they provided them. I asked you if your -- got them from your supervisor. I'm just trying to figure out how you went about --

A They was in -- in the toolbox on the truck.
Q Okay. Fair enough.
A Yes, sir.
Q And was there any writing on the bag that had all the dust masks in it?
A Yes, sir, there was writing on it.
Q Can you tell me anything about the writing that was on the bag?
A No, sir.
Q Did you have any facial hair at that time? Did you have any facial hair at that time?
A No, I didn't think I did. I didn't have none of this (indicating).
Q Same at -- at Daniel Construction? That was in early '80s, '79 to '81.
A No.
Q Did you wear any other protective equipment while you were at this one particular job we've been talking about at Gordon Myrick?
A Just some safety glasses.
Q What -- what were those for, or why did you wear those?
A Make sure you didn't get sand in your eyes, anything -- you know, anything flying.
Q Who -- did you bring those from -- from your

house, or how -- how did you get the safety glasses?
A I got them from the company.
Q Were they in the toolbox with the...
A Yes, sir. That's where -- where all -- you know, you're keeping everything, or you would keep it in your shirt.
Q Did you ever have any safety meetings with your employer while -- the entire time that you were at Gordon Myrick?
A They required us to have a safety meeting Monday morning. Every morning before we started work, they -- they usually go through a safety meeting.
Q What -- what kinds of -- did y'all ever talk about using respiratory equipment?
A No, sir.
Q What kind of -- just generally speaking, what did get discussed at a safety meeting on a Monday morning?
A If we see anything that we -- you know, pertained to safety, we -- you know, you got to take care of it, you know, get it fixed, or you have to -- some even have to walk over and if something's too low, you need to put some kind of string or that -- that warning so they can know what is there. Rebar, you know, you tie some warning strings on it or you

put the caps on it.

Q Yes, sir. Who would lead those meetings?

A Sir?

Q Who would lead those meetings? Who -- who led the safety meeting?

A Red Hardy did when I worked with Red Hardy. He was the only supervisor I worked with.

Q And when Red wasn't there, did y'all just discuss it amongst yourselves?

A When Red wasn't there, we just usually go to work.

Q Okay. Fair enough.

A It was very seldom he ain't there.

Q Did you get a new mask every day --

A Yes, sir.

Q -- while at Gordon Myrick --

A Yes, sir.

Q -- on -- on that one particular job? Let me -- let me finish my question.

Did you wear a new dust mask each day during that four-to-five-day job that we have been talking about when you were with Gordon Myrick?

A Yes, sir.

Q Okay. Did you notice any spot on the inside of the dust mask during that particular job?

A A bunch of times.

Q During this one job we've been talking about?

A The three -- the three-to-four-day job.

Q Describe for me what -- what that looked like. The same as the other?

A Yes, sir. It's, like I guess, a dark spot.

Q So the -- and so it's a dark spot right in the middle of the mask on the inside part?

A Yeah. Right in the middle.

Q Right -- right over your mouth?

A Over the mouth and nose.

Q Did you ever complain to -- to anybody during the time that you were at Gordon Myrick about, you know, your lungs or breathing problems or anything of that nature?

A No, sir.

Q And you also talked about working concrete, I believe, when you were with Gordon Myrick?

A Yes, sir. We poured concrete, too.

Q Okay. As I appreciate it -- and I'm not trying to put words in your mouth. Well, let me just ask.

Did you wear a dust mask while you were pouring concrete?

A Yes, sir. If you didn't, sometimes the -- the concrete will get in your mouth.

Q Okay. On what kind of jobs would you -- would you pour concrete? What -- what would you do for Gordon Myrick that required you to pour concrete? What were y'all doing?

A For instance, we did the library down at JC. We did the ladies dormitory down at JC. We did the -- the recreation room down at JC when I worked with Gordon Myrick. We remodeled the -- the -- over here where the theater is at, we remodeled that. We -- we did a lot of -- a lot of stuff containing concrete, then we'd chip in it.

Q Your -- your remodeling work included lots of things, not just pouring concrete and finishing concrete. Correct? Can you answer out loud, please, sir? Just for the record, you have to answer "yes" or "no". That was -- I saw you shaking --

A Okay. Now -- now, say the question again.

Q Sure. While you were remodeling and doing other work for Gordon Myrick, you did -- you had lots of other job duties other than just pouring concrete and finishing concrete?

A Yes, sir.

Q Now, other than this job that we've talked

about at the house with the sandblasting of the wood and other than pouring concrete and doing concrete work, is there any other particular job where you wore a dust mask?

A Yes, sir.

Q Okay. Tell me about that.

A Well, we poured a concrete wall. Once we take -- we formed up the concrete wall. We've got any problem in it, we got to take the chipping hammer and chip all the rocks out of it to be refixed again. And over here at the theater -- theater we did, they put in new windows. So we chipped out and get bigger windows in it, a lot of chipping.

Q What about other than concrete work and the sandblasting of the wood floors, was there anything else that you did that you wore a dust mask for?

A Yeah. Cleaning up, sweeping.

Q What -- are you talking about concrete?

A Well once they finish a room, it's completed, we have to go in there with a broom and sweep it up.

Q Now, you worked for Gordon Myrick for five years. Right?

A Something like that.

Q During a given week, how many days a week

would you wear a -- a dust mask?

A Well, it's -- it's according on what you're doing that day -- that day. You could be cleaning up, you could be pouring concrete, or you could be chipping.

Q During the entire time that -- that you worked at Gordon Myrick, how many different kinds of dust masks did you use?

A Several different kinds.

Q We've talked about this mask that you -- or this cupped mask that you've described as an American Optical or an AO mask. What -- what other dust masks did you use between '86 and '91 while working --

A With Gordon Myrick?

Q I'm sorry?

A Working with Gordon Myrick?

Q Yeah.

A I believe the 3Ms. I know that we used the 3Ms.

Q Describe what that mask looked like.

A I was -- I think it was just about the same.

Q Any difference in the number of straps or the color of the straps?

A I have used some dust masks that had one strap, some dust masks that had two straps.

Q Yes, sir. I'm -- and we're talking about during this five-year period that you were at Gordon Myrick?

A Yes, sir.

Q You -- you used some with one and some with two? That's -- I'm just trying to clarify.

A Used some of both.

Q Did you use anything other than the -- the cupped mask while you were at -- at Gordon Myrick?

A No, sir.

Q And the -- the 3M mask that -- that you talked about, was there any writing on the -- the cup of the 3M mask?

A Yes, sir. It had writing on it, too.

Q Can you tell me what you remember about the writing on that?

A It had 3M on it.

Q The concrete work that you've described, was that inside work or outside work?

A It was some of both, inside and outside.

Q Did you do any jackhammering?

A Yes, sir.

Q On the work that you -- on the concrete work that you did outside while you were working for Gordon Myrick, what was the air condition like?

A It was pretty fair.

Q How about when you did concrete work inside?

A Inside? It's not -- nothing's stirring inside. It just seems like everything just -- whatever you sweep up stays in the room with you.

Q Now, are there -- is there -- are there certain activities -- I mean, you've described lots of different things that you've done with respect to the concrete.

A Yes, sir.

Q Are there certain activities that are more dusty than others, so to speak?

A Yeah. Certain things, there just -- it's more dust.

Q Describe -- describe those for me, please, sir. I know it's hard. I'm just trying to figure out the different kinds of work that you did and what --

A Okay. If you're on the outside, it's not a lot of dust. If you're on the inside sweeping, it's -- it's dusty. If you're chipping, it's dusty.

Q Okay. And you wore a dust mask?

A Yes, sir.

Q Do you wear it the entire time you were there, anytime you were doing the -- the concrete work?

A When I'm doing concrete work and -- and cleaning up, if I'm outside not doing no kind of -- like that work with concrete, I -- I don't wear it.

MR. IRELAND: We can take a short break.

MR. GIVENS: Yeah.

THE VIDEOGRAPHER: Going off the record. The time now is 11:36.

(Off record)

THE VIDEOGRAPHER: We are back on the record. The time now is 12:47.

BY MR. IRELAND:

Q Mr. McGillberry, before we took lunch, I think that we were talking about your employment with Gordon Myrick. I'm just going to pick up and see if I can move fairly quickly through this.

At Gordon Myrick, y'all primarily built buildings, isn't that right?

A Yes, sir.

Q Okay. And several of those buildings were at Jones Community College?

A Yes, sir.

Q The library and a couple other buildings out there?

A Yes, sir.

Q Now, I understood from your first deposition

that when -- when you were -- part of the cement work that you did is you worked on small pours, I guess, as opposed to large pours. Can you help me understand what it means when you say you worked on small pours?

A Small pours is — it's something you can do in a day. A large pour's when you've got to stay until it's finished.

Q Okay. Now, when you said you worked on -- on small pours -- and I'm not -- as you sit here today, you understand what you meant by that prior testimony?

MR. GIVENS: Didn't you just ask him -- did you just ask how -- in relation to what a small pour was?

MR. IRELAND: Well, he said that.

BY MR. IRELAND:

Q I mean, I'm just trying to figure out what's involved. I mean, you said that a small pour is something that you could finish in a day. A large job is something that you can't do in a day.

A Yeah. It's according to how big the area is, you know, what you're doing.

MR. GIVENS: John, give him an example of what a small pour is, is what he's asking about, I think.

A A small pour is a pour where you could say if you're going to -- when you start a building, you're going to get the footing. Ain't nothing to put in the footing; just pour your concrete and make sure it's the right height. A large pour is when you're trying to do the slab, the whole slab and, you know, you need to work with it until you're through with it.

BY MR. IRELAND:

Q Okay.

A You can't do half a day and -- and don't get it all done. Just try to do the whole thing and be through with it.

Q Okay. Did you do chip work on large pours and small pours?

A Yes, sir.

Q Okay. Now, the -- the chip work that you did was to existing -- or to -- to the cement that y'all had poured. Right?

A Yes, sir.

Q Well -- so the cement would have been pretty fresh, the cement that you would have been chipping?

A No, no, no. Most of the time, it'd be -- then you can dry it. Where it is, they'd come and say, "This needs to come out. It's not a good pour." You know, an engineer might see it. And we just have

to, you know, usually chip it out.

Q Yes, sir. Well, the -- the cement that you would have done the chip work on, it wouldn't have been like as hard as like a sidewalk that we see outside, though, that's been in the sun, you know, all day long?

A Yes, sir. It's -- it'd be something like that.

Q Okay. You're saying it's the same versus --

A What you -- where it dry at. You don't want -- you don't want to chip a concrete where it's still green. All you can do is make it worse than what it was.

Q Okay.

A You need to let it dry so you can get the bad spot out of it and then, you know, go back over it.

Q What kind of concrete did you use while y'all were working with Gordon -- Gordon Myrick?

A I don't know what kinds of concrete they used when they -- when they're pouring concrete. All it -- it gets mixed up when it's done.

Q So did you use any sand -- excuse me, any -- any concrete that came in bags at all while you were working at Gordon Myrick?

A Yeah, we did use the bags of cement.

Q You don't have any idea what those bags were?

A No, sir, I don't know. I don't know the name of it right now.

Q Ever seen any of the warnings or information on those bags -- excuse me, warnings or instructions on those bags?

A Yes, sir. They had warnings and instructions on them.

Q Can you tell me, as you sit here today as best you remember, what the information on those bags said?

A No, sir, I can't.

Q Did y'all use more than one kind of sand -- excuse me. Let me start over.

Did y'all use more than one kind of concrete? And I'm talking about the bags now.

A No, sir. One kind. One kind of cement.

Q Were there different times of the year where the chip work that you did and the other concrete work that you did was dustier than other times?

A When it's real dry, it's -- it is dusty.

Q Okay. The worst of the worst, what -- can you describe the -- what the air looked and felt like?

MS. SKIPPER: Object to the form.
A Well, you'll be outdoors and -- and -- and all of a sudden, the wind come up and it blow a lot of dust up. It'll be something like that, real dusty.
BY MR. IRELAND:
Q What did your employer out at Gordon Myrick tell you about you need to wear a dust mask while you were doing concrete work?
A They didn't tell me nothing about dust masks.
Q Well, did everybody out there at Gordon Myrick wear a dust mask while they were doing the similar concrete work?
A Yes, sir. And I don't know what kind of work they'll be doing. I just can only speak for what -- what I did.
Q I'm not asking you that. I'm asking you if -- if everybody out there wore a dust mask while they were doing the same kind of concrete work you were doing. Did everybody do it, or was it just you is all I'm getting at?
A When we poured concrete, everybody had a dust mask on.
Q All right. Did -- did Gordon Myrick have a policy or any -- about wearing --

A I don't know.
Q Did -- did you ever see any handouts or information about, you know, proper safety practices when you're doing the concrete work?
A They have had brochures when they -- you know, when we have safety meetings.
Q Did -- did those brochures address respiratory protection at all?
A Not as I know of.
Q What did you do with the cupped masks that you wore at Gordon Myrick when you -- when you weren't wearing them?
A If I'm -- if I'm through with it, I'll throw it away.
Q You didn't -- I mean, you didn't wear it all day long, every day. You took it off at different times in the day?
A Yes, sir, we did take it off.
Q With the flat one, you said that you put it in your pocket.
A Yes, sir.
Q Then what would you do with the cupped one?
A Well, if I'm through with it, I'd throw it away. But if we're still using it, it's got that -- that double string on it. You just pulled it down,

and it'll -- it'll hang on your chest right here (indicating).
Q Yes, sir.
A And you've got it with you.
Q Are you aware of whether Gordon Myrick did any air monitoring or air sampling on any of the works that --
A Not as I know of.
Q Who were your coworkers out at Gordon Myrick, that you can -- that you can remember?
A Sammy Love, John Henry Cole and Bobby Taylor, Carlos Taylor, myself, Red Hardy. It's a -- it's a bunch more. I just can't -- I just can't think of all their names right now.
Q You provided some names in an interrogatory response, or your counsel did. And they're Red Hardy, Sam Love, John Cole, Bobby Taylor are in there.
Was John McLaurin a coworker at Gordon Myrick?
A John McLaurin was -- was at Howard Industries.
Q How about LeAnn McGavin?
A At Howard Industries.
Q James Hayes?
A Howard Industries.

Q William Chapman?
A Howard Industries.
Q Tyrone Hicks?
A Howard Industries.
Q James Barnes?
A Howard Industries.
Q Larry Lawrence?
A Didn't you call him a while ago, Larry McLaurin?
Q Larry Lawrence?
A At Howard Industries.
Q Now, you said Red Hardy is not living. I believe you said the same thing about Sam Love. Is that right?
A They were at H. Gordon Myrick.
Q Yes, sir. I mean, is Sam Love alive?
A I can't say. I don't know.
Q Haven't seen him lately?
A Huh?
Q Haven't seen him lately?
A No, sir, I haven't seen him.
Q John Cole, is he alive?
A Yes, sir.
Q Where does he stay at?
A He stay the same place where I stay.

Ellisville.

Q Do you know his address, by chance?

A All I know, he stay in Days Town in Ellisville.

Q Days?

A Days Town Road, Ellisville.

Q What about Bobby Taylor? Is Bobby Taylor still --

A He -- he done passed.

Q What about Carlos Taylor?

A He done passed.

Q Mr. McGillberry, you've told us today, and we've talked about it, two AO masks, the masks that are identified in Exhibit 2 and Exhibit 3. Right?

MR. GIVENS: Exhibits 3 and 4.

A Three and four.

BY MR. IRELAND:

Q I'm -- I'm sorry. Thank you. Three and four.

Have you told us today everything that you remember about the warnings and instructions you read on -- on the two AO masks that are depicted in those exhibits.

A Have I told you what, now?

Q Everything that you remember about the

warnings and instructions that -- that you may have seen on those two masks that are depicted in those two exhibits?

A Yes, sir.

Q Did you ever tell any of your employers that any of the dust masks that you wore, any of them, didn't fit good?

A Oh, no, sir.

Q Did you have any problems with the fit?

A No, sir.

Q Did you ever ask for another mask? "Hey, I don't like this mask, do you have another one?"

A No, sir, I never did.

Q You've talked about using a 3M -- well, let me just ask.

Did I understand your testimony correctly that you used 3M and AO masks at Tom Pittman and at Daniel Construction and at Gordon Myrick?

A Yes, sir.

Q If -- if there were -- if there were two kinds of masks that were available one morning, if there was a 3M mask and an American Optical mask, which one would you pick?

A Whatever one is closest.

Q It didn't matter to you?

A No, sir.

Q Mr. McGillberry, did you look through similar kinds of picture books prior to your first deposition?

A Yeah. He showed me some pictures.

Q Were there a number of dust masks similar to the cupped one we see in Exhibit 4 and --

A Yes, sir.

Q Okay. Did -- did the books that you saw before your prior deposition, did they -- did they include any packaging or warnings type information?

A Yes, sir. A couple of letters on the top of it and a number.

Q Just generally speaking, did the books that -- that you looked at before your first deposition, as best you can remember, did they include not only pictures of masks but pictures of packaging and boxes and bags and things of that nature?

A I don't remember seeing no boxes.

Q Okay. Now, in your first deposition, Mr. McGillberry, the only masks that you identified were 3M masks. And you've identified additional masks --

A Uh-huh.

Q -- here today. Would you have seen the --

the masks -- well, let me just ask it like this: Did you see the masks that are pictured in Exhibits 3 and 4 in the books that you looked at prior to the first deposition?

A That -- I don't think they had the -- the same -- I don't know. But after we went through these books, it was -- that mask come up. And it -- it did seem like some of the masks that we used.

Q Yes, sir. I'm just -- I'm not sure you quite answered my question. I was asking if those two masks that are in Exhibit 3 and Exhibit 4 were in the books that you looked at before your first deposition.

MR. GIVENS: I'm going to object. That's asked and answered. He said he doesn't know, and then he followed up with an explanation. So he did answer your question.

BY MR. IRELAND:

Q I'm fine with -- with you don't know. Is that your answer?

MR. GIVENS: That -- that's his answer. That's what he said.

BY MR. IRELAND:

Q And I -- I don't -- I really don't have very much left.

With respect to the dust masks that you used

at Tom Pittman, can you tell me in terms of percentage of use, 3M masks versus American Optical masks?
A You're saying what, the time?
Q No, sir.
A Or which one I used the most?
Q Yeah. Well, how much did you use a 3M mask, and how much did you use the American Optical mask at Tom Pittman?
A To me, about the same.
Q Same question with Daniel Construction. What percentage of the time did you wear a 3M mask versus an American Optical mask?
A Usually, whatever -- whatever mask is in that box when I go to get it, that's what I get. I didn't -- didn't -- didn't nobody tell me what specific mask to wear. Whatever was in that box, that's what I got.
Q So you can't tell me how often you used the American Optical versus --
A No, sir, I cannot.
Q Now, with respect to Gordon Myrick, can you tell me what percentage of the time you used a 3M mask versus an AO mask?
A No, sir.
Q Do you have any living brothers and sisters?

A It's 11 of us.
Q All in Jones County or --
A Yes, sir.
Q I'll just ask at --
A Yeah, everybody at home.
Q All McGillberrys?
A Couple of sisters married.
Q Okay. Tell me their last names. Well, tell me -- tell me your brothers' and sisters' names, please, sir.
A My oldest brother, Lamar McGillberry. My next brother is Larry McGillberry. My next sister is Eileen McGillberry.
MR. GIVENS: What's her name now?
A Her name is Eileen Wiggim now. And my -- I'm next. The one after that is Fannie Millsap. And I have a brother, he's deceased -- deceased, he died. And the next one is Rita -- I can't think of their last name. And then I've got Wanda Thomas, Barbara McGillberry and Henry McGillberry.
BY MR. IRELAND:
Q Tell me Eileen's last name again. I didn't catch it.
A Wiggim.
Q Can you spell that?

A No, sir.
Q Okay. Neither can I.
Did you -- did you work with any of your brothers and sisters at Pittman?
A I have worked with my -- James McGillberry. But he's -- that's the one that's passed.
Q James?
A Yes, sir.
Q What about at Daniel Construction?
A No, sir.
Q How about at Gordon Myrick?
A No, sir.
Q You talked a little bit about your first silica lawsuit. Mr. McGillberry, did you receive any settlement money in connection with the first case? I don't need to know numbers right now, but I'm just asking if you received any settlement money overall.
A Not that I know of. I think.
Q Your recollection today is -- is that you didn't receive any settlement money in connection with the first silica lawsuit?
A Yes, sir.
MR. IRELAND: Okay. I don't have any more questions right now.
THE WITNESS: Can I go to the bathroom?

I've got to go.
THE VIDEOGRAPHER: We are going off the record. The time now is 1:06.
(Off record)
THE VIDEOGRAPHER: We're back on record. The time now is 1:10.
MR. IRELAND: Do you have any --
MR. GIVENS: One quick -- right -- that last question you asked him about the settlement, can you -- can you ask that again? He remembered out there.
MR. IRELAND: Sure.
MR. GIVENS: Just so he can clear that up while we're on the record.
BY MR. IRELAND:
Q Did you receive any settlement money in connection with your first silica lawsuit?
A I got some money, but I don't know what it was for. They never did say. And don't know how much it was. It's been a while.
Q You did get some, just don't remember how much?
A Yes, sir.

EXAMINATION

BY MS. SKIPPER:

Q Mr. McGillberry, my name is Jennifer Skipper. I represent Clark Sand Company, Inc. And I do have some questions for you today.

Is it your understanding that you also filed a suit claiming asbestos exposure?

A Yes, ma'am.

Q Okay. Do you know who your lawyers were for that lawsuit?

A No. Because when I first did it, that was the first one I ever did. I'm not for sure.

Q Does the name Patrick Malouf mean anything to you?

A Patrick, unh-unh.

Q No? I'm sorry. I usually actually get to answer -- ask the questions first. So it's funny for me to do on -- on the flip side. We have a court reporter here today.

A Uh-huh.

Q And she can't take down an "uh-huh" or "unh-unh."

A Okay. Okay. I'm sorry.

Q So if I point --

A Yes, ma'am.

Q -- to her --

A Okay.

Q -- that's just me trying to remind you to say --

A Okay. Okay. Yes or no.

Q -- "yes" or "no". Yes.

A Okay.

Q Okay. And I remember what the question was that I asked you. Does the name Patrick Malouf mean anything to you?

A No.

Q Okay. Have you talked with any lawyers about your asbestos lawsuit?

A It's been -- been a long time now.

Q Do you remember where the lawyers were that you talked to?

A I don't -- I don't know for sure.

Q Did you have an idea? You said not for sure. So that makes me think that you have an idea, you just --

A I know I had one.

Q Uh-huh.

A But everything was -- didn't go through. So I hadn't heard nothing from them.

Q Okay.

A So I don't know for sure what were their names. Because that was -- that was way back before

my childrens were even born.

Q Do you think that you have an asbestos-related condition?

A Everybody say I do.

Q Do you think you do?

A I don't know what to believe.

Q You don't know what to believe?

A I don't know what to believe.

Q Why do you think that there's a question?

A I am getting the runaround.

Q Okay. You're getting the runaround from your lawyers or the runaround from defendants?

MR. GIVENS: I object.

BY MS. SKIPPER:

Q Runaround from --

MR. GIVENS: I'm objecting because you're asking him basically for medical testimony here. And he's not here to --

MS. SKIPPER: I'm not asking him for medical testimony.

MR. GIVENS: I disagree. And I'm going to state my objection for the record.

A Well, I just -- I just don't know.

MR. GIVENS: He -- you're borderline asking him for expert medical testimony, which he's not

qualified to offer. The medical records will speak for themselves. He's testified that he has a lung condition and a lung injury, and I just believe that the question is improper for this witness.

MS. SKIPPER: Okay.

BY MS. SKIPPER:

Q Do you -- since you filed an asbestos complaint, you were -- is it your understanding that you were seeking money from companies related to your exposure to asbestos?

A Yes, sir -- yes, ma'am.

Q It's okay.

Do you remember any of the defendants that you sued in that matter?

A No, ma'am.

Q Where were you exposed to asbestos?

A My lungs.

Q I'm sorry?

A In my lungs.

Q Okay. At what work site?

MR. GIVENS: Can you put your hands down?

THE WITNESS: Okay.

BY MS. SKIPPER:

Q At what work site were you exposed to asbestos?

A I don't know which one. You know, all I know is they all -- they asked me what different places I worked at.
Q Uh-huh.
A And they was going from there, and that -- that's all I -- I know.
Q Do you know what products related to asbestos you might have used?
A No, ma'am.
Q And you said your lungs. Do you think that your exposure to asbestos has affected your lungs?
A Yes, ma'am.
Q And how do you think it has affected your lungs?
A Can you repeat the question, please, ma'am?
Q Yes, sir. How do you think it has affected your lungs? "It" being asbestos exposure.
A I don't know. I don't know.
Q If your asbestos complaint claimed a lung injury due to asbestos, what would that mean to you? The lung injury that was being claimed in that complaint.
A What would it do to me?
Q What would it mean to you? What does that mean?

MR. GIVENS: Now, you're seriously going to sit here and ask him what a legal pleading means to a common person?
MS. SKIPPER: I just -- it was in the complaint, which he was a party to. I'm simply asking what he was claiming in that complaint.
MR. GIVENS: Y'all are absurd in what y'all ask.
A All I can say is if I had it, I just had it. That's all I can say.
BY MS. SKIPPER:
Q Did you receive any money from your asbestos lawsuit?
A No, ma'am.
Q You never received any checks from any of the defendants?
A No, ma'am.
Q Did you receive any checks from any lawyer related to your asbestos suit?
A I received money one time. And that's the only time I received any money.
Q You receive disability. Correct?
A Yes, ma'am.
Q How much do you receive in disability in a month?

A Well, since they cut it, I get 1,299 a month.
Q Why did they cut it?
A I don't know.
Q When was that?
A The first of the year.
Q Does your wife work?
A Yes, ma'am.
Q Where does she work?
A She's a home health sitter. She sits for a lady.
Q Who does she sit for?
A Alice Robertson.
Q Is that in Laurel or --
A Ellisville.
Q And I know you know what the end of my sentence is going to be, but it makes her job a lot easier if you'll let me finish before you answer. Otherwise, she has to type back and forth so she can get to the end of our -- our sentences.
How long have you been receiving disability?
A I believe I started getting it in -- close to two years after I applied for it when I got off work in 2001. I think about maybe 2003, somewhere in there, or four, but I'm not for sure.

Q Before it was reduced at the beginning of this year, do you remember what you were receiving in disability?
A Over 13-something.
Q Why do you receive disability?
A Because I can't -- I can't work no more.
Q What did you claim?
A Ma'am?
Q What did you claim in your disability file?
A Well, it's -- it's -- it's my health, my lungs is messed up. I just -- I can't -- I can't work without this (indicating) right now.
Q Did you ever claim silicosis or a silica-related condition when you filed for disability?
A Well, my doctor took me off work. That's all -- that's all I did. When he took me off work, I just filed for that.
Q Did you claim that you had an asbestos-related condition?
A Before I got off of the work or after the work?
Q When you filed for disability.
A No, I did not.
Q Did you claim that you had sarcoidosis?

A Yes. Yes.

MR. GIVENS: Stop for a second. If you have his disability report here, and you're going to make it an exhibit, then you're going to let him look at it because he filled that out probably seven years ago, eight years ago. And I'm not going to have you sit here and ask him questions that you're making him to appear to not be telling the truth because he can't recall what's in the document he filled out that long ago. So if you want to ask him questions about it, then let's produce it and we're going to make it an exhibit.

MS. SKIPPER: I've produced the entire file to you.

MR. GIVENS: If you're going to ask questions about it today, you're going to make it an exhibit to the testimony. That's all I'm saying.

MS. SKIPPER: I certainly will be glad to show you the documents.

BY MS. SKIPPER:

Q So you did claim that you had sarcoidosis?

A Yes, ma'am. That was -- was told to me --

Q Okay.

A -- a long time ago.

Q And you talked about every -- twice a year

you go to your lung specialist.

A Yes, ma'am.

Q Who is your lung specialist?

A Well, my lung specialist now is -- is Dr. Lewis Neese.

Q Okay. And I'm going to show you --

MS. SKIPPER: And we'll make this -- what are we on five -- collective 5. It's Bates 273 and 272 of the Social Security earnings -- or Social Security Administration Disability file.

(Exhibit 5 marked)

BY MS. SKIPPER:

Q And these are letters that Dr. Neese wrote to Social Security regarding your disability.

A Uh-huh.

Q And you're copied on those letters. Do you remember receiving those letters?

A I've got plenty of letters. I don't know for sure.

Q Okay. If you want to take a look at those, it's just copied back and front.

A I might have got them, but I don't -- I don't know for sure.

Q Is that your address at the bottom?

A At the bottom?

Q Yes, sir.

MR. GIVENS: The 809 McManus Street.

A I see it. Yeah, that's my address.

BY MS. SKIPPER:

Q Okay. Has that -- those letters both are trying to tell you -- and feel free to read them and tell me if I'm not paraphrasing this correctly — are trying to say that you're disabled because of sarcoidosis. And he's asking that the disability office reconsider your denial of your disability claim. Is that what you understand those letters to be?

A Yeah, I know. I understand.

Q All right. So Dr. Neese thinks that you have sarcoidosis.

A Uh-huh.

Q Is that fair?

A That's -- that's -- that's all I've ever knowed.

Q Okay.

A Because that's what they told me that I had.

Q I want to talk about your non-treating doctors, doctors related to litigation. How many screenings have you been to?

MR. GIVENS: When she uses that fancy word

"screen," she means when you go and get tested somewhere.

A I got tested once in Laurel, and I did an x-ray in Jackson. That's it.

BY MS. SKIPPER:

Q I'm going to show you -- it's from 1999. It is from a Dr. Phillip Lucas. This was also in your disability file.

MS. SKIPPER: We'll make that Exhibit No. 6.

(Exhibit 6 marked)

BY MS. SKIPPER:

Q Do you remember going to see a Dr. Lucas in 1999?

A I ain't never heard the name.

Q I'm sorry?

A I hadn't heard the name.

Q Do you remember seeing that document?

A Okay. Now, I remember the name.

Q Okay. Tell me about how that -- how we got to that document. Where were you, and when did you see Dr. Lucas? How did that come about?

MR. GIVENS: Let me object because that document doesn't say that he saw Dr. Lucas. The only thing that document says is that Dr. Lucas read two x-rays.

MS. SKIPPER: Okay.
THE WITNESS: Is he out of Jackson?
MS. SKIPPER: I don't know.
THE WITNESS: I don't know either.
MR. GIVENS: If you don't know, then that's the final answer.
A I don't know.
BY MS. SKIPPER:
Q Do you remember seeing a Dr. Lucas?
A Like I said, only two places I did see people was in Laurel; they did the x-ray. And they did some work in -- in Jackson.
Q When was the Laurel work?
A That was the first one I done a long time ago.
Q What year are we talking about?
A Way back. That's the -- that's the first time they did the asbestos.
Q Are we talking --
A I don't know.
Q -- '80s, '90s, 2000?
A That's way before 2000, way back.
Q And the testing in Jackson, when was that?
A You know, I don't know what -- what kind of test it was. All I remember is going behind a -- a

curtain.
Q Do you remember where it was?
A In one of the motels up there in Jackson. I'm not for sure which one. I don't know.
Q Do you remember what year?
A I believe it was in 2000.
Q How did you know to go to the motel in 2000?
A I had received a letter.
Q Do you remember who that letter was from?
A No, ma'am. Not -- not now, I don't.
Q Do you still have the letter?
A I don't know.
Q Okay. We would request that you look. And if you do, inform your counsel. And then he can either produce it to us or claim a privilege if one is applicable.
In 2000, did you have any lawyers?
A Was it Foxworth out of Gulfport? I believe.
Q I'm going to show you -- it's a report from Dr. Ray Harron that's dated June 26th, 2002. I want to see if you've ever seen that document.
A I'm not for sure. I don't know.
Q Okay.
MS. SKIPPER: We'll mark that as the next exhibit. It's two page --

A Ma'am?
BY MS. SKIPPER:
Q I was talking really to the court reporter.
MS. SKIPPER: We're going to mark that as Exhibit 7. It's a two-page exhibit.
MR. GIVENS: I'm going to object to that being admitted. There's no foundation and no testimony for this.
MR. IRELAND: Object to that being a previous exhibit, also.
(Exhibit 7 marked)
BY MS. SKIPPER:
Q Would you mind handing me 7 back, please? Thank you.
Has anyone ever told you that you have coal worker's pneumoconiosis?
A Not as I know of.
Q Have you ever worked with coal?
A I don't know of a -- coal, now?
Q Coal.
MR. GIVENS: Like the black stuff.
A No, unh-unh.
BY MS. SKIPPER:
Q Never worked with coal?
A No, sir -- no, ma'am.

Q Maybe just on a barbecue. Just like a barbecue, coal.
A Coal?
MR. GIVENS: Coal bricks, you know, you barbecue with.
A Oh, yeah.
BY MS. SKIPPER:
Q But there's no other type of --
A No.
Q -- coal?
A The coal you eat with, you're talking about?
Q Yeah. You could -- you could if you have a -- a coal-burning stove.
How about the name Dr. Jay Segarra?
A I never heard that one. But I imagine I did see him somewhere. I don't know.
Q Okay. Do you remember in October 2004 going to Jackson to do a breathing test where you breathe into a tube? They tell you to breathe, breathe, breathe, breathe, breathe. You're supposed to breathe as hard as you can.
MR. GIVENS: It's called a PFT. Have you ever done a PFT?
A No, I did one in Laurel. I didn't do one in Jackson.

BY MS. SKIPPER:

Q We will mark as the next exhibit, it's 8. And you're welcome to look at it and tell me if you've ever seen it. It does state on Page 2 that there was a PFT performed in Jackson, on October 9th, 2004, on you.

MR. GIVENS: Same objection.

(Exhibit 8 marked)

A I don't remember.

BY MS. SKIPPER:

Q Have you ever seen that document before?

A I don't know, ma'am. I don't know. Seriously, I do not.

Q And your counsel has it, but I have another copy. On the second page under diagnosis and impression, it does state that you have an advanced stage four pulmonary sarcoidosis. And under 2, it's on Page 2 listed No. 2, "No convincing evidence of pneumoconiosis, asbestosis or silicosis."

Do you see that?

A Uh-huh.

Q Has anyone ever actually told you you don't have silicosis or asbestosis?

A No, ma'am. All I do is go take the test, that's it.

Q I'm going to show you a document from Dr. Steven Stogner dated August 6th, 2009.

MS. SKIPPER: Nine? I'll mark this as Exhibit No. 9.

BY MS. SKIPPER:

Q Have you ever seen that document before?

(Exhibit 9 marked)

A You know, all my doctors is in Hattiesburg Clinic.

BY MS. SKIPPER:

Q Uh-huh. Dr. Neese, Dr. Parkman, Dr. Oshneo.

A Dr. Phillips.

Q Uh-huh.

A See, all my doctors are down there.

Q How about Dr. Stogner?

A Stogner?

Q Stogner.

A Stogner. New doctor?

Q He's not new.

MR. GIVENS: Mr. McGillberry, that's a medical expert witness we've hired to help us in this case.

THE WITNESS: Uh-huh.

BY MS. SKIPPER:

Q That's true.

Have you ever seen that document before?

A 2009.

MR. GIVENS: It's okay to say -- if you haven't seen it, it's okay to say no, you haven't seen it.

A I don't remember.

BY MS. SKIPPER:

Q Have you ever seen Dr. Stogner?

A Like I say, I got a lot of doctors down there. Names don't mean anything. Faces -- I know a lot of faces, but no names. I don't remember.

Because the only lung doctor I see down there is -- is Dr. Neese. Now -- now, he could be one of the doctors that have come around when Dr. Neese is not there. He might have seen me in the hospital. I don't know.

Q Has any doctor that you go see if you were sick, not for a legal purpose, not for any kind of screening, but in a nonlegal sense, has any of those doctors ever told you you have silicosis or a silica-related condition?

A No, ma'am.

Q Same question for asbestos. Has any doctor in a nonlegal setting told you you have an asbestos-related condition or asbestosis?

A No, ma'am.

Q Is it my understanding that all the doctors you've seen in a nonlegal setting have told you you have sarcoidosis?

A The three doctors I go to, yeah. That was my lung doctor.

Q Uh-huh.

A He just told me I had silicosis -- I mean, not silicosis but --

Q Sarcoidosis.

A -- sarcoidosis.

Q Have you ever had histoplasmosis? Does that name sound familiar to you?

A No, ma'am.

Q I thought I saw an old record of yours. Have you ever been around chickens?

A Yes, ma'am.

Q Okay. Live chickens?

A Yes, ma'am.

Q Have you ever been around chicken droppings?

A It's in the house.

Q It's in the house, in your house?

A In the chicken house.

Q Oh.

A No, no, no, in the chicken house.

Q I didn't know if you kept chickens in your house. I mean, did you have a chicken coop?
A No, ma'am.
Q Where were you around a chicken house?
A I worked for Sanderson Farms, used to work for Sanderson Farms.
Q Okay. And you had to go in the chicken house?
A Pick up eggs.
Q Other than your silica suit and your asbestos suit, have you had any other lawsuits which you have filed?
A Containing?
Q About anything.
A A car accident.
Q Okay. When was that?
A This lawyer right here (indicating) did it.
Q Sorry?
A The lawyer in here did it. I don't know for sure what -- what -- what year.
Q Was it in the last five years?
A It's about -- maybe five years.
Q Were you injured in that accident?
A Yes, ma'am.
Q What -- what injuries did you have?

A I had -- it messed my back up and my neck.
Q Do you know who you sued?
A No, ma'am. They -- they died.
Q Okay. It was a person, not a company?
A It was a person.
Q Okay. Other than your car accident suit, the asbestos suit and the silica suit, have you had any other lawsuits that you've filed?
A No, ma'am.
MR. GIVENS: It says in the -- now, we did disclose in this discovery responses we -- I think you told us previously you may have had some type of workers' comp case back in the early '80s. I don't know if you remember or not. I mean, is that what you're asking about?
MS. SKIPPER: I think the supplement says that was a mistake.
MR. GIVENS: That was a mistake. Okay. I just wanted to make sure that was the same.
BY MS. SKIPPER:
Q Yeah. I think your original responses said you had a workers' comp case, but the supplement -- correct me if I'm wrong -- I think said that it was a mistake, and you didn't have a workers' comp case.
A Well, I went to the -- what is it? Is it

the EEOC?
Q Oh, discrimination?
A Yes, ma'am.
Q Okay. And what was that for?
A But I don't think -- they said I didn't get fired because of what they got -- what they had got fired for. What they were saying is, this person did that and you got fired for it. They should have fired her. So it's got to be the similar, the same thing.
Q Okay. And who were you working for when you thought you had an EEOC claim?
A Who was I working for? I think it was -- I don't know. I don't know.
Q Do you remember if you were being -- if you were a truck driver at that time, or if it was before you became a truck driver?
A It was before I become a truck driver.
Q Okay. Have you -- and I -- and I don't know exactly what it was related to, but I -- I've seen your name related to a lawsuit against First Family Financial Services, Inc., and a lawyer, Charles Gibson, with The Gibson Law Firm.
A Correct.
Q I haven't gotten the information yet.
A I done heard something from the Gibson Law

Firm.
Q Okay. Did -- did you ever hire Mr. Gibson?
A Yeah, I remember that name. But I can't -- okay. Okay. I see what you're talking about. I see what you're talking about. It was the First Family or city?
Q First Family Financial Services, Inc.
A Yeah. It was something like they was overcharging, something -- something like that they were saying.
Q Overcharging you, do you remember in relation to what?
A Interest or something like that. Whatever it was, they were charging me too much. Something like that, now.
Q Did you have like a loan with them?
A Huh?
Q Did you have a loan with them, or what was your dealings?
A Well, what come up was, that one company, they was -- they were charging you one price and getting back something else for it. And they come up with a lawsuit for that. But then I don't think nothing happened about it.
Q Do you remember hiring any other lawyers for

any other lawsuits that you've filed?
A Could be, but I can't think of none right now.
Q I don't have anything in my bag of tricks, so I don't know either. I was just asking.
How about being sued, has anyone ever sued you?
A For not paying a bill.
Q And who was that party?
A Who was that? It's been a long time. I can't think of the...
Q Are you aware that this lawsuit is set for trial August 2nd?
A Yes, ma'am.
Q Are you planning on being at trial?
A Yes.
Q Okay. No one has told you you're not going to be at trial?
A No, ma'am.
Q When we took your deposition in 2004 -- and I was there then, too.
A I know, yeah.
Q All right. It's hard to forget a six-foot-tall woman.
Did you know that your case was set for

trial then?
A If it -- I don't know. I don't know.
Q Do -- was it your understanding we were taking your deposition because we certainly were working towards trial?
A Now, that's what I thought when they took my deposition, it was going to trial.
Q Okay. Who supplies your oxygen?
A Apria Healthcare out of Hattiesburg.
Q What was that first name?
A Apria.
MR. GIVENS: Is it on there?
THE WITNESS: It's on there somewhere. There it is right there (indicating).
MR. GIVENS: It's A-P-R-I-A Healthcare.
MS. SKIPPER: Okay.
MR. GIVENS: Which -- that makes the oxygen. They're out of Lake Forest, California.
THE WITNESS: California. But they have an office in Hattiesburg.
MR. GIVENS: Oh, they have an office there?
THE WITNESS: Yeah.
MR. GIVENS: Okay.
MS. SKIPPER: Okay. Thank you.
THE WITNESS: That's just the main office.

BY MS. SKIPPER:
Q Do you know what silicosis is?
A No, ma'am.
Q Have you told Dr. Neese or any of your treating doctors about this lawsuit?
A No, ma'am.
Q Okay. And when your counsel was questioning you, you said something like that you know what you have doesn't have a cure. What were you referring to?
A It don't have a cure for it.
Q What -- what is "it?"
A Whatever I got. When he told me I had sarcoidosis, he said I can get a -- a lung transplant and live a normal life --
Q Uh-huh.
A -- or die from this -- die with it.
Q Dr. Neese told you that or who?
A Well, he give me the medicine, you know, to slow it down. But like he told me, it wasn't no cure for it. I done had it.
Q For a long time?
A For a long time.
Q I think -- when is the first time you started dealing with sarcoidosis, in the late '70s?
A The late '70s, early '80s.

Q Okay. That's what I thought.
A With Dr. Parkman.
Q Does Dr. Parkman -- he's still at the at Hattiesburg Clinic?
A Yeah.
Q You just changed to Dr. Neese?
A Yes, ma'am. They changed me.
Q Oh, they changed you?
A Yes, ma'am. I didn't change, they changed.
Q And dates get away from me, as well. Today you said earlier that you're -- you started having some breathing problems in '94 or '95. When you filed for disability, you'd written -- and you're welcome to see it.
MR. GIVENS: Let's just make that whole application the next exhibit like I requested a minute ago, please.
BY MS. SKIPPER:
Q The date is January 10th, 1986. You're welcome to look at it if you want. Do you think that it was the '80s or do you think it's the '90s? I'm not trying to trick you. I'm just trying to figure out if you started having problems a little bit earlier than the '90s.
A I'll tell you like this here (indicating),

my secretary filled all my paperwork out.
Q Your secretary. Who's your secretary?
A My wife.
Q Uh-huh.
A She take care of all the paperwork.
Q Okay.
A She knows more about me than I know myself.
Q Okay.
A So whatever date she put down there, it could be right, it could be wrong. I just -- I don't know.
Q Okay. And the rest of this is the rest of that -- that application. On the back page is your signature, I believe. It wanted to get you to look at that and tell me --
MR. GIVENS: That's your signature.
BY MS. SKIPPER:
Q -- if that's your signature.
A That's my signature.
MS. SKIPPER: Okay. We'll make that ten.
(Exhibit 10 marked)
BY MS. SKIPPER:
Q So -- and tell me if I -- if I'm not correct in this. Would it be fair then to say, if your wife said you started having breathing problems in 1986

that she's probably remembering more correctly than you are?
A Well, she -- she remember a lot of stuff that -- that I don't remember.
Q Okay.
A And it's like some things you tell her, and some things you don't tell her. And some things she can -- she can feel for her herself and -- and where you're at, or what you're doing.
MR. GIVENS: Yeah. And we'll be glad to stipulate that he started having breathing problems before '86 if you want to push the damages back even further. I mean, now, that's fine.
BY MS. SKIPPER:
Q So whether it's 1986 or '94 or '95, you did keep working after that?
A Yes, ma'am.
Q Okay. And sometime around in that time frame, you started being a truck driver?
A Yes, ma'am.
Q And you have your SRT shirt on today. That's Southern --
A Refrigeration Transportation.
Q Trucking. You -- Transportation. Right.
A Yes, ma'am.

Q And you were a truck driver for them.
A Yes, ma'am.
Q Is that correct?
Did you make more money driving trucks than you did when you were working for Daniel Construction or Myrick or Gordon Pittman (sic)?
A Uh-huh.
Q You did?
A Uh-huh.
Q Yes?
A Yeah. Yes, ma'am.
Q Okay. I know you told me you have 11 brothers and sisters. And I think I wrote them all down, but I have 10 with you. Lamar, Larry, Eileen, you, Fannie, James, Rita, Wanda, Barbara -- Barbara, excuse me, Henry. Is there another one?
A Who?
Q Is there another one?
A Haven't you got 10?
Q That's 10. I thought you said you have 11.
A I've got 11. Let me see. There's so many you can't keep up with them. Lamar, Larry, Eileen, me.
Q What was that second name, Lamar?
A Larry.

Q Oh, okay. I know we got Larry.
A You didn't get Larry?
Q No, we got Larry.
A Lamar, Larry, Eileen, John, Fannie. Okay, Debra.
Q Debra?
A Debra.
Q What's Debra's last name?
A Moore. Yes, Debra.
Q I want to ask you if any of your siblings' spouses are from Jones County?
A All of them are Jones County. All of them but one.
Q Okay. Who's the one that's not from Jones County?
A My sister Debra. Her husband was Odea Moore from Hattiesburg.
Q Do they live in Jones County now?
A They live in Hattiesburg.
Q Hattiesburg. Okay. Tell me the maiden name of Henry's wife?
A Henry not married.
Q Not -- never married? Been divorced?
A He done had so many womens, I don't know.
Q Okay. How about Barbara, has she been

married?

A No, ma'am.

Q Never been married?

A Never.

Q And Wanda's last name is Thomas?

A Yes, ma'am.

Q Who -- who is her husband?

A He husband's dead.

Q He's dead?

A Yes, ma'am. He died in the oil field.

Q Oh, do you remember what his name was?

A Thomas.

Q His first name?

A Bobby Charles.

Q I know you couldn't remember Rita's last name a moment ago. Do you happen to remember?

A It's McGill.

Q McGill?

A McGill.

Q Okay.

A Her husband from Heidelberg, but he dead.

Q Okay. Was James married before he passed?

A He was married to a girl named Vivian. And I think she was a Vincent, I think, now.

THE VIDEOGRAPHER: I need to change the

tape. Going off the record. The time now is 1:52.

(Off record)

THE VIDEOGRAPHER: We're back on the record. The time now is 1:52.

BY MS. SKIPPER:

Q How about Lamar, who is his wife?

A Mary.

Q What was her maiden name?

A Horn.

Q Oren?

A Horn.

Q Horn, excuse me.

How about Larry?

A His wife's name Christine -- Christine.

Q And her maiden name was?

A Harrick.

Q Harrick?

A Yes, ma'am.

Q And I know you said you had 16 grandchildren. Are any of them over the age of 18?

A None.

Q None. Are any of them going to be 18 before August 2nd?

A None.

Q Okay. Have you ever worn a sandblasting

hood?

A I tried once.

Q Do you know who manufactured that hood?

A No, ma'am.

Q Have you ever read your prior deposition?

A Have I read it?

Q Uh-huh.

A No, ma'am.

Q Have you gotten a copy of it?

A Not as I know of.

Q Have you given any other depositions other than the one in 2004 and this one?

A I did one when I was in an accident.

Q In the car accident?

A Truck accident.

Q Oh, that's right. In New Orleans?

A Yes, ma'am.

Q If memory serves, that was for SRT, too?

A Yes, ma'am.

Q Okay. Have you ever testified at trial?

A No, ma'am.

Q Have you ever seen any mental health professionals? That could be a psychiatrist, psychologist, a mental health counselor.

A No. I remember I think I talked -- I take

a -- a stress pill.

Q I'm sorry, a stress pill?

A Yes, ma'am.

Q Do you know the name of that?

A No, ma'am.

Q Do you know who prescribes it?

A I was in the hospital one -- one day, and they gave it to me.

Q When were you in the hospital that they gave it to you?

A I don't know what day it was.

Q Do you remember if it was this year?

A No, it wasn't this year.

Q Last year?

A No. I think -- I think I've been taking this a long time.

Q Okay. And what is it supposed to do?

A For stress.

Q How often do you take it?

A Once a day.

Q Where do you go get your prescriptions filled?

A Ward's Pharmacy in Ellisville.

Q Say that name for me again.

A Ward's.

Q Ward's.
Have you taken any medication today?
A Yes, ma'am. I took all my medicine this morning.
Q What does that involve?
A I take nine pills a day in the morning. I take five at night.
Q Okay. Would it be easier for you to give that list to your attorney and let him give that to us?
A Yes, ma'am.
Q Okay. Is it fair to say you don't -- you couldn't remember all of those?
A I can't -- can't remember all of them.
Q Okay. You would --
A I would just call -- call one of them healthcare companies.
Q Okay. That would be great if --
A Just one of them.
Q -- if you wouldn't mind doing that.
We talked about some of your coworkers. Mr. Ireland went over some of them. But I didn't get where they are. Are they all in the Ellisville area or are any of these, Mr. Lawrence, Barnes, Hicks, are they anywhere outside of Ellisville?

A They all live in the county.
Q In Jones County?
A Yes, ma'am.
Q When's the last time you talked to any of these gentlemen?
A The last one I talked to was Larry McLaurin probably a month ago.
Q Okay. Did you tell him about your lawsuit?
A No, ma'am.
Q Did you tell him you were going to put in his name in the discovery responses?
A Well, I -- I gave them his name.
Q Uh-huh. Did you tell him, "Hey, man, I'm going to tell them."
A No. I didn't say I'd give him no money. No.
Q I didn't -- well, I mean, it's good to know you didn't tell him you were going to give him any money. But I was just wondering if you -- if you told him, you know, somebody might be trying to find you, or you might get caught up in this.
A Well, the first thing I asked was, "Could I use your name?"
Q Uh-huh.
A And he agreed, you know, you can give my

name to the lawyer.
Q Okay. And he said that was fine?
A Yes, ma'am.
Q Do you know if he has a lawsuit?
A No, ma'am.
Q Other than Mr. McLaurin, have you talked to any of these other gentlemen? And if you need -- I mean, these are your discovery responses.
A Well, I know they're mine.
Q Okay.
A James Barnes.
Q When did you talk to him?
A Maybe about three months ago. James Hayes.
Q Okay. When --
A Same day.
Q Do you see him at -- did y'all have coffee together at someplace?
A No.
Q Or did you -- were they someplace together and you saw them?
A Well, no. One I see all the time. And one I was at one house, and he got a phone number. And I talked to both of them at the same time.
Q Who do you see all the time?
A The one I see all the time, Larry McLaurin.

Q Okay. Does he live close to you?
A No, he live out in the county. But he -- he drives trucks, also. He come -- comes by the house every -- you know, all the time.
Q Okay.
A You know, I stay close to the -- the highway.
Q And he gave you these gentlemen's numbers?
A No.
Q Okay. I'm sorry. Tell me -- I feel like I'm playing a game.
Tell me who gave you the number and how that all happened.
A I got Larry McLaurin's number --
Q Uh-huh.
A -- because I seen him.
Q Uh-huh.
A I went to James Barnes' house, got his number. James Hayes, some people that worked at -- at Howard where I used to work at, that's -- that know him, and they got me the number. John Cole, he stay in Ellisville. So I see him a pretty good while. About the -- all of them are around the same time when I, you know, got their numbers.
Q And from what I understand here today, we're

not claiming any exposure at Howard Industries?

A No, ma'am.

Q Okay. Would -- what could these gentlemen tell me if I called them on the phone?

A Whatever you asked them. What -- what kind of work I did, did I do that at Howard, that's all. Whatever. They probably could say what I did at Howard. They can't say what I did at anywhere else.

Q Okay.

A Besides John Cole.

Q Okay. What can Mr. Cole tell me?

A I worked with him at Gordon Myrick.

Q And you have his phone number?

A That's been a long time. I'll give it to them in my discovery. I don't -- I don't know if I laid it down or whatever, but I had -- I don't have it.

Q Okay. I'm kind of going to jump around a little bit because I'm going to ask some questions that I wrote down while you were talking to your counsel.

Gordon Myrick, you worked '86 to '91. And we were trying to get a year down for that. And your counsel said you think this blasting that was in Mr. Myrick's house was at the second half. And you

agreed, you thought that that was correct.

What does "the second half" mean?

A It -- it might be second half of the year, you know, if there were two years in between there. You know, from one year -- you know, what is it, '94 to what? '93 to '94, something like that.

MR. GIVENS: No. Look in there and see when you worked.

THE WITNESS: Wasn't it '94 to '95?

MR. GIVENS: No.

A Oh, Gordon Myrick?

BY MS. SKIPPER:

Q Yes.

A I'm looking at Tom Pittman. I'm sorry. From '86 to '91.

Q Do you have any idea in those five years when that job would have been?

A All I remember, it was in the summertime.

Q Summertime?

A Uh-huh.

Q But it could have been at any point during those five years?

A Yes, ma'am.

Q And am I correct that you worked at Gordon Myrick -- you testified here today that you worked

there for four days?

A Yes, ma'am.

Q Okay.

A At the house.

Q Do you remember your testimony back in 2004? You were asked how long you worked there, and your response was, "I worked there two days."

Is it possible you worked at Gordon Myrick's for two days blasting that house or around blasting at the home, rather than four?

A I believe it was four days.

Q Okay.

A Because we got -- all we had to do the ceiling, walls and the floor.

Q Okay. I'm going to -- and this is Page 34 of your deposition. You're welcome to look at it.

Can you tell me why you believe now, six years later, it was four when in 2004 you said it was two?

MR. GIVENS: He told you that's all he remembers. It's asked and answered.

BY MS. SKIPPER:

Q You can answer.

A Ma'am?

Q You can answer.

MR. GIVENS: Well, he's already answered. He said because -- that he thinks it's four because he had to do walls, ceilings, and floors. So he's answered your question.

BY MS. SKIPPER:

Q And you talked about that in 2004. In fact, correct me if I'm wrong -- that this was wood that they pulled out of an old school.

A Yes, ma'am.

Q And from the -- that deposition testimony the house was just framed up, and that y'all were actually putting the wood on the walls and on the floor. Is that's correct?

A Yes, ma'am.

Q Okay. And I guess what I'm getting at -- and you tell me, you know, there really isn't a reason, you just think now it's four instead of two. Why -- you were very definitive in 2004. And you said, "I was there for two days." And now you're telling me that you think that you were there for four days.

A Well, I believe it was four days.

Q Why do you believe that now?

A Time wise, you know, I forgot about how big it was. It was just a pretty big house. And like I

said, I believe it was four days.
Q And am I correct that you didn't stay there for the whole job?
A What do you mean, to finish -- the start to finish?
Q That's right. It may have been a big house, but you testified that you didn't stay there the whole time.
A Until we got it cleaned up. You know, I helped and sweep it out after we -- and then I had to go to another job in Warren State.
Q You wouldn't have done the whole house?
A Yeah, we did. We did. We sandblasted the whole house and started cleaning up. Then they moved me to go to another job. And left one man up there to finish it up because we were 90 percent finished. And they said he can do it by himself because he stay up that way. So we had to go the way I had to go.
Q Okay. And in that -- on that same piece of paper, you told me that you didn't stay until the job was finished. And that's when the statement --
A I did. Maybe I didn't understand what you were saying.
Q Okay. Would you mind reading the question and the answer and telling me what was confusing? And

those actually aren't my questions. They were someone else's questions.
A I don't know. I don't know.
Q In that same vein, today I have heard you now tell me that you remembered that it was Clark Sand at the Myrick job.
A Yes, ma'am.
Q Is that correct?
A Yes, ma'am.
Q Do you remember testifying to me in 2004 that you didn't remember any writing on the same bag?
A I didn't.
Q You did?
A I don't remember.
Q Okay. I'll show you Page No. 116 from your 2004 deposition.
A But I know it was Clark Sand, though.
Q Okay. Can you explain to me why now, six years later, you think it was Clark?
A Maybe I misunderstood the question.
Q Okay. Can you read the questions and tell me what was confusing about them?
A Okay. I don't know.
Q Okay. In fact, the questions were, "Do you know what any of the writing said? Do you remember?"

And your answer -- and please follow along, was, "All it said was sandblasting. I'm not for sure what -- what did it say." The next question is, "But you do remember it said sandblast on it?" Answer: "Sand."
So I -- I guess I'm asking for an explanation of -- of why your memory is better now --
A Uh-huh.
Q -- than it was then.
A Well, you know, it -- it might have came at a -- at a wrong time when I answered the question. It might have been later that day. I might have been tired.
Q And we deposed you for two days. And in the second day, you said the same thing.
A Uh-huh.
MR. GIVENS: He's answered your question.
A I know it's Clark Sand.
MR. GIVENS: I understand you're not satisfied with his answer, but you made your point. Move on to the next point.
MS. SKIPPER: Okay.
BY MS. SKIPPER:
Q In follow-up to your statement, when did you remember that it was Clark Sand?
A I don't know.

Q You don't remember any point when you told anybody it was Clark Sand?
A It's just the same picture on this paper right here (indicating).
Q Where did that picture come from?
A It was in some of the books that, you know, we looked at.
Q And those books, are they the same books you looked at in 2004?
A I don't know was it the same books that John bought me that were what I had when Foxworth did it. I don't know for sure.
Q Did they look similar?
A Some -- some pictures in the book they got, and some pictures in the book they didn't have.
Q Which one didn't they have?
A I don't know for sure which one it was.
Q Which ones did they have?
A It was a lot of different pictures, you know, was in -- in John's book.
Q Okay. Well, I guess we will need a listing of what pictures were in John's book.
A I don't have that book.
Q Okay. Well, we would request that those pictures we listed, as well as the products that were

show him in 2004 --

MR. GIVENS: If you want to depose John Foxworth, you're free to do that. I don't have any knowledge of what he was shown in 2004. I wasn't even licensed to practice law at that time.

MS. SKIPPER: Okay. We've made our request.

BY MS. SKIPPER:

Q I want to talk about the time that you were at Pittman. Where exactly was this tank that was being worked on?

A It was in Heidelberg.

Q Heidelberg. Is that tank still there in Heidelberg?

A I have no idea, ma'am.

Q When's the last time you saw the tank?

A The only time I saw it is when we worked on it. I hadn't never been back on that site.

Q And we were talking about that site at your last deposition. We talked about -- it was a great description. You gave me a visual that those steps were like the barbecue grates. That they were steel, but like --

A Yeah.

Q -- open steel.

A Yes, ma'am.

Q Is that correct?

A Yes, ma'am.

Q And today you've told me that you remember Clark Sand at Tom Pittman -- is that the name, Tom Pittman -- today. But I'm going to read to you -- and this is on Page 14 -- the question back in 2004. And these were my questions.

"Can you tell me who the minor manufacturer of that -- those sandbags were?" Your answer, "No, I'm not for sure." Question: "Did you ever see any warnings on the sandbags at Pittman?"

"Not as I know of" was your answer. "Is that a you don't remember them?" Your answer was, "I'm not -- I don't remember them."

And I'll show you that page just so you'll know that I read that correctly.

Can you explain to me why you could not remember in 2004 that it was Clark, but in 2006 you now say there was Clark at Tom Pittman?

A I guess he got a better picture than what they had.

Q Okay. And you think that -- and I'll show it for the camera if they want to zoom in on it.

This is a partial bag. Is that correct?

A Yes, ma'am.

Q You have it in front of you. In fact, it's not a full bag, is it?

A No, ma'am.

Q What else is on that bag?

A Red writing.

Q What else is on it? Like, what's missing that is not on that bag in that picture? Is there anything else on that bag?

A All -- it just got "Clark" on it and the warning.

Q Okay. Is -- there's a big hole in the middle. Is there something that's in the middle?

A I guess sand.

Q How about on the back, is there anything on the back of that bag?

A I don't know.

Q Are there any pictures anywhere on that bag?

A No, ma'am.

Q Any logos?

A No, ma'am.

Q Phone numbers?

A Not that I see.

Q Anywhere where it says where it came from? And I'm not talking about the picture, I'm talking about an actual Clark bag.

A Oh. Oh, okay. I'm sorry. I'm sorry. I'm sorry.

Q Okay. Can you answer any of those questions?

A No, ma'am.

Q And you still have that testimony I gave you, Page 14, I believe. And then I asked you, "Did you ever read a warning?" And you then say not as you remember.

Can you explain to me why now you've testified that you did read the warning on the Clark bag?

A I don't know, ma'am.

Q At any point, did you tell anybody that you remembered there was a Clark bag at Pittman?

A No. I don't remember telling nobody.

Q At any point, did you tell anybody that you remembered there were warnings on a Clark bag that you read?

A No, ma'am.

MR. GIVENS: Objection. Actually, he told you that today saying he has told somebody that.

BY MS. SKIPPER:

Q Before today, did you tell anybody?

A No, ma'am.

MR. GIVENS: Obviously, his discovery is going to say the same thing. So he told you before that, too.

BY MS. SKIPPER:

Q Do you have any memory of telling anybody, before today, those things that I asked you?

A No, ma'am.

Q Okay. And then in that same vein -- you can put that down -- I asked you again -- this is on Page 16. And I'll be glad to show it to you, as well.

"Over the time that you've used sand in your work history, did you ever stop and read the warnings that were on the bags?" Your answer was, "No."

Do you actually remember reading a bag of sand's warnings?

A I might not have read every bag.

Q Okay.

A You know, I do remember reading a bag.

Q About?

A I'm not -- like I said, I don't remember reading every bag that I touched. But I do remember the warning.

Q Okay. The word "warning" gets your attention, doesn't it?

A Sure. It's supposed to.

Q What does the word "warning" mean to you?

A It -- it lets you know different things about this item.

Q Okay. And if it says, "Warning: Contains free silica. Do not breathe the dust. May cause delayed lung injury, silicosis. OSHA approved respiratory equipment should be worn."

A Right.

Q Does that sound familiar to you?

A That's why I had a dust mask on.

Q Okay. Do you remember reading that warning?

A I could have.

Q But you can't -- could you swear before a jury that you've read that warning?

A I might not have read the whole thing. I -- I read some of it.

Q What part did you read?

A About the silica.

Q Okay.

A And then I didn't -- I didn't know what that means.

Q Did you go ask anybody?

A No, I didn't ask. It wasn't but two of us out there.

Q Okay. Two of you out where?

A When we were sandblasting at Gordon Myrick.

Q At Gordon Myrick. How about out at Pittman?

A Didn't ask nobody.

Q Okay.

A You know how it is. You got to get the job done. Go ahead and do it. Come on, you know.

Q You don't have time to read every warning on every product?

A Yes, ma'am.

Q Why do you believe that you have read part of that warning now, and you never said anything about that to me or to anyone else that was there in 2004?

A Repeat the question again, please.

Q Okay. Why do you now believe you've read part of that warning when in 2004, myself and other people asked you about it --

A Uh-huh.

Q -- and you wouldn't say anything about it? In fact, you very definitively said no, you didn't read it.

MR. GIVENS: Objection. He said -- actually, he testified he didn't remember whether or not he read them, and then you kept pressing the issue with a previous counsel that didn't object properly. And you finally got that answer you wanted.

MS. SKIPPER: I'm objecting to your --

MR. GIVENS: So I'm going to object to the mischaracterization of his testimony. And I'm objecting now because you're repeatedly badgering him about these questions in his previous testimony. He's already explained to you that he's remembered now. You've made your points. Move on to your next question.

MS. SKIPPER: I object to the speaking objection and any kind of characterization.

BY MS. SKIPPER:

Q I certainly hope I'm not, you know, badgering you. I'm certainly not being rude. I'm trying to simply get an answer as to why we spent two days -- and, Mr. McGillberry, I will tell you this: I remember you very definitively. And I remember you because I had found out --

MR. GIVENS: I'm objecting to your commentary on the record. Do you have a question?

MS. SKIPPER: Okay.

MR. GIVENS: Are you through objecting, or commentating, or do you have a question?

MS. SKIPPER: I'm getting to my original question.

MR. GIVENS: Then ask the question.

BY MS. SKIPPER:

Q That I was having my first child the day before we deposed you the first day, and I was very sick, so I hung on every word you said. So my memory is that we asked -- and the transcript will speak for itself, certainly -- several times regarding warnings. And each time you said, no, you didn't read them. No, you don't remember seeing one. No, no, no, no, no.

Why now are you testifying differently?

MR. GIVENS: I'm going to object to asked and answered.

A Like I said, I might not have read all -- all of it, you know, some of it I did.

BY MS. SKIPPER:

Q Do you have a reason why you're testifying differently?

A No, ma'am. I had just seen it.

Q I'm sorry?

A I'd just seen it -- seen the warning on the bag.

Q Seen it -- seen it where?

MR. GIVENS: He said he saw the warning on the bag. You've made your point, Jennifer. You're going over the same stuff over and over. He's answered your question. Move on to your next topic.

BY MS. SKIPPER:

Q The -- is the warning on this product the warning that you remember, that you've identified that's in Exhibit No. 2? Is that it?

A Yes, ma'am.

Q And that warning says, "Warning: Contains free silica. Do not breathe dust. May cause silicosis, delayed lung injury. OSHA approved respiratory equipment should be worn."

At any point, did you ask anyone about that?

A No, ma'am. That's why I said I had a dust mask on, and there's two of us there.

Q Okay. Did you ask anybody if that was OSHA approved?

A No, ma'am.

Q Do you know if that's OSHA approved?

A No, ma'am.

Q But you know what OSHA is?

A Yes, ma'am.

Q Okay. Lots of our products come with warnings. It seems like everything these days comes with a warning. Do you stop and read all the warnings that come like with your VCR or your --

A No, ma'am.

Q -- TV?

A No, ma'am.

Q On your McDonald's cup of coffee?

A No, ma'am.

Q In that same deposition, the question was asked, and I'm quoting, "But what piece of equipment or what type of material do you associate the name Sandstorm with, with regard to sandblasting?" And your answer was, "It was on the bag." The question -- and these aren't my questions, it was another defense counsel -- "On the bag?" And your response was, "Uh-huh."

Do you remember using a Sandstorm product?

A No, ma'am.

Q So you don't now believe that the word Sandstorm was on any of the bags?

A I don't know.

Q When you were testifying earlier, you said something about when y'all were working on the house that you were outside. Is that correct?

A Yes, ma'am.

Q So how did that work? You were -- the pot, they stayed outside of the frame of the house?

A Yes, ma'am.

Q And the blaster was actually inside with the wood?

A Yes, ma'am.

Q So how far away was that -- was -- was the pot from the end of the hose?

A End of the hose where the -- the man is holding sandblasting?

Q That's right.

A I think it was at about, what, 25-foot hose or more.

Q Do you know what a PSI is, if I said that?

A That's how much pressure.

Q Right. Good. Do you know what PSI was being used for blasting the wax off that wood?

A I know it was a lot of pressure.

Q It was a lot of pressure?

A Yeah, that's PSI. That's what it's for.

Q Yeah. It's -- it's pounds per square inch.

A Uh-huh.

Q That's right.

MR. GIVENS: She's asking if you know the number. You either know the number of the PSI or you don't.

A No, ma'am.

BY MS. SKIPPER:

Q Okay. So you don't know what they were actually -- the force that was being --

A No, ma'am.
Q -- blasted with?
A No, ma'am.
Q We've talked about your lung problems, and you told me that you had some back problems because of that accident. What other health problems do you have?
A I got bad knees. I had a knee replacement.
Q You need a knee replacement?
A I done had a knee replacement. They added ligaments to both sides of the same knee before the knee replacement.
Q Yeah. You were walking with a cane in 2004. Is that right?
A Uh-huh.
Q Do you not have a cane anymore?
A Unh-unh.
Q No. Okay.
A I walk with it when I'm really walking further. But when I'm real close somewhere -- it's short where I don't need it. I don't -- I don't walk with it.
Q And -- and back then, I think you were walking for exercise ten minutes a day or so?
A I'm walk -- walking more than that now.

Q Okay.
A Yes, ma'am.
Q You do still walk?
A Yes, ma'am. I kind of get a little bit more every day.
Q What are you up to now? How long do you walk?
A About a mile.
Q Do you just walk your street or do you have a treadmill?
A No. I just walk my street.
Q Okay. We have your knees and your back. What other health problems do you have?
A That's all, besides the asthma.
Q When were you first diagnosed with asthma?
A I'm not sure what -- what year was it.
Q Were you a child or were you an adult?
A Oh, it was after I was, you know, diagnosed with sarcoidosis.
Q Do you have high blood pressure or diabetes?
A Both.
Q Have you ever had a stroke?
A No, ma'am.
Q Seizures?
A I fell out one time in church.

Q When was that?
A Been a couple years.
Q Did the doctor tell you what was wrong?
A They couldn't find nothing wrong.
Q Do you have any heart problems?
A Yes, ma'am. I've got a -- I take a heart -- for the heart a blood pressure pill.
Q Have you ever had any kind of irregular heartbeat, angina?
A No. They said my heart was pretty good.
Q And you don't smoke?
A No, ma'am.
Q Have you ever smoked?
A No, ma'am.
Q Have any of your employers -- and that is not just the ones we've talked about today, but also your truck employment -- have any of your employers ever given you a medical evaluation?
A Unh-unh.
Q No?
MR. GIVENS: You've got to speak up.
A Oh. No, ma'am.
THE WITNESS: Can we take a break?
MS. SKIPPER: Yes. I'm almost through. That will be good news to you.

THE WITNESS: Huh?
MS. SKIPPER: I said I'm almost through.
THE VIDEOGRAPHER: Going off the record. The time now is 2:28.
(Off record)
THE VIDEOGRAPHER: Back on the record. The time now is 2:36.
BY MS. SKIPPER:
Q Mr. McGillberry, I just have a few more questions for you.
Did it make you curious that OSHA actually regulates and says what you can and cannot wear around certain products?
A Did I know that?
Q Would it make you curious? Did you know, and would you be curious if -- if they said that?
A Well, I -- I thought that was OSHA's job. You know, when something's -- it's too dangerous, you know, they usually have something -- something there.
Q Okay.
A Like on the pots.
Q Okay.
A You know, should -- should, you know, let you -- it just like at a job site. You -- you've got the OSHA rules right here. You can't do this, you

can't do that. But it wasn't no -- no rules or, you know, regulations on that job besides what was on the sand.

Q Where have you seen those OSHA rules being posted?

A Apache, North Carolina.

Q And if memory serves, there was a bad accident in Apache --

A I was there.

Q -- and OSHA actually came on out.

A I was there.

Q Have you seen OSHA in -- on any other job sites other than that wreck being on a job site?

A Unh-unh. That's the only one.

Q Did you know that OSHA says what you can and cannot wear around sandblasting sand?

A Yes, ma'am.

Q Do you know what you can wear around sandblasting sand?

A No, ma'am. I do not know what all you need to wear.

Q Okay. Do you think your employers should have known?

A I think they should have.

Q Do you think that your employers should have

supplied you with a safe workplace?

A A safe workplace? I thought it was safe where I was.

Q So you would expect that your employers keep a safe workplace for you?

A Yes, ma'am.

Q If there were any OSHA violations by your employer, would you find fault with your employer for those violations?

MR. GIVENS: Objection. You're asking for a legal conclusion.

BY MS. SKIPPER:

Q Would you fault your employer? Would you think that was something he shouldn't have done?

MR. GIVENS: Objection. Complete lack of foundation. There's no -- besides an accident where OSHA showed up -- OSHA showed up, you have no -- there's no violations in the record.

MS. SKIPPER: Okay.

MR. GIVENS: There are no -- again, then there's no foundation for that question.

MS. SKIPPER: I tell you what, we'll make that clear.

BY MS. SKIPPER:

Q Now, you told me that you wore a dust mask

when you were around some sandblasting sand.

A Yes, ma'am.

Q And while there was sandblasting going on.

A Yes, ma'am.

Q And OSHA says you can't do that. It says you're not supposed to wear that when you're around sandblasting.

A I didn't know that.

Q If there were violations, and that is a violation, would you fault your employer for having that happen?

A What you're saying is if that were wrong, and my boss man knew it was wrong, and I didn't know it --

Q Right.

A -- do I need to fault my boss man?

Q Yep. Do you think he's partly to blame?

A If it was a better dust mask, I guess he figured it was okay.

Q Okay. And OSHA says --

A It was --

Q I'm sorry, go ahead.

A Now it was, you know, like this. He puts you out to do that job, and I guess he think that what you had -- the equipment to use with it, it's okay to

use it.

Q And OSHA says you can't do that.

A I didn't -- haven't heard of that. Never heard of it.

Q But your employer has an obligation to know what OSHA says you can and cannot do.

A Uh-huh.

Q If he did something OSHA said you can't do, would you blame him for not doing what OSHA said you had to do?

A Well, if I'd have heard it. OSHA said you can't, you know, use that, I'd have -- I'd have known. But I didn't see nothing like that.

Q And we're not talking about you. You know, OSHA actually governs the employer.

A Yes, ma'am.

Q And trying to keep the workplace safe.

A Uh-huh.

Q And there are laws that are quasi laws. If OSHA's regulations were that you could or could not do certain things with your job --

MR. GIVENS: I mean, it's -- you're borderline -- this is borderline expert questioning. I mean, you've made your point with these questions. He doesn't understand. He's never seen -- you have no

foundation in this regards to these questions. I just -- you just need to move on from this point.

BY MS. SKIPPER:

Q And I guess I'm just trying to get an answer to my question. I'm -- I think each time you've -- you've told me about what you -- you did and didn't know. And if you say you don't know, that's fine with regard to the employer.

But if your employer didn't do something that OSHA said they should have done, would you think that your employer was wrong for doing that?

A I got a question to ask.

Q Okay.

MR. GIVENS: No. Just let her ask the question, please. I mean, if you don't understand the question, you can ask her to rephrase. If you don't know, say I don't know.

A I don't -- I don't know.

BY MS. SKIPPER:

Q Okay. What part of that don't you know? You don't know if you would fault your employer?

MR. GIVENS: He answered your question. He said he doesn't know. You asked a question. He said, "I don't know."

MS. SKIPPER: Okay.

MR. GIVENS: There you go.

BY MS. SKIPPER:

Q Have you talked about your testimony, at any point today, outside of this room?

A No, ma'am.

Q When did you get here today?

A I think sometime after eight.

Q Sometime after eight?

A Yes, ma'am.

Q Did you meet with your attorney?

A He met me at the door.

Q Okay. And until you walked in this room, you were meeting with your attorney?

A Well, we stayed until y'all got ready.

Q What medical expenses do you relate to silica exposure that you plan on claiming?

MR. GIVENS: We're going to supplement that. And, I mean, I don't think he can sit here today -- and I think it'd be a lot cleaner for us to submit the bills to you and us argue over whether they're related as opposed to having a layperson talk about them. And we'll be claiming all medical expenses we can relate to his silica-related injuries.

MS. SKIPPER: So you're telling me he's not going to testify independent of those bills?

MR. GIVENS: Any of -- no, of the bills, no. At trial, he'll -- can we go off the record for a second?

THE VIDEOGRAPHER: Going off record. Time is 2:44.

(Off record)

THE VIDEOGRAPHER: We're back on the record. The time is 2:44 p.m.

BY MS. SKIPPER:

Q You heard our discussion. I think we will wait until -- we've asked for your medical bills in discovery. And we haven't gotten those yet, but your attorneys assured us they're coming. So we'll hold that question. And if we have anything else to ask you, we'll just reserve our right to come back specifically on that issue.

Has anyone told you that you have lung cancer?

A No, ma'am.

Q No one's ever told you --

A No, ma'am.

Q -- that you might get lung cancer either?

A No, ma'am. Well, that's what they thought it was at first when they -- they did the biopsy. And then that's what they came up with. They said

sarcoidosis.

Q Okay. Have you had any change between 2004 and today with your activities?

A Yes, ma'am.

Q Okay. Tell me about that.

A Well, I guess, I'm a lots tired quicker.

Q Okay.

A And I just ain't got that get up and go no more.

Q Uh-huh.

A I sits a lot, and -- and I guess worry. I worry about this right here.

Q Uh-huh.

A I have a lot of problem at night trying to sleep where I -- I can't. That's why I had to end up taking sleeping pills to go to sleep.

Q Uh-huh. You went to the doctor about -- now it's been about 90 days, for your checkup. You go twice a year.

A Yes, ma'am.

Q What did the doctor tell you then?

A Well, they told me I had, you know, no change, and everything is still the same. And my breathing is -- he said it could get better, but it's -- it's not better. But, you know, he just --

because he had -- I think he had me take some extra pills, you know, one time.

Q It looks like you were on some statins for cholesterol -- cholesterol problems?

A Yes, ma'am.

Q You got off those, and you've been doing fine?

A No. I'm still on cholesterol.

Q You're still on cholesterol?

A Yes, sir. Yes, sir. I'm -- it's a cheaper pill.

Q Okay.

A Where that pill cost me a lot of money. So they just gave me a cheaper pill.

Q Are you on both Medicare and Medicaid?

A No, I'm just on one.

Q What are you on?

A I've got the red and white and blue card. I don't know if it's Medicare.

Q Medicare? Is it Medicare?

A Yes, ma'am.

Q That's in relation to your disability, you got on Medicare at the same time?

MR. GIVENS: She said, did you get on Medicare because of your Social Security disability, is what she's asking you.

BY MS. SKIPPER:

Q Lots of times that happens. And you can make sure that that's with a disability insurance --

A Well, they asked me did I want the insurance, and I took the insurance out. Where I would -- don't see it. It just comes straight out of my check.

Q Do you have any supplemental --

A No, ma'am.

Q -- insurance?

A No, ma'am.

MS. SKIPPER: I hate to ask these questions if I don't have to. Are you going to claim any kind of loss of consortium?

MR. GIVENS: I think this will be more properly suited for the wife if we do. Let's reserve those, and I'll let you know. And we'll reopen just for that if we need to. And we'll -- we'll allow you to, you know, sometime prior to trial ask those questions if we're going to pursue that.

MS. SKIPPER: I think those are all my questions, Mr. McGillberry. If you will indulge me like a minute break just to flip through my notes, but I think I covered all my questions.

I think those are all my questions.

MR. GIVENS: Robert, do you have anything? I just have a real brief redirect.

FURTHER EXAMINATION

BY MR. GIVENS:

Q John, I'm just going to ask you a few follow-up questions. We're -- we're almost done today. You okay to go forward for just a few more minutes?

A Yes, sir.

Q All right. Earlier Mr. Ireland was asking you about some -- about your location in relation to the sandblasting going on at the oil field in Heidelberg.

Do you recall him asking you about that?

A Yes, sir.

Q And you -- you were tending the pot out there. Correct?

A Yes, sir.

Q And when you were doing the other work out there -- I think you said you were doing some slab work, too?

A We was getting the slab ready to be poured.

Q Okay. And can you estimate for us within how many feet that was from where the actual sandblasting was?

A Twenty, twenty-five feet.

Q Okay. Thank you.

There was a lot of questions about the dark spot coming through on your mask on the white paper mask you were wearing.

A Yes, sir.

Q The AO-1010 right here (indicating).

A Yes, sir.

Q In regards to that, I think it's clear that there was a dark spot there, but is it true, or was it your testimony that there was also dirt and sand and dust on your face underneath the mask when you got through using it?

A Uh-huh.

MR. IRELAND: Object to the form.

BY MR. GIVENS:

Q In regards to the -- you'll recall there's been some testimony today to you about sandblasting at Gordon Myrick's house. Correct?

A Yes, sir.

Q And I think we've established, now, that the pot was kept right outside the house?

A Yes, sir.

Q And that's where you tended the pot?

A Yes, sir.
Q Would you go inside once -- immediately after the sandblasting was finished?
A Yes, sir.
Q And why would you go inside at that time?
A Well, the sandblaster take a break, and I go in there and kind of sweep all the sand up in a -- in a pile.
Q Okay. And would you be -- I -- I don't think we're real clear on this. Would you be standing kind of right outside the door where the pot was or --
A Right next to the pot.
MS. SKIPPER: Object to the form.
BY MR. GIVENS:
Q Okay. I think there was a -- I just want to clear this up because I think there was a little confusion on this. Mr. Ireland was asking you when you were working for Gordon Myrick.
A Yes, sir.
Q About whether or not you wore a dust mask when you did outside work. And I -- I think I heard you say that you didn't. But I wanted to ask you a little more about that because I thought -- and I'm just going to start with Myrick.
Did you wear a dust mask while you worked

outside at Gordon Myrick?
A You mean -- when he said outside, I thought maybe they thought I was doing something else outside besides chipping. I didn't -- I didn't wear a dust mask when I'm like cleaning up and stuff, picking up wood and stuff like that there.
Q Like picking up trash --
A Yes, sir.
Q -- on the job site?
A Yes, sir.
Q But if you were -- so in other words, if you were chipping or jackhammering or doing concrete work outside --
A I have -- I have --
Q -- were you wearing something?
A Yes, sir. I have a dust mask on.
Q Okay.
A Well, that's what I thought. I thought maybe he was asking me was I when I worked outside.
Q And now, we've established that you've worn AO dust masks and 3M dust masks.
A Yes, sir.
Q Is that correct?
MR. IRELAND: Object to the form.
BY MR. GIVENS:

Q Okay. Now, I believe we established that you wore the AO dust mask in Exhibit 3 at Tom Pittman. And then you've also established that you wore it at Daniel Construction.
A Yes, sir.
MR. IRELAND: Object to the form.
BY MR. GIVENS:
Q Now, I think you got confused when you were being cross-examined.
How often, if you had to estimate, that you -- how often would you have worn the AO mask as compared to the 3M mask?
MR. IRELAND: Object to the form.
A Most of the time.
BY MR. GIVENS:
Q Would you -- would it be fair to say that you wore it at least 50 percent of the time?
MR. IRELAND: Object to the form.
A Yes, sir.
BY MR. GIVENS:
Q Okay. And the same goes for wearing the mask pictured in Exhibit 4, the AO-1010 that you wore at Gordon Myrick from the five years that you worked there.
Would it be fair to say that you wore this

mask at least 50 percent of the time?
MR. IRELAND: Object to the form.
A Yes, sir.
BY MR. GIVENS:
Q Okay. Thank you. Counsel opposite showed you some testimony in regards to how long it took you to do the sandblasting job at Gordon Myrick. And I'd like to show you a couple of other pages where you testified during that deposition about how long it took you.
On Page 34 of your -- of Volume 1 in your deposition not Volume 2, can you read Lines 11 through 14 for me? Just read the lines on -- I'm sorry. I didn't point that out to you very well. You're going to read that line through that (indicating) line. Just read it straight like it says.
A What do you mean, read it out to you?
Q Yeah, read it out loud.
A Oh, okay. Number --
Q Lines -- Line 11 through 14. Here, let me do it this way. I'm going to read it to you and see if you can follow. And I'm just --
A I ain't got my glasses with me.
Q Oh, okay. Well, then it makes sense. Okay. I'm going to start on Page -- I'm going to read Page

34 starting Line 2 where he goes, "Were you around any sandblasting at Southern Touch?" And you said, "No, sir."

And you still stand by that, don't you?

A None at Southern Touch.

Q And "Did you do any cement or concrete work at Southern Touch?" And you said, "Now, Southern Touch and -- and -- and H. Gordon Myrick, now, I was working both jobs at the same time."

A Listen, what -- what I was saying was, I was working for Southern Touch on the weekends.

Q Okay.

A And I was working for H. Gordon Myrick Monday through Friday.

Q Okay. And that's fine.

A And --

Q And then -- and then we'll go on -- we'll -- that's fine. But then you said -- right after that you said, "One of them was a weekend job, which was the Southern Touch. And one of them was like Gordon Myrick was, you know, five days."

A Yes, sir.

Q "Southern Touch was just the weekend."

A Yes, sir.

MR. GIVENS: And you know what? I'm going

to withdraw that whole line of questioning because I think I misread that question.

MS. SKIPPER: Yeah. It's wrong.

BY MR. GIVENS:

Q But let's go on to -- on Pages 102 to 103 on Volume 1 in your deposition.

In reference to Mr. Myrick's house, they were asking you what all you were doing. And you said, "You know like off the floor, that tongue and groove wood, you know, I'm taking the wax off of it." And he asked you, "How long did it take y'all to take the wax off the wood that y'all used to build the house." And you said, "It was -- it was quite awhile. I'm not for sure what -- how many days or weeks it took. But it was quite awhile."

Now, in your opinion, would quite awhile be at least four to five days like you've testified here today?

MS. SKIPPER: Object to the form.

MR. IRELAND: Object to the form.

A Yes, sir.

BY MR. GIVENS:

Q Okay. And just because you said two days later in the deposition, I mean, you think it was longer than that now. Right?

A Yes, sir.

MS. SKIPPER: Object to the form and the characterization, and the testimony.

MR. GIVENS: I can't remember if he said it was three to four or four to five. So shoot me. The record will speak.

MS. SKIPPER: Okay.

BY MR. GIVENS:

Q I understand that you may not read a warning that comes with a VCR. Is that correct? You may not read a warning that comes with a TV. Is that correct?

A Yes, sir.

Q But if you're outside doing a job and using a product such as that (indicating), did you -- did you read the warning on the bag of sand that's here?

A Yes, sir.

MS. SKIPPER: Object to the form.

BY MR. GIVENS:

Q And as you sit here today in 2010, is this bag of sand right here (indicating)? This Clark Sand, is that the sand you used at Tom Pittman in the '70s and at Gordon Myrick in the '80s?

MS. SKIPPER: Object to the form.

A Yes, sir.

BY MR. GIVENS:

Q And do you know -- do you have any knowledge whether Tom Pittman -- the supervisors out there or Tom Pittman himself or Gordon Myrick or the supervisors out there, had any knowledge of the dangers of silica and sandblasting?

A No, sir.

MS. SKIPPER: Object to the form.

MR. IRELAND: Object to speculation.

BY MR. GIVENS:

Q Did they ever tell you that it was dangerous?

A No, sir.

Q Did -- did they ever tell you that concrete work and the chipping up concrete and creating dust was dangerous?

A No, sir.

Q Did they ever tell you that could cause -- create respirable silica?

A No, sir.

MR. GIVENS: That's all the questions I have.

MR. IRELAND: I just have one --

MR. GIVENS: No follow-up. We're done.

MR. IRELAND: -- mainly because I'm confused

about it.

MR. GIVENS: I don't -- I don't think you heard me. We're not having any follow-up. It's done.

MR. IRELAND: Well, I'm -- it's --

MR. GIVENS: You had your -- I asked you before I stopped. I didn't go outside of y'all's cross. It's redirect, and I stayed within my bounds. We're not going to ask him about that.

MR. IRELAND: All right. Let's just go off the record for a second.

THE VIDEOGRAPHER: We're now off the record. The time is 2:59.

(Off record)

THE VIDEOGRAPHER: We're back on the record. The time is three o'clock.

MS. SKIPPER: Mr. McGillberry, this is not directed at you. This is simply for the record. We had filed a motion to quash of full protective order. It was obviously denied so we appeared here today. We reserve our right to reurge that and/or motion to strike based on the testimony here today.

MR. IRELAND: I join.

MR. GIVENS: And I object to that objection being untimely. It should have been done prior to the deposition starting. That's it.

THE VIDEOGRAPHER: This concludes the deposition. The time now is three o'clock p.m.

(Deposition concluded)

CERTIFICATE OF REPORTER

I, CARRIE L. BENOIST, in and for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the deposition of JOHN MCGILLBERRY taken in the aforenamed case at the time and place indicated, to the best of my skill and ability.

We also certify that the witness was placed under oath to tell the truth and that all answers were given under that oath.

We also certify that we have no interest, monetary or otherwise, in the outcome of this case.

This the 26th day of May, 2010.

CARRIE L. BENOIST, CSR #1744

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| JOHN MCGILBERRY | ) | PLAINTIFFS |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2007-16-CV5 |
| | ) | |
| PANGBORN CORPORATION, | ) | |
| ET AL. | ) | DEFENDANT |

ORAL DEPOSITION

STEVEN EARL HABER, M.D.

JUNE 25, 2010

ORAL DEPOSITION OF STEVEN EARL HABER, M.D., produced as a witness at the instance of Defendant American Optical Corporation, and duly sworn, was taken in the above-styled and numbered cause on the 25th day of June, 2010, from 10:12 a.m. to 12:57 p.m., before Dana Richardson, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the Skyline Suites, 11757 Katy Freeway, Suite 1300, Houston, Texas 77079, pursuant to the Mississippi Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Job No. 1603-95394

EXHIBIT "R"

(Witness sworn)

MR. IRELAND: Let the record reflect that this deposition is being taken pursuant to notice and the Mississippi Rules of Civil Procedure.

You know, actually, I haven't -- I haven't heard from anybody from Clark Sand. Do you know if they're going to participate in this?

MR. SMITH: They settled.

MR. IRELAND: Okay.

STEVEN EARL HABER, M.D.,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. IRELAND:

Q. Dr. Haber, my name is Robert Ireland. I'm here on behalf of American Optical Corporation. We met yesterday in the deposition in another case.

What did you bring to the deposition with you today, please, sir?

A. My entire file on Mr. McGilberry.

Q. Okay. Can you go through the file and tell me what's included?

A. Sure. I've got two CDs with X rays. I have another CD with a variety of medical records and reports and such. I've got probably about 50 pages or so of printed-out medical records from the CD of medical records. And there's actually

Q. Can you state to a reasonable degree of medical probability whether Mr. McGilberry would have developed any silica-related lung disease if you took Mr. McGilberry's work around sandblasting away?

A. I think he -- the -- the situation would have remained as it did and that he would have still gotten silicosis.

Q. Now, the other activities that he performed at these three employers, Pittman Construction, Daniel Construction and Gordon Myrick, the other activities that exposed him to respirable silica, are those detailed in your report?

A. Yes, sir.

Q. How often did he work around concrete and cement at Pittman during an average week?

A. He was -- he told me that he was chipping concrete on a daily basis using an air jackhammer, but it was about 25 to 50 percent of his time. So, I guess, if you're looking at a 40-hour week, somewhere between 10 hours and 20 hours a week.

Q. And, I mean, at the end of the day, you -- you claim that his work around concrete and cement was an appropriate amount of exposure to cause his silicosis, right?

A. Yes, sir.

Q. Are you relying on any other expert's testimony or opinions to come to that conclusion?

A. Other than, you know, what's in the literature and

## Robert Ireland

**From:** Jennifer J. Skipper [SkipperJJ@fpwk.com]
**Sent:** Tuesday, June 08, 2010 4:32 PM
**To:** Robert Ireland
**Subject:** RE: McGilberry
**Attachments:** Agreed Order of Dismissal for multiple defendants FILED 05.28.10.pdf; ATT2068435.txt

There in this order

**Jennifer J. Skipper**
Forman Perry Watkins Krutz & Tardy LLP

-----Original Message-----
**From:** Robert Ireland [mailto:rireland@watkinseager.com]
**Sent:** Tuesday, June 08, 2010 4:29 PM
**To:** Jennifer J. Skipper
**Subject:** McGilberry

Jennifer,
One more thing. We are going back over pleadings to make sure we have everything. I didn't see a dismissal with or without prejudice as to Precision Packaging. Is that in the works (or perhaps even done awhile ago)?

Robert Ireland
Watkins & Eager PLLC
Direct: (601) 965-1829

EXHIBIT
"S"

**IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI**
**FIRST JUDICIAL DISTRICT**

**JOHN McGILBERRY** — **PLAINTIFF**

**v.** — **CIVIL ACTION NO. 2007-16-CV5**

**PANGBORN CORPORATION, et al.** — **DEFENDANTS**

MIN BK 40 PG 682 - 06/01/2010 10:58 AM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

**AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE**

This matter came before the Court on the joint motion of Plaintiff John McGilberry and Defendants Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc., to have plaintiff's claims against Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc. dismissed without prejudice. The Court, having considered the motion, and being further advised that the parties to this order are in agreement, finds that the motion is well-taken and should be granted.

IT IS, THEREFORE, ORDERED that the claims of Plaintiff John McGilberry are dismissed without prejudice as to Defendants Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc. with each party to bear its own costs.

SO ORDERED, this 27th day of May, 2010.

FILED
MAY 28 2010
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

CIRCUIT COURT JUDGE

AGREED TO:

Edwin S. Gault, Jr., MSB No. 10187
Jennifer J. Skipper, MSB No. 100808
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099
Telephone: (601) 960-8600
Facsimile: (601) 960-8613

Attorneys for Defendants

Timothy W. Porter, MSB No. 9687
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
P.O. Box 12768
Jackson, Mississippi 39236-2768

R. Allen Smith, MSB No. 99984
THE SMITH LAW FIRM
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

**Attorneys for Plaintiff**

MIN 40 683

**Porter & Malouf, P.A.**
ATTORNEYS AT LAW

TIMOTHY W. PORTER*
PATRICK C. MALOUF
*also admitted in Louisiana

825 Ridgewood Road
Ridgeland, Mississippi 39157
Post Office Box 12768
Jackson, Mississippi 39236
Telephone (601) 957-1173
Facsimile (601) 957-7366
www.portermalouf.com

JOHN T. GIVENS

May 28, 2010

Jennifer Skipper
Forman Perry Watkins Krutz and Tardy
Post Office Box 22608
Jackson, Mississippi 39225

Robert Ireland
Watkins & Eager
Post Office Box 650
Jackson, Mississippi 39205

Re: Vernon Rose Testimony in McGilberry

Dear Jennifer and Robert:

Dr. Rose will testify consistent with his previous opinions regarding your respective products. Robert all testimony, affidavits, and other evidence having been supplied in the *Birmingham* case will be used in this case also since the AO 1010 and AO 1050 are at issue in this case. Therefore, inform Michael Gwin that we will not be changing our theories of the case multiple times. You are now on notice of our claims.

Please let me know if you still wish to depose Dr. Rose in this matter and we will work out some dates. With Kindest Regards, I remain

Sincerely yours,

PORTER & MALOUF, P.A.

John T. Givens, Esq.

**EXHIBIT**
**"T"**





PULMONARY MEDICINE
HATTIESBURG CLINIC

AMERICAN
LUNG
ASSOCIATION
of Mississippi

Lewis W. Neese, M.D.
Charles J. Parkman, M.D.
Andrew H. Rogness, M.D.
Steven W. Stogner, M.D.
Hermes S. Velasquez, M.D.
Walid G. Younis, M.D.
(601) 268-5650

August 6, 2009

Mr. Allen Smith
C/o Smith Law Firm
681B Town Center Blvd
Ridgeland, MS 39157

Re: John E. McGilberry

Dr. Mr. Smith:

Mr. McGilberry has severe silicosis with massive fibrosis. I base this on his significant exposure history to sandblasting during the early 1970s through 1987, and my review of his chest radiographs, including12/7/2000, 8/22/2001, 11/3/2002, and 10/9/2004. His CXRs also show evidence of asbestosis in the lower one-half lung fields.

If I can be of further assistance, please give me a call.

Sincerely,

Steven W. Stogner, MD

EXHIBIT "U"

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN MCGILBERRY PLAINTIFF

VS. CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, ET AL. DEFENDANTS

**AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE AS TO DEFENDANT KELCO SALES & ENGINEERING COMPANY, A DIVISION OF POLLEY, INC.**

This matter having come before the Court on the *ore tenus* Motion of Plaintiff JOHN MCGILBERRY to dismiss Defendant KELCO SALES & ENGINEERING COMPANY, A DIVISION OF POLLEY, INC., without prejudice from this action and the Court, having been fully advised of the premises of the Motion and knowing that counsel for both parties are in agreement, is of the opinion that said Motion is well-taken and should be GRANTED. It is therefore,

ORDERED, ADJUDGED, AND DECREED that Defendant KELCO SALES & ENGINEERING COMPANY, A DIVISION OF POLLEY, INC., is hereby dismissed without prejudice as a Defendant in the above-referenced action, with each party to bear its own costs. Plaintiff expressly reserves his claims against all remaining Defendants in this action.

SO ORDERED AND ADJUDGED this the 14th day of June, 2010.

CIRCUIT JUDGE

MIN BK 40 PG 711 - 06/16/2010 04:29 PM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

FILED
JUN 15 2010
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

EXHIBIT
"W"

BK 40 Pg 711-H

APPROVED:

Timothy W. Porter, MSB No. 9687
John T. Givens, MSB No. 101561
**PORTER & MALOUF, P.A.**
Post Office Box 12768
Jackson, MS 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr., MSB No. 99984
**THE SMITH LAW FIRM, P.L.L.C.**
681-B Towne Center Blvd.
Ridgeland, MS 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
**Attorneys for Plaintiff**

Jeffrey P. Fultz, MSB No. 101058
Hal Roach, Jr., MSB No. 102114
**WILLINGHAM, FULTZ & COUGILL L.L.P.**
The Niels Esperson Building
808 Travis Street, Suite 1608
Houston, Texas 77002
Telephone: (713) 333-7600
Facsimile: (713) 333-7601
**Attorneys for Defendant Kelco Sales & Engineering Company, a division of Polley, Inc.**

**IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI**
**FIRST JUDICIAL DISTRICT**

**JOHN MCGILBERRY** **PLAINTIFF**

**VS.** **CIVIL ACTION NO. 2007-16-CV5**

**PANGBORN CORPORATION, ET AL.** **DEFENDANTS**

**AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE AS TO DEFENDANTS BOB SCHMIDT, INC. AND SCHMIDT MANUFACTURING, INC.**

MIN BK 40 PG 713 - 06/16/2010 04:38 PM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

This matter having come before the Court on the *ore tenus* Motion of Plaintiff JOHN MCGILBERRY to dismiss Defendants BOB SCHMIDT, INC. and SCHMIDT MANUFACTURING, INC., without prejudice from this action and the Court, having been fully advised of the premises of the Motion and knowing that counsel for both parties are in agreement, is of the opinion that said Motion is well-taken and should be GRANTED. It is therefore,

ORDERED, ADJUDGED, AND DECREED that Defendants BOB SCHMIDT, INC. and SCHMIDT MANUFACTURING, INC., are hereby dismissed without prejudice as Defendants in the above-referenced action, with each party to bear its own costs. Plaintiff expressly reserves his claims against all remaining Defendants in this action.

SO ORDERED AND ADJUDGED this the 14th day of June, 2010.

CIRCUIT JUDGE

FILED
JUN 15 2010
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

APPROVED:

Timothy W. Porter, MSB No. 9687
John T. Givens, MSB No. 101561
**PORTER & MALOUF, P.A.**
Post Office Box 12768
Jackson, MS 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

R. Allen Smith, Jr., MSB No. 99984
**THE SMITH LAW FIRM, P.L.L.C.**
681-B Towne Center Blvd.
Ridgeland, MS 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
**Attorneys for Plaintiff**

Jeffrey P. Fultz, MSB No. 101058
Hal Roach, Jr., MSB No. 102114
**WILLINGHAM, FULTZ & COUGILL L.L.P.**
The Niels Esperson Building
808 Travis Street, Suite 1608
Houston, Texas 77002
Telephone: (713) 333-7600
Facsimile: (713) 333-7601
**Attorneys for Defendants Bob Schmidt, Inc. and Schmidt Manufacturing, Inc.**

MIN 40 714

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

**JOHN MCGILBERRY** **PLAINTIFF**

**VS.** **CIVIL ACTION NO. 2007-16-CV5**

**PANGBORN CORPORATION, ET AL.** **DEFENDANTS**

---

**AGREED JUDGMENT OF DISMISSAL WITHOUT PREJUDICE AS TO ALL CLAIMS OF PLAINTIFF JOHN MCGILBERRY AGAINST EMPIRE ABRASIVE EQUIPMENT CORPORATION**

---

This cause having come on to be heard on the joint *ore tenus* motion of the Plaintiff John McGilberry and Defendant Empire Abrasive Equipment Corporation and the Court having been advised that the parties are in agreement as to the dismissal of Empire Abrasive Equipment Corporation in this matter, the Court does hereby:

**ORDER AND ADJUDGE** that the claims of the Plaintiff John McGilberry are hereby dismissed without prejudice as to Empire Abrasive Equipment Corporation with each party bearing their own respective costs;

**ORDER AND ADJUDGE** that pursuant to Rule 54(b) of the Mississippi Rules of Civil Procedure, the Clerk of the Court is hereby directed to forthwith enter this Agreed Order, there being no just cause for delay.

So **ORDERED AND ADJUDGED** this 9th day of June, 2010.

CIRCUIT COURT JUDGE

FILED
JUN 10 2010
BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

MIN BK 40 PG 707 - 06/14/2010 10:32 AM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

Agreed as to form and content:

W. MARK EDWARDS, ESQ.
Page, Mannino, Peresich & McDermott, PLLC
759 Vieux Marche Mall
Post Office Drawer 289
Biloxi, MS 39533
Tel: (228) 374-2100 Fax: (228) 374-3838
***Counsel for Defendant Empire Abrasive Equipment Corporation***

JOHN T. GIVENS, ESQ.
Porter & Malouf, P.A.
P.O. Box 12768
Jackson, MS 39236-2768
Tel: (601) 957-1173 Fax (601) 957-7366

R. ALLEN SMITH, ESQ.
The Smith Law Firm, P.L.L.C.
681 Towne Center Blvd., Suite B
Ridgeland, MS 39157
Tel: (601) 952-1422 Fax (601) 952-1426
***Counsel for Plaintiff John McGilberry***

MIN 49 708

IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JOHN McGILBERRY PLAINTIFF

v. CIVIL ACTION NO. 2007-16-CV5

PANGBORN CORPORATION, et al. DEFENDANTS

MIN BK 40 PG 682 - 06/01/2010 10:58 AM
Bart Gavin, Circuit Clerk, Jones County, Mississippi

## AGREED ORDER OF DISMISSAL WITHOUT PREJUDICE

This matter came before the Court on the joint motion of Plaintiff John McGilberry and Defendants Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc., to have plaintiff's claims against Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc. dismissed without prejudice. The Court, having considered the motion, and being further advised that the parties to this order are in agreement, finds that the motion is well-taken and should be granted.

IT IS, THEREFORE, ORDERED that the claims of Plaintiff John McGilberry are dismissed without prejudice as to Defendants Ash Grove Cement Company, Clemco Industries Corporation, Custom Aggregates & Grinding, Inc., Hanson Aggregates, Inc. f/k/a Hanson Aggregates Central, Inc. f/k/a Pioneer South Central, Inc. f/k/a Pioneer Concrete of Texas, Inc., Humble Sand Co., Inc. d/b/a Humble Sand & Gravel, Inc., Parmelee Industries, Inc., Precision Packaging, Inc. f/k/a Quikrete Materials, Inc. and Southern Silica of Louisiana, Inc. with each party to bear its own costs.

SO ORDERED, this 27th day of May, 2010.

FILED

MAY 28 2010

BART GAVIN
CIRCUIT CLERK
JONES COUNTY, MS

CIRCUIT COURT JUDGE

AGREED TO:

Edwin S. Gault, Jr., MSB No. 10187
Jennifer J. Skipper, MSB No. 100808
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099
Telephone: (601) 960-8600
Facsimile: (601) 960-8613

Attorneys for Defendants

Timothy W. Porter, MSB No. 9687
John T. Givens, MSB No. 101561
PORTER & MALOUF, P.A.
P.O. Box 12768
Jackson, Mississippi 39236-2768

R. Allen Smith, MSB No. 99984
THE SMITH LAW FIRM
681 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426

**Attorneys for Plaintiff**

MIN 40 683



**Search Results Include Filings Through 06/28/2010 12:00 AM**

Search
- By Business Name
- By Business ID
- By Officer Name
- By Registered Agent
- New Corporations

Annual Report
- File Online

Verification
- Verify Certification

Online Orders
- Register for Online Orders
- Order Good Standing

Fee Schedules
- Corporations
- Limited Partnerships
- Limited Liability Partnerships
- Limited Liability Companies

Miscellaneous
- Registered Agents
- Download Corporate Forms and Instructions
- Look Up an SIC

Contact
- Corporations Unit

Business

Home

**Date:** 7/6/2010 **View Filed Documents**

Name History

| **Name** | **Name Type** |
|---|---|
| QUIKRETE MATERIALS, INC. | Legal |

Business Corporation - Foreign - Information

| | |
|---|---|
| **Business ID:** | 533945 |
| **Status:** | Name Change |
| **Creation Date:** | 12/18/1986 |
| **State of Incorporation:** | AR |
| **Principal Office Address:** | 8900 INDIAN CREEK PKY, SUITE 500 OVERLAND PARK KS 66210-1513 |
| **Listing Address:** | No Address |

Registered Agent

| | |
|---|---|
| **Agent Name:** | C T CORPORATION SYSTEM |
| **Office Address:** | 118 NORTH CONGRESS STREET JACKSON MS 39205 |
| **Mailing Address:** | |

Officers & Directors

Home | Accessibility Policy | Contact Us | E-mail Us | Links | Search

Copyright © 2010 Mississippi Secretary of State. All rights reserved.
Due to the use of DHTML and Java, this Web site is optimized for Microsoft Internet Explorer 5+ or Netscape 6+.

EXHIBIT "V"

# APPLICATION FOR AMENDED CERTIFICATE OF AUTHORITY

(Attach exact or conformed copy)

303574

RECEIVED

☒ PROFIT ☐ NONPROFIT

The undersigned corporation, pursuant to Section 79-4-15.04 (if a profit corporation) or Section 79-11-369 (if a nonprofit corporation) of the Mississippi Code of 1972, hereby executes the following document and sets forth:

1. The name of the corporation is Quikrete Materials, Inc. ...SON, MS.
315 Phillips Road, North Little Rock, AR 72117

2. The corporate name is changed to Precision Packaging, Inc.
Same As Above

3. The state or country of its incorporation is changed to No Change - Arkansas

4. The period of duration is changed to Name Change 7/8/93

By [signature]

PRINTED NAME, CORPORATE TITLE Vice President SIGNATURE John H. Ross III

Time: 8:00 A.M.

Amount Received: $50.00

Filed: 2-1-94

[signature]
Secretary of State
State of Mississippi

#0100[illegible]



W. J. "Bill" McCuen
SECRETARY OF STATE

**State of Arkansas**
**SECRETARY OF STATE**
State Capitol
Little Rock, Arkansas 72201-1094

# CERTIFICATE OF GOOD STANDING

# OF A

# DOMESTIC CORPORATION

I, Bill McCuen, Secretary of State of the State of Arkansas, and as such, keeper of the records of domestic and foreign corporations, do hereby certify that the records of this office show:

PRECISION PACKAGING, INC.
a corporation chartered under the laws of the State of ARKANSAS, filed Articles of Incorporation DECEMBER 9, 1986.

I further certify that as far as the records show, this corporation is at this time chartered and in good standing, having met all the requirements governing a domestic corporation in this State.

In Testimony Whereof, I have hereunto set my hand and official seal, on this, the 20TH day of JANUARY, 19 94.

W. J. "Bill" McCuen, Secretary of State

by: NICHOLE P. DAVIS Corporations Division

C-2/Rev 10-1-88

SECRETARY OF STATE
MISSISSIPPI
SECRETARY OF STATE
Business Services

**Search Results Include Filings Through 06/28/2010 12:00 AM**

Search
- By Business Name
- By Business ID
- By Officer Name
- By Registered Agent
- New Corporations

Annual Report
- File Online

Verification
- Verify Certification

Online Orders
- Register for Online Orders
- Order Good Standing

Fee Schedules
- Corporations
- Limited Partnerships
- Limited Liability Partnerships
- Limited Liability Companies

Miscellaneous
- Registered Agents
- Download Corporate Forms and Instructions
- Look Up an SIC

Contact
- Corporations Unit

Business

Home

**Date:** 7/6/2010 **View Filed Documents**

Name History

| **Name** | **Name Type** |
|---|---|
| PRECISION PACKAGING, INC. | Legal |

Business Corporation - Foreign - Information

| | |
|---|---|
| **Business ID:** | 604296 |
| **Status:** | Good Standing |
| **Creation Date:** | 12/18/1986 |
| **State of Incorporation:** | AR |
| **Principal Office Address:** | 2805 Meter Road<br>Jackson MS 39204 |
| **Listing Address:** | No Address |

Registered Agent

| | |
|---|---|
| **Agent Name:** | C T CORPORATION SYSTEM |
| **Office Address:** | 645 LAKELAND EAST DR STE 101<br>FLOWOOD MS 39232 |
| **Mailing Address:** | |

Officers & Directors

Home | Accessibility Policy | Contact Us | E-mail Us | Links | Search

Copyright © 2010 Mississippi Secretary of State. All rights reserved.
Due to the use of DHTML and Java, this Web site is optimized for Microsoft Internet Explorer 5+ or Netscape 6+.